1  ROBERT W. FERGUSON
   *Attorney General*
2  NOAH GUZZO PURCELL, WSBA #43492
   *Solicitor General*
3  NATHAN K. BAYS, WSBA #43025
   KRISTIN BENESKI, WSBA #45478
4  ANDREW R.W. HUGHES, WSBA #49515
   CRISTINA SEPE, WSBA #53609
5    (*application for admission forthcoming*)
   *Assistant Attorneys General*
6  EMMA GRUNBERG, WSBA #54659
   TERA M. HEINTZ, WSBA #54921
7    (*application for admission forthcoming*)
   KARL D. SMITH, WSBA #41988
8    (*application for admission forthcoming*)
   *Deputy Solicitors General*
9  800 Fifth Avenue, Suite 2000
   Seattle, WA  98104
10 (206) 464-7744

11

12               **UNITED STATES DISTRICT COURT**
                 **EASTERN DISTRICT OF WASHINGTON**
13                        **AT YAKIMA**

14 STATE OF WASHINGTON,            NO.
   STATE OF COLORADO, STATE
15 OF CONNECTICUT, STATE OF        COMPLAINT FOR
   ILLINOIS, STATE OF             DECLARATORY JUDGMENT,
16 MARYLAND, STATE OF             MANDAMUS, AND
   MICHIGAN, STATE OF             INJUNCTIVE RELIEF
17 MINNESOTA, STATE OF
   NEVADA, STATE OF NEW
18 MEXICO, STATE OF OREGON,
   STATE OF RHODE ISLAND,
19 STATE OF VERMONT,
   COMMONWEALTH OF
20 VIRGINIA, and STATE OF
   WISCONSIN,
21
                        Plaintiffs,
22        v.

COMPLAINT FOR DECLARATORY          1
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

1
2
3
4
5
6

DONALD J. TRUMP, in his
official capacity as President of the
United States of America;
UNITED STATES OF AMERICA;
LOUIS DEJOY, in his official
capacity as Postmaster General;
UNITED STATES POSTAL
SERVICE,

                    Defendants.

7

## I.    INTRODUCTION

8       1.      The United States Postal Service (USPS or the Postal Service) has

9    been a cherished and vital American institution since our country's founding,

10   when Benjamin Franklin served as the first Postmaster General. It provides an

11   essential service for all Americans by delivering prescriptions, Social Security

12   payments, books and magazines, mail-in ballots, and more, and it has long been

13   America's most popular federal agency.

14       2.      The mission of the Postal Service is more vital than ever today, with

15   the COVID-19 pandemic forcing many Americans, especially seniors and the

16   medically vulnerable, to quarantine at home and to rely increasingly on receiving

17   material through the mail. The pandemic has also prompted many States to take

18   steps to make it easier for their residents to vote by mail, so that no American is

19   forced to choose between risking their health and exercising their fundamental

20   right to vote.

21

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

2

3.      Despite the venerable history and obvious importance of the Postal Service, Postmaster General Louis DeJoy has recently instituted sweeping changes that undermine the Postal Service's ability to provide consistent and timely service. DeJoy has called these changes "transformative" and has acknowledged that they have "impacted our overall service levels."

4.      DeJoy instituted these "transformative" changes following repeated statements from President Trump evincing a partisan political motive for making it harder to vote by mail, such as his statement that ""MAIL-IN VOTING WILL . . . LEAD TO THE END OF OUR GREAT REPUBLICAN PARTY."[1]

5.      The "transformative" changes DeJoy has implemented are both procedurally and substantively unlawful. As a matter of procedure, Congress has established a specific process the Postal Service must follow before making changes in postal services, requiring the Postmaster General to consult with the Postal Regulatory Commission and to give the public an opportunity to comment. 39 U.S.C. § 3661. General DeJoy never engaged in that process here. As a matter of substance, these changes will have a wide range of negative consequences that violate a diverse array of federal laws, from harming individuals with disabilities in violation of the Rehabilitation Act to disenfranchising voters in violation of the Constitution.

_____

[1] Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020, 6:00 PM), https://twitter.com/realDonaldTrump/status/1266172570983940101.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

3

6.      The States of Washington, Colorado, Connecticut, Illinois, Maryland, Michigan, Minnesota, Nevada, New Mexico, Oregon, Rhode Island, Vermont, and Wisconsin and the Commonwealth of Virginia bring this action to protect our States and our residents against these unlawful actions.

## II.      JURISDICTION AND VENUE

7.      The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 (federal question) and 39 U.S.C. § 409 (suits against the Postal Service). The Court has jurisdiction to award the relief requested pursuant to 28 U.S.C. § 1361 (mandamus) and 28 U.S.C. § 2201 (declaratory relief and further relief).

8.      Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1).

9.      Defendants are United States agencies or officers sued in their official capacities. The State of Washington is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred or will imminently occur within the Eastern District of Washington. In particular, the Postal Service's changes to the nature of postal services will delay the receipt and postmarking of mail, harming the health and well-being of residents who depend on the mail for critical and time-sensitive items such as medications, bills, benefits payments, and legal documents. The delayed mail will include mailed ballots, affecting elections of federal, state, legislative, judicial, county, city, town, and district officers scheduled for November 3, 2020.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

4

This disruption to elections conducted by the States, including Washington, negatively impacts the States and disenfranchises their residents. Mail delays also harm the States' economies, and directly harm state agencies that use mail to send and receive time-sensitive materials. Additionally, the Postal Service's sudden and unilateral changes to the nature of postal services deprived the States, including Washington, of their procedural right to comment on such changes prior to implementation as established by federal law.

## III.   PARTIES

10.    Plaintiff the State of Washington is represented by its Attorney General, Bob Ferguson, who is the State's chief legal advisor. The powers and duties of the Attorney General include acting in federal court on matters of public concern to the State.

11.    Plaintiff the State of Colorado is a sovereign state of the United States of America. This action is brought on behalf of the State of Colorado by Attorney General Phillip J. Weiser, who is the chief legal representative of the State of Colorado, empowered to prosecute and defend all actions in which the state is a party. Colo. Rev. Stat. § 24-31-101(1)(a).

12.    Plaintiff the State of Connecticut, represented by and through its Attorney General, William Tong, is a sovereign state of the United States of America. The Attorney General brings this action as the state's chief civil legal officer under Conn. Gen. Stat. § 3-124 *et seq*.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

13.    Plaintiff the State of Illinois is a sovereign state of the United States of America. This action is being brought on behalf of the State of Illinois by Attorney General Kwame Raoul, the State's chief legal officer. *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

14.    Plaintiff the State of Maryland, by and through its Attorney General, Brian E. Frosh, is a sovereign state of the United States of America. The Attorney General is Maryland's chief legal officer with general charge, supervision, and direction of the State's legal business. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

15.    Plaintiff the State of Michigan, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General is Michigan's chief law enforcement officer and is authorized under Michigan law, Mich. Comp. Laws §§ 14.28 and 14.29, to pursue this action.

16.    Plaintiff the State of Minnesota is represented by its Attorney General, Keith Ellison, who is the State's chief legal officer. The powers and

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    duties of the Attorney General include acting in federal court in matters of State

2    concern and to protect the interests of Minnesota residents. *See* Minn. Stat. § 8.01

3    (2018).

4        17.    Plaintiff the State of Nevada, represented by and through its

5    Attorney General, is a sovereign state of the United States of America.  Attorney

6    General Aaron D. Ford is the chief legal officer of the State of Nevada and has

7    the authority to commence actions in federal court to protect the interests of the

8    State. Nev. Rev. § 228.170.

9        18.    Plaintiff State of New Mexico, represented by and through its

10   Attorney General, is a sovereign state of the United States of America. Attorney

11   General Hector Balderas is the chief legal officer of the State of New Mexico. He

12   is authorized to prosecute all actions and proceedings on behalf of New Mexico

13   when, in his judgment, the interest of the State requires such action.  N.M. Stat.

14   Ann. § 8-5-2(B). Likewise, he shall appear before federal courts to represent New

15   Mexico when, in his judgment, the public interest of the state requires such

16   action. N.M. Stat. Ann. § 8-5-2(J). This challenge is brought pursuant to Attorney

17   General Balderas's statutory and common law authority.

18       19.    Plaintiff Oregon is represented by its Attorney General, who is the State's chief

19   legal officer. The Attorney General is authorized by Oregon law to perform all legal services

20   for the State of Oregon.

21

22

20.    Plaintiff the State of Rhode Island is a sovereign state of the United States of America. This action is brought on behalf of the State of Rhode Island and the people of the State of Rhode Island by Attorney General Peter F. Neronha, who is constitutionally and statutorily empowered to prosecute and protect the legal interests of Rhode Island and its citizens. *See* R.I. Gen. Laws § 42-9-6.

21.    Plaintiff the State of Vermont, represented by and through its Attorney General, Thomas J. Donovan, is a sovereign state in the United States of America.  The Attorney General is the state's chief law enforcement officer and is authorized to pursue this action pursuant to Vt. Stat. Ann. tit. 3, §§ 152 and 157.

22.    Plaintiff Commonwealth of Virginia is represented by its Attorney General, who is the Commonwealth's chief legal adviser. The powers and duties of the Attorney General include acting in federal court on behalf of the Commonwealth on matters of public concern.

23.    Plaintiff the State of Wisconsin is a sovereign state of the United States of America and brings this action by and through its Attorney General, Joshua L. Kaul, who is the chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests. *See* Wis. Stat. § 165.25(1m). The Attorney General's powers and duties include appearing for and representing the State, on the governor's request, "in any court

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    or before any officer, any cause or matter, civil or criminal, in which the state or

2    the people of this state may be interested.

3        24.    The States bring this action to redress harms to their sovereign,

4    proprietary, and quasi-sovereign interests caused by the Postal Service's sudden

5    and unilateral changes to the nature of postal services with no opportunity for

6    public input.

7        25.    As users of the mail, the States have a procedural right to participate

8    in a hearing prior to the adoption of any "change in the nature of postal services

9    which will generally affect service on a nationwide or substantially nationwide

10   basis[.]" 39 U.S.C. § 3661. USPS has a corresponding duty to seek an advisory

11   opinion from the Postal Regulatory Commission prior to making such a change

12   in the nature of postal services, triggering the requirement for a hearing. *Id.*

13   Absent any other adequate remedy, this duty is enforceable via a writ of

14   mandamus.

15       26.    Furthermore, the States have sovereign interests in their retained

16   power to conduct elections as they see fit. Under specific grants of authority in

17   the Constitution, States conduct presidential and congressional elections. *See*

18   U.S. Const., art. I, § 4; art. II, § 1; and amend. XVII. Within constitutional and

19   statutory limits, States administer access to the ballots, identify and administer

20   polling locations, set the times for voting on Election Day, print ballots and

21   voters' pamphlets, train election workers, and count and certify ballots. States

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1  also hold statewide and local elections on Election Day. USPS's unlawful actions

2  at issue impinge on the States' sovereign powers to conduct elections by mail, in

3  whole or in part, during the COVID-19 pandemic. A number of States have

4  increased their reliance on mail-in ballots to conduct their elections in 2020.

5      27.    As extensive users of the mail for critical functions, the States have

6  proprietary interests in the mail system. States send an enormous amount of mail,

7  from ballots to benefit payments to legal notices. The Postal Service's changes

8  to the nature of postal services will negatively impact the States' ability to get

9  materials to recipients in a timely fashion, just as they would affect any business

10 or entity that relies on the mail for core functions. The States also have proprietary

11 interests in the conduct of their elections, such as having made significant

12 financial investments in postage for mailed ballots, printing ballots and

13 instructions for returning ballots, and messaging to voters about voting

14 procedures during the COVID-19 pandemic, in reliance on the availability of

15 timely postal services consistent with past USPS policies and practices.

16     28.    The States also have interests in protecting their citizens'

17 fundamental right to vote, and in protecting the health and welfare of residents

18 who depend on the availability of timely postal services for the delivery of critical

19 items such as medications, ballots, utility bills, checks, business deliveries, legal

20 documents, and a wide range of other time-sensitive materials.

21

22

29.     Defendant Donald J. Trump is the President of the United States of America. He is sued in his official capacity.

30.     Defendant United States of America includes government agencies and departments responsible for the Postal Service.

31.     Defendant Louis DeJoy is the Postmaster General. He is sued in his official capacity.

32.     Defendant United States Postal Service is an independent agency of the executive branch of the United States government.

## IV.    FACTUAL ALLEGATIONS

**A.    The History and Role of the Postal Service**

33.     Article 1, Section 8 of the U.S. Constitution vests Congress with the power to "establish Post Offices and Post Roads." In 1792, Congress passed and President George Washington signed the Postal Service Act, which established the U.S. Post Office Department.

34.     The Postal Service has been a fundamental part of America for over two centuries and is a critical underpinning of our democratic infrastructure. The Founders used the postal system to promote an informed electorate by delivering newspapers at subsidized rates. As then-Congressman James Madison observed, following Independence, the postal system had become "the principal channel through which a general knowledge of public affairs, was diffused." For Madison, the circulation of newspapers and correspondence throughout the 13

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

states was "justly reckoned among the surest means of preventing the degeneracy of a free Gov't." Alexis de Tocqueville marveled at our country's postal system, remarking in his study of American democracy that "the mail, that great link between minds, today penetrates into the heart of the wilderness." The postal system bound—and continues to bind—this nation together.

35.    In the 1800s, the Postal Service was one of the few places where women could work, acting as small-town postmasters. After the Civil War, it employed significant numbers of Black Americans. Today, the Postal Service is one of the largest employers for veterans—employing over 97,000 veterans.

36.    Along with providing mail delivery and low-cost parcel post, the Post Office also provided banking services. It sold Treasury bonds to help fund the New Deal and allowed GIs to bank while abroad during World War II.

37.    Today, the Postal Service remains a very popular institution and employs over 500,000 workers. Its carriers deliver more than 470 million pieces of mail each day.

38.    The Postal Service delivers critical mail: voter registration applications and mail-in ballots, utility bills, Social Security and stimulus checks, Census questionnaires, prescriptions, and more. Amidst the COVID-19 pandemic, postal employees have continued to deliver mail to meet the essential needs of this country.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    39.    The Postal Service serves all of America—whether in rural, urban,

2    or suburban areas.

3    40.    The Postal Service also serves the States, who themselves are high-

4    volume users of the Postal Service. The States use the Postal Service not only for

5    the delivery of mail-in ballots to eligible voters, but also for countless other state

6    processes that rely on efficient and effective mail delivery.

7    **B.    Statutory Requirements Governing Postal Services**

8    41.    The United States Postal Service is "a basic and fundamental service

9    provided to the people by the Government of the United States, authorized by the

10   Constitution, created by Act of Congress, and supported by the people." 39

11   U.S.C. § 101(a). The Postal Service's "basic function" is its "obligation to

12   provide postal services to bind the Nation together through the personal,

13   educational, literary, and business correspondence of the people. It shall provide

14   prompt, reliable, and efficient services to patrons in all areas and shall render

15   postal services to all communities. The costs of establishing and maintaining the

16   Postal Service shall not be apportioned to impair the overall value of such service

17   to the people." *Id.*

18   42.    The paramount duty of the United States Postal Services is to "plan,

19   develop, promote, and provide adequate and efficient postal services." 39 U.S.C.

20   § 403. "The Postal Service shall serve as nearly as practicable the entire

21   population of the United States." *Id.*

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

13

43.    To further this duty, Congress passed the Postal Accountability and Enhancement Act (PAEA) in 2006. Pub. L. N. 109-435 (Dec. 20, 2006).

44.    The PAEA converted the former Postal Rate Commission into the independent Postal Regulatory Commission (PRC), and assigned the PRC a host of new duties and powers related to rate-setting, service standards, and oversight of the USPS.

45.    The PAEA directs the Postal Service to develop a set of service standards, in consultation with the PRC, for postal services. 39 U.S.C. § 3691(a).

46.    These service standards "shall be designed to achieve" several "objectives," including "enhanc[ing] the value of postal services to both senders and recipients," "preserv[ing] regular and effective access to postal services in all communities, including those in rural areas," and "reasonably assur[ing] Postal Service customers delivery reliability, speed and frequency consistent with reasonable rates and best business practices." 39 U.S.C. § 3691(b).

47.    Pursuant to the PAEA, the USPS has promulgated regulations setting service standards for different classes of mail. 39 C.F.R. Part 121. These regulations dictate how long the USPS should take to deliver mail under various circumstance. For example, for First Class mail, most letters within the contiguous 48 states are to be delivered within 1–3 days. 39 C.F.R. § 121.1.

48.    To further promote accountability, the PAEA gives postal customers who believe the USPS's service standards do not comply with the statutory

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

objectives of the PAEA or that the USPS is failing to comply with its regulations, the right to sue to enforce the PAEA and/or its regulations. 39 U.S.C. § 3691(d); 39 U.S.C. § 3662.

49.     Under the statute, "[a]ny interested person . . . who believes the Postal Service is not operating in conformance with the requirements of . . . this chapter (or regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission[.]"

50.     Even before the PAEA was implemented, postal customers have long enjoyed the right to participate in USPS decision making by requiring a hearing before the USPS can make changes to postal service.

51.     Specifically, 39 U.S.C. § 3661(b) provides: "When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change."

52.     And 39 U.S.C. § 3661(c) provides: "The Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under [the Administrative Procedure Act] has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public."

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**C.      Changes in postal services have created widespread mail delays.**

53.      In May 2020, the U.S. Postal Service's Board of Governors, whose members were appointed by President Trump, selected Louis DeJoy to serve as the 75th Postmaster General.

54.      Louis DeJoy is a major donor to the Republican Party, including to President Trump's election campaign. DeJoy has given more than $2 million to the Trump campaign or Republican causes since 2016 and was in charge of fundraising for the Republican National Convention in Charlotte.[2] Prior to becoming Postmaster General, he was on the board of directors at XPO Logistics, a transportation and logistics company that does business with the USPS and other U.S. government agencies.

55.      Media outlets report that DeJoy continues to own equity in XPO Logistics, totaling between $30 million and $75 million, creating a major conflict of interest or the appearance of a major conflict of interest.[3] DeJoy also owns stock options in Amazon, a USPS competitor and courier.

---

[2] Josh Dawsey, Lisa Rein & Jacob Bogage, *Top Republican fundraiser and Trump ally named postmaster general, giving president new influence over Postal Service*, *Wash. Post* (May 6, 2020), https://wapo.st/2Y5JCmD.

[3] Marshall Cohen, *Financial disclosures reveal postmaster general's business entanglements and likely conflicts of interest, experts say*, CNN (Aug. 12, 2020), https://cnn.it/342m99H.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTION RELIEF

16

56.    DeJoy is the first Postmaster General in over twenty years to not have risen through the ranks of the Postal Service.

57.    In what has been called the "Friday Night Massacre," on August 7, 2020, DeJoy centralized his control over the United States Postal Service by reassigning or displacing twenty-three postal executives, including the two top executives overseeing day-to-day operations.

58.    Soon after his term began in June, DeJoy instituted broad operational changes. DeJoy has admitted that these "transformative" changes have "had unintended consequences that impacted [the Postal Service's] overall service levels."[4]

59.    DeJoy has taken several actions that have cumulatively delayed the mail and reduced the Postal Service's service on a nationwide or substantially nationwide basis. The "transformative" changes include: (i) eliminating overtime; (ii) instructing carriers to leave mail behind; (iii) decommissioning sorting machines; (iv) removing mailboxes; (v) reducing operating hours; and (vi) changing how election mail is classified and charged.

60.    **Eliminating overtime.** DeJoy eliminated overtime necessary to complete the day's work, affecting hundreds of thousands of postal workers.

---

[4] *PMG addresses restructuring*, Postal Times (Aug. 13, 2020), https://bit.ly/2Q1JDDm.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

17

61.     The elimination of overtime places a particular stress on the postal system currently as thousands of postal workers have been quarantined or out sick due to the coronavirus.

62.     **Instructing carriers to leave mail behind.** Carriers have been instructed to leave mail behind on the workroom floor or docks if taking it would slow down the delivery process.[5] DeJoy has mandated that carriers cannot make additional trips from a facility to ensure timely distribution of letters and parcels, and that they must "return [from mail routes] on time" even if they have not fully completed their deliveries for the day. Postal workers were previously trained to not leave letters behind and to make multiple delivery trips to ensure timely distribution of letters. DeJoy wrote to employees, "if we cannot deliver all the mail due to call offs or shortage of people and you have no other help, the mail will not go out[.]"

63.     Postal workers report that the mail is piling up in their offices and that mail is backed up across the country.

64.     **Decommissioning sorting machines.** At the same time, 671 machines used by the Postal Service to organize and sort letters or other pieces of mail have been or will be removed from dozens of cities across America. This

---

[5] Jacob Bogage, *Postal Service memos detail 'difficult' changes, including slower mail delivery*, Wash. Post (July 14, 2020), https://wapo.st/2FwSr2n.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

18

action effectively decommissions 10 percent of the Postal Service's sorting machines between June and September of 2020.

65.    These 671 machines—Automated Facer-Canceler Systems, Delivery Bar Code Sorters, Automated Flat Sorting Machines, and Flat Sequencing Systems—can label and sort tens of thousands of paper mail items, such as letters, bills, and ballots, each hour. These machines have the capacity to sort over 21 million pieces of mail per hour. The machines allow carriers to spend more time delivering mail rather than organizing it at a facility.

66.    Postal Service employees have reported personally witnessing machines costing millions of dollars being "destroyed or thrown in the dumpster."[6]

67.    The removal of sorting machines is taking place across the country, but removals would particularly affect sorting capacity in states where recent presidential elections have been particularly close, including Michigan, Ohio, Pennsylvania, and Florida.[7]

---

[6] Aaron Gordon, *Internal USPS Documents Outline Plans to Hobble Mail Sorting*, Motherboard (Aug. 14, 2020).

[7] Erin Cox, Elise Viebeck, Jacob Bogage & Christopher Ingraham, *Postal Service warns 46 states their voters could be disenfranchised by delayed mail-in ballots*, Wash. Post (Aug. 14, 2020), https://wapo.st/2FsD0Il.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

19

1
2
3
4
5
6
7
8
9
10
11



68.    These removals are diminishing and will continue to diminish the Postal Service's capacity to speedily process flat mail, such as ballots.

69.    According to the Postal Service's Equipment Reduction Plan, the Postal Service has set a "target" of reducing 969 total machines by the end of fiscal year 2020, with the majority being removed by September 30, 2020.

70.    Responding to widespread alarm and criticism over the recently decommissioned sorting machines, the President's Chief of Staff, Mark Meadows, asserted in an interview that "[s]orting machines between now [August 16, 2020] and Election Day will not be taken offline." But Meadows continued that this freeze applied to machines that were not part of an "already

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    scheduled reallocation."[8] Meadows did not respond to questions about sorting

2    machines that were recently decommissioned and why they were taken offline.

3    71.    **Removing mailboxes.** The Postal Service has confirmed that

4    dozens of mailboxes were removed in parts of New York, Pennsylvania, Oregon,

5    and Montana. As Senator Jon Tester of Montana has stated, these removals have

6    "real life implications for folks in rural America and their ability to access critical

7    postal services like paying their bills and voting in upcoming elections."[9]

8    72.    **Reducing operating hours.** The Postal Service has announced that

9    post offices in many States, including West Virginia, New Jersey, Florida, and

10    Ohio will reduce hours. Upon information and belief, the Postal Service has not

11    provided adequate notice pursuant to 39 U.S.C. § 404.

12    73.    **Changing how election mail is classified and charged.** The Postal

13    Service has further warned state elections officials that they must pay First Class

14    postage for mail ballots to ensure timely delivery and will no longer treat election

15    mail as First Class mail. The Postal Service's typical practice has been to process

16    and deliver election mail as First Class mail regardless of the paid class of

17

18    _____

19    [8] *Tapper presses Meadows on mail-in voting*, CNN (Aug. 16, 2020),

20    https://cnn.it/3iOeXCc.

21    [9] Jacob Bogage, *Postal Service will stop removing mailboxes*, Wash. Post

22    (Aug. 14, 2020), https://wapo.st/3h2OGQb.

COMPLAINT FOR DECLARATORY          21          ATTORNEY GENERAL OF WASHINGTON
JUDGMENT, MANDAMUS, AND                             Complex Litigation Division
INJUNCTIVE RELIEF                                      800 5th Avenue, Suite 2000
                                                        Seattle, WA 98104-3188
                                                            (206) 464-7744

1    service.[10] First class mail normally has a delivery standard of 2-5 days, and

2    Nonprofit Marketing Mail has a delivery standard of 3-10 days.

3        74.    An Office of the Inspector General report on the 2018 election found

4    that 95.6 percent of election and political mail was delivered within the 1-3 day

5    service standard applied to First Class mail. This is near the Postal Service's

6    overall goal of delivering 96 percent of First Class mail within the 1-3 day service

7    standard and indicates that election mail was processed across the country as if it

8    were First Class mail.[11]

9        75.    Paying First Class postage will nearly triple the cost—from 20 cents

10   to 55 cents per ballot. The Postal Service had previously allowed States to pay a

11   lower rate when mailing ballots, rather than paying the more expensive First

12   Class rate. This change in the rate requirements will cost States tens of millions

13   of dollars.

14       76.    These steps, among others, have led to slower and less reliable mail

15   delivery. For example, Baltimore residents report going weeks without mail

16

17

18   _____

19       [10] *Service Performance of Election and Political Mail During the 2018*

20   *Midterm and Special Elections*, USPS Office of the Inspector General, Audit

21   Report No. 19XG010NO000-R20 (Nov. 4, 2019).

22       [11] *Id.*

deliveries,[12] New York City postal workers reported that some mail has been delayed by five to six days,[13] Maine postal workers said they were forced to leave 80,000 letters behind rather than being allowed to wait 10 minutes for it to be processed,[14] and Milwaukee has seen dozens of trailers filled with packages that are left behind every day,[15] among other complaints.

77.    As the Washington Post has reported, "[t]he new policies have resulted in at least a two-day delay in scattered parts of the country, even for express mail, according to multiple postal workers and union leaders. Letter carriers are manually sorting more mail, adding to the delivery time. Bins of mail ready for delivery are sitting in post offices because of scheduling and route

---

[12] Barry Sims, Baltimore residents demand answers after weeks without mail delivery, WBAL TV 11 (July 24, 2020), https://bit.ly/30ZADoG.

[13] Clodagh McGowan, *Some Mail Is Delayed Five to Six Days in NYC, Postal Workers' Union Says*, NY1.com (Aug. 13, 2020), https://bit.ly/2DYylxw.

[14] Reuben Schafir, *Postal workers' union says up to 80,000 letters were held back Monday in southern Maine*, Sun Journal, https://bit.ly/3h2Y99T.

[15] Luke Broadwater, Jack Healy, Michael D. Shear & Hailey Fuchs, *Postal Crisis Ripples Across Nation as Election Looms,* N.Y. Times (Aug. 15, 2020), https://nyti.ms/311VNTd.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

changes. And without the ability to work overtime, workers say the logjam is worsening without an end in sight."[16]

78. The effects of these mail delays are widespread, with troubling impacts on vulnerable populations, small businesses, and political franchise.

79. Operational changes at the Postal Service have also delayed veterans' access to prescriptions. Millions of veterans rely on the Postal Service for timely deliveries of prescription medications from the Department of Veterans Affairs (VA). The VA fills 80 percent of veteran prescriptions by mail through the Consolidated Mail Outpatient Pharmacy. The VA Mail Order Pharmacy fills almost 120 million prescriptions a year. Every working day, it processes 470,000 prescriptions and over 330,000 veterans receive their prescriptions in the mail.

80. The VA states that prescriptions usually arrive within 3 to 5 days. But veterans and VA staff have expressed concern that recently, medications are taking weeks to be delivered, causing veterans to miss doses of their vital medications.[17]

_____

[16] Michelle Ye Hee Lee et al., *Postal Service Backlog Sparks Worries that Ballot Delivery Could Be Delayed in November*, Washington Post (July 30, 2020), https://wapo.st/3h8Yfgh.

[17] Letter from 31 Senators to Louis DeJoy (Aug. 13, 2020), https://bit.ly/345AaDj.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

81.    Senator Gary Peters of Michigan has received hundreds of accounts from veterans impacted by delivery delays and other problems, writing "Veterans who rely on the Postal Service to deliver prescriptions have reported experiencing weeks-long waits for critical medication. Other veterans have reported financial harm caused by late fees incurred because bills and payments sent by mail took far longer to arrive in July and August than they had prior to these changes."[18]

82.    Other Americans also rely on the Postal Service for delivery of prescriptions. This is particularly critical for Americans with disabilities and Americans with chronic conditions, such as high blood pressure, diabetes, and asthma, who need prescription medicines on an ongoing basis and are most at-risk if they contract the coronavirus. But recent changes slowing delivery have threatened these Americans' ability to access lifesaving drugs.

83.    The "transformative" changes instituted by DeJoy have also delayed seniors' receipt of Social Security checks and many Americans receipt of utility bills and benefits sent by mail.

84.    Small businesses are also suffering from mail delays and have expressed concerns that losing the ability to quickly process and send orders

---

[18] Letter from Senator Gary Peters to Hal. J. Roesch II (Aug. 13, 2020), https://bit.ly/311tQe5.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

25

means losing customers quickly.[19] Others have expressed worry that their products will go bad now that deliveries are taking twice as long.[20]

85.    The COVID-19 pandemic has already put small businesses on the precipice. Delays of the Postal Service's own doing—through "transformative" organizational and operational changes made without observance of procedural safeguards—should not be the reason for their fall.

86.    Election officials have also expressed concern that a reduction in postal service will impede voting by mail.

87.    The Postal Service itself has warned 46 States and the District of Columbia that it may not be able to meet State deadlines for delivering mail-in ballots. In many States, completed ballots that are not received by Election Day are invalidated. In other States, ballots must be postmarked by Election Day to be counted. A decrease in operational capability and delays in processing and delivery would disenfranchise voters. Voters may not receive voter registration

---

[19] Michelle Wolf, *Mail delays hurting local small business owners*, Fox 8 (Aug. 9, 2020), https://bit.ly/3g5fQEB; Aaron Gordon, *The Post Office's Great Mail Slowdown Is Hurting Small Businesses*, Vice (Aug. 4, 2020), https://bit.ly/34afXML.

[20] Luke Broadwater, Jack Healy, Michael D. Shear & Hailey Fuchs, *Postal Crisis Ripples Across Nation as Election Looms,* N.Y. Times (Aug. 15, 2020), https://nyti.ms/311VNTd.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

26

applications or ballots on time. Operational delays may cause completed ballots, which would ordinarily take 1-3 days to arrive at canvassing offices, far longer. They could also cause postmark stamps to be delayed by a day or more, even when a completed ballot is placed in a mailbox before Election Day.

88.    The removal and destruction of Advanced Facer-Canceler Machines could contribute to these delays. Those machines "cancel"—in other words, apply a postmark to—pieces of mail, preventing the stamp from being used again. Without these machines, as postal workers are required to hand-cancel a larger volume of mail, delays and errors will increase.

89.    As a federal district court in New York has observed in considering the constitutionality of recent postal service changes, a delay in delivery can mean that a "voter's right to vote . . . may hinge on random chance," with two ballots mailed at the same time, at different post offices, with whether either vote is counted depending "entirely on the speed at which their local post office delivered their votes." *Gallagher v. New York State Bd. of Elections*, No. 20 CIV. 5504 (AT), 2020 WL 4496849, at *20 (S.D.N.Y. Aug. 3, 2020).

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

90.     Nationwide, for primary elections held so far, over 65,000 mail-in ballots have been rejected because they arrived past the deadline, portending the issues to come for the general election.[21]

**D.     The President has repeatedly sowed mistrust about voting by mail.**

91.     Amidst the COVID-19 pandemic, election officials and policymakers have looked at how to minimize transmission risks while voting. One option is to increase access to voting by mail. Election officials from both major political parties have encouraged voters to cast their votes by mail as a way to avoid contracting or spreading COVID-19.

92.     But since the spring of 2020, President Trump has attacked mail voting more than 70 times in interviews, remarks, and tweets.[22] He has railed about supposed massive fraud in voting by mail without supporting evidence.

---

[21] Pam Fessler & Elena Moore, *Signed, Sealed, Undelivered: Thousands Of Mail-In Ballots Rejected For Tardiness*, NPR (July 13, 2020), https://n.pr/31264il.

[22] Amy Gardner & Josh Dawsey, *As Trump leans into attacks on mail voting, GOP officials confront signs of Republican turnout crisis*, Wash. Post (Aug. 3, 2020), https://wapo.st/31WozE5.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

93.     For example, in April, the President tweeted that mail-in voting has

2     "Tremendous potential for voter fraud[.]"[23] In May, he asserted that mail-in

3     ballots would lead to "the greatest Rigged Election in history."[24] Two days later,

4     he tweeted that "There is NO WAY (ZERO!) that Mail-In Ballots will be

5     anything less than substantially fraudulent."[25] The next day, he added that mail-

6     in ballots "would be a free for all on cheating, forgery and the theft."[26] The day

7     after that, Trump stated that "MAIL-IN VOTING WILL LEAD TO MASSIVE

8     FRAUD AND ABUSE. IT WILL ALSO LEAD TO THE END OF OUR GREAT

9     REPUBLICAN PARTY."[27] In June, he tweeted that mail-in voting "will lead to

10

11

12     _____

13     [23] Donald J. Trump (@realDonaldTrump), Twitter (Apr. 8, 2020,

14     5:20 AM), https://twitter.com/realDonaldTrump/status/1247861952736526336.

15     [24] Donald J. Trump (@realDonaldTrump), Twitter (May 24, 2020,

16     7:08 AM), https://twitter.com/realdonaldtrump/status/1264558926021959680.

17     [25] Donald J. Trump (@realDonaldTrump), Twitter (May 26, 2020,

18     5:17 AM), https://twitter.com/realDonaldTrump/status/1265255835124539392.

19     [26] Donald J. Trump (@realDonaldTrump), Twitter (May 27, 2020,

20     4:11 AM), https://twitter.com/realdonaldtrump/status/1265601615261827072.

21     [27] Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020,

22     6:00 PM), https://twitter.com/realDonaldTrump/status/1266172570983940101.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

29

the most corrupt Election is USA history."[28] In July, he tweeted: "The 2020 Election will be totally rigged if Mail-In Voting is allowed to take place, & everyone knows it. So much time is taken talking about foreign influence, but the same people won't even discuss Mail-In election corruption."[29] The President's deputy campaign manager and former senior counsel, Justin Clark, has said that "[t]he President views vote by mail as a threat to his election."[30]

94.     On July 30, 2020, the President explicitly cited expanded voting by mail as a basis for delaying the November election—an unprecedented and unconstitutional move.[31]



**Donald J. Trump** ✓
@realDonaldTrump

With Universal Mail-In Voting (not Absentee Voting, which is good), 2020 will be the most INACCURATE & FRAUDULENT Election in history. It will be a great embarrassment to the USA. Delay the Election until people can properly, securely and safely vote???

5:46 AM · Jul 30, 2020 · Twitter for iPhone

---

[28] Donald J. Trump (@realDonaldTrump), Twitter (June 28, 2020, 7:30 PM), https://twitter.com/realDonaldTrump/status/1277429217190428673.

[29] Donald J. Trump (@realDonaldTrump), Twitter (July 26, 2020, 1:51 PM), https://twitter.com/realdonaldtrump/status/1287490820669616128.

[30] 60 Minutes, *How the Coronavirus and Politics Could Impact Voting in the 2020 General Election*, CBS News (Jun. 28, 2020).

[31] Donald J. Trump (@realDonaldTrump), Twitter (July 30, 2020, 5:46 AM), https://twitter.com/realDonaldTrump/status/1288818160389558273.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

30

95.     Despite his attacks on voting by mail, President Trump himself has voted by mail in at least two prior elections: He voted by mail during New York's mayoral election in 2017 and cast an absentee ballot during the state's midterm election the following year. The President and the First Lady have also received ballots to vote by mail in Florida's 2020 primary election. When asked at a White House press conference how he could reconcile the fact that he has voted by mail with his position that voting by mail is corrupt, he responded, "Because I'm allowed to."[32]

96.     Along with spreading misinformation regarding mail-in ballots, the President's reelection campaign and the Republican National Committee are also fighting the expansion of mail balloting through legal challenges.

97.     They have filed or intervened in lawsuits in more than a dozen states, including Colorado, Florida, Minnesota, Michigan, Nevada, Pennsylvania, and Wisconsin. In Pennsylvania, for instance, the President's reelection campaign and the RNC sued the state government and election boards in all 67 counties to ban the use of secure drop boxes for submitting take-home ballots and to eliminate the requirement that poll watchers can only serve in the county where they live. In California, the RNC sued California Governor Gavin Newsom over

_____

[32] *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing*, The White House (Apr. 7, 2020), https://bit.ly/342xPsZ.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

a plan to mail absentee ballots to all eligible voters. In Nevada, the President's reelection campaign and the RNC filed a lawsuit to challenge the State's passage of laws providing for mailing of ballots to registered voters this November.

98.    The President has also opposed election aid for States and the Postal Service, explaining that he wants to prevent the expansion of mail voting. In an interview with Fox Business News, the President stated he opposed $25 billion of emergency funds for the Postal Service and $3.5 billion in additional election funding proposed by the House of Representatives: "[T]hey need that money in order to have the Post Office work so it can take all of these millions and millions of ballots . . . .  But if they don't get those two items, that means you can't have universal mail-in voting because they're not equipped to have it . . . .  Now, if we don't make a deal, that means they don't get the money. That means they can't have universal mail-in voting, they just can't have it."[33]

99.    At an August 13 White House press briefing, the President stated that he did not want to fund the Postal Service because of expanded voting by mail: "But if the bill isn't going to get done, that would mean the Post Office isn't going to get funded, and that would also mean that the three and a half billion

---

[33] Brett Samuels, *Trump says no Post Office funding means Democrats 'can't have universal mail-in voting'*, The Hill (Aug. 13, 2020), https://bit.ly/3kViz7o.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

32

dollars isn't going to be taken care of. So I don't know how you can possibly use these ballots, these mail-in ballots . . . ."[34]

100.   The purpose of this pattern of conduct is to purposely burden the right of States to conduct elections using the mail, as they have done for many years.

**E.    Voting by mail is safe and promotes no partisan advantage.**

101.   Voter fraud of any form in the United States is extremely rare.

102.   Incident rates for voter impersonation fraud are between 0.0003 percent and 0.0025 percent, making it more likely that an American "will be struck by lightning than that he will impersonate another voter at the polls."[35]

103.   The President tasked the Presidential Advisory Commission on Election Integrity to review claims of voter fraud following his discredited claims that millions of undocumented immigrants had voted in the 2016 presidential election. But the Commission did not issue any findings showing evidence of fraud before the President disbanded the Commission.

---

[34] *Remarks by President Trump in Press Briefing*, The White House (Aug. 13, 2020), https://bit.ly/2Q3s45W.

[35] Justin Levitt, *The Truth About Voter Fraud*, Brennan Center for Justice (2007), https://bit.ly/31RouRS.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

33

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

104.    An investigative journalism analysis of all known voter fraud cases identified only 491 cases of absentee ballot fraud from 2000 to 2012.[36] As an election law professor noted, during that period "literally billions of votes were cast."[37]

105.    In another study, looking at five states that use universal vote-by-mail systems, the researchers found just 29 instances of fraudulent votes attempted by mail. For context, nearly 50 million general election votes were cast during the same period.[38]

---

[36] *About the Voting Rights Project*, News 21 (Aug. 12, 2012), https://bit.ly/3kViSPA.

[37] Opinion, Richard L. Hasen, *Trump is wrong about the dangers of absentee ballots*, Wash. Post (Apr. 9, 2020), https://wapo.st/2Cy2N0N.

[38] Elaine Kamarck & Christine Stenglein, *Low rates of fraud in vote-by-mail states show the benefits outweigh the risks*, Brookings (June 2, 2020), https://brook.gs/2E0505F.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

34

1
2
3
4
5
6
7
8
9

| Vote-by-mail state | Number of fraudulent votes attempted by mail | Time period for collection of fraud cases | Year vote-by-mail enacted | Number of general election votes cast over the same time period |
|---|---|---|---|---|
| Colorado | 8 | 2005–2018 | 2013 | 15,955,704 |
| Hawaii | 0 | 1982– 2016 | 2019 | 6,908,429 |
| Oregon | 14 | 2000–2019 | 1998 | 15,476,519 |
| Utah | 0 | 2008 | 2013 | 971,185 |
| Washington | 7 | 2004–2010 | 2005 | 10,605,749 |

10
11
12
13

106.  States have several tools to ensure the security of mail ballots. Such tools include using ballot envelopes that bear a tracking bar code or tally mark that is unique to each voter and rejecting ballots if they are not sent in regulation envelopes that vary widely from state to state in format, size, and paper stock.

14
15
16

107.  Many States require signatures and other personal information to be matched against voter registration documents and use mail ballot secrecy envelopes. And States can employ post-election audits to detect irregularities.

17
18
19
20
21
22

108.  In many States, voters can return their ballots to a physical location, like a drop box or local election office. According to MIT's Election Data + Science Lab, in 2016 73% of voters in Colorado, 59% in Oregon, and 65% in

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

35

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Washington returned their ballots to some physical location such as a drop box or local election office.[39]

109.   The President has also attacked expanding vote-by-mail systems as partisan, baselessly claiming that "you'd never have a Republican elected in this country again."[40]

110.   But studies have shown that voting by mail does not provide any clear partisan advantage.

111.   For example, a Stanford study that looked at elections in California, Utah, and Washington from 1996 to 2018 concluded that no party benefits when a state switches to universal vote-by-mail. The data showed "a truly negligible effect" on partisan turnout rates. The effect on partisan vote share was indistinguishable from zero. But the study did find a modest boost in across-the-board turnout, meaning both major parties saw a modest but equal increase in turnout.[41]

---

[39] "Voting by mail and absentee voting," MIT Election Data + Science Lab, https://electionlab.mit.edu/research/voting-mail-and-absentee-voting.

[40] Sam Levine, *Trump says Republicans would 'never' be elected again if it was easier to vote*, The Guardian (Mar. 30, 2020), https://bit.ly/2CD7kPC.

[41] Daniel M. Thompson, et al., *Universal Vote-by-Mail Has No Impact on Partisan Turnout or Share*, Proceedings of the National Academy of Sciences of

**F.    Voting by Mail in the States**

112.    Voting by mail has a long and storied history. One of the earliest known instances of absentee voting occurred with Continental Army soldiers voting during the American Revolution. Wide-scale absentee voting first arose during the Civil War. States allowed Union and Confederate soldiers to vote while away, either at a field station or by mail.

113.    After the Civil War ended, States gradually passed new laws to expand absentee voting to civilians. Between 1911 and 1924, 45 States adopted some kind of absentee voting system. Today, registered voters can vote absentee in all 50 States. Many States allow absentee voting with no excuse, though eight States require a reason (other than the COVID-19 health crisis) to allow it.

114.    In 1998, Oregon by referendum decided to issue all its ballots by mail. Washington followed in 2011. Colorado, Hawaii, and Utah are other states that rely on all-mail elections.

115.    More than 250 million votes have been cast via mailed-out ballots since 2000 in all 50 States. In the last two federal elections, roughly one out of every four Americans cast a mail ballot. In 2018, more than 31 million Americans cast their ballots by mail, about 25.8% of election participants.

_____

the    United    States    of    America    (June    9,    2020), https://www.pnas.org/content/117/25/14052.

COMPLAINT FOR DECLARATORY            37
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

116.   Many States have made it easier to request or receive an absentee ballot due to concerns regarding the COVID-19 crisis. Roughly 76% of American voters—over 180 million people—are eligible to receive a ballot in the mail for the 2020 general election.[42]

117.   States have relied on the past performance of the Postal Service to support the use of mail in elections. Some states, like Washington, Colorado, and Oregon, adopted substantially all-mail balloting after having significant, and successful, experience with more limited mail balloting. Neither Washington, Colorado nor Oregon have substantially changed their mail balloting systems after using them for several election cycles. Other states have greatly expanded the use of mail in balloting this year because of COVID-19 based on prior performance in their states and elsewhere. The proposed changes to the Postal Service operations threaten to disrupt this long history of the successful use of mail in balloting.

## 1.   Washington

### a.   Washington's history and procedures for mail-in ballots.

118.   Washington has a decades-long history of safely and securely administering mail-in elections. Washington first permitted special elections to

---

[42] Juliette Love, Matt Stevens & Lazaro Gamio, A *Record 76% of Americans Can Vote by Mail in 2020*, N.Y. Times (Aug. 16, 2020), https://nyti.ms/3g73JH4.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

38

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

be conducted by mail in 1983. In 1991, Washington State expanded vote-by-mail options by allowing any qualified voter to register as an "ongoing absentee voter," to thereby receive absentee ballots for every election.

119.    In 2005, Washington passed a law that provided counties the option of conducting elections entirely by mail.  In response, more than two-thirds of Washington counties switched to all-mail elections. Now, by law, each voter in Washington receives a postage-paid ballot for each general election, special election, and primary. *See* Wash. Rev. Code § 29A.40.010.

120.    Voters can register or update their address online or by mail up until eight days before the election. Wash. Rev. Code. § 29A.08.140. Unlike the ballot deadline, the mail voter registration form deadline is based on receipt, not postmark. Alternatively, voters may register or update their information in person through Election Day.

121.    County auditors mail ballots to Washington voters at least eighteen days before each primary election, and as soon as possible for any subsequent voter registration changes. Each voter receives a ballot, a security envelope in which to conceal the ballot after voting, a larger envelope in which to return the security envelope, a declaration that the voter must sign, and instructions for marking and returning the ballot. Wash. Rev. Code § 29A.40.091.

122.    Washington voters may return completed ballots by mail (with postage prepaid by the State) or via a limited number of ballot drop boxes. The

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

39

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    State accepts completed ballots that are postmarked no later than Election Day.

2    Completed ballots submitted via drop box must be in the box no later than

3    8:00 p.m. on Election Day.

4        123. Canvassing boards must examine the postmark on the return

5    envelope and signature on the declaration before processing the ballot. Signatures

6    are also reviewed to ensure that a voter's signature on ballot declaration matches

7    the signature of that voter in the registration files. Wash. Rev. Code

8    § 29A.40.110. Canvassing boards can open and process ballots upon receipt and

9    can start counting ballots after 8:00 p.m. on Election Day. *See id.*

10       124. For a general election, canvassing boards must complete the canvass

11   and certify the election results 21 days after Election Day. Wash. Rev. Code

12   § 29A.60.190. Each ballot that was returned before 8:00 p.m. on Election Day,

13   or postmarked on or before Election Day and received no later than the day before

14   certification—that is, 20 days after Election Day—must be included. Wash. Rev.

15   Code § 29A.60.190.

16       125. For prior elections, counties in Washington have paid the USPS

17   marketing mail rate for distributed ballots. Regardless of the rate paid, USPS has

18   processed ballots as First Class mail. According to the USPS Office of the

19

20

21

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

40

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Inspector General's 2018 Audit Report, ballots are "Election Mail," which is "generally First Class Mail and its service standard ranges from 1-3 days."[43]

126.    Washington's vote-by-mail system has proven to be secure. For the 2016 and 2018 elections, the Washington Secretary of State's Office identified only 216 cases of potential voter fraud out of 6.5 million votes cast, or about 0.003% of votes cast in those two general elections.

127.    Washington's vote-by-mail system allowed the state to run elections during the COVID-19 pandemic without the danger of voters congregating at overcrowded polling stations and leading to potential COVID-19 outbreaks as seen in other states. In fact, voter turnout has increased in Washington during the pandemic; turnout for the August 4, 2020, primary election was an estimated 54.09%, considerably above the 40.79% turnout for the most recent similar election, the August 7, 2018 primary election.[44]

---

[43] *Service Performance of Election and Political Mail During the 2018 Midterm and Special Elections*, USPS Office of the Inspector General, Audit Report No. 19XG010NO000-R20 (Nov. 4, 2019).

[44] Aug. 4, 2020 Primary Results, Washington Office of the Secretary of State,  https://results.vote.wa.gov/results/current/Turnout.html  (last accessed Aug. 16, 2020); Aug. 7, 2018 Primary Results, Washington Office of the Secretary of State,  https://results.vote.wa.gov/results/20180807/Turnout.html  (last accessed Aug. 16, 2020).

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

41

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

**b.      Impacts of USPS's recent changes in Washington.**

2

128.   Three of the five mail processing facilities in Washington are no

3

longer processing outgoing mail: those in Wenatchee, Yakima, and Tacoma.

4

These changes were made with minimal advance notice to USPS staff and no

5

warning to the public. This means that all outgoing letters originating in the areas

6

surrounding these cities, including ballots, will no longer be processed at these

7

facilities, but will instead be transported to the two remaining facilities in Seattle

8

and Spokane for processing. For example, a letter sent from Yakima, Washington

9

to a location across town will be sent all the way to Spokane for processing and

10

then back to Yakima. A letter sent from Olympia to a location across town will

11

be sent up the I-5 corridor to Seattle for processing and then back down to

12

Olympia. This will slow delivery time. This may also move up collection times,

13

particularly in rural areas, and make it less likely for ballots to get postmarked in

14

a timely way.

15

129.   Upon information and belief, USPS has removed or is removing six

16

Delivery Bar Code Sorters from Seattle, Tacoma, and Yakima, each of which are

17

major distribution centers. Upon information and belief, USPS has removed or is

18

removing at least one Advanced Facer Canceler System and at least one

19

Automated Flat Sorting Machine from Seattle.

20

130.   Processing and sorting-machine closures are expected to lead to

21

delays in postmarking and delivery for ballots and other mail due to increased

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

42

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

transportation time and increased load on the remaining sorting machines, leading to longer sorting time. Factors leading to delay include not only the increased distance mail must travel for processing and delivery, but also winter weather, travel on high-traffic corridors, and new USPS policies like reduced staff overtime and an earlier deadline for end-of-day mail processing.

131.   Washington voters with disabilities, like all voters, have options for returning a ballot in Washington:

(A) They can choose to use their ballot received by mail.

(B) They can log on to the Secretary of State's website to download an online replacement ballot, which they can print and mark, or use their own assistive technology at home to aid them in marking their ballot. They can then print and mail the marked ballot, or print and drop off the ballot at a ballot drop box.

(C) They can choose to go to any voting center in the state to vote in person using an accessible voting device or to obtain a paper ballot.

132.   The General Counsel for the Postal Service sent a letter dated July 31, 2020 to Washington's Secretary of State to notify her that "certain deadlines concerning mail-in ballots, particularly with respect to voters who register to vote or update their registration information shortly before Election Day, may be incongruous with the Postal Service's delivery standards." The letter went on to warn the Secretary of State that "this mismatch creates a risk that

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

43

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

ballots requested near the deadline under state law will not be returned by mail in time to be counted under your laws as we understand them."

### 2.    Colorado

#### a.    Colorado's history and procedures for mail-in ballots.

133.    Colorado mails every registered voter a ballot through the U.S. Mail without having to request one. In 2013, Colorado passed the Voter Access and Modernized Elections Act. 2013 Sess. Laws 681. The Colorado General Assembly enacted this measure because "the people's self-government through the electoral process is more legitimate and better accepted when voter participation increases" and decided that "expand[ing] the use of mail ballot elections" was an appropriate "means to increase voter participation." *Id.*

134.    Every voter in Colorado receives a mail ballot packet delivered through the U.S. Mail to the voter's last registered mailing address. The ballots must be mailed between 18 and 22 days prior to an election. § 1-7.5-107(3)(a)(I), C.R.S.

135.    The mail ballot packet received by every Colorado voter includes the ballot, instructions for completing the ballot, a return envelope, and may include a secrecy sleeve. § 1-7.5-103(5), C.R.S. The voter is responsible for securing adequate postage if the voter elects to return the ballot through the U.S. Mail. § 1-7.5-104.5(2)(b)(IV), C.R.S.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

44

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

136.   Overseas military voters are sent their ballots no later than 45 days before the election. § 1-8.3-110(1), C.R.S. Colorado has a large number of active-duty military personnel. Unlike the ballots mailed to other Colorado voters, these ballots may be sent electronically. § 1-8.3-110(2).

137.   Colorado voters rely heavily on the mail to vote. In the 2016 state primary, 97% of Colorado voters cast the ballot they received in the mail. In the 2020 state primary, 99% of Colorado voters cast their mail ballot. Of those that cast their mail ballot, about 25% return their mail ballot through the mail as well, while the rest return their mail ballots to drop boxes or polling places.

138.   Many Colorado voters, in the military and otherwise, reside in other states but are legally authorized to vote in Colorado. Colorado's elections thus would be negatively impacted by degradation to mail service in Colorado or elsewhere.

139.   As the above numbers make clear, voters of both parties overwhelmingly vote using their mail ballot. In the 2016 general election, slightly more registered Republicans returned their mail ballot than registered Democrats. In the 2018 general election, slightly more registered Democrats returned their mail ballot than registered Republicans.

140.   Delays in the mail can have a significant impact on Colorado's balloting system. Colorado is an "in-hand" state, meaning that all ballots must be in the possession of an election official at 7 pm on Election Day to be counted.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

45

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

This is a hard deadline. Even events outside of the control of the voter, such as mailing delays, do not alter the deadline. Even if the mail ballot shows a postmark from before Election Day, that voter's ballot will remain uncounted. § 1-7.5-107(4)(b)(II), C.R.S.

141.   In 2020, every voter's ballot will contain numerous matters of statewide concern. First, the General Assembly has referred three measures to the voters of Colorado to determine whether to enact or repeal certain state laws concerning a nicotine tax, state bingo licenses, and property tax rates. Second, the citizens of Colorado have gathered sufficient signatures to place at least four measures on the ballot that may alter the state's laws on a variety of topics, including the state's electoral college process and abortion. Finally, one of Colorado's two senators in the United States Congress will also be chosen by the voters of Colorado in 2020.

**b.    Impacts of USPS's recent changes in Colorado.**

142.   Upon information or belief, USPS has removed or is removing five Delivery Bar Code Sorters and at least one Flat Sequencing System from Denver, a major distribution center.

143.   These removals are expected to lead to delays in postmarking and delivery for ballots and other mail due to increased load on the remaining sorting machines, leading to longer sorting time. Factors leading to delay include not only the increased load on the remaining sorters, but also winter weather, travel

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

46

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

on high-traffic corridors, and new USPS policies like reduced staff overtime and an earlier deadline for end-of-day mail processing.

144.   These delays are likely to affect Colorado's all-mail elections. As of August 1, 2020, Colorado had nearly 3.5 million active, registered voters, who would be in line to receive and return their voted November ballots through the U.S. Mail.

145.   These expected delays are also likely to affect Colorado veterans. According to the U.S. Department of Veterans Affairs Eastern Colorado Healthcare System, approximately 50,000 veterans served by that System—which covers the entire Colorado Front Range—use pharmacy mail order requests.

### 3.   Connecticut

#### a.   Connecticut's history and procedures for mail-in ballots.

146.   The COVID-19 public health crisis has infected more than 46,000 people and killed more than 4,300 in Connecticut. The State has responded by expanding mail-in voting to ensure that every eligible resident can vote both safely and securely in the 2020 primary and general election season.

147.   Connecticut does not have universal or no-fault mail-in voting. Instead, state law limits mail-in voting to cases of absence, illness, disability, or

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

47

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    religious objection.[45] Article VI, § 7 of the Connecticut Constitution provides that

2    the General Assembly may enact laws authorizing mail-in voting by "qualified

3    voters of the state who are unable to appear at the polling place on the day of

4    election because of absence from the city or town of which they are inhabitants

5    or because of sickness, or physical disability or because the tenets of their religion

6    forbid secular activity."

7    148.    Pursuant    to    the    state    constitutional    grant    of    authority,    the

8    Connecticut General Assembly convened in a special session in July of 2020,

9    while the coronavirus and its associated illness, COVID-19, was sweeping the

10    state and the country, to pass Public Act No. 20-3. The Act, in relevant part,

11    amends Conn. Gen. Stat. § 9-135 to provide that, for the purposes of the

12    November 2020 election, the ongoing pandemic – and the risk of contracting "the

13    sickness of Covid-19" – is a valid reason for any eligible Connecticut resident to

14    vote by mail.

15    149.    In response to the new law, Connecticut Secretary of State

16    Denise Merrill intends to send a mail-in ballot application to every registered

17    voter in the state—a total of more than 2.1 million people—in the run-up to the

18    November 3, 2020 general election. While these applications will be sent by the

19    _____

20    [45] Connecticut officials and the public alike generally refer to mail-in

21    voting as "absentee" voting. Here it is called "mail-in voting" to reflect its

22    expanded scope due to COVID-19.

COMPLAINT FOR DECLARATORY          48          ATTORNEY GENERAL OF WASHINGTON
JUDGMENT, MANDAMUS, AND                          Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
INJUNCTIVE RELIEF

Secretary of State, they must be returned to the town clerks in each of Connecticut's 169 municipalities. These clerks, in turn, are responsible—directly or through a contracted mail processing house—for processing the applications and sending mail-in ballots to valid applicants. With the exception of blank ballots sent to voters oversees and to service members in the Armed Forces, those mail-in ballots cannot be sent to voters until October 2, 2020. Conn. Gen. Stat. §§ 9-135, 9-140. While absentee ballots can be requested—by mail or in person—until the day before the election, Connecticut by law can only count ballots that it receives by 8 p.m. on Election Day.

150.   Connecticut expects a record-breaking volume of mail-in voting in the November 2020 election, as residents continue to reduce coronavirus exposure and the risk of COVID-19 sickness by avoiding the social contact that comes with in-person voting. In the state's primary election, held on August 11, 2020 under similar rules to those that will be in place in November, mail-in voting exceeded prior-year benchmarks by a factor of 10. Nearly 57% of Connecticut voters in the primary used mail-in ballots. Election officials anticipate that the November use of mail-in ballots will meet or exceed that high-water mark.

151.   To try and ensure that every vote will be counted, Connecticut has placed at least one secure ballot drop box in each of the state's municipalities, but election officials still anticipate that the Postal Service will be called upon to deliver a significant volume of election mail at four key points in the mail-in

49

voting process: Ballot application delivery; ballot application return; printed ballots sent by town clerks to voters; and completed ballots returned by voters to town clerks.

152.   Connecticut has chosen to expand mail-in voting because it is not only safe—in the sense of sparing voters the risk of coronavirus exposure—but also secure. The state has a history of secure voting by mail. On information or belief, in the past ten years, the state has prosecuted and convicted just four people of absentee ballot fraud out of 486,460 votes cast in general elections alone—a fraud rate of 0.00082227%.

**b.    Impacts of USPS's recent changes in Connecticut.**

153.   On July 31, 2020, Connecticut Secretary of State Merrill received a letter from Thomas Marshall, USPS' General Counsel, warning of a "mismatch" between Connecticut's mail-in voting process and USPS delivery standards. Among other things, Mr. Marshall advised that, in light of USPS delivery standard, a completed mail-in ballot in Connecticut should be sent by Tuesday, October 27 in order to be received on time for the November 3 election.

154.   On information or belief, the USPS has never before warned Connecticut that it requires seven days to deliver First Class election mail to in-state destinations. That extraordinary delay for in-state mail is not a function of geographic distance: Connecticut is the third-smallest state in the country, measured in square miles. The distance between Greenwich, on Connecticut's

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

50

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   western border, to Stonington, on the state's eastern border, is just 106 miles—a

2   drive of less than two hours on the interstate highway. And the lion's share of

3   completed mail-in ballots are sent to addresses not just within the state but within

4   the same town—a short distance, given Connecticut's compact size. The state's

5   largest municipality by geographic area, the city of Danbury, is just 41 square

6   miles.

7       155.   Instead, the unprecedented threat of ballot delay reflects service

8   changes that USPS has made in the run-up to the November 3 general election.

9   On information or belief, USPS has removed or will, prior to the November 3

10  election, imminently remove, 18 key mail sorting machines from processing

11  facilities in Connecticut and from facilities in directly-adjacent communities that

12  process mail sent to Connecticut addresses. These machines include, at a

13  minimum, one Advanced Face Canceler System in Hartford, Connecticut, and

14  another in Westchester, New York, from a facility that serves many Connecticut

15  residents; 8 Delivery Bar Code Sorters from facilities in central and southern

16  Connecticut, and another 6 in Westchester; and both an Automated Flat Sorting

17  Machine and a Flat Sequencing System in Westchester. In addition, two

18  machines in Springfield, MA—in a facility that serves some Connecticut

19  residents for some types of mail—have also been, or will soon be, taken offline.

20      156.   Some of these machines are able to sort upwards of 30,000 mail

21  pieces per hour. The removal and decommissioning of these machines—has had

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

51

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    the effect of significantly reducing the USPS' capacity to process letters—and

2    thus mail-in ballots—and other forms of mail in Connecticut.

3        157.   The mail processing delays consequent to bringing machines offline

4    has been exacerbated by new USPS policies (the "transformative" changes) that

5    slow mail processing and delivery. If mail is not sorted by machines, it must be

6    sorted by hand. But USPS directives assertedly aimed at blocking overtime mean

7    that there is simply not time enough in the work day for mail clerks and letter

8    carriers to process, sort, and deliver the mail timely, especially given workforce

9    depletions owing to COVID-19 illness and staff members' childcare needs

10   related to the closure of schools and summer camps across the state.

11       158.   The result has been significant mail backlogs in towns and cities

12   across Connecticut. Just months ago, in-state First Class Mail could be expected

13   to be delivered within two days. Now, as unsorted mail accumulates in post

14   offices and processing facilities, delays of up to a week are routine, and even

15   longer delays are increasingly common.

16       159.   On information or belief, USPS' service changes have already

17   resulted in numerous mail delays that have deprived eligible Connecticut

18   residents of the right to vote in the August primary election or significantly

19   burdened that right, in some instances forcing voters to choose between

20   exercising their right to vote and avoiding exposure to the coronavirus.

21

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

52

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    160.  Connecticut held its state and national primary election on

2    August 11, 2020. In the aftermath, numerous voters across the state reported

3    receiving their mail-in ballots after Election Day—even though the ballots had

4    been postmarked at least a week, and in some instances up to ten days, earlier.

5    Still more voters who requested mail-in ballots weeks in advance reported

6    receiving their ballots within days of the primary election, too late for mail-in

7    voting. Those voters were forced to risk coronavirus exposure in order to vote in

8    person or else to avail themselves of the state's drop boxes—an option that can

9    be difficult for many people with disabilities and to some older people with

10    limited mobility.

11    161.  In addition to compromising residents' right to vote, the USPS

12    service changes are harming the health, wellbeing, and fiscal stability of

13    Connecticut residents. Across the state, residents have reported unprecedented

14    mail delays since the service changes were instituted. Those delays have kept

15    residents from timely receiving necessary medicine and equipment. They have

16    kept residents from timely receiving funds that they rely on for rent, food, and

17    child support. They have kept residents from timely receiving bills and filing

18    important court documents. In every instance, residents report that the delays

19    arose only in the past weeks: Service was regular, swift, and reliable until the

20    USPS' recent recent "transformative" service changes.

21

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

53

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

4.    **Illinois**

a.    **Illinois's history and procedures for mail-in ballots.**

162.    Illinois has successfully used vote by mail procedures for over a decade. In addition to using vote by mail procedures to enable members of the military and Illinois citizens temporarily residing outside the state to exercise their right to vote, *see* 10 ILCS 5/20-1 et seq., Illinois has expanded the availability of vote by mail more broadly in recent years. Since 2009, Illinois law has provided that any qualified and registered voter in the state may choose to vote by mail in accordance with deadlines and procedures established in the Illinois Election Code. *See* Pub. Act 96-0553 (eff. Aug. 17, 2009) (amending 10 ILCS 5/19-1, et seq.).

163.    This year, in response to the Covid-19 pandemic, Illinois enacted new legislation to further enhance the availability of vote by mail for Illinois voters participating in the 2020 general election. On June 16, 2020, Public Act 101-0642 became law in Illinois. *See* Pub. Act 101-0642 (eff. June 16, 2020) (creating 10 ILCS 5/2B et seq.). Since Public Act 101-0642 took effect on June 16, 2020, eligible voters in Illinois (referred to as "electors") have been able to request applications "for an official ballot for the 2020 general election to be sent to the elector through mail." 10 ILCS 5/2B-15(a). In addition, election authorities have been required to send applications for "an official vote by mail ballot for the 2020 general election" to any elector who voted, whether by mail

54

1   or in person, in any of the following: (i) the 2018 general election; (2) the 2019

2   consolidated election (in which various municipal elections occur in Illinois); or

3   (3) the 2020 general primary election. *Id.* § 5/2B-15(b). Vote by mail applications

4   must also be sent to voters who have registered to vote or changed their

5   registration address after March 17, 2020, the date of the general primary

6   election, and on or before July 31, 2020. *Id.*

7       164.   The vote by mail applications sent to Illinois voters under Public Act

8   101-0642 must also include a notice stating that "upon completion of the

9   application, the elector ***will receive*** an official ballot no more than 40 days and

10  no less than 30 days before the election[.]" *Id.* § 5/2B-15(c) (emphasis added).

11  The notice also informs voters that they may return the application by mail to

12  their election authority. *Id.* Both the application and notice are to be sent by mail

13  "to the elector's registered address and any other mailing address the election

14  authority may have on file, including a mailing address to which a prior vote by

15  mail ballot was mailed." *Id.* § 5/2B-15(d).

16      165.   Beginning September 24, 2020, election authorities in Illinois must

17  mail official ballots to voters in Illinois who have requested them. *Id.* § 5/2B-

18  20(a). Voters requesting a vote by mail ballot on or before October 1, 2020, must

19  receive one "no later than October 6, 2020." *Id.* For requests received after

20  October 1, 2020, an election authority must mail an official ballot within two

21  business days after receiving the application. *Id.* Election authorities must

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

55

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

continue accepting vote by mail applications received by mail or electronically through October 29, 2020—five days before Election Day, November 3, 2020. *See* 10 ILCS 5/19-2. Voters may also submit a vote by mail application in person as late as November 2, 2020, the day before Election Day. *Id.*

166.   For Illinois voters returning their completed ballots by mail, their ballots must be postmarked on or before Election Day and received within the fourteen-day period following Election Day during which provisional ballots are counted. *See* 10 ILCS 5/19-3, 19-8(c); 10 ILCS 5/20-2.3. Illinois law also permits election authorities to create "secure collection sites for the postage-free return of vote by mail ballots." Voters who received vote by mail ballots have until the close of the polls on Election Day to deliver them to collection sites for the issuing election authority. 10 ILCS 5/2B-20(e). Illinois law specifically provides that "[e]lection authorities shall accept any vote by mail ballot returned, including ballots returned with insufficient or no postage[.]" *Id.*

### b.      Impacts of USPS's recent changes in Illinois.

167.   On July 30, 2020, USPS sent a letter to the Illinois State Board of Elections warning that "under our reading of Illinois' election laws, certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards. This mismatch creates a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted under your laws as we understand them." The letter specifically

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

56

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

flagged that Illinois permits voters intending to vote by mail to apply for a vote by mail ballot "as late as 5 days before the November general election." It also asserted that "the Postal Service cannot adjust its delivery standards to accommodate the requirements of state election law." The July 30, 2020 letter from USPS to the Illinois State Board of Elections did not disclose, however, that USPS was simultaneously removing critical mail sorting equipment from Illinois, thereby enhancing the risk of disenfranchisement to Illinois voters seeking to vote by mail.

168. Upon information and belief, USPS has removed or plans to remove critical mail sorting equipment from at least seven facilities in Illinois: the Cardiss Collins processing and distribution center in Chicago; the Carol Stream processing and distribution center; the Champaign processing and distribution facility; the Springfield processing and distribution center; the Palatine processing and distribution center; the Peoria processing and distribution facility; and the South Suburban processing and distribution center in Bedford Park.

169. According to USPS documents, USPS has recently removed or plans to remove twenty-one Delivery Bar Code Sorters from USPS facilities in Illinois, including: two from Carol Stream; four from Chicago; one from Champaign; six from Palatine; two from Peoria; one from Springfield; and five from Bedford Park. The removal of these machines will represent a 15% reduction in Delivery Bar Code Sorters at facilities in Illinois compared to

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

57

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

February 2020, when there were a total of 141 such machines in Illinois facilities according to USPS documents.

170.    According to USPS documents, USPS has recently removed or plans to remove Advanced Facer Canceler Systems ("AFCS"), Automated Flat Sorting Machine 100s ("AFSM100"), and Flat Sequencing Systems ("FSS") from USPS facilities in Illinois, including:  one AFCS each from facilities in Carol Stream and Bedford Park; one AFSM100 from Bedford Park; and two FSS from Bedford Park and one from Palatine.

171.    The removal of critical mail sorting equipment from Illinois is occurring at a time when prompt mail delivery has never been more essential for protecting the right to vote for Illinois citizens. Maintaining and enhancing USPS capacity is an urgent priority for Illinois in light of the expansion of vote by mail options Illinois has adopted in response to the Covid-19 pandemic.

### 5.    Maryland

#### a.    Maryland's history and procedures for mail-in ballots.

172.    In Maryland, every voter is eligible to vote by mail-in ballot. Md. Code Ann., Elec. Law § 9-304. This year, due to the COVID-19 crisis, mail-in ballot applications with paid return postage are being mailed to all registered voters for the 2020 general election.

173.    By order of Governor Lawrence J. Hogan, Maryland mailed ballots to every voter for the two elections that have taken place thus far in 2020—an

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

58

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

April 28, 2020 congressional special election triggered by the death of Rep. Elijah E. Cummings, and the June 2, 2020 presidential primary election.

174.  The April 28, 2020 special general election for Maryland's 7th Congressional District was the first vote-by-mail election for a congressional election in Maryland history and spanned three jurisdictions: Baltimore City, Baltimore County, and Howard County. Although there were three in-person voting centers open on the day of the election, voters were strongly encouraged to cast a ballot by mail. Of the approximately 157,000 votes cast in the election, only 849 were cast in person, as opposed to over 156,000 votes by mail.

175.  The June 2 primary election was the first statewide vote-by-mail election in the history of Maryland and 97% of all ballots—representing 1,463,007 voters—were cast by mail or deposited in ballot drop-boxes.

176.  It is expected that many more voters than in years past will vote by mail-in ballot in the November general election. The current record high for the number of mail-in ballots was set in 2008, with approximately 233,000 ballots sent to voters and 210,000 completed ballots received. As of August 13, Maryland had already received 210,634 requests for absentee ballots for the November election.

177.  Maryland pays the First Class rate for distributed ballots and returned ballots.

59

1
2
3
4
5
6
7
8
9

178.   After receiving a letter from USPS General Counsel Thomas Marshall dated July 31, 2020, which warned that Maryland election deadlines were "incompatible with the Postal Service's delivery standards," the Maryland State Board of Elections moved up the deadline for submitting mail-in ballot applications to October 20, 2020, from October 27 (for ballots sent by mail) and October 30 (for ballots delivered over the internet). Moving the application deadline will result in more voters missing the deadline and voting in person rather than by mail, increasing the risk of COVID-19 transmission at crowded voting centers.

10
11
12

179.   Maryland accepts completed ballots that are postmarked on or before Election Day and are received before 10:00 a.m. on the second Friday after the election—November 13, 2020 for this year's general election.

13

**b.    Impacts of USPS's recent changes in Maryland.**

14
15
16
17
18
19
20

180.   Widespread delays and disruptions in USPS delivery service have been reported across Maryland in recent weeks. Some residents have reported not receiving any mail at all. Others have described extensive delays in receiving critical mail such as prescription medication, paychecks, benefit payments, loans, and legal documents. Local postal workers have ascribed the delays to the recent changes to overtime policy, the deadline for end-of-day mail processing, and the removal of mail processing machines.

21
22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

60

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

181.   Upon information or belief, USPS removed six mail processing machines from Maryland facilities in early August—four from Baltimore City and two from the USPS Linthicum facility. Those machines are typically used to process letter mail, including election mail.

182.   The recent problems with mail service have provoked anxiety about vote-by-mail in Maryland, with voters expressing concern that their mail-in ballots will not be delivered on time or at all. As a result of the uncertainty caused by mail delays, more Marylanders will predictably choose to vote in-person, increasing the risk of COVID-19 transmission at voting centers.

**6.    Michigan**

**a.    Michigan history and procedures for mail-in ballots.**

183.   Michigan has had absentee voting for more than 60 years. Prior to the passage of Proposal 3 in 2018, a voter could vote absentee when one of the following statutory grounds existed:  the voter expected to be absent from the community in which he or she was registered for the entire time the polls were open on Election Day; the voter was physically unable to attend the polls without the assistance of another; the voter could not attend the polls because of the tenets of his or her religion; the person had been appointed an election precinct inspector in a precinct other than the one where they resided; the voter was 60 years of age or older; or the voter could not attend the polls because he or she was confined in

61

1   jail awaiting arraignment or trial. MCL 168.759(5) (amended by 2018 PA No

2   603).

3   184.   In November 2018, though, Michigan voters overwhelmingly

4   approved Proposal 3, which amended Michigan's Constitution and gave all

5   Michigan voters the constitutional right to vote by absentee ballot *without*

6   *providing a reason*.

7   185.   Under Michigan's Constitution, "every citizen of the United States

8   who is an elector qualified to vote in Michigan shall have . . . the right, once

9   registered, to vote an absent voter ballot without giving a reason, during the forty

10  (40) days before an election, and the right to choose whether the absent voter

11  ballot is applied for, received and submitted in person or by mail." Const. 1963,

12  art 2, §4(1)(g).

13  186.   An application for an absent voter ballot may be made by a written

14  request signed by the voter, on an absent voter ballot application form provided

15  by the clerk, or on a federal postcard application. MCL 168.759. The application

16  may be returned by mail or by delivering it in-person. *Id.*

17  187.   Requests to have an absent voter ballot mailed must be received by

18  the local clerk no later than 5:00 p.m. the Friday before the election. MCL

19  168.759.

20  188.   Mailed ballots must reach the clerk before the close of the polls at

21  8:00 p.m. on Election Day to be counted. MCL 168.764a; MCL 168.720.

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

62

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

189.   Mailed ballots that reach the clerk after the polls close on Election Day are spoiled and may not be counted, even if they were postmarked before Election Day.

**b.    Impacts of USPS's recent changes in Michigan.**

190.   Local clerks in Michigan use both First Class and marketing mail to mail ballots. Historically, the USPS has worked with the state and clerks to ensure that election mail is marked and receives expedited service regardless of the class of mail.

191.   In 2019 and 2020, the state, clerks, and print vendors have expended significant time and money on ensuring absent voter ballot envelopes meet USPS standards for election mail. Since a statewide election in March 2020, the state has allocated more than $2 million for the purchase of absent voter ballot envelopes that meet these standards. The state led this effort largely at the urging of the USPS. The USPS did not request that absent voter ballot envelopes be sent only by First Class mail as part of this process. Rather, the state's expectation was that USPS would continue to provide expedited service for election mail regardless of class, and that increased statewide compliance with USPS design standards for election mail would facilitate this service.

192.   Voters pay First Class to have ballots returned, though some local jurisdictions prepay for postage.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

63

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

193.    On July 29, 2020, Mr. Thomas Marshall, General Counsel for the USPS, sent a letter to Michigan Secretary of State Jocelyn Benson to notify her that "certain deadlines for requesting and casting mail-in ballots [in Michigan] are incongruous with the Postal Service's delivery standards." Accordingly, Mr. Marshall notified Secretary Benson that "this mismatch creates a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted under your laws as we understand them."

194.    Mr. Marshall also advised Secretary Benson that, as a result of the Postal Service's delivery standards, to the extent the mail is used to transmit ballots to and from voters, "there is significant risk that, at least in certain circumstances, ballots may be requested in a manner that is consistent with your election rules and returned promptly, and yet not be returned in time to be counted."

195.    As of August 14, 2020, Michigan has had more than 90,000 confirmed cases of COVID-19. The scourge of COVID-19 in Michigan has increased reliance on voting by mail by more than 50 percent. In Michigan's previous statewide election in March, under 40 percent of voters cast ballots by mail. In the August election, 65 percent of votes were cast by mail (a record for a statewide election).

196.    The August election set a state record for number of votes by mail (1.6 million) despite having much lower turnout than November elections.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

64

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Although the Secretary of State does not yet have statewide empirical data, she has received reports from several clerks that ballots they put in the mail took several weeks to reach voters.

197.   Moreover, there are anecdotal reports that mail is building up at processing facilities, especially the Pontiac, Michigan processing center, and most jurisdictions that have reported mail delays have their mail routed through Pontiac. The Washington Post recently reported that cutbacks at the USPS, including the loss of sorting and processing machinery, has resulted in a reduction in the amount of mail that can be processed at the Pontiac facility by approximately 394,000 pieces of mail per hour.

198.   The State of Michigan tracks the demographics of its residents that have tested positive, or died, from COVID-19. When measured in cases per million by race, as of August 14, 2020, COVID-19 has disproportionately impacted African Americans who have accounted for 15,487 cases per million, compared to 4,250 American Indian/Alaska Native; 4,790 Asian/Pacific Islander; and 4,984 White.[46]

199.   Because of the disproportionate impact that COVID-19 has had on communities of color in Michigan, and because COVID-19 has increased reliance on voting by mail by more than 50% in Michigan, delays in postal

---

[46]   State of Michigan, *Coronavirus – Michigan Data*, https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

65

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

delivery could disproportionality impact the voting rights of minorities in Michigan.

### 7.    Minnesota

#### a.    Minnesota's history and procedures for mail-in ballots.

200.    The Minnesota Constitution provides that "[n]o member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers," and that "[e]very person 18 years of age or more who has been a citizen of the United States for three months and who has resided in the precinct for 30 days next preceding an election shall be entitled to vote in that precinct." Minn. Const. arts. I, § 2, VII, § 1.

201.    Together, these provisions guarantee the right to vote to eligible Minnesota residents. Minnesota courts have long held that the right to vote and the right to participate in the political franchise is a fundamental right. *See, e.g.*, *Kahn v. Griffin*, 701 N.W.2d 815, 831 (Minn. 2005).

202.    Moreover, the Minnesota Supreme Court has recognized that absentee voting is crucial to participation in the franchise: "The purpose of the absentee ballot is to enfranchise those voters who cannot vote in person." *Erlandson v. Kiffmeyer*, 659 N.W.2d 724, 734 (Minn. 2003).

203.    Minnesota law has permitted absentee balloting since 1862, when the state legislature permitted state residents serving in the Union military to

66

1
2
3
4
5
6
7
8

complete and mail their ballots to local election officials. 1862 Minn. Laws, 1st Spec. Sess. ch. 1, at 1-13. Under current Minnesota law, any eligible voter may vote by absentee ballot. Minn. Stat. § 203B.02, subd. 1 (2018). A voter may apply for an absentee ballot at any time at least one day before the election. *Id*. § 203B.04. When a local election official receives an absentee ballot application, the registrar mails the applicant a sealed envelope containing the unmarked ballot, instructions for completing the ballot, and an envelope for resealing the marked ballot. *Id.* § 203B.07, subds. 1–3.

9
10
11
12
13
14

204.   The resealing envelope has "[a] certificate of eligibility to vote by absentee ballot printed on the back" on which the voter must provide personal identification information, such as the last four digits of their Social Security number, their driver's license number, or their state identification number. *Id.*, subd 3. After a voter marks the ballot, they must seal the ballot in its envelope and sign the eligibility certificate on the back. *Id.*

15
16
17
18
19
20
21
22

205.   Once a completed absentee ballot is received, it is reviewed by a "ballot board" appointed by the local county or municipal election office. *Id.* § 203B.121. The ballot board accepts the ballot if a majority of the board is satisfied that the voter's name and address match the voter's application, the signed envelope matches the identification number on the application, the voter is eligible and registered to vote, the envelope includes a "certificate [that] has

67

1
2

been completed," and the voter has not voted twice in that election. *Id.*, subd. 2(b).

3   206.   Minnesota law contains a separate procedure for eligible voters who
4   serve in the military or are temporarily outside of the United States and wish to
5   cast an absentee ballot from overseas. *See id.* §§ 203B.16–.28. The election
6   procedure for military and overseas absentee balloting is substantially identical
7   to the standard absentee procedure detailed above. *See id.* §§ 203B.17, subd. 2
8   (governing applications for absentee ballots), .22(a) (governing transmission of
9   ballots), .23, subd. 2 (requiring ballot board to accept ballot if it meets statutory
10  criteria). Notably, the military and overseas absentee balloting process relies
11  heavily on the U.S. Mail.

12  207.   Minnesota law provides for an additional procedure, separate from
13  absentee balloting, under which all voting in certain rural precincts is conducted
14  by mail. *Id.* § 204B.45. In precincts using mail balloting, county election officials
15  send ballots to all registered voters between 14 and 46 days before each regularly
16  scheduled election. *Id.* subd. 2. A ballot board reviews completed mail ballots
17  and accepts or rejects them based on statutory criteria. *Id.*

18  208.   Under Minnesota law, an absentee or mail ballot must be received
19  no later than 8:00 p.m. on Election Day in order to be counted. *Id.* §§ 203B.08,
20  subd. 3, 204B.45-.46, Minn. R. 8210.2200, subp. 1, .3000. In light of the global
21  health pandemic caused by COVID-19, for the purposes of the 2020 general

22

COMPLAINT FOR DECLARATORY          68          ATTORNEY GENERAL OF WASHINGTON
JUDGMENT, MANDAMUS, AND                              Complex Litigation Division
INJUNCTIVE RELIEF                                     800 5th Avenue, Suite 2000
                                                       Seattle, WA 98104-3188
                                                          (206) 464-7744

election, this deadline has been postponed by one week, pursuant to a consent decree entered by a state district court. *LaRose v. Simon*, No. 62-CV-20-3149, Order and Mem. at 1, 7 (Minn. Dist. Ct. Aug. 3, 2020), Stipulation and Partial Consent Decree § VI.D, *appeal filed and accelerated review granted* Nos. A20-1040, A20-1041 (Minn. Aug. 12, 2020). Under the consent decree, absentee and mail ballots postmarked on or before Election Day will be accepted if election officials receive them no later than 8:00 p.m. on November 10. *Id.*

### b.    Impacts of USPS's recent changes in Minnesota.

209.    Minnesotans rely on the U.S. Mail system for a wide range of services, including exercising their fundamental right to vote, receiving medications, conducting business, and maintaining connections with loved ones.

210.    Absentee voters in Minnesota rely on the USPS more so than voters in many states because Minnesota has no statutory infrastructure regarding ballot drop boxes. Postal delays risk imposing particularly serious harms on Minnesota voters because a lack of drop boxes means voters have fewer alternatives for transmitting absentee or mail ballots to election officials. The rights of Minnesotans who rely on absentee balloting on grounds such as these are at particular risk as the result of USPS's recent changes.

211.    If the ballots of Minnesotans who vote absentee are not received by election officials in time for the ballots to be counted in the 2020 November general election, these voters will be disenfranchised.

69

212.   The stakes are particularly high in this election cycle: Minnesota election officials expect there will be at least 1.2 million state residents voting from home, which represents an extraordinary increase over previous elections in terms of both raw numbers and percentage of the electorate.

213.   Minnesota is home to eleven federally recognized Native American tribal communities, many of whose members reside on reservations where mail service is often unreliable. Further degradation of USPS's ability to efficiently deliver absentee and mail ballots risks imposing especially severe harms on Native American voters.

214.   Recent changes to USPS facilities and procedures inside or outside of Minnesota have resulted in substantial changes to the time needed to deliver U.S. Mail sent to or from Minnesota addresses. Minnesotans have reported experiencing delays in their mail service. For example, Minnesota residents have faced delays in receiving medications and in having face masks delivered to combat the COVID-19 pandemic. Just days ahead of Minnesota's August 11, 2020 primary election, some Minneapolis residents had not yet received their requested absentee ballots. Many of these residents' personal circumstances made voting in person more difficult, particularly for those at a higher risk of viral infection. Postal workers have attributed these types of delays to changes made by the Postmaster General.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

70

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

215.    The USPS's sorting capacity in the Twin Cities area has reportedly been reduced by approximately 100,000 to 200,000 pieces of mail per hour. Minneapolis and St. Paul have the two largest mail-processing facilities in the state. Upon information and belief, at least three mail sorting machines have been decommissioned in Minneapolis in the past few months and six more are scheduled for decommission. Upon information and belief, St. Paul's facility has recently lost the use of six letter-sorting machines and one flat-sorting machine. The facility is scheduled to lose another four letter-sorting machines by the end of the month, resulting in a total of a ten-machine reduction for letter sorting. Ten letter-sorting machines can process five million pieces of mail a day.

216.    This reduction in speed to process mail is particularly likely to have a disparate impact on persons of color who use the U.S. Mail system to vote or for other reasons. Whereas about 20% of Minnesota's population is composed of persons of color, about 40% of Minneapolis residents are persons of color and 49% of St. Paul's population are persons of color.

### 8.    Nevada

#### a.    Nevada's History and Procedures for Mail Voting

217.    Nevada has a decades-long history of safely and securely administering mail-in elections. In 1991, Nevada adopted a no-excuse absentee system whereby any voter may request a paper ballot and cast it by mail.  Since as early as 1960, Nevada has also mailed ballots to the residents of designated

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

71

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   mailing precincts. Until 2020, mailing precincts were typically established in

2   remote rural areas where it is difficult or impractical to staff physical polling

3   locations.

4      218.   In 2020, due to the COVID-19 pandemic, Nevada's state and local

5   election officials worked in partnership to expand mailing precincts to cover the

6   entire geographic area of the state. This was accomplished through administrative

7   action, as opposed to legislation.  The Nevada Secretary of State emphasized that

8   the expansion of mailing precincts was only to be effective for the June 9, 2020

9   primary election.

10     219.   With the expansion of mailing precincts for the June 9, 2020 primary

11  elections, local election officials mailed ballots to all active registered voters in

12  Washoe County, in Carson City, and in each of Nevada's fourteen rural counties.

13  Additionally, in Clark County, local election officials mailed ballots to all active

14  and inactive registered voters, most of whom reside within the Las Vegas Valley

15  metropolitan area.  Although local election officials established at least one

16  physical polling location in each of their respective jurisdictions, more than

17  ninety-eight percent of voters opted to vote by mail in the 2020 primary election.

18  The statewide voter turnout for the 2020 primary election was thirty percent,

19  which is relatively high compared to turnout for the 2018 primary election (23%)

20  and the 2016 primary election (19%).

21

22

220.   On July 31, 2020, recognizing the importance of voting by mail as a means to enfranchise voters who might otherwise be unable to vote due to circumstances beyond their control, Nevada legislators introduced Assembly Bill (AB 4) of the 32nd (2020) Special Session of the Nevada Legislature. Signed by Governor Sisolak on August 3, 2020, AB 4 directs state and local election officials to mail ballots to all active registered voters in Nevada during certain declared emergencies such as the COVID-19 pandemic.  As a practical matter, AB 4 directs state and local election officials to repeat, in the 2020 general election, the vote-by-mail processes that they developed for the 2020 primary election.

221.   Applicable to elections occurring during declared emergencies, AB 4 establishes a hybrid vote-by-mail system in which voters have the option to vote by mail or by personal appearance.  Those who choose to vote in person may do so at designated vote centers during Nevada's two-week early voting period or on Election Day.  Those who vote by mail must submit ballots in postage prepaid return envelopes that are postmarked on or before Election Day.  If a ballot return envelope does not bear a legible postmark, it is presumed to have been deposited in the mail on or before Election Day if received by election officials within 3 days after Election Day.  In light of these provisions of AB 4, slow mail service could easily disenfranchise voters who timely deposit their ballots in the mail on or before Election Day.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

73

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

222.   Voting by mail will be especially important in Nevada's remote rural communities.  In recent years, for example, Native Americans have been involved in litigation over voting access on the Pyramid Lake, Walker River, and Duck Valley reservations.  Because polling locations had often been inaccessible due to long travel distances, the residents of these communities requested that physical polling be placed on or near the reservations in question.  The issue of polling places was partially addressed by legislation in 2017, but the onset of the pandemic has now made physical polling locations problematic in these outlying communities.  Consequently, reliable, speedy mail service is crucially important to enfranchise the many Native Americans, among others, who reside in remote parts of the state.

223.   For prior elections, Washington and Nevada have paid the USPS marketing mail rate for distributed ballots. Regardless of the rate paid, USPS has processed ballots as First-Class Mail. According to the USPS Office of the Inspector General's 2018 Audit Report, ballots are "Election Mail," which is "generally First-Class Mail and its service standard ranges from 1-3 days."[47]

224.   Nevada's vote-by-mail system was effectively tested during the 2020 primary election and proved to be secure.  No instances of voter fraud were

_____

[47] *Service Performance of Election and Political Mail During the 2018 Midterm and Special Elections*, USPS Office of the Inspector General, Audit Report No. 19XG010NO000-R20 (Nov. 4, 2019).

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

74

1  reported during the 2020 primary election.  Moreover, as noted above, Nevada

2  has offered its voters no-excuse absentee voting since 1991.  Reports of voter

3  fraud related to absentee voting are exceedingly rare, and no instances of such

4  fraud were confirmed during the 2016 and 2018 election cycles.

5  **b.    Impacts of USPS's Recent Changes in Nevada.**

6  225.    Upon information or belief, USPS has removed three Delivery Bar

7  Code Sorters from Las Vegas and Reno, Nevada's two major distribution centers.

8  Upon information or belief, USPS has removed at least one Automated Flat

9  Sorting Machine from Las Vegas.

10  226.    Processing and sorting-machine closures are expected to lead to

11  delays in postmarking and delivery for ballots and other mail due to increased

12  transportation time and increased load on the remaining sorting machines,

13  leading to longer sorting time. Factors leading to delay include not only the

14  increased distance mail must travel for processing and delivery, but also winter

15  weather, travel on high-traffic corridors, and new USPS policies like reduced

16  staff overtime and an earlier deadline for end-of-day mail processing.

17  227.    The USPS service changes are harming the health, wellbeing, and

18  fiscal stability of Nevada residents. Across the state, residents have reported

19  unprecedented mail delays since the service changes were instituted.

20  228.    The "transformation initiative" has delayed seniors receiving Social

21  Security checks and Americans from getting utility bills.

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

75

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

229.   More importantly during these stark economic times, the USPS service delays have kept residents from timely receiving funds that they rely on for rent, food, and child support.  Specifically, Nevada, as a benefits provider, relies on the USPS to deliver benefit payments as an electronic debit card. Delays are particularly harmful for Nevada, which has experienced unprecedented unemployment levels and delays associated with processing unprecedented numbers of new benefit claims.

230.   The USPS delays have kept Nevada residents from timely receiving necessary medicine and equipment. They have kept residents from timely receiving bills and filing important court documents. In every instance, residents report that the delays arose only in the past weeks: Service was regular, swift, and reliable until the USPS' recent service changes.

231.   The USPS delays also threaten Nevada's administration of its mail voting election during this declared public health emergency.

**9.     New Mexico**

**a.     New Mexico's history and procedures for mail-in ballots.**

232.   New Mexico permits all voters to request a mailed ballot. No excuse or reason is needed to vote by mail. N.M. Stat. Ann. § 1-6-4. A person may submit an application for a mailed ballot either by mail or electronic application on a website authorized by the Secretary of State. N.M. Stat. Ann. § 1-6-4(B), (C).

233.    To be counted, ballots must be received by the county clerk by 7:00 p.m. on Election Day. N.M. Stat. Ann. § 1-6-10(C). Ballots received after that time shall not be counted. N.M. Stat. Ann. § 1-6-10(D).

234.    During the COVID-19 public health crisis, New Mexico has seen increased demand for voting by mail. In the June 2020 primary election, more than 247,000 absentee ballots were cast, over 23,000 more than in 2016.[48]

235.    New Mexico anticipates this demand for voting by mail to continue with the 2020 general election. In anticipation of this demand and to accommodate the public health precautions needed with COVID-19, the New Mexico Legislature passed legislation to adapt the election procedures for the 2020 general election. N.M. Senate Bill 4 (2020 1st Special Sess.).[49]

    a.    The legislation permits county clerks to mail applications for mailed, absentee ballots to all registered voters with active addresses and who do not already receive mailed ballots pursuant to other laws. N.M. Senate Bill 4, §2(D) (2020 1st Special Sess.). Ten county clerks, including

---

[48] Morgan Lee, *New Mexico Voting Surges, Shifts to Absentee Balloting*, Associated Press (June 3, 2020), https://bit.ly/323dr8v.

[49] The final version of the legislation is available at: https://www.nmlegis.gov/Sessions/20%20Special/final/SB0004.pdf

1    the clerks of New Mexico's four largest counties, have elected this option

2    to mail absentee ballot applications to all voters.[50]

3        b.    The by-mail, absentee balloting process designed by the

4    New Mexico Legislature in anticipation of the 2020 general election, to be

5    conducted in the midst of a pandemic, assumes a functioning Postal

6    Service with usual delivery times for election mail. Except for military and

7    overseas voters, applications for absentee ballots must be received by

8    October 20, 2020. N.M. Senate Bill 4, §2(F) (2020 1st Special Sess.).

9    Ballots are then mailed to voters, which by law must contain the notice that

10   "[i]f this ballot is returned by mail, to ensure timely postal delivery to the

11   county clerk, the ballot should be mailed no later than Tuesday,

12   October 27, 2020." *Id.*, § 2(E). If mail is delayed, there may be insufficient

13   time for absentee ballots to be sent to voters and returned to county clerks

14   during the two-week window between October 20 and Election Day. The

15   notice provided to voters to mail their ballots one week before Election

16   Day also may provide inaccurate advice about when voters need to mail

17   ballots to ensure they are counted.

18

19

20   ———————————

21   [50] Dan Boyd, *With Election Day in Sight, NM Absentee Ballot Planning*

22   *Underway*, Albuquerque J. (Aug. 11, 2020), https://bit.ly/2PXieCR.

COMPLAINT FOR DECLARATORY        78
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

1

      **b.**    **Impacts of USPS's recent changes in New Mexico.**

2

    236.   It recently came to light that one mail sorting machine, a Delivery

3

Bar Code Sorter, has been removed from its facility in Albuquerque, and two

4

more are in the process of being removed. An Automated Facer Canceller Sorter

5

is also being removed. New Mexico is concerned that these removals will impact

6

USPS's operations in Albuquerque and cause delays in processing and delivery

7

    237.   Delays in postal service are likely to disproportionately affect

8

Native American voters in New Mexico. Although the State has taken a number

9

of measures to ensure that Native Americans can cast ballots in the general

10

election, including measures in the special legislation for the 2020 election,[51] the

11

rural, remote nature of many Native American communities make disruptions to

12

postal service particularly harmful.[52] Because many homes in Native American

13

communities do not have traditional addresses, voters often use post-office

14

15

           —————————————

16

    [51] *See, e.g.,* N.M. Senate Bill 4, §2(C) (2020 1st Special Sess.) (ensuring

17

polling places in each Indian nation, tribe, or pueblo even where there are

18

closures due to COVID-19).

19

    [52] *See generally* Native Am. Rights Fund, Obstacles at Every Turn:

20

Barriers to Political Participation Faced by Native Am. Voters at 93–102,

21

June 2020, https://bit.ly/2DZ6r4k (discussing challenges of vote-by-mail for

22

Native communities).

COMPLAINT FOR DECLARATORY         79        ATTORNEY GENERAL OF WASHINGTON
JUDGMENT, MANDAMUS, AND                      Complex Litigation Division
INJUNCTIVE RELIEF                            800 5th Avenue, Suite 2000
                                         Seattle, WA  98104-3188
                                         (206) 464-7744

boxes. Additionally, mail routes are circuitous, with ballots often taking a long time to be delivered even under normal operations.[53]

238.  These obstacles have grown larger during the COVID-19 public health crisis. Closures of pueblos due to COVID-19 have caused voters to travel longer distances to pick up their absentee ballots and disrupted Postal Service deliveries.[54] During New Mexico's primary election, despite overall voter turnout increasing, turnout among Native American voters declined, as mail delays "were compounded by lockdowns, nontraditional addresses, a historic lack of infrastructure and the pandemic."[55] Additional delays and disruption to postal

---

[53] *See* National Journal, *COVID-Era Changes Could Hurt Native American Voter Access* (June 1, 2020), https://bit.ly/2Ed3VXW (discussing challenges to by-mail voting in New Mexico and efforts by New Mexico Secretary of State, Representatives, and Senators to ensure Native American voting rights).

[54] UCLA Voting Rights Project, UNM Center for Social Policy, *N.M. Vote-by-Mail: Matters of the Primary & State Election Laws*, at 7, June 17, 2020, https://bit.ly/345HP4I (describing closure of Zia Pueblo and need for voters to drive 20 miles to drop off and pick up mail ballots when Postal Service could not access pueblo).

[55] Michael Gerstein, "Native Americans Faced Difficulties Voting in Primary," Santa Fe N. Mexican, July 11, 2020, https://bit.ly/2Yb5WLq; *see also*

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

80

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

service during the 2020 general election are likely to compound these problems and cause many Native American voters in New Mexico to be unable to vote by mail.

239.   The recent USPS changes are also likely to have a disproportionate impact on Hispanic voters. Upon information and belief, USPS is implementing a new pilot program at the Five Points Post Office in Albuquerque, New Mexico, which is in a part of the city that has the highest percentage of Hispanic population. The pilot program will entail mail carriers making deliveries earlier in the day, while leaving behind first and second class mail—which includes checks, newspapers, and in the near future, political mailings, absentee ballots, and absentee ballot applications.

### 10.    Oregon

### a.    Oregon's history and procedures for mail-in ballots

240.   Oregon became the first state to conduct all primary and general elections entirely by mail on November 7, 2000. Vote by mail was legislatively adopted for local elections in 1981.  In 1998 Oregon voters overwhelmingly passed a measure adopting vote by mail for primary and general elections.  In 2007 the Oregon legislature required all elections to be conducted by mail.

_____

Stanford-MIT Healthy Elections Project, "The 2020 N.M. Primary," at 10–11, July 17, 2020, https://bit.ly/31YSGuF (describing challenges to voting by mail among Native Americans in 2020 New Mexico primary).

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

81

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

241.   Eligible voters who are registered to vote 21 days before an election are mailed a ballot by county election officials. The ballot, along with a return envelope and an optional security insert, are mailed to those voters no later than the fourteenth day prior to the election and typically no sooner than the twentieth day prior (with an exception for ballots being mailed out of state).

242.   Prior to mailing ballots, election officials must determine what is to appear on those ballots, design the ballots, and perform myriad other steps in preparation for the election. These steps are laid out in significant detail in an 88-page procedural manual, available at https://secure.sos.state.or.us/oard/viewAttachment.action.

243.   A voter must return the ballot using an envelope provided for that purpose. That outside of the envelope must be signed by the voter. The envelope may be returned through the mail or to a designated ballot drop box. It must be received by 8:00 PM on the day of the election. By law, the postage of the envelope provided for returning a ballot is a "business reply" envelope, with First Class USPS postage paid for by the State of Oregon.

244.   Consistent with the Postal Service's website explanation that First Class mail is delivered in 1-3 business days, Oregon voters in prior elections have been told they must mail their ballots not later than the Wednesday prior to the election to ensure that it will be timely received.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

82

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

245. Vote by mail in Oregon, following the procedures just described, has generated high levels of voter turnout. The percentage of eligible voters who have voted in Oregon general elections since the first all-mail election, rounded to the nearest percentage, are:

- November 6, 2018: 68%
- November 8, 2016: 79%
- November 4, 2014: 70%
- November 6, 2012: 82%
- November 2, 2010: 72%
- November 4, 2008: 86%
- November 7, 2006: 70%
- November 2, 2004: 86%
- November 5, 2002: 69%
- November 7, 2000: 80%

https://sos.oregon.gov/elections/Documents/Historic_Cost_Participation.pdf.

### b. Impacts of USPS's recent changes in Oregon

246. On July 31, 2020 USPS General Counsel and Executive Vice President Thomas J. Marshall sent a letter to Oregon election officials regarding USPS handling of ballots. In that letter Mr. Marshall states that Oregon voters "should" have sufficient time to complete and return their ballots. The letter goes

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

83

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

on to state that votes should be mailed "at least one week before the state's due date . . . no later than October 27."

247.    The letter from Mr. Marshall to Oregon further states that voting officials should use First Class mail to send ballots and allow one week for delivery.

248.    Mr. Marshall's directions, combined with the previously-described timeframes for mailing ballots to Oregon voters, mean that Oregon voters may have to return their ballots by mail on the same day the ballots arrive, if elections officials require the full time allotted to them to complete production of the ballots and prepare to mail them. If elections officials can send the ballot at the earliest day generally allowed by state law, voters may still have only six days. Even these timeframes depend on the ability of elections officials to pay for First Class postage.

249.    Under the delivery timeframes stated on the USPS website, by contrast, Oregon voters could safely expect to have at least one week and possibly two to three weeks to complete and mail their ballots.

250.    The shorter timeframe suggested by Mr. Marshall's letter – and indeed the discrepancies between the general delivery timeframes provided in that letter and the delivery times claimed by USPS on its website – appear to be the result of the improper policy changes that are subject of this litigation.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

84

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    251.   The shorter timeframes outlined in Mr. Marshall's letter are likely

2    to result in materially lower voter turnout in Oregon's election, and a materially

3    higher number of ballots that must be disregarded because they are returned too

4    late. Oregon has an important sovereign interest in reasonably ensuring that the

5    outcomes of its elections in fact represent the will of Oregon voters. The

6    unlawfully-adopted policies complained of in this action are likely to irreparably

7    harm that sovereign interest.

8    **11.   Rhode Island**

9    **a.    Rhode Island's history and procedures for mail-in ballots**

10   252.   Rhode Island voters can vote by mail for any of the reasons

11   enumerated in R.I. Gen. Laws § 17-20-2, including when any voter "may not be

12   able to vote at his or her polling place in his or her city or town on the day of the

13   election." Thus, after completing a mail ballot application, any registered Rhode

14   Island voter may vote by mail during the COVID-19 pandemic.

15   253.   Due to the impact of the COVID-19 pandemic on voting in Rhode

16   Island, the Rhode Island Secretary of State and the Rhode Island Board of

17   Elections anticipate that the majority of ballots cast in the 2020 September

18   primary and November general election will be mail-in ballots.

19   254.   Due to the impact of the COVID-19 pandemic on voting in Rhode

20   Island, the majority of ballots cast in the June 2020 Presidential Preference

21   Primary were mail-in ballots.

22

COMPLAINT FOR DECLARATORY          85          ATTORNEY GENERAL OF WASHINGTON
JUDGMENT, MANDAMUS, AND                         Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744
INJUNCTIVE RELIEF

255.   An analysis by Rhode Island's Secretary of State of voters who submitted mail ballots in Rhode Island's June 2020 Presidential Preference Primary, conducted in the midst of the COVID-19 pandemic, concluded that many Rhode Islanders who voted by mail were senior citizens.

256.   In order to receive a mail ballot, a Rhode Island voter must fill out a mail ballot application and send or deliver it to the appropriate state official; depending on the election, Boards of Canvassers of Rhode Island's thirty-nine cities and towns, or the state Board of Elections, will receive mail ballot applications.

257.   Beginning the week of September 7, 2020, the Rhode Island Secretary of State intends to send each active, eligible voter in Rhode Island a mail ballot application for the November 2020 general election.

258.   For the September 2020 primary election, mail ballot applications must be *received* by the Boards of Canvassers by Tuesday, August 18, 2020, at 4:00 PM EST in order for the voter to be eligible to receive a mail ballot. *See* R.I. Gen. Laws § 17-20-2.1.

259.   For the November 2020 general election, mail ballot applications must be *received* by the Board of Elections no later than Tuesday, October 13, 2020, at 4:00 PM EST in order for the voter to be eligible to receive a mail ballot. *See id*.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

86

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

260. Upon receipt by a Board of Canvassers or Board of Elections, mail ballot application authentication is undertaken by the Board of Canvassers. (The Board of Elections does not authenticate mail ballot applications). Not later than 4:00 p.m. EST on the eighteenth (18th) day before the date of any election, or within seven (7) days of receipt by the local board, whichever occurs first, the Board of Canvassers must either certify or reject a mail ballot application. *See* R.I. Gen. Laws § 17-20-10(c). At the culmination of the authentication process, which includes an analysis to verify the authenticity of the voter's signature on the mail ballot application, the mail ballot may be rejected or approved. If there is a ballot application deficiency, the Board of Canvassers will mail a notice of deficiency to the applicant (or otherwise contact the applicant) and provide the applicant an opportunity to cure the deficiency. If the mail ballot application is approved, a Board of Canvassers will certify the mail ballot application and input the voter's information into Rhode Island's Central Voter Registration System. Inputting the voter's mail ballot information into the Central Voter Registration System triggers the Rhode Island Secretary of State's mail ballot vendor ("the vendor") to send a mail ballot to the voter.

261. The Secretary of State's mail ballot vendor is located in Everett, Washington.

262. Each day that the Boards of Canvassers certify mail ballot applications, the vendor receives a list of all voters whose mail ballot

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

87

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

applications have been approved that day. The vendor mails via first class mail, mail-in ballots to these voters on a rolling basis no later than one day after receipt of the list of approved mail ballot applications.

263.   The vendor prints all mail ballots for Rhode Island voters at its headquarters in Everett, Washington. The vendor then sends the mail ballots to all Rhode Island voters using the Seattle, Washington mail processing facility. The mail ballots are then typically delivered to Boston, Massachusetts and then trucked to a Rhode Island mail processing facility.

264.   The mail ballots are sent by the vendor to Rhode Island voters via United States Postal Service First-Class Mail.

265.   While a large majority of Rhode Island mail ballots will be sent by the vendor to Rhode Islanders at their homes in Rhode Island, upon information and belief some Rhode Islanders are expected to request that mail ballots be sent to temporary addresses outside of Rhode Island due to temporarily residing in such a state. For example, certain out-of-state college students and  members of the Armed Forces may request that mail ballot be sent to temporary addresses outside of Rhode Island.

266.   Upon receipt of a mail ballot, a Rhode Island voter fills out the mail ballot, places the mail ballot in an oath envelope, signs the oath envelope to authenticate the ballot, and places the signed oath envelope in a pre-paid postage envelope.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

88

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

267.   The pre-paid postage on the mail ballot envelopes is United States Postal Service First-Class Mail.

268.   The voter may then deposit the mail ballot envelope in one of a limited number of secure ballot drop boxes in Rhode Island, or in a mail box either in Rhode Island or outside the State if the voter is temporarily residing outside of Rhode Island.

269.   According to Rhode Island law, mail ballots must be *received* by the Rhode Island Board of Elections by 8:00 PM EST on Election Day in order to be counted. R.I. Gen. Laws § 17-20-8.

270.   In order for a person's mail ballot to count, therefore, Rhode Island's mail balloting process is statutorily dependent upon the timely processing and receipt of mail ballots by the United States Postal Service.

### b.    Impacts of USPS's Recent Changes in Rhode Island

271.   Upon information and belief, the USPS has recently begun a new delivery initiative test in the State of Rhode Island: the Expedited Street/Afternoon Sortation ("ESAS"). The ESAS pilot program is reportedly underway in Pawtucket, Rhode Island and, upon information and belief, may curtail the ability of letter carriers to deliver the mail on a consistent and timely basis.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

89

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

272.   Other postal branches in Rhode Island may have also decided to implement this program, or a hybrid of the ESAS, which may result in limitations or delays of mail delivery.

273.   Due to the implementation of the ESAS pilot program and hybrid versions of the program, all mail delivery, including but not limited to mail ballots, may be delayed on a recurring basis with an increasing backlog.

274.   Furthermore, in Rhode Island's 2020 Presidential Preference Primary election, many postal workers in Rhode Island went above and beyond their job duties to ensure that all timely posted ballots were delivered to polling places on time, which was a challenge given the much higher than usual volume of mailed ballots.   For example, 38,294 people voted by mail in the 2004 Presidential Primary Preference, and 22,670 voted by mail in the 2012 Presidential Primary Preference – the two most recent Rhode Island Presidential Preference Primaries that also featured an incumbent president of one major party and an ongoing primary for the other party.   *See* https://elections.ri.gov/elections/results/2004/preference/   and https://www.ri.gov/election/results/2012/presidential_preference_primary/.   By comparison, 125,991 voted in the 2020 Presidential Preference Primary, with 104,542 of those voters voting by mail ballots. https://www.ri.gov/election/results/2020/presidential_preference_primary.

90

275.  Considering the volume of expected mail-in ballots for the September primary and the November general election, the elimination of overtime and other recently announced USPS operation changes may threaten to delay the delivery of mail ballot applications and mail ballots in a timely manner.

276.  Rhode Island also expects, with the certainty of a high turnout and heavy reliance on voting by mail for this impending election, that postal service disruptions could threaten to disenfranchise voters and additionally could compromise the integrity of election results if the delivery of ballots are delayed such that they will not be counted.

277.  Finally, some Rhode Island voters are expected to vote by mail from outside of Rhode Island. For example, under Rhode Island law members of the Armed Forces and Rhode Island residents temporarily living outside of Rhode Island for other reasons may vote by mail. Thus United States Postal Service delays in jurisdictions outside of Rhode Island may disenfranchise Rhode Islanders temporarily living out of the state and impede Rhode Island's efforts to timely and efficiently count mail ballots.

### 12.  Vermont

#### a.  Vermont's history and procedures for mail-in ballots.

278.  In Vermont, voters have been able to vote by mail (no-excuse absentee voting) since 2001. Vermonters also have the ability to vote early at their town clerk's office during regular hours for 45 days prior to the election.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

91

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    Ballots must be received in the town clerk's office before the close of business

2    on the Monday before Election Day, or ballots may be delivered to the polls on

3    Election Day before the polls close at 7:00 p.m.[56]

4    279.   On July 2, 2020, Act 135 became law. This legislation, along with

5    previously enacted Act 92, authorized the Vermont Secretary of State to order or

6    permit, as applicable, appropriate elections procedures for the purpose of

7    protecting the health, safety, and welfare of voters, elections workers, and

8    candidates in carrying out elections, including expanding mail voting by sending

9    ballots by mail to all registered voters.

10    280.   The Vermont Secretary of State has exercised his authority under

11    Act 135. In a directive issued by the Secretary of State on July 20, 2020, it was

12    announced that the Vermont Secretary of State will send ballots to all registered

13    voters via First Class mail (paid at the First Class rate) for the 2020 general

14    election. The State of Vermont will also include prepaid envelopes, postage First

15    Class for the return ballots.

16

17

18

19    _____

20    [56] There is an exception for ballots that have been mailed to the town clerk.

21    To be counted, they must arrive before 7:00 p.m. on Election Day. 17 V.S.A. §

22    2543(d)(1)(B).

COMPLAINT FOR DECLARATORY            92        ATTORNEY GENERAL OF WASHINGTON
JUDGMENT, MANDAMUS, AND                              Complex Litigation Division
INJUNCTIVE RELIEF                                      800 5th Avenue, Suite 2000
                                                       Seattle, WA  98104-3188
                                                          (206) 464-7744

281.   Under Vermont's current election law, ballots returned by mail must be received by the clerk no later than 7:00 p.m. on Election Day, regardless of when the ballot is postmarked.[57]

282.   Voting by mail is especially beneficial for Vermonters who are homebound, such as the elderly and members of the disabled community; those who are economically disadvantaged and have limited access to transportation and childcare that would enable them to vote in person during a set timeframe; overseas and military voters; those who are temporarily away from home for work or family reasons; and those who may not have time to get to the polls during set hours, such as shift workers, caregivers, single parents, and those without childcare or time off from work.

283.   In the 2020 election, there is another category of Vermonters who would be disproportionately affected by the need to vote in person: older voters and those with compromised immune systems who are particularly susceptible to harm from COVID-19. This category also includes voters who live with or care for a vulnerable household member or relative, and who fear that voting in person may expose them to the virus, which they may then spread to more vulnerable individuals.

284.   The COVID-19 pandemic has led to a massive increase in voting by mail. More voters requested absentee ballots for the 2020 primary election than

---

[57] 17 V.S.A. § 2543(d)(1)(B).

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

93

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   the number of Vermonters who actually voted in the last two primaries, as

2   reflected in the following chart:

| Statewide Primary Year | Total Ballots Voted | Early/Absentee Ballots Voted (% of total) |
|---|---|---|
| 2016 | 107,000 | 17,000 (16%) |
| 2018 | 120,000 | 22,000 (18%) |
| 2020 | 168,000 | 150,000 requested (89%) *(Voted data is not available)* |

*Voted totals are rounded down to the nearest 1,000.*

### b.    Impacts of USPS's recent changes in Vermont.

285.   In the 2020 primary election, many postal workers in Vermont went above and beyond their job duties to ensure that all timely posted ballots were delivered to polling places on time, which was a challenge given the much higher volume of mailed ballots than in previous years. Vermont is concerned that, with the elimination of overtime and other recently announced USPS operational changes, postal workers will be unable to fulfill these functions for the 2020 general election.

286.   Vermont is concerned that, with the strong likelihood of a high turnout and heavy reliance on absentee voting or voting by mail for this impending election, postal service disruptions will disenfranchise voters, make

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

94

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    receipt and processing more difficult for election workers, and undermine the

2    integrity of election results if large numbers of ballots are not returned on time.

3    **13.        Virginia**

4    **a.    Absentee Voting in Virginia.**

5    287.   Virginia permits any qualified voter to vote absentee after

6    completing and returning a valid absentee ballot application. Va. Code §§ 24.2-

7    700 and 24.2-701. After receiving a valid application for an absentee ballot, the

8    general registrar then enrolls the name and address of the applicant on the

9    absentee voter applicant list. Va. Code § 24.2-706. The voter then has the option

10   to vote either in-person absentee, Virginia Code §§ 24.2-701.1 and 24.2-701.2,

11   or by mail, Virginia Code § 24.2-707.

12   288.   Absentee voting in Virginia has seen a marked increase since the

13   beginning of the COVID-19 pandemic. In the 2020 June primary elections,

14   542,318 total ballots were cast, and, of those ballots, 105,832 were absentee. In

15   the 2020 May town and city general and special elections, 139,454 total ballots

16   were cast, and, of those ballots, 66,333 were absentee. In comparison, for the

17   2018 May town and city general and special elections, during which the number

18   of total ballots cast was 130,829, there were only 4,466 absentee ballots cast.

19   289.   Virginia law sets forth robust protections to prevent fraud in

20   absentee voting, including: (1) Absentee ballot applicants must provide

21   identifying information, including their name, address, and the last four digits of

22

COMPLAINT FOR DECLARATORY                    95
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

their social security number, Va. Code Ann. § 24.2-701(C); (2) An applicant must swear to the truth of the provided information, subject to felony penalties for making false statements, § 24.2-701(A); (3) All general registrars maintain a publicly available absentee voter list with the name and address of each registered absentee voter and a separate file of the applications of the listed applicants, § 24.2-706; (4) For each absentee ballot application, the general registrar confirms that the applicant is a registered voter, § 24.2-706; (5) Only the actual voter may complete a ballot, and voters using absentee ballots must include a signed attestation confirming identity, eligibility, and absence of double-voting, § 24.2-706; (6) Upon receipt of the absentee ballot, the general registrar or electoral board checks the ballot against the absentee voter applicant list and marks the date of receipt in the appropriate column opposite the name and address of the voter; and (7) Voter malfeasance triggers harsh criminal penalties, see Va. Code § 24.2-1004(B) ("Any person who intentionally (i) votes more than once in the same election . . . is guilty of a Class 6 felony."); § 24.2-1016 ("Any willfully false material statement or entry made by any person in any statement, form, or report required by this title shall constitute the crime of election fraud and be punishable as a Class 5 felony."); § 24.2-1012 ("Any person who knowingly aids or abets or attempts to aid or abet a violation of the absentee voting procedures . . . shall be guilty of a Class 5 felony" and "[a]ny person attempting

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

96

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1
2

to vote by fraudulently signing the name of a qualified voter shall be guilty of forgery and shall be guilty of a Class 4 felony.").

3

**b.    Impacts of USPS's recent changes in Virginia.**

4

290.    It remains to be seen what any changes to the USPS system will have

5

on the absentee voting system in Virginia. Since these changes have been

6

proposed, localities in the Commonwealth have not had to mail out ballots. The

7

last ballots mailed out were for the July 7 and 14 special elections in Arlington

8

and Smyth Counties. However, ballot proofs will begin being reviewed on

9

August 22 and must be mailed out no later than September 18. To introduce

10

changes to the absentee voting system at this late a date promotes chaos and

11

undermines the absentee voting system.

12

**14.    Wisconsin**

13

**a.    Wisconsin's history and procedures for mail-in ballots.**

14

291.    Wisconsin's qualified electors may vote either in-person or

15

absentee, including by returning absentee ballots by mail. *See generally* Wis.

16

Stat. §§ 6.76–82 (in-person voting procedures), 6.84–89 (absentee voting

17

procedures). Any qualified elector in Wisconsin may vote absentee for any

18

reason. *See* Wis. Stat. §§ 6.20, 6.85(1).

19

292.    Absentee voters in Wisconsin may request a ballot from municipal

20

election officials either in person or by mail. *See* Wis. Stat. § 6.86(1)(a). Any

21

absentee ballot requests made by mail are valid if received before 5 p.m. on the

22

fifth day preceding the election. *See* Wis. Stat. § 6.86(1)(b). Upon a proper request for an absentee ballot, local election officials typically mail the ballot to the elector. *See* Wis. Stat. § 6.87(3)(a). Any such mailing must be made within one business day after receiving an absentee ballot request. *See* Wis. Stat. § 7.15(1)(cm).

293.    After receiving and completing the absentee ballot, the absentee voter may return it to local election officials either in person (which can include deposit into a ballot drop box) or by mail. *See* Wis. Stat. § 6.87(4)(b)1. In either circumstance, the ballot must be received by 8 p.m. on Election Day to be counted. *See* Wis. Stat. § 6.87(6).[58]

294.    Since the outbreak of COVID-19, demand for by-mail absentee voting in Wisconsin has increased dramatically. For the April 2020 election in Wisconsin, the Wisconsin Election Commission received more than 1.3 million requests for absentee ballots, and voters returned nearly one million of those ballots by mail. This represented an increase of 440% in absentee ballots returned by mail compared to the spring 2016 election. Around 81,000 of these ballots were received after Election Day, around 79,000 of which were accepted only due to a federal court ruling extending the receipt deadline.

---

[58] The effects of this statutory deadline during the COVID-19 pandemic are currently being challenged in *Gear, et al. v. Bostelmann, et al.*, No. 20-cv-278 (W.D. Wis.).

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

98

295.   Similarly, for the August 2020 primary election, Wisconsin voters returned almost 600,000 absentee ballots out of around 900,000 requested. Only around 106,000 absentee ballots were returned in Wisconsin's comparable 2018 primary.

296.   Wisconsin Election Commission staff project that nearly 2 million voters, around two-thirds of the usual total turnout for a presidential election, will vote by mail in November. On September 1, the Commission will mail around 2.6 million packets of information about voting in the November election to every registered voter without an absentee request on file. The mailing includes an absentee application and a postage-paid return envelope.

### b.    Impacts of USPS's recent changes in Wisconsin.[59]

297.   Several local distribution centers in Wisconsin have been closed in recent years. Any election mail sent by, for instance, election officials in Madison, Wisconsin, to Madison voters must be routed nearly 90 miles to Milwaukee for sorting and distribution. Similarly, mail sent by election officials in Eau Claire, Wisconsin, to Eau Claire voters must first be routed around 80 miles to a Postal Service distribution center St. Paul, Minnesota.

298.   This distribution process adds at least a day or two to mail delivery times in many Wisconsin municipalities and thereby creates a small margin for

_____

[59] The allegations in this section are drawn from recent news reports and are therefore pleaded on information or belief.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

99

error for timely election mail delivery. Because Wisconsin voters may request ballots up until five days before Election Day, additional delays in mailing ballots to and from voters would almost certainly cause more ballots to miss the receipt deadline of 8:00 p.m. on Election Day.

299.   The Lakeland postal district, which serves much of Wisconsin including its largest metropolitan area—Milwaukee—has already rarely met targets for on-time mail delivery and has often had scores below the national level since late 2016. Any further reduction or degradation of Postal Service operations in Wisconsin would further threaten on-time mail delivery in the state.

300.   Slowdowns have already been reported at the Postal Service's package processing facility in Oak Creek, Wisconsin, a Milwaukee suburb. COVID-19 had already depleted the available supply of postal workers there, and the elimination of overtime for Postal Service employees has only exacerbated the problem.

301.   Because Postal Service employees may not now work overtime, any mail not processed at these facilities serving Wisconsin by the end of a shift is left for the next shift. Postal Service employees in Wisconsin have been directed not to wait for late mail and instead to leave it for the next day. Delivery drivers have similarly been instructed to leave at set times, which gives them no leeway to pick up mail that arrives late. All of these service changes threaten to create more backlogs and delays in Wisconsin mail delivery.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

100

302.    These slowdowns will be exacerbated by the Postal Service's decision in June to remove four sorting machines used at its distribution center in downtown Milwaukee; it apparently plans to remove three more. That would leave the facility with 29 sorting machines instead of the 36 it had a couple of months ago. Previously, two workers had been operating each sorting machine, but staff shortages have reduced that number to one. Again, these changes threaten additional delays in mail processing and delivery, especially if and when mail volume increases around the November 2020 election.

303.    Madison election officials report that it now takes around five to seven days for absentee ballots mailed from Madison to arrive at Madison voters' residences.

304.    These increasing delays in Postal Service mail delivery, if not addressed, will almost certainly disenfranchise Wisconsin electors who will choose to vote by mail in the November 2020 elections. Again, any elector can request an absentee ballot by mail up until five days before Election Day, for example on October 29, 2020, five days before the November 3, 2020, general election. If the Postal Service manages to hit its standard delivery targets of one to three business days for First Class mail, that could leave just enough time for voters to receive and return the ballot by mail before the deadline of 8:00 p.m. on Election Day. But further degradations of Postal Service operations like the ones described herein will cause more delays in mail delivery, meaning many more

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

101

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    Wisconsin absentee voters will likely miss the receipt deadline and thereby lose

2    the right to have their ballot counted.

3        305.    For example, Madison voters who request their ballot by mail on the

4    last possible day, October 29, 2020, would not even receive their ballot before

5    Election Day on November 3, 2020, given that ballots mailed from Madison

6    election officials to Madison voters are now taking around five to seven days to

7    arrive. This pattern threatens to repeat itself throughout Wisconsin due to the

8    recent slowdowns in Postal Service operations.

9        306.    Likewise, even Wisconsin voters who receive their absentee ballots

10   well before Election Day will likely return their completed ballots by mail in

11   reliance on their past experience using the Postal Service, expecting that

12   traditional service patterns and delivery timelines will still hold true. The Postal

13   Service has traditionally represented that First Class mail—the classification for

14   election mailings in Wisconsin—will be delivered within one to three business

15   days. Although the Postal Service now caveats that timeline due to COVID-19,

16   voters have likely come to rely on delivery in that general timeframe. Voters who

17   therefore return their completed ballots by mail within that timeframe before an

18   election may miss the ballot receipt deadline, again due to new mailing delays

19   resulting from the recent changes in Postal Service operations.

20       307.    These delays threaten to disenfranchise a significant number of

21   Wisconsin voters. Given the COVID-19 crisis, Wisconsin election officials have

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

102

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

been encouraging absentee voting for the November 2020 general election—around 2 million absentee votes by mail are expected. But those Wisconsin voters now face substantial uncertainty about the integrity of Postal Service operations and whether they can rely on the Postal Service to deliver their ballots in a timely manner.

308.    Already in Wisconsin's April 2020 elections, around 81,000 ballots were received after Election Day, before the recent Postal Service operational changes took effect. Given the projected increase in absentee voting by mail in the November 2020 general election, it is likely that the recent degradations in Postal Service operations would again lead to large numbers of untimely ballots.

## V.    CAUSES OF ACTION

### CLAIM I

### Writ of Mandamus

309.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

310.    The USPS has a non-discretionary duty to seek an advisory opinion from the Postal Regulatory Commission "prior to" implementing any "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b) ("When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

103

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    basis, it shall submit a proposal, within a reasonable time prior to the effective

2    date of such proposal, to the Postal Regulatory Commission requesting an

3    advisory opinion on the change.").

4        311.   Defendants' recent "transformative" changes have created a

5    "change in the nature of postal services . . . nationwide" by significantly slowing

6    mail delivery. *See Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 262–63 (5th Cir.

7    1975) (holding that there is a "change in the nature of postal services" under 39

8    U.S.C. § 3661(b) when "the manner in which postal services available to the user

9    will be altered").

10       312.   Defendants have failed to perform their non-discretionary duty to

11   seek an advisory opinion from the Postal Regulatory Commission "prior to"

12   implementing these "transformative" changes.

13       313.   As a result of Defendants' failure to perform this mandatory duty,

14   the States have been deprived of their statutory right to notice and comment on

15   USPS' nationwide service changes. *See* 39 U.S.C. § 3661(c) ("The Commission

16   shall not issue its opinion on any proposal until an opportunity for hearing on the

17   record under [the APA] has been accorded to the Postal Service, **users of the**

18   **mail**, and an officer of the Commission who shall be required to represent the

19   interests of the general public.") (emphasis added). This injury is particularly

20   grave here because the "transformative" changes appear specifically aimed at

21

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

104

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    interfering with the States' ability to reliably use the USPS in conducting the

2    upcoming November 3, 2020 election.

3    314.    Absent mandamus, the States will have no adequate remedy for

4    Defendants' failure to comply with 39 U.S.C. § 3661. While a litigant could

5    ordinarily seek review of the USPS' failure to comply with 39 U.S.C. § 3661 by

6    filing a complaint with the Postal Regulatory Commission, the Postal Regulatory

7    Commission cannot act quickly enough to alleviate the States' election-related

8    and other harms. As a result, the States will suffer irreparable harm absent

9    mandamus.

10    315.    For these reasons, the States are entitled to a writ of mandamus

11    under 28 U.S.C. § 1361 directing Defendants to "submit a proposal . . . to

12    the Postal Regulatory Commission requesting an advisory opinion on the"

13    "transformative" changes and enjoining Defendants from implementing these

14    changes pending receipt of the requested advisory opinion.

15    ## CLAIM II

16    ### *Ultra Vires* Agency Action

17    316.    Plaintiffs reallege the foregoing allegations as if fully set forth

18    herein.

19    317.    In the alternative to mandamus relief, Defendants' "transformative"

20    changes should be declared unlawful and enjoined because they are *ultra vires*.

21

22

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

105

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

318.    Under 39 U.S.C. § 3661, the USPS has authority to adopt service changes with the advice of the Postal Regulatory Commission, and subject to the public's opportunity to comment on the proposed changes.

319.    In ignoring 39 U.S.C. § 3661 and enacting national service changes without following the clear terms of the statute, Defendants are acting *ultra vires*.

320.    For these reasons, the States are entitled to a declaration that the "transformative" changes are unlawful, and an injunction enjoining Defendants from implementing them.

### CLAIM III

### Violation of Article I, Section 4, Clause 1

321.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

322.    Article I, section 4, clause 1 of the United States Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

323.    Article I, section 4, clause 1 of the United States Constitution gives the specific right to the States to establish the time, place, and manner of electing Senators and Representatives.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

106

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

324.   The States have done so in reliance on the consistent demonstrated ability of the Postal Service to support such elections, including mailing ballots to voters and delivering completed ballots from voters.

325.   Defendants' actions on the eve of the 2020 election—well after the States have established systems for voting using the Postal Service—to no longer support the manner chosen by the States interferes with the States' constitutional right to set the "Times, Places, and Manner of holding Elections for Senators and Representatives."

326.   Defendant's actions will irreparably harm the States' constitutional right and duty to set the time, place, and manner of the imminent November 2020 congressional election.

327.   Defendants' actions also overstep the limited role given to the Federal Government in modifying States' choices. The Constitution permits only Congress, not the Executive Branch, from modifying States' choices.

328.   Defendants' actions thus violate the States' rights to prescribe "the Time, Places and Manner of holding Elections for Senators and Representatives" guaranteed by Article I, Section 4, Clause 1 of the United States Constitution.

## CLAIM IV

### Violation of Article II, Section 1

329.   Plaintiffs reallege the foregoing allegations as if fully set forth herein.

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

107

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

330.    Article II, Section 1 of the United States Constitution provides that "Each state shall appoint, in such manner as the Legislature thereof may direct, a number of electors, equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress." The Twelfth Amendment to the United States Constitution provides, in relevant, that "The Electors shall meet in their respective states and vote by ballot for President and Vice-President."

331.    All 50 States vest the right to vote for President in their people and appoint their presidential electors based on the results of popular elections.

332.    The United States Constitution does not allow the federal government to interfere with the manner in which States appoint presidential electors.

333.    Defendants' actions impermissibly interfere with the Plaintiff States' right to appoint presidential electors "in such manner" as their Legislatures direct.

334.    Because the 2020 election in November will occur before state legislatures can modify their election systems developed in reliance on the Postal Service's prior conduct, Defendants' actions will cause irreparable harm to the States' constitutional obligation to regulate the appointment of their presidential electors.

335.    Defendants' actions violate Article II, Section 1 of the United States Constitution and the Twelfth Amendment of the United States Constitution.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

108

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**CLAIM V**

**Violation of the Tenth Amendment**

336.   Plaintiffs reallege the foregoing allegations as if fully set forth herein.

337.   The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Through this amendment, the Framers intended the States to "keep for themselves. . . the power to regulate elections." *Gregory v. Ashcroft*, 501 U.S. 452, 461-62 (1991).

338.   Defendants' actions—well after the States have established systems for voting using the Postal Service—to interfere with the manner chosen by the States to elect state officers deprives the States of their constitutional rights to regulate state elections and determine the manner in which state officers will be chosen. Defendants' actions thus impermissibly interfere with the reserved authority of States and thereby violate the Tenth Amendment.

339.   Defendants' actions will cause imminent, irreparable harm to the States' ability to regulate state and local elections for officers and ballot initiatives, including proposed constitutional amendments.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

109

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

## CLAIM VI

### Violation of the Constitutional Right to Vote

340.   Plaintiffs reallege the foregoing allegations as if fully set forth herein.

341.   The United States Constitution guarantees that "all qualified voters have a constitutionally protected right to vote . . . and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

342.   This right arises from multiple constitutional provisions, including (1) Article I, section 2, clause 1, which provides that members of the United States House of Representatives are "chosen . . . by the People of the several States"; (2) Article IV, section 2, clause 1, which provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States," and, therefore, the right to vote for national officers is a right and privilege of national citizenship that is protected by Article IV, section 2, clause 1; and (3) the Seventeenth Amendment which provides that United States Senators are "elected by the People of" each State.

343.   Defendants' actions interfere with the ability of residents of the Plaintiff States to timely receive and return voter registration forms and ballots and have their votes counted, thereby burdening the right to vote of residents of the Plaintiff States.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

110

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

344.   Defendants' actions also interfere with the States' constitutional interests in choosing the method of electing national officers that respects this constitutional right to vote. The States have an interest in conducting elections, under their Constitutional authority, that honor this constitutional right of their residents. In addition, States have selected methods for state elections that frequently follow the procedures used for selecting national offices, which would be similarly interfered with by Defendants and the States have an interest in the state elections allowing for their residents to exercise their right to vote. These state interests are separate and in addition to their residents' interests in their constitutional right to vote.

345.   Defendants' actions are not supported by any interest that justifies this serious burden on the right to vote.

346.   Defendants' actions thus violate the right to vote guaranteed by the United States Constitution and the States' interest in having elections that respect that right to vote.

## CLAIM VII

### Violation of the Fifth Amendment – Equal Protection

347.   Plaintiffs reallege the foregoing allegations as if fully set forth herein.

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

111

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

348.    The Due Process Clause of the Fifth Amendment guarantees qualified voters a substantive right to participate equally with other qualified voters in the electoral process.

349.    Defendants' actions interfere with the ability of residents of the States to timely receive and return voter registration forms and ballots and have their votes for United States Representatives, United States Senators, and Presidential Electors counted. Defendants are prohibited from arbitrarily imposing disparate treatment on similarly situated voters.

350.    Defendants' actions burden the right of qualified voters in the States to cast their ballots effectively.

351.    Defendants' actions are not supported by any interest that justifies the serious burden on the right of qualified voters to cast their ballots effectively.

352.    Defendants are thus depriving qualified voters of equal protection under the law secured to them by the Fifth Amendment.

## CLAIM VIII

### Violation of the Rehabilitation Act

353.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

354.    Section 504 of the Rehabilitation Act provides that individuals with disabilities shall not be "excluded from the participation in, be denied the benefits

COMPLAINT FOR DECLARATORY JUDGMENT, MANDAMUS, AND INJUNCTIVE RELIEF

112

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

of, or be subjected to discrimination under any program or activity . . . conducted by . . . the United States Postal Service." 29 U.S.C. § 794(a).

355. Many of the States' residents with disabilities rely on the United States Postal Service for receiving important, life-saving medications through the mail; casting mail-in ballots to participate in national, state, and local elections; and conducting other important, time-sensitive activities that may otherwise be prohibitively difficult because of their conditions.

356. Defendants' actions impermissibly interfere with the rights of the States' residents with disabilities to be free from discrimination under Section 504 of the Rehabilitation Act.

357. Defendants' actions impermissibly interfere with the rights of the States' residents with disabilities to receive the benefits of and participate meaningfully in the programs and services of the United States Postal Service.

358. Defendants' actions will have a disparate impact on individuals with disabilities, severely imperiling their ability to receive critical, life-saving medications through the mail, participate in elections, and conduct other important, time-sensitive activities.

359. Defendants' actions violate Section 504 of the Rehabilitation Act.

## VI.   PRAYER FOR RELIEF

WHEREFORE, the Plaintiff States request that the Court enter a judgment against Defendants and award the following relief:

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

113

1    A declaration that USPS has violated the procedural requirements of 39 U.S.C. § 3661 by making a change or changes "in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" absent a request for a Postal Regulatory Commission advisory opinion and the public hearing that must precede the issuance of such an advisory opinion;

2.    A writ of mandamus to compel USPS to submit a proposal requesting an advisory opinion on any "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" prior to the implementation of any such change;

3.    An injunction prohibiting Defendants from implementing any of the operational changes, distribution center closures, removal of mail sorting machines, or any other "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" prior to its receipt of an appropriate advisory opinion from the Postal Regulatory Commission; and requiring Defendants to rescind any such changes implemented in the absence of an appropriate advisory opinion so as to restore the status quo before their illegal actions;

4.    Vacatur of the operational changes, distribution center closures, removal of mail sorting machines, and policy changes affecting mail delivery;

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

114

1    5.    Award the Plaintiff States their costs and reasonable attorneys' fees;

2  and

3    6.    Award such additional relief as the interests of justice may require.

4  DATED this 18th day of August, 2020.

5                                        ROBERT W. FERGUSON
                                         Attorney General
6
                                         */s/ Noah Guzzo Purcell*
7                                        NOAH GUZZO PURCELL, WSBA #43492
                                             *Solicitor General*
8                                        NATHAN K. BAYS, WSBA #43025
                                         KRISTIN BENESKI, WSBA #45478
9                                        ANDREW R.W. HUGHES, WSBA #49515
                                         CRISTINA SEPE, WSBA #53609
10                                           *(application for admission forthcoming)*
                                             *Assistant Attorneys General*
11

12                                       EMMA GRUNBERG, WSBA #54659
                                         TERA M. HEINTZ, WSBA #54921
13                                           *(application for admission forthcoming)*
                                         KARL D. SMITH, WSBA #41988
14                                           *(application for admission forthcoming)*
                                             *Deputy Solicitors General*
15                                       800 Fifth Avenue, Suite 2000
                                         Seattle, WA  98104
16                                       (206) 464-7744
                                         noah.purcell@atg.wa.gov
17                                       nathan.bays@atg.wa.gov
                                         kristin.beneski@atg.wa.gov
18                                       andrew.hughes@atg.wa.gov
                                         cristina.sepe@atg.wa.gov
19                                       emma.grunberg@atg.wa.gov
                                         tera.heintz@atg.wa.gov
20                                       karl.smith@atg.wa.gov
                                         *Attorneys for Plaintiff State of Washington*
21

22

COMPLAINT FOR DECLARATORY              115        ATTORNEY GENERAL OF WASHINGTON
JUDGMENT, MANDAMUS, AND                                 Complex Litigation Division
INJUNCTIVE RELIEF                                      800 5th Avenue, Suite 2000
                                                        Seattle, WA  98104-3188
                                                            (206) 464-7744

1

2

PHIL WEISER
Attorney General of Colorado

3

*/s/ Eric R. Olson*
ERIC R. OLSON, CO #36414
Solicitor General

4

Office of the Attorney General
Colorado Department of Law

5

1300 Broadway, 10th Floor
Denver, CO 80203

6

(720) 508 6548
Eric.Olson@coag.gov

7

    *Attorneys for Plaintiff the State of*
    *Colorado*

8

9

WILLIAM TONG
Attorney General
State of Connecticut

10

11

*s/ Joshua Perry*
JOSHUA PERRY

12

Special Counsel for Civil Rights
Office of the Attorney General

13

165 Capitol Avenue
Hartford, CT  06106

14

(860) 808-5372
joshua.perry@ct.gov

15

    *Attorney for Plaintiff Connecticut*

16

17

KWAME RAOUL
Attorney General State of Illinois

18

*s/ Christopher G. Wells*

19

CHRISTOPHER G. WELLS*
(ARDC #6304265)

20

Chief, Public Interest Division
Office of the Illinois Attorney General

21

100 West Randolph Street, 12th Floor
Chicago, IL  60601

22

(312) 814-1134

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTION RELIEF

116

cwells@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

BRIAN E. FROSH
Attorney General of Maryland

*s/  Steven M. Sullivan*
STEVEN M. SULLIVAN
*Solicitor General*
JEFFREY P. DUNLAP
*Assistant Attorney General*
200 St. Paul Place
Baltimore, MD 21202
T: (410) 576-7906
F: (410) 576-6955
jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

DANA NESSEL
Michigan Attorney General

*s/ Christina Grossi*
CHRISTINA GROSSI (P67482)
Chief of Operations
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48933
*Attorney for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota
JOHN KELLER
Chief Deputy Attorney General
JAMES W. CANADAY (*pro hac vice forthcoming*)
Deputy Attorney General

*s/ Angela Behrens*
ANGELA BEHRENS

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

117

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

(*pro hac vice forthcoming*)
NATHAN J. HARTSHORN
(*pro hac vice forthcoming*)
STEPHEN D. MELCHIONNE
(*pro hac vice forthcoming*)
Assistant Attorneys General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
(651) 757-1204 (Voice)
angela.behrens@ag.state.mn.us
nathan.hartshorn@ag.state.mn.us
stephen.melchionne@ag.state.mn.us

Attorneys for Plaintiff State of Minnesota


AARON D. FORD
Attorney General

*s/ Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Avenue, Suite 3900
Las Vegas, NV 89101
hstern@ag.nv.gov


HECTOR BALDERAS
Attorney General

*s/ Nicholas M. Sydow*
Nicholas M. Sydow*
Civil Appellate Chief
Office of the New Mexico Attorney General
201 Third Street NW, Suite 300
Albuquerque, NM  87102
(505) 717-3571
nsydow@nmag.gov
*Attorneys for Plaintiff State of New Mexico*

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

118

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ELLEN F. ROSENBLUM
Attorney General of the State of Oregon

*s/ Michael C. Kron*
MICHAEL C. KRON
(Pro Hac forthcoming)
Special Counsel
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Phone: (971) 673-3806
michael.c.kron@doj.state.or.us
  *Attorneys for the State of Oregon*


PETER F. NERONHA
Attorney General of Rhode Island

*s/ Keith Hoffmann*
KEITH HOFFMANN
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI  02903
Tel: (401) 274-4400, Extension 1882
Fax: (401) 222-2995
khoffmann@riag.ri.gov


THOMAS J. DONOVAN, JR.
Attorney General

*s/ Eleanor Spottswood*
JOSHUA DIAMOND
Deputy Attorney General
ELEANOR SPOTTSWOOD
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-3178
joshua.diamond@vermont.gov

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

119

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

MARK R. HERRING
Attorney General of Virginia

*s/ Michelle S. Kallen*
MICHELLE S. KALLEN
CAROL L. LEWIS
Office of the Attorney General
202 North Ninth Street
Richmond, VA  23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
mkallen@oag.state.va.us
   *Attorneys for Plaintiff Commonwealth of*
   *Virginia*


JOSHUA L. KAUL
*Attorney General of Wisconsin*

*s/ Colin T. Roth*
COLIN T. ROTH, #1103985*
*Assistant Attorney General*
Wisconsin Department of Justice
P. O. Box 7857
Madison, WI  53707-7857
(608) 264-6219
rothct@doj.state.wi.us
*Attorneys for State of Wisconsin*
(*Pro hac vice motion pending)

COMPLAINT FOR DECLARATORY
JUDGMENT, MANDAMUS, AND
INJUNCTIVE RELIEF

120