1

2

PETER S. HOLMES (WSBA #15787)
Seattle City Attorney

The Honorable Stanley A. Bastian

3

By: Ghazal Sharifi (WSBA #47750)
Assistant City Attorney

4

Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050

5

Seattle, WA 98104-7095
Phone: 206-684-8217

6

ghazal.sharifi@seattle.gov

7

*Attorneys for Amicus Curiae City of
Seattle*

8

9

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

10

**AT YAKIMA**

11

12

STATE OF WASHINGTON, et al.,

No. 1:20-cv-03127-SAB

13

Plaintiffs,

[PROPOSED] AMICI CURIAE
BRIEF OF THE COUNTY OF

14

v.

SANTA CLARA, THE CITY OF
COLUMBUS, AND THIRTY-

15

DONALD J. TRUMP, *in his official capacity
as President of the United States,* et al.,

EIGHT LOCAL AND TRIBAL
GOVERNMENTS

16

Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

1

# **TABLE OF CONTENTS**

2

Page

TABLE OF AUTHORITIES ....................................................................................4

STATEMENT OF INTEREST ...............................................................................7

SUMMARY OF ARGUMENT ...............................................................................9

ARGUMENT ...........................................................................................................10

I.    USPS CHANGES HARM *AMICI*'S ABILITY TO ADMINISTER AND FACILITATE THE NOVEMBER 3, 2020 PRESIDENTIAL GENERAL ELECTION...................................................................................10

    A.    USPS Changes Impede *Amici*'s Ability to Reliably Send and Receive Critical Election Materials to Voters. ........................11

        1.    USPS Changes Impede Delivery and Receipt of Vote-By-Mail, Absentee, Replacement, Emergency, Military, and Overseas Ballots. ......................................12

        2.    USPS Changes Impede Voter Registration and List Maintenance. .................................................................15

        3.    USPS Changes Impede Voter Outreach and Education Efforts. ..........................................................................16

        4.    USPS Changes Impede Outreach to Cure Ballot Deficiencies. .................................................................17

    B.    USPS Changes Create Significant Administrative and Operational Burdens for *Amici* Administering Elections.........18

        1.    Many *Amici* Must Seek to Expand In-Person Voting Options and Resources. .................................................19

        2.    Many *Amici* Will Need to Add Official Ballot Drop Boxes, More Frequently Empty Drop Boxes, and Increase Messaging Around Drop Box Availability......20

        3.    *Amici* Must Absorb Increased Mail and Other Costs.....22

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

II.    USPS CHANGES UNDERMINE OTHER CORE LOCAL AND
       TRIBAL GOVERNMENT FUNCTIONS. ........................................... 23

       A.    USPS Delays Interfere with Timely Payments to and from
             *Amici* and Increase Administrative Burdens. ........................... 23

       B.    USPS Delays Harm *Amici*'s Enforcement Efforts. ................. 26

       C.    USPS Delays Undermine Critical Local Health Care
             Services. ...................................................................................... 27

III.   A NATIONWIDE INJUNCTION IS REQUIRED TO REDRESS
       THE HARMS CAUSED BY THE USPS CHANGES. ....................... 30

CONCLUSION .......................................................................................... 32

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

1

2

# TABLE OF AUTHORITIES

Page

3

## CASES

4

5

*Pennsylvania v. Trump*,
    351 F. Supp. 3d 791, 830-35 (E.D. Pa.)........................................................30

6

*Trump v. Int'l Refugee Assistance Project*,
    137 S. Ct. 2080, 2087 (2017) ......................................................................30

7

## FEDERAL STATUTES AND REGULATIONS

8

9

52 U.S.C. § 20507 ...........................................................................................15

10

52 U.S.C. § 21004(a)(3) ..................................................................................16

11

Fed. R. App. P. 29(a)(4)(E) ...............................................................................7

12

## STATE STATUTES AND REGULATIONS

13

10 Ill. Comp. Stat. 5/1A-17 .............................................................................16

14

10 Ill. Comp. Stat. 5/2B-15 .............................................................................16

15

10 Ill. Comp. Stat. 5/2B-20 .............................................................................18

16

10 Ill. Comp. Stat. 5/7-40(a) ...........................................................................16

17

10 Ill. Comp. Stat. 5/20-8 ................................................................................18

18

10 Ill. Comp. Stat. 5/19-8(b)-(c) ......................................................................18

19

10 Ill. Comp. Stat. 5/19-8(g-5) ........................................................................17

20

Cal. Elec. Code §§ 2225(b), (c) .......................................................................15

21

Cal. Elec. Code § 3019 ....................................................................................17

22

Cal. Elec. Code § 3020(b)(1), (d) .....................................................................18

23

Cal. Elec. Code § 4005(a)(10)(I)(i) ..................................................................16

24

Tex. Elec. Code § 18.061 .................................................................................15

25

Tex. Elec. Code § 86.006 .................................................................................22

26

Tex. Elec. Code § 87.0431(a), (b)(3) ................................................................17

27

28

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

## LOCAL AND TRIBAL ORDINANCES

Cincinnati, Ohio, Mun. Code § 1101-63 ........................................................26

Cincinnati, Ohio, Mun. Code § 1123-05 ........................................................26

Cincinnati, Ohio, Mun. Code §§ 1101-57, 1101-61, 1101-81 ......................26

Emergency Yurok Tribe Election Ordinance §§ 4003, 4203, 4401, 4502 (Aug. 11, 2020)...........................................................................................................20

## OTHER AUTHORITIES

Alexa Ura, *Texas Tells Harris County to Halt Plan to Send all Voters Applications for Mail-in Ballots*, Tex. Trib. (Aug. 28, 2020).........................................13

Alexa Ura, *Texas' Most Populous County Sending Mail-in Ballot Applications to Millions of Registered Voters*, Tex. Trib. (Aug. 25, 2020).........................13

Bethany Blankley, *Candidates, Others Sue Secretary of State over Election Law Violations*, Ctr. Square (Aug. 21, 2020) ....................................................22

Bill Bush, *Few Will Travel Far to Franklin County's Single Early-Voting Site, Analysis Finds*, Columbus Dispatch (Nov. 11, 2018)..................................21

Catherine Candisky, *Ohio Drug Overdose Deaths Back on Rise*, Columbus Dispatch (July 21, 2020) ...........................................................................29

Cherokee County, Iowa, *Military/Overseas Voting* ....................................14

Columbus, Ohio, *Access to Naloxone*..........................................................29

Cook County Government, *Cook County Health Patients Experience Major Delays in Mail Deliveries for Daily Medical Prescriptions* (Aug. 24, 2020) ..........27, 28, 29

Erin Cox et al., *Postal Service Warns 46 States Their Voters Could Be Disenfranchised by Delayed Mail-In Ballots*, Wash. Post (Aug. 14, 2020).............13

Erin Spaht, *VERIFY: No, the Post Office Did Not Triple the Cost States Pay to Mail Election Ballots*, WUSA (Aug. 13, 2020).........................................22

Jacob Bogage, *'Everyone's Clueless': Cost-Cutting Uncertainty Mires Postal Service In More Delays*, Wash. Post (Aug. 29, 2020).........................................10

Jacob Pramuk, *Fewer voters say they're voting by mail amid uproar over USPS changes, CNBC/Change Research polls find*, CNBC (Aug. 26, 2020)...................18

Jan Hoffman, *Fearing a 'Twindemic,' Health Experts Push Urgently for Flu Shots*, N.Y. Times, (Aug. 16, 2020) ........................................................................8

Letter from Thomas J. Marshall, Gen. Couns., U.S. Postal Serv., to U.S. States (July 29, 2020) ............................................................................................12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lila Carpenter, *Signature Match Laws Disproportionately Impact Voters Already on the Margins*, ACLU (Nov. 2, 2018)........................................................18

Mark Munro, *As COVID-19 Resurges, So Does the Threat to Local Budgets*, Brookings Inst. (June 2020)........................................................24

Nat'l Conf. of State Legislatures, *Voting Outside the Polling Place*, at tbl. 11 (2020)............................................13, 17

Nat'l Inst. of Health, *National institute on Drug Abuse: Opioid Summaries by State (2018)*........................................................29

Ohio Sec'y of State, *The Use of Drop Boxes and Additional Instructions for Curbside Voting* (Aug. 12, 2020)........................................................21

Press Release, Harris County Clerk, *Harris County Clerk Chris Hollins Requests Governor Abbott to Extend Deadline to Receive Mailed Ballots After Election Day* (Aug. 20, 2020)........................................................13

Samuel Stebbins & Grant Suneson, *Amid Coronavirus Pandemic, Missed Rent and Mortgage Payments Are Piling Up In Nearly Every State*, USA Today (July 2020)........................................................25

Santa Clara County, Cal., *Emergency Ballot Delivery Program*, at 3, 7 (2020)..........14

Tony Romm, *Over 700 Cash-strapped Cities Halt Plans to Repair Roads, Water Systems, or Make Other Key Investments*, Wash. Post (June 23, 2020)..................24

U.S. Ctrs. for Disease Control & Prevention, *CDC COVID Data Tracker: Trends in Number of COVID-19 Cases in the US Reported to CDC, by State/Territory*...........7

U.S. Dep't of Health & Human Servs., *Cincinnati City Health Department: Northside Health Center*........................................................29

U.S. Dep't of Just., *Uniformed and Overseas Citizens Absentee Voting Act*, (Feb. 18, 2020)........................................................14

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey: 2018 Comprehensive Report,* at i, 98 (2018)........................................................12

U.S. Postal Serv., *2020 Official Election Mail*........................................................10

U.S. Postal Serv., *State and Local Election Mail – User's Guide*, Pub. No. 632 (Jan. 2020)........................................................22

United Indian Health Servs, *UIHS COVID-19 Response*, Facebook (Apr. 2, 2020)...28

United Indian Health Servs., *Consortium Tribes*........................................................28

Zach Gespart, *Harris County OKs $17M to Add Polls, Voting Hours and Drive-Thru Balloting For November Election*, Houston Chronicle (Aug. 25, 2020).........20

1

## STATEMENT OF INTEREST

2 *Amici*, led by the County of Santa Clara and the City of Columbus,[1] are local

3 and tribal governments from across the country—representing communities large and

4 small, rural and urban. *Amici* rely on the United States Postal Service ("USPS" or

5 "Postal Service") as the operational backbone of many essential government

6 functions. Through the mail, *amici* administer elections, issue notices of violations of

7 local ordinances, send pension checks, deliver medication, and provide diagnostic

8 medical testing results—many of which are time-sensitive, time-bound, or otherwise

9 require immediate attention.

10 *Amici*'s dependence on reliable Postal Service mail delivery has taken on even

11 greater significance over the past six months due to the outbreak of the COVID-19

12 pandemic across the United States.[2] With many government offices closed, in-person

13 staffing significantly reduced, and residents encouraged to limit in-person contacts

14 with people outside of their households, much of the business of government is

15 conducted online, over the phone, and increasingly, through the mail. For some

16 segments of the population, whether because of lack of familiarity with or access to

17 the internet, the mail is the easiest way to apply for benefits, pay tickets and utility

18

_____

19 [1] *Amici* declare that: (i) none of the parties nor their counsel prepared this brief in

20 whole or in part; (ii) no party or party's counsel contributed money that was intended

21 to fund the preparation or submission of the brief; and (iii) no person or entity

22 contributed money that was intended to fund the preparation or submission of the

23 brief. Fed. R. App. P. 29(a)(4)(E).

24 [2] As of September 10, 2020, more than 6.3 million people have contracted COVID-19

25 and over 190,000 COVID-19-related deaths have been reported in the United States.

26 U.S. Ctrs. for Disease Control & Prevention, *CDC COVID Data Tracker: Trends in*

27 *Number of COVID-19 Cases in the US Reported to CDC, by State/Territory*,

28 https://perma.cc/3ANU-MY28.

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

1   bills, or obtain additional services from their local or tribal government. The COVID-
2   19-induced public health and economic crises have increased residents' reliance on
3   their local and tribal governments, including for the receipt of rental assistance and
4   health care.

5       *Amici* also rely on the Postal Service to administer and facilitate federal, state,
6   and local elections. Some *amici* run elections operations directly, setting up polling
7   locations and counting mail-in or absentee ballots. Others facilitate local elections,
8   protect public safety at polling locations, and engage their communities through
9   registration drives, voter outreach, and other efforts to ensure that residents fulfill their
10  civic duty to vote. All *amici* are more dependent on the efficient and reliable delivery
11  of election-related mail this year due to public health concerns. Public health experts
12  warn of a new surge of COVID-19 in the fall and winter, which may be aggravated by
13  a severe flu season.[3] To mitigate the health risks associated with interactions outside
14  of the home such as voting in person, some *amici* are mailing ballots to all eligible
15  voters, while others are encouraging voters—especially those with health risks or who
16  are living with vulnerable family members—to use mail-in options to cast their
17  ballots. All *amici* have a vested interest in ensuring that elections are run effectively
18  and fairly, protecting the fundamental rights of their constituents, and fulfilling their
19  statutory obligations to run and support elections while complying with public health
20  orders and recommendations.

21      But now, a series of changes enacted by the recently appointed Postmaster
22  General Louis DeJoy has undermined *amici*'s ability to use the mail. By slowing mail
23  delivery and reducing the availability of mail services in certain areas, these changes
24  hamper *amici*'s ability to execute their core governmental functions at a time when
25
26

27  [3] Jan Hoffman, *Fearing a 'Twindemic,' Health Experts Push Urgently for Flu Shots*,
28  N.Y. Times, (Aug. 16, 2020), https://perma.cc/ZUY3-V4TL.

1 communities need services more than ever. *Amici* submit this brief to highlight the
2 urgent harms that *amici* face.

3 <center>**SUMMARY OF ARGUMENT**</center>

4       For *amici*—a broad group of local and tribal governments—reliable and
5 efficient mail services are essential to the administration of core local government
6 functions. That reliance is even more acute today because of the COVID-19
7 pandemic.

8       The changes to Postal Service policies will irreparably harm *amici's* ability to
9 administer and facilitate the November General Election. *Amici* rely on the Postal
10 Service at nearly every point in the election administration process—to maintain voter
11 rolls, register voters, conduct voter outreach and education, provide ballots, and
12 receive completed ballots. The uncertainty and delays caused by the USPS policy
13 changes now jeopardize these critical functions. The changes have undermined public
14 confidence in voting by mail at a time when public health risks weigh strongly against
15 unnecessary interactions outside of the home such as voting in person. The changes
16 also have increased the administrative burdens on *amici* to rapidly set up additional
17 ways for voters to exercise their constitutional right to vote.

18       Further, the changes interfere with *amici*'s other essential government functions
19 such as collecting fees and taxes, sending pension payments, and enforcing local
20 ordinances. *Amici* also depend on reliable Postal Service mail to provide critical health
21 care services such as prescription refills, contact tracing, sexually-transmitted
22 infection testing, and opioid overdose prevention. Without these services, patients are
23 at risk for complications that could lead to emergency room visits and hospitalizations
24 at a time when individuals are encouraged to stay home. In many instances, a delay of
25 even a day can lead to irreparable harm—for *amici*, in fulfilling statutory obligations
26 and ensuring efficient service delivery, and for their constituents, an elderly voter's
27 ballot may not be counted, a retiree may not be able to pay rent, or a patient may not

28

<center>9</center>

1  receive life-saving medication. For these reasons, *amici* urge this Court to grant

2  Plaintiffs' motion seeking preliminary relief.

3                              **ARGUMENT**

4  **I.   USPS CHANGES HARM *AMICI*'S ABILITY TO ADMINISTER AND**

5  **FACILITATE THE NOVEMBER 3, 2020 PRESIDENTIAL GENERAL ELECTION.**

6       *Amici* and their voting constituents rely on the Postal Service to conduct free

7  and fair elections. Especially for the *amici* that are responsible for election

8  administration, their reliance became even more pronounced in recent months as they

9  planned for greater voting by mail in response to public health concerns surrounding

10 in-person contact during the pandemic.[4] However, those plans were thrown into

11 question starting in early July 2020, when newly appointed Postmaster General Louis

12 DeJoy instituted significant changes to USPS policies and operations. These changes

13 included restricting operating hours and extra delivery trips, delaying mail processing

14 and sorting, and no longer treating election mail as First Class mail no matter its

15 classification.[5] The resulting degradation of USPS operations and mail delivery speed

16 (1) impedes *amici*'s ability to reliably send and receive critical election materials to

17 voters and (2) creates significant administrative and operational burdens for *amici*,

18

19

_____

20 [4] The Postal Service also anticipates increased vote by mail in the General Election.

21 *See, e.g.*, U.S. Postal Serv., *2020 Official Election Mail*, https://perma.cc/6DXC-UZ96

22 (noting its creation of an official mail kit "in preparation for increasing Official

23 Election Mail volume during the 2020 election season").

24 [5] On August 18, 2020, Postmaster DeJoy issued a statement "suspending" some of the

25 changes, at least temporarily, but his statement did not reverse the confusion and

26 harms already caused to USPS operations and *amici*. *See, e.g.*, Jacob Bogage,

27 *'Everyone's Clueless': Cost-Cutting Uncertainty Mires Postal Service In More*

28 *Delays*, Wash. Post (Aug. 29, 2020), https://perma.cc/8FMC-XDHQ.

1  which must now augment their non-mail voting options and related messaging less

2  than two months before the General Election.

3  **A. USPS Changes Impede *Amici*'s Ability to Reliably Send and Receive**

4  **Critical Election Materials to Voters.**

5       The changes to Postal Service operations and policies hinder *amici*'s ability to

6  disseminate and receive core election information and materials, as required by federal

7  and state law. Specifically, the USPS changes impede *amici*'s ability to: (1) send and

8  receive requests for vote-by-mail, absentee, replacement, emergency, military, and

9  overseas ballots; (2) regularly update and maintain voter registration rolls; (3) conduct

10 voter outreach and education, including distribution of voter information guides; and

11 (4) enable voters to timely address vote-by-mail ballot deficiencies.

12      These concerns about mail efficiency and reliability are not mere speculation.

13 On August 6, 2020, for example, a candidate for office in Santa Clara County

14 contacted the County's Registrar of Voters to update the candidate's statement of

15 qualifications and inform the County that the candidate would send the requisite

16 payment using USPS overnight guaranteed delivery. Six days later, the Postal Service

17 sent the candidate a notice indicating it was unable to locate delivery information for

18 the envelope carrying the check, which the County had not received. Not until August

19 14, 2020, long after the filing deadline, did the Postal Service locate and deliver the

20 envelope. Had the candidate not acted swiftly to find an alternate payment method,

21 due to the Postal Service delays, the candidate likely would have been unable to have

22 the statement included in the county voter information guide.

23      The Postal Service has acknowledged this new reality. In letters to forty-six

24 states and the District of Columbia, the Postal Service stated that its newly instituted

25 operational delays will slow election-related mail, even indicating that some ballots

26 requested close to state deadlines are unlikely to arrive in time to be counted.[6] As

27

28  ---
    [6] *See* Letter from Thomas J. Marshall, Gen. Couns., U.S. Postal Serv., to U.S. States

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

detailed below, similar delays now imperil *amici*'s election administration and facilitation plans a mere two months before the General Election.

**1. USPS Changes Impede Delivery and Receipt of Vote-By-Mail, Absentee, Replacement, Emergency, Military, and Overseas Ballots.**

The mail is a critical way by which voters receive and return their ballots. Whether a voter is using a vote-by-mail, absentee, replacement, or emergency ballot, or is a military or overseas voter, many citizens rely upon the mail to exercise their fundamental right to vote. More than a quarter of the 120 million Americans who cast ballots in the 2018 General Election did so by mail, and Postal Service mail was the most common method of ballot return.[7] In Santa Clara County more than 950,000 voters received ballots in the mail in the March primary—and 87% of those who voted used mail-in ballots to cast their votes. In Chicago, Illinois, vote-by-mail is on the rise, jumping from around 4% of ballots cast in the 2000-2012 presidential elections to more than 20% in the March 2020 primary, with further increases expected in the 2020 General Election. In surrounding suburban Cook County, Illinois, the County Clerk's Office already has received more than 176,800 vote-by-mail applications for the upcoming General Election—more than double the total number of mail ballots cast in the 2016 General Election. Harris County, Texas, experienced a more than 550% increase in vote-by-mail use between the 2016 and 2020 presidential primary run-offs and expects even larger numbers in the November General Election due, in part, to plans to mail ballot applications to all 2.4 million registered voters.[8] And in

(July 29, 2020), https://perma.cc/E34C-7YXG.

[7] U.S. Election Assistance Comm'n, *Election Administration and Voting Survey: 2018 Comprehensive Report,* at i, 98 (2018), https://perma.cc/8UGH-98UJ. Ballots may also be returned at polling locations and ballot drop boxes, depending on local and state regulations and policies.

[8] Press Release, Harris County Clerk, *Harris County Clerk Chris Hollins Requests*

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

1  Los Angeles County, all registered voters will receive vote-by-mail ballots, meaning

2  that approximately 5.5 million votes could be cast by mail.

3       The efficient delivery of these ballots is critical for voters to receive, complete,

4  and mail their ballots back to *amici* in time for their votes to be counted—as the Postal

5  Service itself acknowledged.[9] This is particularly true in the vast majority of states

6  where ballots, postmarked on or before Election Day, must also be received by

7  Election Day or shortly thereafter.[10] It is also disproportionately true for elderly

8  voters, who are more likely to vote by mail, particularly given their increased

9  vulnerability to COVID-19. For example, in the March 2020 primary, 93.5% of Santa

10  Clara County voters who were 65 and older used mail-in ballots, compared to around

11  70-80% of younger voters.

12       Mail delays are especially harmful to the emergency ballot delivery program in

13  Santa Clara County and similar programs administered by other *amici*. The program is

14  used by facilities that house voters who are hospitalized, incarcerated, or disabled and

15

16  *Governor Abbott to Extend Deadline to Receive Mailed Ballots After Election Day*

17  (Aug. 20, 2020), https://perma.cc/Y58Z-MEW9; Alexa Ura, *Texas' Most Populous*

18  *County Sending Mail-in Ballot Applications to Millions of Registered Voters*, Tex.

19  Trib. (Aug. 25, 2020), https://perma.cc/8NSK-LZBX. Whether all 2.4 million

20  applications for ballots ultimately will be sent to Harris County voters is being

21  contested by the Texas Secretary of State. Alexa Ura, *Texas Tells Harris County to*

22  *Halt Plan to Send all Voters Applications for Mail-in Ballots*, Tex. Trib. (Aug. 28,

23  2020), https://perma.cc/HH8U-THUD.

24  [9] *See* Erin Cox et al., *Postal Service Warns 46 States Their Voters Could Be*

25  *Disenfranchised by Delayed Mail-In Ballots*, Wash. Post (Aug. 14, 2020),

26  https://perma.cc/5CAW-YWR4.

27  [10] *See* Nat'l Conf. of State Legislatures, *Voting Outside the Polling Place*, at tbl. 11

28  (2020), https://perma.cc/SJ9E-CLPW.

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

unable to retrieve their ballots themselves or to vote in person, allowing them to request a replacement vote-by-mail ballot. The program has particularly high uptake with senior living facilities, assisted living centers, residential care facilities, and behavioral health care facilities. If a facility requests to participate in the program, the County's Registrar of Voters allows voters to request a ballot to be mailed to them up until seven days before Election Day.[11] But given the proximity of these requests to Election Day, mail delays of even one or two days could mean that ballots are not sent to voters or received by the County's Registrar of Voters in time to be counted.

Uniformed and overseas voters are also acutely impacted. To receive a ballot, these voters must complete a request form, which is typically sent by Postal Service mail.[12] In turn, *amici* must mail, fax, or email the ballot to the military or overseas voter. Once complete, most of these voters must return their ballots by mail, now risking that their ballots will not be received by *amici* in time to be counted.[13] Moreover, some *amici* have strict time limits within which to mail military and overseas ballots, which increases this risk. In Los Angeles County, for example, the Registrar must mail these ballots between September 4 and September 19; as a result,

---

[11] *See, e.g.*, Santa Clara County, Cal., *Emergency Ballot Delivery Program*, at 3, 7 (2020), https://perma.cc/P6RG-5CU2. If the ballot is requested within six days of the election, the County will arrange for ballots to be hand-delivered to, or picked up by, the facility. But even then, the voters may be reliant on USPS to return their completed ballots.

[12] *See generally* U.S. Dep't of Just., *Uniformed and Overseas Citizens Absentee Voting Act*, (Feb. 18, 2020), https://perma.cc/SF3F-5XAE.

[13] *See, e.g.*, Cherokee County, Iowa, *Military/Overseas Voting*, https://perma.cc/5K3U-ASBJ. Further, in Santa Clara County, even where these voters had the option of returning their ballots by fax, 80% of military and overseas voters in the March 2020 election elected to return their ballots by mail.

14

1    delays in delivering or returning mailed ballots could result in disenfranchisement.

2              **2.  USPS Changes Impede Voter Registration and List Maintenance.**

3              Efficient and reliable mail is critical for *amici* that directly administer elections.

4    The mail is the primary method for voters to update their voter registration and for

5    elections officials to confirm address changes and update their voter rolls, as required

6    under federal and state law.[14] For example, in Santa Clara County, in the last five

7    months alone, almost 31,000 new voters registered to vote, more than 8,000 of whom

8    completed their registrations by paper affidavit and returned them using Postal Service

9    mail.

10             In addition, most residency confirmation required by federal and state law is

11   conducted by sending out postcard mailers. When an elections official receives

12   information indicating possible voter address changes, the official sends postcards by

13   mail to the address at which the voter is registered.[15] If the postcard is undeliverable,

14   the voter will not receive a vote-by-mail ballot unless they contact the elections

15   official—often by mail—to update or confirm their address. This process is critical to

16   ensuring that voter registration rolls are up to date—*i.e.*, that active voters receive

17   their voting materials and that these materials are not erroneously sent to voters who

18   have moved or are deceased, thereby reducing the likelihood of voter fraud. In Santa

19   Clara County, at least a few hundred postcards have been marked as undeliverable.

20   But due to Postal Service delays, the County now may not receive those address

21   corrections in time to send ballots to these voters and have them returned in time to be

22   counted.

23

24   [14] *See* 52 U.S.C. § 20507; 10 Ill. Comp. Stat. 5/1A-25 (requiring Illinois to create and

25   maintain a centralized statewide voter registration list); Tex. Elec. Code § 18.061

26   (requiring Texas to implement and maintain a statewide computerized voter

27   registration list).

28   [15] *See, e.g.*, Cal. Elec. Code §§ 2225(b), (c).

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

### 3. <u>USPS Changes Impede Voter Outreach and Education Efforts.</u>

Voter education and outreach is another critical aspect of *amici*'s election administration and facilitation efforts. It is also core to the mission of many *amici*'s elections departments. In many jurisdictions, significant outreach beyond the basic requirements of the Help America Vote Act is statutorily required.[16] Moreover, *amici* must mail out voter information guides and other voter education material to ensure that voters have essential information in advance of the election—including how to change mailing addresses to receive vote-by-mail ballots. This outreach and messaging may need to be augmented and retooled to address concerns about voting by mail, requiring *amici* to make additional expenditures. In Santa Clara County, for example, because of uncertainty caused by the USPS changes, the Registrar of Voters altered its outreach messaging to further emphasize that vote-by-mail ballots can be dropped off at official ballot drop boxes and at polling locations as an alternative to returning ballots through the mail.[17] And in response to voter concerns about the Postal Service, the City of Madison plans to have poll workers available in 206 city parks on Saturday, September 26, and on Saturday, October 3, 2020. Voters may drop

---

[16] 52 U.S.C. § 21004(a)(3) (requiring state programs for voter education); *see, e.g.*, Cal. Elec. Code § 4005(a)(10)(I)(i) (same); 10 Ill. Comp. Stat. 5/1A-17 (requiring state departments and public institutes of higher learning to make voter registration information available); *id.* 5/7-40(a) (regulating ballot boxes, which allow voters to vote via drop box instead of in-person or by mail); *id.* 5/2B-15 (requiring Illinois election authorities, in light of COVID-19, to automatically send vote by mail applications to any person who voted by mail or in person in a 2018, 2019, or 2020 primary election, as well as to any person who registered to vote or changed their registration address between Illinois' 2020 primary election and July 31, 2020).

[17] Marin County has recommended that, in addition to these alternatives, voters return vote-by-mail ballots at least seven days before Election Day.

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

off their absentee ballot with a poll worker, who will also be available to serve as a witness, if needed. The City estimates that this initiative will cost around $106,000.

### 4. USPS Changes Impede Outreach to Cure Ballot Deficiencies.

USPS delays and uncertainty also impede voter outreach by certain *amici* to cure ballot deficiencies, as permitted by state law. Nineteen states have a process for voters to correct errors on their mailed-in ballot, such as a missing signature or signature that does not match voter registration records. However, most of these states have extremely short timeframes for elections officials to notify voters of the error and for the voter to correct it, all of which is predominantly done by Postal Service mail.[18] For example, in California, when elections officials find a missing signature or mismatch between the signature on file and the signature on the ballot, they mail a statement to the voter explaining how the ballot error can be cured.[19] The voter must send back the requisite information, arriving no later than two days before certification of the election, or return the form in-person by the deadline, for the ballot to be counted. Postal Service delays mean these voters may not have time to cure their ballots and have them counted, absent hand-delivering them during a pandemic.[20]

---

[18] Nat'l Conf. of State Legislatures, *supra* note 10.

[19] *See* Cal. Elec. Code § 3019 (requiring elections officials in California to provide notice to all voters with mismatching signatures on vote-by-mail ballots an opportunity to verify their signatures). In Santa Clara County, the County's Registrar of Voters received around 1,500 of these signature verification forms by USPS mail in the March 2020 primary. *See also* 10 Ill. Comp. Stat. 5/19-8(g-5) (requiring the election authority in Illinois to send notice by mail of the rejection of a vote-by-mail ballot and allowing up to fourteen days after the election for the voter to cure); Tex. Elec. Code § 87.0431(a), (b)(3) (requiring notice of signature mismatch, but no opportunity to cure).

[20] This concern is heightened in California, where the state proactively extended

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

1  Moreover, in previous elections, older voters, especially voters with disabilities, may

2  have had their ballots disproportionately rejected due to signature mismatches. These

3  voters therefore may be more likely to need to use the signature cure process, and thus

4  especially harmed by USPS delays.[21]

5  **B. USPS Changes Create Significant Administrative and Operational**
   **Burdens for *Amici* Administering Elections.**

6

7  The USPS changes have rattled the public's confidence in using the Postal

8  Service for election-related services.[22] As a result, more voters are likely to opt for in-

9  person voting, despite the COVID-19 pandemic, or to seek out ballot boxes. Yet at the

10  same time, far more voters are receiving ballots by mail than in any prior election. As

11  a result, *amici* will need to augment their plans for in-person voting, mail-in voting,

12

13

---

14  statutory deadlines for receipt of ballots by mail, allowing them to be counted if

15  postmarked on or before Election Day and received by seventeen days after Election

16  Day. Cal. Elec. Code § 3020(b)(1), (d); *see also* 10 Ill. Comp. Stat. 5/19-8(b)-(c)

17  (requiring that mail-in votes postmarked no later than Election Day to counted).

18  However, the cure period was not also extended in Illinois, which means that voters

19  have an even shorter period to verify their signature. *Compare* Cal. Elec. Code § 3019

20  with Act of June 18, 2020, ch. 4, 2020 Cal. Legis. Serv. __ (West) (making no

21  changes in period to cure signature mismatches); *compare* 10 Ill. Comp. Stat. 5/2B-

22  20, with id. 5/20-8 (same).

23  [21] Lila Carpenter, *Signature Match Laws Disproportionately Impact Voters Already*

24  *on the Margins*, ACLU (Nov. 2, 2018), https://perma.cc/U7JG-4QUU.

25  [22] *See, e.g.*, Jacob Pramuk, *Fewer Voters Say They're Voting by Mail amid Uproar*

26  *over USPS Changes, CNBC/Change Research Polls Find*, CNBC (Aug. 26, 2020),

27  https://perma.cc/TCJ3-WBYG (describing swing-state poll indicating significant

28  drops in voters who plan to vote by mail).

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

1  ballot drop boxes, and other election services, imposing significant administrative and

2  operational burdens only two months before the General Election.

3  ///

### 1. <u>Many *Amici* Must Seek to Expand In-Person Voting Options and Resources.</u>

6      Due to the unreliability of USPS mail, *amici* must now seek to increase in-

7  person voting opportunities to the extent practicable. These changes must be

8  implemented only two months before the General Election and in accordance with

9  state and local pandemic-related public health orders and recommendations. Yet many

10  polling locations—many of which are senior centers and living facilities—are now

11  declining to serve in that capacity due to COVID-19 concerns.[23] At the same time,

12  *amici* may be unable to increase poll-worker staff at existing polling locations while

13  maintaining a six-foot distance between work stations, as recommended by the

14  Centers for Disease Control and Prevention. Given these constraints, some

15  jurisdictions are now making significant changes to increase voting hours and

16  otherwise supplement capacity to ensure all voters can safely exercise their right to

17  vote. For instance, after the Postal Service informed the state of Texas of potential

18  delays, to account for the uncertainty of whether voters will vote in person or by mail,

19  Harris County approved an additional $17 million outlay to extend early voting hours

20  to 10 p.m. on multiple nights, add one 24-hour voting period, and provide drive-

21  through options, as well as to obtain new equipment to process an anticipated record

22  number of ballots received by mail.[24] The City of St. Paul similarly plans to increase

---

24  [23] For example, as of the end of August 2020, five senior centers or living facilities in

25  Santa Clara County have declined to serve as polling locations due to COVID-19-

26  related concerns.

27  [24] Zach Gespart, *Harris County OKs $17M to Add Polls, Voting Hours and Drive-*

28  *Thru Balloting For November Election*, Houston Chronicle (Aug. 25, 2020),

19

the number of in-person early voting locations in anticipation that uncertainty about the Postal Service may lead more voters to choose to vote in person.

However, for other local jurisdictions, increasing in-person voting capacity is not an option. For example, the Yurok Tribe, which is located in rural Del Norte and Humboldt counties in California, passed emergency legislation requiring the General Election to be conducted entirely by mail because of COVID-19 associated risks.[25] As a result, tribal voters are entirely dependent on the mail to vote. In an area where access to the Postal Service is already extremely limited,[26] these voters now have no choice but to be subject to USPS's delays, increasing the likelihood that their ballots will not arrive or be returned in time to be counted. Ultimately, due to uncertainty caused by the USPS changes, many *amici* will have to prepare for both scenarios: increased voting at polling locations, and increased use of mail-in ballots and ballot boxes—even though budgets are tight and time to prepare is short.

### 2. **Many *Amici* Will Need to Add Official Ballot Drop Boxes, More Frequently Empty Drop Boxes, and Increase Messaging Around Drop Box Availability.**

Particularly where it is not possible to increase polling locations, *amici*, where possible, will need to increase the number of official drop boxes, drop box pick-ups, and messaging about drop box availability. In Santa Clara County, because of the USPS changes, the Registrar of Voters will need to add three additional routes to pick

---

https://perma.cc/XYK4-XNDE.

[25] Emergency Yurok Tribe Election Ordinance §§ 4003, 4203, 4401, 4502 (Aug. 11, 2020).

[26] In some Yurok tribal areas, mail cannot be delivered to households; rather, members depend on access to transportation to a local Post Office to pick up and send mail. The local Post Office has limited business hours and depends on a postal processing site in Eureka, California, leading to further mail delivery delays.

1  up drop box ballots. The County will also need to place twenty-three additional boxes

2  at locations that had high volume return in the March 2020 primary and increase its

3  public messaging to urge greater drop box use. Similarly, the City of St. Paul is

4  adding mail ballot drop-off locations to encourage voters to drop off ballots to ensure

5  timely arrival. These *amici* must now seek to identify funds to provide these

6  additional services at a time when local and tribal government budgets are facing

7  enormous strains due to mounting COVID-related community needs that dwarf

8  shrinking revenue.

9    Other *amici* are constrained from increasing drop box availability, putting

10  additional pressure on *amici* to find other ways to expand voting opportunities. In

11  Ohio, for example, the Secretary of State has issued a directive prohibiting any Board

12  of Elections from using more than one drop box location per county.[27] That means

13  that any resident of the City of Columbus, for example, can drop off their ballot at

14  only *one* location—the Franklin County Board of Elections office—even though that

15  location may be a long distance to travel, in some cases more than 25 miles roundtrip,

16  for many residents of Columbus and broader Franklin County.[28] The same is true for

17  the City of Cincinnati, where the only drop box is located outside of the City and is

18

19  [27] Ohio Sec'y of State, *The Use of Drop Boxes and Additional Instructions for*

20  *Curbside Voting* (Aug. 12, 2020), https://perma.cc/392P-MZGN ("Boards of elections

21  are prohibited from installing a drop box at any other location other than the board of

22  elections.").

23  [28] In 2018, due to state restrictions, Franklin County only operated one early polling

24  location. Almost half of the County's residents who voted in-person before Election

25  Day lived within five miles of the polling location; those that lived further away used

26  it "sparingly." Bill Bush, *Few Will Travel Far to Franklin County's Single Early-*

27  *Voting Site, Analysis Finds*, Columbus Dispatch (Nov. 11, 2018)

28  https://perma.cc/EG59-CW6A.

1  hard to access by public transit. In Harris County—and all counties in Texas—drop

2  boxes are not permitted, though voters may deposit their ballots at the voting clerk's

3  office. For these jurisdictions, even in the face of a pandemic, in-person voting will be

4  the primary option for casting a vote due to the uncertainty caused by the USPS

5  changes for voting by mail—putting even greater pressure on these jurisdictions to

6  boost in-person voting capacity while adhering to public health orders and

7  recommendations amid shrinking budgets.[29]

8           **3.  *Amici* Must Absorb Increased Mail and Other Costs.**

9           The USPS's longstanding practice has been to treat all election mail as First

10  Class mail, which means election mail receives priority and is typically delivered

11  between two and five days after mailing.[30] Now, USPS has announced that election

12  mail instead will be treated as standard mail, with delivery timeframes between three

13  and ten days,[31] and possibly more when mail volumes are unusually high such as

14  during the winter holidays. As a result, *amici* may need to pay approximately 35 cents

15  more per piece of election mail to ensure it is treated as First Class mail[32]—a

16  significant cost and logistical change with little time to locate funds. The City of

17

18  [29] *See* Tex. Elec. Code § 86.006. Harris County has piloted allowing these ballot drop

19  boxes at eleven of the clerk's office's locations, making ballot delivery more

20  accessible. Whether these ballot drops can occur during an extended early voting

21  period is currently being litigated. *See* Bethany Blankley, *Candidates, Others Sue*

22  *Secretary of State over Election Law Violations*, Ctr. Square (Aug. 21, 2020),

23  https://perma.cc/T42Z-LE2N.

24  [30] *See* U.S. Postal Serv., *State and Local Election Mail – User's Guide*, Pub. No. 632

25  (Jan. 2020), https://perma.cc/TGE5-2NW5.

26  [31] *Id.*

27  [32] Erin Spaht, *VERIFY: No, the Post Office Did Not Triple the Cost States Pay to Mail*

28  *Election Ballots*, WUSA (Aug. 13, 2020), https://perma.cc/Y2K7-6Z3C.

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

1   Denver, for example, has had to divert additional resources to cover over $130,000 in

2   First Class Mail fees for its electorate. Other costs include a likely uptick in counter

3   services required to address voting questions at various Registrars of Voters and

4   Boards of Election offices and otherwise deal with the upheaval caused by the USPS

5   changes. Marin County has already noted an increased number of concerned calls to

6   its Registrar of Voters about USPS changes.

7          Taken together, these changes undermine the reliability of election-related

8   mail—and *amici*'s election administration plans—on the eve of a Presidential General

9   Election that *amici* must administer and facilitate during the worst pandemic in a

10  century. Moreover, these changes come at a time when, as detailed below, USPS

11  delays will impose significant non-election related costs on *amici*.

12  **II.   USPS CHANGES UNDERMINE OTHER CORE LOCAL AND TRIBAL**

13  **GOVERNMENT FUNCTIONS.**

14         Separate and apart from the harms to election administration, the USPS changes

15  will hamper other core local and tribal government functions. Indeed, USPS delays

16  will further stress local government services at a time when they already face

17  unprecedented challenges due to COVID-19. These impacts include delays in

18  payments, enforcement actions, and critical health care services.

19         **A.   USPS Delays Interfere with Timely Payments to and from *Amici* and**

20  **Increase Administrative Burdens.**

21         USPS delays will impede revenue streams that fund essential services for

22  residents. *Amici* collect millions to billions of dollars in parking tickets, tax payments,

23  and user fees, which support police and fire services, public schools, libraries, and

24  park districts, among other services. Much of this revenue flows through the postal

25  system—and is time-sensitive. Year-to-date, for example, the City of Chicago's

26  Department of Finance has received over $18 million in mailed parking tickets, red

27  light camera violations, and speed camera violations; over $233 million via mailed tax

28

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

payments; and $422 million in mailed payments related to its Aviation Department.[33] And in 2019, Chicago received over $349 million via 403,813 mailed payments for its Utility Billing and Customer Services, which include water, sewer, and garbage fees and related taxes.

Mail delays thus present a two-fold problem for local revenue streams. First, given that cities and counties collect up to billions of dollars through mail-in payments, even small delays can result in the loss of millions of dollars of earned interest income on savings or investments. These losses, in turn, directly impact *amici*'s bottom lines and budgets, which already are stretched thin during the pandemic and economic downturn. Second, mail delays create confusion for payees and additional operational burdens for local government employees. In Chicago, for example, an automated system electronically imposes late fees on parking ticket fines that are not paid within the allotted time. If a resident's otherwise timely payment gets delayed or lost in the mail, Chicago must then track the original payment, manually remove the late fee, and communicate with the payee regarding the true amount owed. Given the volume of parking tickets processed daily, particularly in larger cities, these extra administrative burdens can add up to significant manpower and notice costs at a time when localities already are facing significant budget and staffing cuts.[34]

---

[33] These payments include, for example, payments for Landing Fees, Terminal Area Use Charges, Rents, Concessions, and other Passenger Facility Charges and Customer Facility Charges.

[34] *See, e.g.*, Mark Munro, *As COVID-19 Resurges, So Does the Threat to Local Budgets*, Brookings Inst. (June 2020), https://perma.cc/T9GC-SHZP (reporting that in June 2020, states and localities across the country already had laid off 1.5 million government workers as a result of COVID-19 budget cuts); *see also* Tony Romm, *Over 700 Cash-strapped Cities Halt Plans to Repair Roads, Water Systems, or Make Other Key Investments*, Wash. Post (June 23, 2020), https://perma.cc/XS42-7BF5.

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

1    Relatedly, USPS delays pose a threat to residents who rely on the mail for
2  certain local government payments. In Cincinnati, for example, many residents
3  receive retirement service and pension payments from the City through the mail. A
4  mail delay of just a few days—at a time when 24% of Ohioans either missed their
5  most recent housing payment or are not confident that they will be able to make their
6  next one[35]—can make the difference between a missed or late payment and related
7  fees. In the Yurok Tribe, fishermen confronted with depleted salmon stocks rely upon
8  the tribal government to disburse disaster relief payments, sent through the mail, to
9  make ends meet. Delays could be devastating for these fishermen. As a result of mail
10 delays, the Yurok Tribe's Department of Social Services already has had to scramble
11 to ensure that Temporary Assistance for Needy Families funds for housing, childcare,
12 and other basic needs reach residents on time. The Department has limited options to
13 respond to mail delays. It has limited staff in order to deliver funds in person; the lack
14 of a bank on the reservation from which to withdraw funds also limits the utility of
15 switching to a new system, where funds could be transferred electronically. Similarly,
16 the City of Chicago's Department of Family and Support Services operates a Rental
17 Assistance Program to help those who may face homelessness due to COVID-19.
18 Within the past four months, Chicago received over 500 applications for this program
19 through the mail. Even with a significant increase in funding for the program in
20 response to the pandemic, the Department receives twice the number of applications
21 than it can fund in a single month. Because the program has a finite budget that is
22 inadequate to address local demand, and because applications often require back-and-
23 forth to ensure all requirements have been met, mail delays could cause applicants to
24 miss out on this program, or to not apply to other assistance programs for which they
25
26 [35] Samuel Stebbins & Grant Suneson, *Amid Coronavirus Pandemic, Missed Rent and*
27 *Mortgage Payments Are Piling Up In Nearly Every State*, USA Today (July 2020),
28 https://perma.cc/DVA4-LQ7A.

would be eligible if their rental assistance applications were denied. As a result, more Chicago residents could be at risk of becoming homeless.

### B.    USPS Delays Harm *Amici*'s Enforcement Efforts.

In addition to revenue collection, the USPS changes threaten to delay and undermine local enforcement efforts. Specifically, many local governments use the mail system to deliver code violation and fine notices. Timely delivery of these notices is thus crucial to correcting infractions as soon as possible and thereby protecting residents' safety and well-being.

In Cincinnati, for example, the City relies on the mail system to enforce building standards and prevent mass foreclosures. Indeed, the Cincinnati Department of Buildings and Investigations—responsible for maintaining the health, safety, and welfare of Cincinnati residents in connection with residential and commercial buildings[36]—spends $41,000 on postage costs alone each year. Cincinnati uses this postage to send out critical notices concerning building demolitions and repairs that violate city code and face administrative proceedings.[37] A delay in these notices may, as a result, perpetuate or create dangerous conditions for residents. Moreover, Cincinnati requires that within ten business days of filing a foreclosure action on residential property, banks register—through the mail—the vacant or foreclosed property with the city and maintain it until it is sold or reoccupied.[38] Accurate and timely registrations are critical to Cincinnati's efforts to track and combat the proliferation of abandoned properties and neighborhood blight, particularly in the present economic downturn.[39]

---

[36] Cincinnati, Ohio, Mun. Code § 1101-63.

[37] *Id*. §§ 1101-57, 1101-61, 1101-81.

[38] *Id.* § 1123-05.

[39] *See supra*, note 34.

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

1       Local code enforcement extends beyond building violations and, in fact,
2   touches almost every aspect of residents' everyday lives. In an average year, for
3   example, the City of Chicago's Department of Streets and Sanitation writes 40,000 to
4   50,000 tickets for violations, including overgrown weeds, overflowing garbage, and
5   rat harborage—all of which are sent via USPS mail. Similarly, the Yurok Tribe relies
6   on the mail to send violation notices and to abate environmental violations.[40]
7   Accordingly, even a few days' delay in mail can create and exacerbate unsafe and
8   unsanitary living conditions.

9       More generally, *amici* rely upon the mail for basic registration and
10  authorization functions. Chicago's Department of Business Affairs and Consumer
11  Protection, for example, depends on the mail to send out business license applications,
12  certificates, and account documents, including new licenses, cancellation forms, and
13  license payments. Delays in this official correspondence can create significant
14  confusion and backlogs in the licensing process, thus adding to the City's
15  administrative burdens and harming businesses forced to delay their operations while
16  waiting on documents.  And for localities, such as Denver, that operate within "first in
17  time" real estate recording states, delays in mail can adversely impact residents'
18  commercial and residential property rights, including delays in closings and
19  foreclosure redemptions.

20      **C.    USPS Delays Undermine Critical Local Health Care Services.**

21      USPS delays present a particularly acute problem for locally administered
22  health care services, which many *amici* provide to millions of residents. Many of these
23  local health care systems use the mail system to provide aspects of this care.

24

25

---

26  [40] Yurok Tribe, Tribal Code §§ 21.20.080(d)(1)A (water pollution enforcement),
27  21.25.150(b) (water quality control enforcement and penalties procedure),
28  21.05.140(c)(1)(A) (air quality enforcement process).

Cook County, Illinois, for example, operates one of the largest hospital systems in the nation. In this role, Cook County Health's mail order pharmacy fulfills more than 20,000 prescriptions each month and relies on USPS to deliver prescriptions to patients.[41] In July 2020, 23% of those prescriptions—more than 5,000 prescriptions— were delayed.[42] In comparison, less than 1% of prescriptions faced delays in March of 2020.[43] And already-vulnerable populations are disproportionately impacted by these delays. In certain zip codes within the Chicago area's South Side neighborhoods, for example, as many of 50% of Cook County Health's mail order prescriptions faced mail delays in July.[44] Similarly, members of the Yurok Tribe—many of whom already face severely limited mail conditions—depend on mail order prescriptions delivered through the United Indian Health Services.[45] Moreover, the Los Angeles County Department of Health Services ("DHS") has seen a marked increase in patients receiving their prescriptions by mail during the COVID-19 pandemic, jumping from about 15-16% prior to the pandemic to over 70-72% of patients during it. However,

---

[41] Cook County Government, *Cook County Health Patients Experience Major Delays in Mail Deliveries for Daily Medical Prescriptions* (Aug. 24, 2020), https://perma.cc/NBH3-HH43.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] The Yurok Tribe is one of nine tribes that joined a consortium to operate the United Indian Health Services' network of clinics. United Indian Health Servs., *Consortium Tribes*, https://perma.cc/KT53-35ZS. During the pandemic, the network has recommended that patients receive their prescriptions by mail to avoid in-person contact. United Indian Health Servs, *UIHS COVID-19 Response*, Facebook (Apr. 2, 2020), https://perma.cc/C3SM-GBW8.

1  DHS reports that since the USPS policy changes, delivery times for prescriptions have
2  shifted from three to five days to as long as three weeks.

3      These medication delays have life-threatening consequences, particularly when
4  in-person options pose significant health risks during the pandemic. As the Chief
5  Medical Officer at Cook County Health has explained, "[i]n many cases, these
6  [delayed prescriptions] are life-saving medications that treat diabetes, hypertension
7  and other chronic illnesses. Without these medications, patients are at risk for
8  complications that could lead to emergency room visits and hospitalizations at a time
9  when we are asking people to stay home."[46] Indeed, the Postal Service's cost-cutting
10  measures will exacerbate the spread of COVID-19 in more ways than one: local
11  government health care providers not only rely upon mail-prescriptions to encourage
12  patients to stay home, but also use the Postal Service for infectious disease contact
13  tracing and quarantine notices for individuals without reliable internet or phone. A
14  postal delay of just one day could, as a result, lead to innumerable infections if an
15  unknowingly infected person goes to work or school while waiting for results,
16  undermining efforts to control an outbreak.

17      Amici's mail-related health care services extend beyond prescription programs
18  and the mailing of COVID-19 notices and test results. The State of Ohio, for example,
19  has the fourth highest rate of opioid-involved overdose deaths in the country,[47] and
20  Columbus and its surrounding suburbs have the highest number of overdose deaths—
21  543 in 2019—in the state.[48] To combat this crisis, Columbus sends free naloxone
22
23

24  [46] Cook County Government, *supra* 41.

25  [47] Nat'l Inst. of Health, *National Institute on Drug Abuse: Opioid Summaries by State*
26  (2018), https://perma.cc/EV5W-32WA.

27  [48] Catherine Candisky, *Ohio Drug Overdose Deaths Back on Rise*, Columbus
28  Dispatch (July 21, 2020), https://perma.cc/BP65-LQCU.

1  kits—used to prevent overdoses—through the mail to clinic providers and others.[49] A

2  delay in receiving these kits could directly result in preventable deaths. Relatedly,

3  through the mail, the City of Cincinnati provides testing for sexually-transmitted

4  diseases and screening for cancer and other chronic illnesses, such as diabetes.[50] And

5  because testing results are confidential, the City mails notices to vulnerable patients,

6  including elderly or unsheltered community members, to request that they follow up

7  with the Department of Health via phone or in person. In these instances, mail delays

8  could worsen health outcomes not only for the recipients, but also for those with

9  whom they may come into contact.

10 **III.    A NATIONWIDE INJUNCTION IS REQUIRED TO REDRESS THE
        HARMS CAUSED BY THE USPS CHANGES.**

11

12     The significant harms that *amici* and the plaintiff states and jurisdictions are

13 experiencing due to the USPS changes are immediate and irreparable—and they will

14 persist without nationwide relief.[51]

15     If only some states are granted relief, voters receiving ballots outside of those

16 select states will continue to be adversely impacted by the USPS changes. For

17 example, for overseas and military voters, and other voters who receive and mail their

18 ballots outside of the jurisdictions that are granted relief, such relief will be

19 incomplete.[52] This is true across jurisdictions. For example, Santa Clara County has

20

21 [49] Columbus, Ohio, *Access to Naloxone*, https://perma.cc/9ZZ3-CVTU.

22 [50] U.S. Dep't of Health & Human Servs., *Cincinnati City Health Department:*

23 *Northside Health Center*, https://perma.cc/A62G-BSEX.

24 [51] *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per

25 curiam) ("Crafting a preliminary injunction is an exercise of discretion and judgment,

26 often dependent as much on the equities of a given case as the substance of the legal

27 issues it presents.").

28 [52] *See Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 830-35 (E.D. Pa.), *aff'd sub nom.*

1   nearly 7,500 military and overseas voters and anticipates mailing more than an

2   additional 11,000 ballots to voters who live in the County but requested that their

3   ballots be mailed to an out-of-state address. The City of Madison has nearly 1,000

4   military and overseas voters and anticipates more than 2,500 total absentee ballots will

5   be mailed outside of the county. Marin County has nearly 3,000 military and overseas

6   voters, and the Yurok Tribe has over 1,300 registered voters outside of its service area

7   that must vote by mail. Piecemeal relief will cause further confusion for voters and

8   *amici* seeking to administer and facilitate elections, with little time to engage in

9   outreach to clarify which voters will still be affected by USPS mail delays. Moreover,

10  these mail delays cannot be redressed or otherwise mitigated through other voting

11  avenues, as out-of-jurisdiction voters do not have the option of depositing a ballot in a

12  local drop box or voting in person. Similarly, many local government operations

13  conducted through the mail are not confined to geographical borders. As explained

14  above, some of *amici*'s infectious disease contact tracing, which can save lives and

15  limit the spread of COVID-19, relies upon mailing test results and quarantine notices

16  to persons connected to local contacts regardless of the other person's location.

17      As the Postal Service letters to nearly all states reveal, the USPS changes are

18  nationwide in scope, and so, too, must be the remedy.

19  ///

20  ///

21

---

22  *Pennsylvania v. President United States*, 930 F.3d 543 (3d Cir. 2019), as amended

23  (July 18, 2019), *cert. granted sub nom. Little Sisters of the Poor Saints Peter & Paul*

24  *Home v. Pennsylvania*, 140 S. Ct. 918, (2020), *and cert. granted sub nom. Trump v.*

25  *Pennsylvania*, 140 S. Ct. 918, (2020), *and rev'd and remanded sub nom. Little Sisters*

26  *of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020)

27  (exercising judgment and discretion in crafting a remedy that provides "complete

28  relief to the plaintiffs").

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

1

2

## CONCLUSION

3      For the foregoing reasons, *amici* urge the Court to grant Plaintiffs' motion for

4   preliminary injunction.

5   Respectfully submitted,

6

7   PETER S. HOLMES                          JAMES R. WILLIAMS
    CITY ATTORNEY                            COUNTY COUNSEL

8
    */s/ Ghazal Sharifi*                     James R. Williams, County Counsel
9   By: Ghazal Sharifi (WSBA #47750)         Greta S. Hansen, Chief Assistant County
    Assistant City Attorney                  Counsel
10  Seattle City Attorney's Office           Tony LoPresti, Assistant County Counsel
11  701 Fifth Avenue, Suite 2050             Laura S. Trice, Lead Deputy County Counsel
    Seattle, WA 98104-7095                   Julia B. Spiegel, Deputy County Counsel
12  Phone: 206-684-8217                      Mary E. Hanna-Weir, Deputy County Counsel
13  ghazal.sharifi@seattle.gov               70 West Hedding Street, East Wing, Ninth
                                             Floor
14  ZACK KLEIN                               San José, California 95110-1770
15  CITY ATTORNEY                            Tel. (408) 497-5198
                                             julia.spiegel@cco.sccgov.org
16
    Zach Klein, City Attorney
17  Richard N. Coglianese, City Solicitor    *Attorneys for the County of Santa Clara,*
18  General                                  *California*
    77 South Front Street, 4th Floor
19  Columbus, Ohio 43215                     Jessica M. Scheller
                                             Chief; Advice, Business & Complex Litigation
20                                           Division
    Jonathan B. Miller, Legal Director       Lauren E. Miller
21  LiJia Gong, Counsel                      Special Assistant State's Attorney
22  Sophia TonNu, Legal Fellow               Civil Actions Bureau - Affirmative & Impact
    Victoria Stilwell, Staff Attorney        Litigation
23  PUBLIC RIGHTS PROJECT                    Cook County State's Attorney's Office
24  4096 Piedmont Avenue #149                500 Richard J. Daley Center
    Oakland, California 94611                Chicago, IL 60602
25
    *Attorneys for the City of Columbus,*
26  *Ohio*                                   *Attorneys for Cook County, Illinois*

27

28  Dated:  September 11, 2020

1

## ADDITIONAL COUNSEL

2
YIBIN SHEN
City Attorney
3
2263 Santa Clara Avenue, Room #280
4
Alameda, CA 94501
*Attorney for the City of Alameda,*
5
*California*
6
NINA HICKSON
7
City Attorney
8
55 Trinity Avenue, Suite 5000
Atlanta, GA 30303
9
*Attorney for the City of Atlanta,*
10
*Georgia*
11
ANNE L. MORGAN
12
City Attorney
P.O. Box 1546
13
Austin, TX 78701-1546
14
*Attorney for the City of Austin, Texas*
15
FARIMAH FAIZ BROWN
16
City Attorney
2180 Milvia Street, 4th Floor
17
Berkeley, CA 94704
18
*Attorney for the City of Berkeley,*
*California*
19
20
EUGENE L. O'FLAHERTY
21
Corporation Counsel
City Hall, Room 615
22
Boston MA, 02201
23
*Attorney for the City of Boston,*
*Massachusetts*
24
25
26
27
28

NANCY E. GLOWA
City Solicitor
City of Cambridge
795 Massachusetts Avenue
Cambridge, MA 02139
*Attorney for the City of Cambridge,*
*Massachusetts*

NICK HERMAN
General Counsel
1526 E. Franklin St., Suite 200
P.O. Box 2388
Chapel Hill, NC 27514
*Attorney for the Town of Carrboro,*
*North Carolina*

MARK A. FLESSNER
Corporation Counsel
30 N. LaSalle Street, Suite 800
Chicago, IL 60602
*Attorney for the City of Chicago,*
*Illinois*

ANDREW W. GARTH
Interim City Solicitor
801 Plum Street, Room 214
Cincinnati, Ohio 45202
*Attorney for the City of Cincinnati,*
*Ohio*

BARBARA J. DOSECK
City Attorney
101 W. Third Street
P.O. Box 22
Dayton, OH 45401
*Attorney for the City of Dayton, Ohio*

33

KRISTIN M. BRONSON
City Attorney
1437 Bannock Street,
Room 353
Denver, CO 80202
*Attorney for the City and*
*County of Denver,*
*Colorado on behalf of the County Clerk*
*and Recorder*

LAWRENCE GARCIA
ELI SAVIT
Corporation Counsel
2 Woodward, Suite 500
Detroit, MI 48226
Attorneys for the City of
Detroit, Michigan

RAFAEL E. ALVARADO JR.
City Attorney
2415 University Ave.
East Palo Alto, CA 94303
*Attorney for the City of*
*East Palo Alto, California*

ANGELA WHEELER
City Attorney
1101 S. Saginaw Street
Flint, MI 48502
*Attorney for the City of Flint, Michigan*

RODNEY POL, JR.
City Attorney
401 Broadway, Suite 101
Gary, IN 46402
*Attorney for the City of Gary, Indiana*

VINCE RYAN
Harris County Attorney
1019 Congress St., 15th Floor
Houston, Texas 77002
*Attorney for Harris County, Texas*

RONALD C. LEWIS
City Attorney
900 Bagby, 4th Floor
Houston, TX 77002
*Attorney for the City of Houston, Texas*

MARY C. WICKHAM
County Counsel
648 Kenneth Hahn Hall of
Administration
500 West Temple Street
Los Angeles, CA 90012
*Attorney for the County of*
*Los Angeles, California*

MICHAEL N. FEUER
City Attorney
200 North Main Street, 8th Floor
Los Angeles, CA 90012
*Attorney for the City of*
*Los Angeles, California*

MICHAEL HAAS
City Attorney
210 Martin Luther King Jr. Blvd.,
Room 401
Madison, WI 53703
*Attorney for the City of Madison,*
*Wisconsin*

BRIAN E. WASHINGTON
County Counsel
3501 Civic Center Drive, Suite 275
San Rafael, CA 94903
*Attorney for Marin County, California*

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

LESLIE J. GIRARD
County Counsel
168 West Alisal Street, 3rd Floor
Salinas, CA 93901
*Counsel for the County of Monterey,*
*California*

BARBARA J. PARKER
City Attorney
One Frank Ogawa Plaza
Sixth Floor
Oakland, CA 94612
*Attorney for the City of Oakland,*
*California*

MARCEL S. PRATT
Philadelphia City Solicitor
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
*Attorney for the City of*
*Philadelphia, Pennsylvania*

KATE GALLEGO
Mayor
200 W. Washington Street
Suite 1100
Phoenix, AZ 85003-1611
*Mayor of the City of Phoenix, Arizona*

YVONNE S. HILTON
City Solicitor
City County Building
414 Grant Street
Pittsburgh, PA  15219
*Attorney for the City of Pittsburgh,*
*Pennsylvania*

TRACY REEVE
City Attorney
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
*Attorney for the City of Portland,*
*Oregon*

JEFFREY DANA
City Solicitor
444 Westminster Street,
Suite 220
Providence, RI 02903
*Attorney for the City of Providence,*
*Rhode Island*

SUSANA ALCALA WOOD
City Attorney
915 I Street, Fourth Floor
Sacramento, CA, 95814
*Attorney for the City of Sacramento,*
*California*

LYNDSEY M. OLSON
City Attorney
400 City Hall and Courthouse
15 West Kellogg Boulevard
Saint Paul, MN 55102
*Attorney for the City of Saint Paul,*
*Minnesota*

ANTHONY P. CONDOTTI
City Attorney
Atchinson, Barisone & Condotti
P.O. Box 481
Santa Cruz, CA 95061
*Attorney for the City of Santa Cruz,*
*California*

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GEORGE S. CARDONA
Interim City Attorney
1685 Main Street, Third Floor
Santa Monica, CA 90401
*Counsel for the City of Santa Monica,*
*California*

FRANCIS X. WRIGHT, JR.
City Solicitor
93 Highland Avenue
Somerville, MA 02143
*Attorney for the City of*
*Somerville, Massachusetts*

MICHAEL RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726
*Attorney for the City of Tucson,*
*Arizona*

MICHAEL JENKINS
City Attorney
Best Best & Krieger, LLP
1230 Rosecrans Avenue, Ste 110
Manhattan Beach, CA 90266
*Attorney for the City of*
*West Hollywood, California*

MAGGIE POFFENBARGER
Associate General Counsel
190 Klamath Blvd.
Klamath, CA 95548
*Attorney for the Yurok Tribe*

[PROPOSED] AMICI CURIAE BRIEF OF THE COUNTY OF SANTA CLARA, ET AL.
NO. 1:20-cv-03127-SAB