1  JEFFREY BOSSERT CLARK
   Acting Assistant Attorney General
2  ERIC R. WOMACK
   Assistant Director, Federal Programs Branch
3  JOSEPH E. BORSON (Va. Bar No. 85519)
   KUNTAL CHOLERA
4  ALEXIS ECHOLS
   DENA M. ROTH
5  Trial Attorney, Federal Programs Branch
   1100 L Street, NW
6  Washington, D.C. 20005
   (202) 514-1944
7  joseph.borson@usdoj.gov

8  *Attorneys for Defendants*

9

10              **UNITED STATES DISTRICT COURT**

11              **EASTERN DISTRICT OF WASHINGTON**

12                        **AT YAKIMA**

13  | STATE OF WASHINGTON, STATE OF | NO. 1:20-cv-03127-SAB |

STATE OF WASHINGTON, STATE OF
COLORADO, STATE OF CONNECTICUT,
STATE OF ILLINOIS, STATE OF
MARYLAND, STATE OF MICHIGAN,
STATE OF MINNESOTA, STATE OF
NEVADA, STATE OF NEW MEXICO,
STATE OF OREGON, STATE OF RHODE
ISLAND, STATE OF VERMONT,
COMMONWEALTH OF VIRGINIA, and
STATE OF WISCONSIN,

                    Plaintiffs,

     v.

DONALD J. TRUMP, in his official capacity
as President of the United States of America;
UNITED STATES OF AMERICA; LOUIS
DEJOY, in his official capacity as Postmaster
General; UNITED STATES POSTAL
SERVICE,

                    Defendants.

NO. 1:20-cv-03127-SAB

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date: September 17, 2020
Hearing Time: 10:00 AM PDT

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................1

BACKGROUND ..........................................................................................3

I.    THE UNITED STATES POSTAL SERVICE .....................................3

II.   USPS'S HANDLING OF ELECTION MAIL ....................................4

    A.    State, Local, and Individual Responsibilities for Election Mail ......6

    B.    USPS's Efforts to Ensure Timely Delivery of 2020 Election
      Mail ...........................................................................................8

        1.    USPS Outreach and Recommendations to Election
          Officials..........................................................................8

        2.    USPS's Longstanding Special Measures for Election
          Mail ...............................................................................11

        3.    USPS's Increased Efforts in Support of the Election ..........13

III.  USPS'S YEARS-LONG MANDATE TO IMPROVE EFFICIENCY
    AND CONTROL EXPENSES .........................................................14

    A.    Periodic, Data-Based Reduction in Redundant Processing
      Equipment and Collection Boxes...................................................15

    B.    USPS's Continued Focus on Adherence to Existing
      Transportation Schedules..............................................................17

    C.    USPS Personnel Practices Related to Overtime Usage and
      Staffing Shortages Caused by the Covid-19 Pandemic .................19

        1.    Overtime ........................................................................19

        2.    The Impact of the COVID-19 Pandemic ...........................20

    D.    Other Efforts Aimed at Improving Efficiency ...............................21

IV.   PROCEDURAL HISTORY ...........................................................21

STANDARD OF REVIEW ...........................................................................22

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

ARGUMENT ........................................................................................23

I.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS
     OF THEIR CLAIMS. ....................................................................24

     A.   Plaintiffs Lack Article III Standing.................................................24

     B.   Plaintiffs Are Not Likely To Succeed On Their 39 U.S.C.
          § 3661 Claim .......................................................................26

          1.   District Courts Lack Subject-Matter Jurisdiction Over
               Complaints Regarding 39 U.S.C. § 3661, Which Are
               Channeled to the Postal Regulatory Commission and
               Then The D.C. Circuit............................................................27

          2.   Plaintiffs' Jurisdictional Objections Are Unavailing
               Because Section 3662 Is Mandatory And Reflects
               Congress's 2006 Decision To Channel Section 3661
               Claims to the PRC and D.C. Circuit ....................................31

          3.   The *Ultra Vires* Doctrine Does Not Provide an Avenue
               for Judicial Review Here ....................................................35

               a.   *Ultra Vires* Review Fails Because Plaintiffs Have
                    an Adequate Remedy....................................................36

               b.   *Ultra Vires* Review Fails Because Plaintiffs Cannot
                    Show That the Postal Service Has Unequivocally
                    Violated Section 3661(b)............................................38

          4.   Mandamus is Unavailable Because Plaintiffs Have an
               Adequate Remedy And Because Their Right to Relief
               is Not Clear and Indisputable ............................................44

     C.   Plaintiffs Are Not Likely To Succeed on their Constitutional
          Challenge.........................................................................46

          1.   The Postal Service Has Not Violated The Elections
               Clause..............................................................................46

          2.   The Postal Service's Policy Changes Do Not Violate
               The Right to Vote ...............................................................50

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

a.     The Rational Basis Test, Not Strict Scrutiny, Would Apply to the Alleged Postal Service Policy Changes ................................................................. 51

b.     The Alleged Policy Changes Survive Rational Basis Review ....................................................................... 55

II.     PLAINTIFFS CANNOT DEMONSTRATE IRREPARABE HARM. ... 56

III.     THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY RELIEF ................................................................................. 57

IV.     A NATIONWIDE INJUNCTION IS INAPPROPRIATE ...................... 59

CONCLUSION ................................................................................. 60

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Cases**

*Aid Ass'n for Lutherans v. USPS,*
  321 F.3d 1166 (D.C. Cir. 2003) ................................................................. 36

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
  458 U.S. 592 (1982) ................................................................................... 25

*Am. Fed. of Gov't Employees v. Sec'y of Air Force,*
  716 F.3d 633 (D.C. Cir. 2013) ................................................................... 37

*Am. Fed'n of Gov't Employees, AFL-CIO v. Trump,*
  929 F.3d 748 (D.C. Cir. 2019) ............................................................. 31, 37

*American Postal Workers, Union, AFL-CIO v. USPS,* No. 06-726 (CKK),
  2007 WL 2007578 (July 6, 2007) .............................................................. 29

*Bank of Louisiana v. FDIC,*
  919 F.3d 916 (5th Cir. 2019) ..................................................................... 30

*Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.,*
  502 U.S. 32 (1991) ............................................................................... 36, 37

*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984) ................................................................................... 32

*Bovard v. U.S. Post Office,*
  47 F.3d 1178 (10th Cir. 1995) ................................................................... 28

*Buchanan v. USPS,*
  375 F. Supp. 1014 (N.D. Ga. 1974) ........................................................... 25

*Buchanan v. USPS,*
  508 F.2d 259 (5th Cir. 1975) .............................................................. *passim*

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ................................................................................... 53

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ................................................................................... 59

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Caribbean Marine Servs. Co., Inc. v. Bldridge*,
    844 F.2d 668 (9th Cir. 1988) .......................................................................... 56, 57

*Chamber of Commerce of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ............................................................................. 37

*Cheney v. U.S. Dist. Ct.*,
    542 U.S. 367 (2004) ......................................................................................... 44, 49

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................................................. 26

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ......................................................................................... 24, 50

*Combined Comm'ns Corp. v. USPS*,
    891 F.2d 1221 (6th Cir. 1989) ............................................................................. 37

*Common Cause/New York v. Brehm*,
    432 F. Supp. 3d 285 (S.D.N.Y. 2020) ................................................................. 51

*Commonwealth of Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ................................................................................... 25, 50, 57

*Cook v. Gralike*,
    531 U.S. 510 (2001) ......................................................................................... 46, 48

*Crawford v. Marion Cty. Election Bd.*,
    553 U.S. 181 (2008) ......................................................................................... 52, 54

*Ctr. for Biological Diversity v. EPA*,
    861 F.3d 174 (D.C. Cir. 2017) ............................................................................. 30

*Disability Law Ctr. of Alaska v. Meyer*,
    2020 WL 5351595 (D. Alaska Sept. 3, 2020) ..................................................... 53

*F.C.C. v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) ............................................................................................... 56

*Foster v. Pitney Bowes Corp.*,
    549 F. App'x 982 (Fed. Cir. 2013) ................................................................. 28, 32

*Foster v. Pitney Bowes Inc.*,
    No. 11-cv-7303 2012 WL 2997810 (E.D. Pa. July 23, 2012) .............................. 33

- iii -

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)...................................................................................... 23

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010)................................................................................ 29, 31

*Gelman v. FEC*,
    631 F.2d 939 (D.C. Cir. 1980)................................................................ 42, 43

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018)................................................................................ 59

*Griffin v. Roupas*,
    385 F.3d 1128 (7th Cir. 2004) .................................................................... 53

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999)..................................................................................... 59

*Heckler v. Ringer*,
    466 U.S. 602 (1984)..................................................................................... 46

*Hironymous v. Bowen*,
    800 F.2d 888 (9th Cir. 1986) ...................................................................... 45

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
    548 F.3d 110 (D.C. Cir. 2008)..................................................................... 30

*In re United States*,
    791 F.3d 945 (9th Cir. 2015) ...................................................................... 45

*Ismailov v. Reno*,
    263 F.3d 851 (8th Cir. 2001) ...................................................................... 32

*Jarkesy v. SEC*,
    803 F.3d 9 (D.C. Cir. 2015)......................................................................... 31

*Kramer v. Union Free Sch. Dist. No. 15*,
    395 U.S. 621 (1969)..................................................................................... 53

*L.A. Haven Hospice, Inc. v. Sebelius*,
    638 F.3d 644 (9th Cir. 2011) ...................................................................... 60

*Leedom v. Kyne*,
    358 U.S. 184 (1958)..................................................................................... 36

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*LeMay v. U.S. Postal Serv.*,
  450 F.3d 797 (8th Cir. 2006) ..................................................... 27, 28, 32

*Lewis v. Casey*,
  518 U.S. 343 (1996) .................................................................... 59, 60

*Libertarian Party v. District of Columbia Bd. Of Elections and Ethics*,
  682 F.3d 72 (D.C. Cir. 2012) ......................................................... 56

*Marciano v. Shulman*,
  795 F. Supp. 2d 35 (D.D.C. 2011) ................................................. 45

*Marrocco v. Johnston*,
  No. 18-cv-02441-JAD-EJY, 2020 WL 3453077 (D. Nev. Mar. 13, 2020) ............ 56

*Mays v. LaRose*,
  951 F.3d 775 (6th Cir. 2020) ......................................................... 53

*McCarthy v. Madigan*,
  503 U.S. 140 (1992) ...................................................................... 45

*McDermott v. Potter*,
  No. C09-0776RSL, 2009 WL 2971585 (W.D. Wash. Sept. 11, 2009),
  *aff'd sub nom., McDermott v. Donahue*, 408 F. App'x 51 (9th Cir. 2011) ............ 28

*McDonald v. Board of Election Com'rs of Chicago*,
  394 U.S. 802 (1969) ...................................................................... 52

*Media Access Project v. FCC*,
  884 F.2d 1063 (D.C. Cir. 1989) ..................................................... 30

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) ....................................................................... 23

*Mittleman v. Postal Regulatory Comm'n*,
  757 F.3d 300 (D.C. Cir. 2014) ................................................... 36, 37

*Moreno v. Bureau of Citizenship & Immigration Servs.*,
  185 F. App'x 688 (9th Cir. 2006) ................................................. 45

*Murphy v. USPS*,
  No. C 14-02156 SI, 2014 WL 4437731 (N.D. Cal. Sept. 9, 2014) ...................... 29

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Service Impasses Panel*,
  437 F.3d 1256 (D.C. Cir. 2006) ............................................................ 36

*Nat'l Ass'n of Postal Supervisors v. USPS*,
  No. 18-cv-2236-RCL, 2020 WL 4039177 (D.D.C. July 17, 2020) ...................... 36

*Nat'l Post Office Collaborative v. Donahoe*,
  2013 WL 5818901 (D. Conn. Oct. 28, 2013) ........................................ 33

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ...................................................... 23

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................. 22

*Norton v. S. Utah Wilderness,All.*,
  542 U.S. 55 (2004) ................................................................... 58

*Nyunt v. Broadcasting Bd. of Govs.*,
  589 F.3d 445 (D.C. Cir. 2009) ....................................................... 36

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ........................................................ 51

*Park Vll. Apartment Tenants Ass'n v. Mortimer Howard Trust*,
  636 F.3d 1150 (9th Cir. 2011) ....................................................... 23

*Pep-Wku, LLC v. USPS*,
  No. 20-cv-0009-GNS, 2020 WL 2090514 (W.D. Ky. Apr. 30, 2020) ................... 28

*Plumbing v. Belodedov*,
  2017 WL 888965 (E.D. Cal. Feb. 14, 2018) ......................................... 23

*Powell v. USPS*,
  No. CV 15-12913-FDS, 2016 WL 409672 (D. Mass. Feb. 2, 2016) ............. 29, 35

*Public Util. Comm'r of Or. v. Bonneville Power Admin*,
  767 F.2d 622 (9th Cir. 1985) ........................................................ 30

*Randall D. Wolcott, M.D., P.A. v. Sebelius*,
  635 F.3d 757 (5th Cir. 2011) ........................................................ 45

*Roche v. Evaporated Milk Ass'n*,
  319 U.S. 21 (1943) ................................................................... 45

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Rodriguez v. Hemit*,
  No. C16-778 RAJ, 2018 WL 3618260 (W.D. Wash. July 30, 2018)....................29

*Rosario v. Rockefeller*,
  410 U.S. 752 (1973)...............................................................................................54

*Roudebush v. Hartke*,
  405 U.S. 15 (1972).................................................................................................48

*Sears, Roebuck & Co. v. USPS*,
  134 F. Supp. 3d 365 (D.D.C. 2015), *aff'd in part on other grounds, vacated
  in part on other grounds, rev'd in part*, 844 F.3d 260 (D.C. Cir. 2016)...............29

*Shalala v. Ill. Council on Long Term Care, Inc.*,
  529 U.S. 1 (2000)...........................................................................................37, 46

*Short v. Brown*,
  893 F.3d 671 (9th Cir. 2018) .................................................................................54

*Smiley v. Holm*,
  285 U.S. 355 (1932)................................................................................47, 48, 49

*Southern California Edison v. USPS*,
  134 F. Supp. 3d 311 (D.D.C 2015).......................................................................33

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016)...........................................................................................24

*State of Alaska v. Nat'l Parks & Conservation Ass'n, Inc.*,
  981 F.2d 1259 (9th Cir. 1992) ...............................................................................51

*Striley v. USPS*,
  No. 16-CV-07233-HRL, 2017 WL 513166 (N.D. Cal. Feb. 8, 2017) ...................29

*Sullivan v. Stroop*,
  496 U.S. 478 (1990)...............................................................................................35

*Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans*,
  379 U.S. 411 (1995).........................................................................................29, 30

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009).........................................................................................25, 57

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Telecomms Res. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ............................................................... 30

*Texas Democratic Party v. Abbott*,
  961 F.3d 389 (5th Cir. 2020) ............................................................... 53

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ............................................................................ 37

*Town of Chester v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017) ........................................................................ 59

*U.S. ex rel. Rahman v. Oncology Assocs., PC*,
  198 F.3d 502 (4th Cir. 1999) ............................................................... 46

*U.S. Term Limits, Inc. v. Thornton*,
  514 U.S. 779 (1995) ................................................................ 47, 48, 50

*United Farm Workers of Am., AFL-CIO v. Chao*,
  227 F. Supp. 2d 102 (D.D.C. 2002) ..................................................... 42

*Washington State Grange v. Washington State Republican Party*,
  552 U.S. 442 (2008) ............................................................................ 48

*Wilson v. USPS*,
  441 F. Supp. 803 (C.D. Cal. 1977) ...................................................... 39

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .......................................................................... 22, 25

**STATUTES**

28 U.S.C. § 569 ..................................................................................... 32

35 U.S.C. § 141 ..................................................................................... 32

39 U.S.C. § 401 ..................................................................................... 36

39 U.S.C. § 409 ..................................................................................... 27

39 U.S.C. § 3661 ............................................................................ *passim*

39 U.S.C. § 3662 ............................................................................ *passim*

39 U.S.C. § 3663 ..................................................................................... 28

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

39 U.S.C. § 3664 ................................................................................... 28

Wash Rev. Code Ann. § 29A.40.160 ................................................... 55

Wash Rev. Code Ann. § 29A.40.180 ................................................... 55

**OTHER AUTHORITIES**

Advisory Opinion Concerning a Proposed Change in the Nature of Postal
   Services, Docket No. 2006-1 (Dec. 12, 2006)........................................ 43

Advisory Opinion Concerning the Process for Evaluating Closing Stations and
   Branches, Docket No. N2009-1 (Mar. 10, 2010),
   https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf. ................. 43

Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1
   (Mar. 24, 2011),
   https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf. ................. 44

Advisory Opinion on Mail Processing Network Rationalization Service Changes,
   Docket No. N2012-1 (Sept. 28, 2012),
   https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_
   09282012.pdf ................................................................................... 43

Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2
   (Aug. 23, 2012),
   https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf ................... 43

Advisory Opinion on Service Changes Associated With Standard Mail Load
   Levelling, Docket No. N2014-1 (Mar 26, 2014),
   https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-
   1_Advisory%20Opinion.pdf ................................................................ 43

Advisory Opinion on Retail Access Optimization Initiative,
   Docket No. N2011-1 (Dec. 23, 2011),
   https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf ........................... 43

Congressional Briefing (Aug. 31, 220),
   https://about.usps.com/newsroom/global/pdf/0831-congressional-service-
   briefing.pdf...................................................................................... 19

*Number of Voters and Voter Registration as a Share of the Voter Population*,
   https://www.kff.org/other/state-indicator/number-of-voters-and-voter-
   registration-in-thousands-as-a-share-of-the-voter-population/?current

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Timeframe=0&sortModel=%7B%22colld%22:%22Location%22,%22
sort%22:%22asc%22%7D ............................................................................ 4

Service Performance Rebounds at Postal Service (Aug. 31, 2020),
    https://about.usps.com/newsroom/national-releases/2020/0831-service-
    performance-rebounds-at-postal-service.htm ........................................... 19

S. Rep. No. 912, 91st Cong. 2d Sess. (1970) ...................................................... 32, 33

USPS Service Performance Continues Upward Trend (Sept. 10, 2020),
    https://about.usps.com/newsroom/national-releases/2020/0910-usps-service-
    performance-continues-upward-trend.htm ............................................. 19

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1

## **INTRODUCTION**

2   This case is not about whether the United States Postal Service ("USPS") will

3   be able to handle the mail volume from individuals who intend to vote by mail in the

4   November 2020 election (the "Election").  Just as it has in past elections, USPS has

5   taken, and will continue to take, a number of efforts to ensure that ballots move

6   quickly and efficiently through the mail. Such efforts include encouraging state

7   officials to appropriately identify and mark ballots to facilitate proper treatment of

8   Election Mail; asking voters to mail their ballots as soon as they are able; and then

9   tracking (where possible), monitoring, and moving the ballots as expeditiously as

10  possible.  Nothing has changed in USPS's approach to Election Mail from past years,

11  except that the Postal Service has put in place *even more* processes to monitor and

12  move these ballots in response to the major increase in Election Mail volume caused

13  by the COVID-19 pandemic.  Indeed, to avoid any doubt about USPS's ability to meet

14  its responsibilities, it has suspended a number of routine, long-standing operational

15  activities—implemented *before* Postmaster General DeJoy's tenure—until after the

16  Election.

17   In light of these publicly expressed commitments, this case is now about

18  Plaintiffs' attempts to have this court oversee the day-to-day operations of USPS,

19  based on a claim that courts have analogized to a "Hail Mary," to right wrongs that

20  do not exist.  Plaintiffs' legally deficient claims, arising from unsupported fears about

21  the potential actions of USPS, do not warrant the extraordinary relief it seeks.

22   First, Plaintiffs cannot show a likelihood of success because they lack Article

23  III standing.   Their purported injuries either involve purely procedural injuries

24  insufficient to justify standing under the Supreme Court's *Summers* decision; attempts

25  to assert *parens patriae* standing on behalf of their citizens that is insufficient under

26  the Supreme Court's *Mellon* decision; and their speculation about future injury caused

27  by future mail delays that is insufficient under the Supreme Court's *Clapper* decision.

28   Even if Plaintiffs had standing, the Court still lacks jurisdiction over Plaintiffs'

- 1 -

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

statutory claim.  Their sole claim is that the Postal Service failed to comply with 39 U.S.C. § 3661's requirement that certain major changes first receive an advisory opinion by the Postal Regulatory Commission.  But Congress has explicitly channeled those claims away from the district court, and towards the Postal Regulatory Commission, an independent executive branch establishment responsible for regulating the Postal Service, with review in the D.C. Circuit.  Decades of precedent thus confirm that district courts have no jurisdiction over these claims.

Although Plaintiffs attempt to turn to the last resort of *ultra vires* jurisdiction to overcome this clear statutory bar, such jurisdiction is unavailable here for two reasons.  First, *ultra vires* review is unavailable where there is a path for judicial review, and because here there clearly is, Plaintiffs cannot invoke this doctrine.  Second, relief under the *ultra vires* doctrine requires a clear violation of an explicit statutory command, implicating the agency's jurisdiction to take such action.  But the statute Plaintiffs rely upon applies only to certain major changes, and here Plaintiffs' challenges never culminated in a "change" of service at the national level.  Nor, largely for the same reasons, is mandamus appropriate.

Plaintiffs' constitutional claims fares no better.  Plaintiffs ask this Court to be the first to recognize a claim under the Elections Clause to prevent any federal action that may indirectly impact State laws concerning the 'times, places, and manner" of their elections.   But USPS has not prevented Plaintiffs from determining how Plaintiffs' citizens may legally vote; indeed, those allowed to vote by mail under Plaintiffs' laws still possess that right today. Plaintiffs' claim thus relies on the remarkable and unprecedented theory that the Elections Clause protects Plaintiffs from any federal policy that may indirectly affect the electoral process.  Unsurprisingly, Plaintiffs cite to no case where a court has adopted this theory—which could potentially jeopardize a number of federal policies—and Defendants are aware of none.  Plaintiffs also claim that the Postal Service's routine operations have violated the right to vote. But this fails for two reasons: first, Plaintiffs are attempting

- 2 -

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

to bring this claim on behalf of their citizens—a type of *parens patriae* claim that is unavailable to them.  And second, they offer no authority for the idea that the incidental activities of a federal agency can violate the right to vote, activities that were, in any event, entirely rational.

Furthermore, Plaintiffs cannot establish the other prerequisites for a preliminary injunction.  Plaintiffs' purported injuries are not irreparable, but rather consist of speculative and unjustified concerns over future mail deliveries, or of speculative injuries to third-parties.  And finally, the balance of the equities and the public interest support allowing the Postal Service to manage its operations as efficiently and effectively as possible, in order to meet the many burdens placed upon it in advance of the upcoming election.  Those equities do not support placing the Postal Service under judicial receivership, with that election only weeks away.

## **BACKGROUND**

### **I.    THE UNITED STATES POSTAL SERVICE**

USPS is a self-supporting, independent establishment of the executive branch, responsible for providing postal services throughout the United States.  USPS has the authority to, among other things, designate mail routes and construct or designate post offices with the authority to carry, deliver, and regulate mail for the entire country. It is one of the nation's largest and most complex business operations. USPS employs more than 630,000 employees; operates more than 31,000 Post Offices; utilizes more than 204,000 delivery vehicles and 8,500 pieces of automated processing equipment; and typically processes and delivers more than 450 million mailpieces to nearly 160 million delivery points in a *single* day.  *See* Ex. 1 (USPS FY2019 Annual Report to Congress) at 2, 7.

The Board of Governors of USPS, which is comparable to the board of directors for a publicly held corporation, directs the exercise of powers of the Postal Service, including, among other things, long-range planning, oversight of service

1  standards, management of expenditures, and review of policy and practices.  The
2  PRC, an independent agency, has regulatory oversight over USPS.

3      Louis DeJoy is the 75th Postmaster General and Chief Executive Officer of
4  USPS.  The Governors appointed Postmaster General DeJoy on May 6, 2020.   He
5  assumed office on June 16, 2020.

6  ## II.    USPS'S HANDLING OF ELECTION MAIL

7      "Election Mail" is defined by USPS as any item mailed to or from authorized
8  election officials that enables citizens to participate in the voting process. *See*
9  Declaration of Robert Glass ("Glass Dec.") ¶ 3. This includes mail sent by election
10 officials to voters (*e.g.*, voter registration materials, mail-in ballot applications,
11 polling place notifications, blank ballots), and mail returned by voters to election
12 officials (*e.g.*, completed ballots, completed registration or ballot applications).[1]  *Id.*
13 USPS regards Election Mail as having special importance.

14     The USPS has determined that it is fully capable—both financially and
15 operationally—of handling a surge of Election Mail in connection with the November
16 Election. By its analysis, even if every registered voter in the United States[2] used a
17 mail-in ballot to cast a vote in the Election, the associated mail volume would
18 represent only a small fraction of the total mailpieces that USPS processes each week,

19
20 _____
21 [1] Election Mail is distinct from "Political Mail" sent by political candidates, political
22 action committees, and similar organizations to engage in advocacy.  Glass Dec. ¶ 3.

23 [2] Publicly available data generally indicate that there are approximately 150 million
24 registered voters in the United States. *See, e.g.*, *Number of Voters and Voter*
25 *Registration as a Share of the Voter Population*, https://www.kff.org/other/state-
26 indicator/number-of-voters-and-voter-registration-in-thousands-as-a-share-of-the-vo
27 ter-population/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location
28 %22,%22sort%22:%22asc%22%7D (last visited Sept. 10, 2020).

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

on average, *id.* ¶ 42, and would pale in comparison to spikes in mail volume that the USPS handles every winter holiday season.    *Id.* ¶ 43; Declaration of Jason DeChambeau ("DeChambeau Dec.") ¶ 23.  Indeed, USPS projects (even accounting for an increased use of mail-in ballots to compensate for COVID-19-related mitigation efforts) that only two to five percent of the total mail volume in October and November 2020 will be Election Mail. Glass Dec. ¶ 42; DeChambeau Dec. ¶ 23. As detailed below and in USPS's declarations and public statements, USPS has been planning for the Election for many months, and has the funds, processing capacity, and personnel to ensure that Election Mail is timely delivered.  Glass Dec. ¶¶ 42-44.[3]

Beyond these financial and operational resources, USPS will continue to employ longstanding practices to facilitate the use of Election Mail by states, and to enhance the Postal Service's handling of Election Mail.  These include extensive outreach to state and local election officials to support effective use of postal services to facilitate the distribution and return of ballots; publishing and distributing the official Election Mail kit (which provides a comprehensive guide to services, resources, and recommendations for Election Mail) to approximately 11,500 state and local election officials; offering official Election Mail markings to improve the visibility and ensure proper handling of Election Mail; and, as the attached declarations further detail, taking extraordinary steps to ensure the timely delivery of Election Mail for the upcoming election. *See* Glass Dec. ¶¶ 3-41.  Further, due to the

---

[3] *See also* Postmaster General Louis DeJoy's Opening Remarks for the USPS Board of Governors Meeting (Aug. 7, 2020) (Ex. 3) at 4 ("[T]he Postal Service has ample capacity to deliver all election mail securely and on-time in accordance with our delivery standards, and we will do so."); Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections (Ex. 5) at 54 ("[W]e have plenty of cash to operate for the election.").

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1    unprecedented demands of the election, the Board of Governors has established a

2    bipartisan Election Mail Committee to actively oversee USPS's support of Election

3    Mail for the Election. *Id.* at ¶ 10.  USPS has demonstrated, both in its public

4    representations and in practice, its commitment to continuing its longstanding practice

5    to facilitate and expedite the timely delivery of Election Mail this year.

6    **A.    State, Local, and Individual Responsibilities for Election Mail**

7    Notwithstanding USPS's longstanding commitment to the timely delivery of

8    Election Mail, election officials and voters bear significant responsibility in the

9    successful utilization of postal services for the Election.  USPS lacks authority over

10   the critical decisions committed by law to states and local election officials regarding

11   their Election Mail policies and procedures.  *Id.* ¶ 4. Generally, each state determines

12   whether, and to what extent, to allow domestic voters to cast their votes by mail.  If

13   mail-in voting is allowed, either the legislature or state and local election officials, if

14   so authorized,  must choose whether to send Election Mail to voters via either First-

15   Class Mail, which  is typically delivered in two to five days, or lower-cost Marketing

16   Mail, which is typically delivered in three to ten days. *Id.* ¶ 4; *see also* Ex. 4 (USPS

17   Office of Inspector General (OIG) Audit Report No. 20-225-R20, "Processing

18   Readiness of Election and Political Mail During the 2020 General Elections*"*

19   (Aug. 31, 2020)).  Regardless of what class of mail election officials use to mail

20   ballots out *to* voters, all ballots returned by mail to election officials *from* voters are

21   First-Class Mail, unless a voter sends it using a premium service with faster delivery

22   standards (*i.e.* Priority Mail or Priority Express Mail). Ex. 4 at 1; Glass Dec. ¶ 4.

23   USPS has not altered, nor will it alter, any of its existing postal services, delivery

24   standards, or rates applicable to the delivery of Election Mail in advance of the

25   Election. *See, e.g.*, Ex. 5 (Tr. of Senate Homeland Security and Governmental Affairs

26   Committee Hr'g on USPS Operations During COVID-19 and the Elections (Aug. 21,

27   2020)) at 18 ("[W]e are not going to change any rates."); Ex. 3 (USPS Office of

28   Inspector General (OIG) Audit Report No. 20-225-R20, "Processing Readiness of

- 6 -

Election and Political Mail During the 2020 General Elections" (Aug. 31, 2020)) at 4 ("We have delivery standards that have been in place for many years. These standards have not changed.").

State legislatures, or election officials, if delegated such authority, also have the responsibility for making key decisions that directly impact mail-in voting. Within the constraints of state and federal law, state and local election officials determine, among other things: (1) the design of their Election Mail (its dimensions and the graphic and textual elements that will be displayed); (2) whether they will sufficiently mark Election Mail to enable USPS to identify and expeditiously process Election Mail for handling and delivery; (3) deadlines for voters to request and return mail-in ballots; (4) when Election Mail will be sent to voters; (5) whether Election Mail will be trackable (for example, using USPS's Intelligent Mail barcode system); and (6) whether to pre-pay postage the return postage for completed ballots from voters (versus requiring voters to affix their own postage). Glass Dec. ¶ 4. Individual voters are responsible for, among other things, providing current addresses to election officials; understanding mail-in voting procedures in their state and locality; and timely requesting ballots from, and returning those ballots to, election officials.

USPS's most significant operational concerns with respect to the Election are those elements controlled by the states themselves, either through legislation or state and local election officials and voters. *Id.* ¶ 45. Indeed, when reviewing an audit of the special and primary elections in May and June 2020, the USPS Office of Inspector General ("OIG") concluded that USPS had improved several of its practices and procedures since prior OIG audits and had appropriately adjusted its processes to accommodate the timely processing of Election Mail to meet the needs of the elections. Ex. 4 at 3, 12. OIG identified, however, several "potential concerns" that may affect the smooth functioning of Election Mail (*i.e.* ballots mailed without tracking technology, ballot mailpiece design, Election Mail sent to voters too close to

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

the election, varying state postmark requirements for ballots, and out-of-date voter addresses)—none of which are controlled by USPS.

**B.** **USPS's Efforts to Ensure Timely Delivery of 2020 Election Mail**

In preparation for the Election, USPS has undertaken extensive, expanded efforts to help election officials and voters in the planning and preparation of Election Mail, strongly encourage election officials, voters, and Postal Service employees to implement best practices, reinforce existing policies and procedures for handling Election Mail with Postal Service employees, and prepare to process and deliver a high volume of Election Mail.

**a.** **USPS Outreach and Recommendations to Election Officials**

USPS has demonstrated its commitment to provide election officials with the tools necessary to use the U.S. Mail as a secure, efficient, and effective way to facilitate the election process. In support of the Election, USPS has already had approximately 42,000 contacts to confer and advise state and local election officials regarding Election Mail best practices and recommendations, and this outreach is ongoing. Glass Dec. ¶¶ 5-9. Additionally, since February 2020, the outreach strategy has included distributing approximately 11,500 copies of "Kit 600," an official Election Mail guide; offering mailpiece design services; designating Election Mail Coordinators to serve each locality; and publishing extensive election-related information and guidance online. *Id.* ¶ 6; *see also* Ex. 6 (USPS 2020 Election Mail – Kit 600). This outreach strategy in the run-up to the 2020 Election is consistent with USPS's outreach efforts in past election years. The principal distinction between this year's effort and those of previous election years is that the volume and frequency of USPS's communications have *increased* to address challenges stemming from the COVID-19 pandemic. Glass Dec. ¶ 32.

In May and July 2020, following dissemination of Kit 600, the USPS General Counsel's office sent letters to election officials to follow up and emphasize key

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

aspects of the USPS's process and recommendations so that they may be taken into account when educating the public on voting by mail. Glass Dec. ¶ 7 & Glass Dec. Ex. 1.  USPS tailored the July 2020 letters to each state, identifying key provisions of each state's election laws and procedures and relevant considerations for the timely, effective use of U.S. Mail to facilitate the voting process.  *See generally* Ex. 15 (July 29, 2020 USPS Letter).  For example, in its letter to Arkansas election officials, USPS cited provisions of state election law that "are incongruous with [USPS] delivery standards" and "create[] a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted." *Id.* at 1.  USPS implored Arkansas election officials, as it did all other state and local election officials, to "keep the Postal Service's delivery standards and recommendations in mind when making decisions as to the appropriate means used to send a piece of Election Mail to voters, and when informing voters how to successfully participate in an election" by mail. *Id.* at 2.  None of the letters sent to state and local election officials by the Postal Service suggested that the Postal Service intended to slow or delay delivery of Election Mail, or that USPS was otherwise altering its service standards for Election Mail.  Rather, these letters aimed to ensure that election officials are fully informed, well in advance of the Election, of USPS's delivery standards, the extensive resources that USPS offers to assist election officials, and the potential risks that local ballot-request or ballot-return deadlines may pose to voters' full participation by mail in the Election. *See* Ex. 1; *see generally* Ex. 15. Moreover, these letters were consistent with USPS's outreach to election officials during past election cycles. *See, e.g.*, Glass Dec. ¶ 8 & Glass Dec. Ex. Ex. 2 (Sept. 23, 2016 letter to state election officials advising them, for example, to consult with USPS Election Mail Coordinators, urge voters to return ballots one week early in order to ensure timely delivery, use the official USPS Election Mail markings, and send Election Mail by First-Class Mail).

In all of its communications regarding 2020 Election Mail, USPS has strongly, and repeatedly, recommended that election officials adopt USPS best practices, including the following[4]:

- Consult with USPS Election Mail Coordinators to better understand the Postal Service's services, resources, recommendations and to help resolve issues should they arise, as well as mailpiece design analysts on how to ensure quality mailpiece design for Election Mail envelopes, including ballot envelopes. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 2; Ex. 6 at 5; *see also* Glass Dec. ¶ 6.

- Identify Election Mail using USPS's official Election Mail logo, Green Tag 191 (which can be applied only to containers of mail enclosing ballots being sent out to voters), or by other means. *See, e.g.*, Ex. 1 at 2; Ex. 6 at 4, 5, 13, 23; Ex. 8 (USPS Election Mail – Graphic Guidelines and Logos (Pub. 631)); *see also* Glass Dec. ¶¶ 11-14.



Official USPS Election Mail Logo

Green Tag 191

- Use tracking technology, for example USPS's Intelligent Mail Barcode, for Election Mail. *See, e.g.*, Ex. 1 at 2; Ex. 6 at 7.

---

[4] *See* Glass Dec. ¶ 32; *see also* Ex. 4 at 2 ("[t]he Postal Service has frequently communicated to state election officials the importance of" following best practices).

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

- Use First-Class Mail to transmit Election Mail (including blank ballots) to voters, and allow sufficient time for delivery to and from voters. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 1; Ex. 7 at 10 (USPS Publication 632, explaining the USPS's different delivery standards and "recommend[ing] the use of First-Class Mail service to obtain timely delivery"); *see also* Glass Dec. ¶ 18.

- Keep USPS delivery standards in mind when informing voters how to vote by mail. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 1.

Lastly, the USPS has consistently urged voters to return their completed ballots early. *See, e.g.*, Ex. 1 at 2; Glass Dec. ¶ 42 ("[T]o mitigate the impacts of any surges in Election Mail sent in the days immediately before Election Day, the Postal Service is actively encouraging voters and election officials to act early"); Ex. 9 at 1 (Statement of Postmaster General Louis DeJoy Before the House Committee on Oversight and Reform (Aug. 24, 2020) "encourag[ing] all Americans who choose to vote by mail to request their ballots early and to vote early, as a common sense best practice.").

### b.   USPS's Longstanding Special Measures for Election Mail

For many years, USPS has taken special measures for handling Election Mail. In anticipation of the Election's increased reliance upon USPS, USPS has ramped up its efforts to ensure Election Mail is timely delivered.

First, USPS personnel have long made special efforts to physically identify and track the progress of Election Mail through USPS facilities, to ensure that Election Mail is not delayed or lost in processing or delivery. This effort is significantly aided when election officials use the official USPS Election Mail logo for all Election Mail mailpieces, affix Green Tag 191 to mail bins containing ballots being sent to voters, and check the "Election Mail" box on the postage statement form that is filled out when bulk Election Mail is entered into the USPS system. *See* Glass. Dec. ¶¶ 11-14. When a mail bin identifiable as Election Mail enters the system, USPS personnel log

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

that container at every step of processing, so that it can be easily located if necessary. *Id.* ¶ 19. USPS facilities also deploy end-of-day "all clears," during which in-plant personnel use a checklist to search for all Election Mail within the facility and confirm that it is in the proper location (either already sent out for delivery or further processing, or at the front of the line for the next day). *Id.*

USPS also has several longstanding practices to expeditiously process and deliver of Election Mail, particularly ballots (whether election officials have chosen to send ballots to voters using Marketing Mail or First-Class Mail). *Id.* ¶ 20. USPS devotes excess First-Class Mail processing capacity to Election Mail sent as Marketing Mail, and thereby advances it through the processing network ahead of other marketing mail. *Id.* ¶ 21. As a result, delivery timeframes for Election Mail entered as Marketing Mail are often comparable to those of Election Mail entered as First-Class Mail. *Id.* And, when identifiable, USPS prioritizes placing ballots on outgoing trucks, whether sent using First-Class Mail or Marketing Mails. *Id.* ¶ 22.

Furthermore, USPS has a longstanding practice of postmarking (also referred to as "cancelling") all completed ballots returned by mail that are readily identifiable as ballots. *Id.* ¶ 34. A postmark is a USPS imprint applied to a mailpiece, usually by an Advanced Facer Cancellation System (AFCS) machine at a processing plant, indicating the date that the USPS accepted custody of the mailpiece, and the location the cancellation mark was applied, in order to cancel affixed postage so that it may not be reused. *Id.* ¶ 33, 35. Many mailpieces do not need to be cancelled, because they bear indicia of postage that is not at risk of being reused (*e.g.*, metered or permitted mail, or mail bearing a pre-cancelled stamp). *Id.* USPS, however, still takes measures to strive to postmark all ballots mailed by voters given the emphasis placed on postmarks by some state laws in validating the timely return of ballots. *Id.* USPS even goes so far as to cancel such ballot envelopes by hand, if necessary, to facilitate postmarking. *Id.* ¶ 34.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Based upon USPS's analysis of contemporaneous data regarding current AFCS machine capacity throughout the country, USPS has ample capacity to postmark all mailpieces readily identifiable as ballots. *Id.* USPS also plans to take extra steps for this election to identify and hand-cancel ballots that are rejected by an AFCS machine. *Id.* ¶¶ 39, 41. Further, and for the first time, USPS will use Ballot Monitors during the week preceding and through Election Day to ensure that all USPS personnel follow proper protocol for identifying and postmarking ballots. *Id.* ¶ 39.

USPS will continue these longstanding practices in support of mail-in voting for the Election. Glass Dec. ¶ 28. USPS Headquarters has not issued any direction interfering with, discouraging, or prohibiting USPS personnel from taking appropriate measures to ensure the timely delivery of Election Mail, especially ballots. Glass Dec. ¶¶ 1, 27.

### c.    USPS's Increased Efforts in Support of the Election

In anticipation of the additional mail volume associated with the Election, USPS remains committed to and has increased its efforts to process and deliver Election Mail. For example, Postmaster General DeJoy publicly committed that, starting on October 1, 2020, USPS will engage standby resources in all areas of its operations to satisfy any unforeseen demand related to the Election. *Id.* ¶ 29; Ex. 10 (Statement of Postmaster General Louis DeJoy (Aug. 18, 2020)) at 1-2. These standby resources will include, among other things, availability of additional staffing, transportation, and mail processing capacity (through the use of idle windows). Glass Dec. ¶ 29. USPS has also expanded its Election Mail Task Force this year to include leaders of the postal unions and management associations, to ensure strong coordination throughout USPS and with state and local election officials, and to make sure any concerns can be raised and timely resolved at the highest levels of the organization. *Id.* ¶ 10. As discussed above, USPS has also increased the volume and frequency of its communications with election officials and will, for the first time, utilize Ballot Monitors. *Id.* ¶¶ 32, 39.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

### III.    USPS'S YEARS-LONG MANDATE TO IMPROVE EFFICIENCY AND CONTROL EXPENSES

USPS's systematic efforts to facilitate the use of U.S. Mail for elections, particularly the 2020 Election, have not been diminished by USPS's mandate to improve performance, adhere to service standards, and help address the Postal Service's precarious financial condition—a mandate that long predates Postmaster General DeJoy's tenure. Per USPS's Fiscal Year 2019 Annual Report to Congress, the USPS's financial condition results, in part, from the steady declines in First-Class and Marketing Mail volumes. *See* Ex. 1 at 28-29; *see also, e.g.*, Ex. 11 (First-Class Mail Volume Since 1926 Report, showing that the volume of First-Class Mail in 2019 was at its lowest point since 1977); Ex. 12 (Statement of Postmaster General and Chief Executive Officer Megan J. Brennan Before the House Committee on Oversight and Reform (Apr. 30, 2019)) at 1 (2019 statement of the former Postmaster noting the steep decline in First-Class Mail, the USPS's "most profitable product"). Pursuant to this mandate, the Postal Service routinely analyzes operations and performance metrics to determine whether and where improvements can be made to further efficient service. To that end, USPS regularly reviews, among other things, collection box and equipment utilization, overtime usage, retail and facility operations, and transportation and delivery initiatives. As a part of that process, the USPS makes determinations as to collection box and equipment removal, implementation of programs to improve efficiency, changing retail hours, consolidation or closing of facilities, and amendments to policies and practices.

In light of the increased scrutiny of these activities recently, and in an effort to bolster public confidence in the Postal Service's ability to handle Election Mail, Postmaster General DeJoy has publicly committed to suspending the aforementioned activities, including equipment and collection box removal, changes to retail hours, plans to consolidate or close any mail processing facilities, and implementation of a limited pilot program for mail carriers. *See, e.g.*, Ex. 10. He also clarified that

- 14 -

overtime was never banned and that it would continue to be permitted. *Id.* The only exception to Postmaster General's DeJoy's directive to maintain the status quo through Election Day pertains to the ongoing effort to improve compliance with existing schedules throughout USPS's transportation and processing networks—which, as discussed below, has not had any lasting negative impact on USPS's service performance.

### A. Periodic, Data-Based Reduction in Redundant Processing Equipment and Collection Boxes

For years, and largely the result of changing operational needs due to the decline in letter and flat mail[5] volume, USPS has periodically gathered and analyzed data relating to the utilization of blue collection boxes and mail processing machines. Based upon these analyses, USPS makes determinations regarding the reduction or reallocation of redundant collection boxes and processing equipment based upon its analyses.

USPS has over 140,000 collection boxes. *See* Declaration of Jennifer Vo ("Vo Dec.") ¶ 4. USPS regularly reviews the need for and location of collection boxes in accordance with procedures set out in the Postal Operations Manual ("POM"). *Id.* ¶ 5. Generally, a collection box is targeted for removal if it averages fewer than 25 mailpieces daily during a two week observation period. With some exceptions, USPS posts a 30-day public notice on collection boxes identified for relocation or removal before final action. *Id.* ¶¶ 5, 8. For the last seven years, USPS has removed an average of 3,100 collection boxes each year, many of which were relocated to more heavily trafficked areas. *Id.* ¶¶ 8, 10. Local USPS officials are primarily responsible for testing, assessing, and identifying collection boxes for removal. *Id.* ¶ 6. USPS has removed approximately 1,500 boxes in 2020 pursuant to this routine process,

---

[5] "Flat mail" refers to periodicals and larger envelopes (for example, newsletters and advertising material). *See, e.g.*, DeChambeau Dec. ¶ 5.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1    consistent with removal rates of previous years. Postmaster General DeJoy was not

2    involved in any decisions relating to the removal of these boxes. *Id.* ¶¶ 10, 19. Rather,

3    the removal and relocation of collection boxes (other than damaged boxes or

4    unsecured boxes) has been suspended at least through the Election at Postmaster

5    General DeJoy's direction. *Id.* ¶¶ 18-19.

6        Similarly, USPS regularly identifies mail processing and sorting equipment in

7    approximately 289 mail processing facilities for removal and/or replacement. *See*

8    DeChambeau Dec. ¶ 7; Declaration of Kevin Couch ("Couch Dec.") ¶ 3; Declaration

9    of Robert Cintron ("Cintron Dec.") ¶ 5. Based on its data analyses, USPS has been

10    steadily reducing its letter and flat mail processing equipment for several years, to

11    align with volume reductions in those types of mail. DeChambeau Dec. ¶ 13. The

12    number of machines reduced varies from year to year, based on utilization data. *Id.*

13    For example, in Fiscal Year 2016, the USPS reduced 1,120 letter and flat sorting

14    machines, while the following year it reduced only 197 machines. *Id.* In 2017, the

15    USPS began a more structured, phased equipment reduction initiative. *Id.* ¶ 14. The

16    first phase focused on reducing unnecessary Delivery Barcode Sorters (DCBS) and

17    Automated Flat Sorting Machines (AFSM), which process letter and flat mail,

18    respectively. *Id.* Later phases included reducing unnecessary AFCS equipment. *Id.*

19    ¶¶ 6, 16. In 2020, the USPS reduced approximately 700 letter and flat sorting

20    machines. *Id.* ¶¶ 19-21. These reductions were planned and scheduled before

21    Postmaster General DeJoy took office, and he had no role in their implementation, *id.*

22    ¶ 22, Couch Dec. ¶¶ 5, 9, Declaration of Michael L. Barber ("Barber Dec.") ¶ 5.

23    Regarding the timing of the removals, as in prior years, the removals were scheduled

24    for summer, when mail volumes are historically lower. DeChambeau Dec. ¶ 19;

25    Couch Dec. ¶ 4.

26        Mail processing machines that are taken out of service are generally removed

27    from a facility floor and disassembled for their usable parts. Couch Dec. ¶¶ 10-11.

28    Other machines may be offered for sale to the general public through the USPS's

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Corporate Asset Accountability Office. *Id.* ¶¶ 10, 12. Indeed, factoring in the mail processing machines that were removed or disconnected this year, USPS's mail processing utilization at the national level ranges from 35 percent (when mail is low) to 65 percent (when mail is high); which means that machines have ample extra capacity. Barber Dec. ¶ 6.

USPS is confident that its processing facilities have ample capacity to process all anticipated Election Mail based on its ongoing monitoring of processing capacity data, taking into account machines that have been removed from service. DeChambeau Dec. ¶ 23; Barber Dec. ¶ 6. USPS Mail Processing Operations tracks mail processing data for machines nationwide in order to evaluate whether machine utilization comports with the volume and types of mail handled in each facility, removing and/or replacing machines accordingly. DeChambeau Dec. ¶ 8; Couch Dec. ¶ 4; Barber Dec. ¶ 4. USPS may also remove machines because they are obsolete, to free up floor space for other use (*e.g.*, sorting operations or package handling equipment), or as a result of facility consolidations, though no mail processing facility closings or consolidations are scheduled for FY 2020 or the first quarter of FY 2021. DeChambeau Dec. ¶¶ 7-12, 18; Couch Dec. ¶ 3; *see* Barber Dec. ¶ 11; *see also* Ex. 10 at 1 ("No mail processing facilities will be closed.").

On August 18, 2020, Postmaster General DeJoy ordered that all removals of equipment be suspended until after the Election. *See* Ex. 10 at 1; DeChambeau Dec. ¶ 22; Couch Dec. ¶¶ 13-15.

### B. USPS's Continued Focus on Adherence to Existing Transportation Schedules

Approximately two years ago, Robert Cintron, Vice President of Logistics at USPS Headquarters, began an initiative to improve compliance with USPS's long-established delivery schedules. Cintron Dec. ¶¶ 1, 11-13, 21. When Postmaster General DeJoy took office in June 2020, Mr. Cintron discussed the initiative with the Postmaster General and other Postal executives. *Id.* ¶¶ 22-23. Concurrent with these

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

discussions, the OIG published a report addressing "late deliveries . . . late dispatch, extra trips, and all the time and costs" that those issues caused. Ex. 5 at 10. In that report, OIG found that "generally, the Postal Service's processing network is not operating at optimal efficiency." Ex. 13 (USPS OIG Audit Report No. 19XG013NO00O-R20, "US. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020)) at 1. In particular, "mail processing operations were not completed on time and mail missed its last scheduled transportation trip. In response, management used overtime . . . and either delayed the scheduled transportation trip or called for an extra trip." *Id.* at 2. Among interrelated problems, "[a]bout 20 percent of total transportation trips (or four million trips) left mail processing facilities late." *Id.*

Soon after joining the Postal Service, Postmaster General DeJoy reemphasized the need to adhere to USPS's existing operational plans, including transportation schedules. Cintron Dec. ¶ 23. Mr. Cintron and his team then developed written guidelines (generally consistent with past practices) regarding the circumstances where the scheduling of extra transportation trips is appropriate. Cintron Dec. ¶ 24 & Ex. 2. On July 14, 2020, the guidelines were distributed to area executives, advising them of USPS's renewed effort to limit unplanned extra and under-utilized trips. *Id.* ¶ 25.[6]

---

[6] USPS is aware of a memorandum dated July 10, 2020, titled "Mandatory Stand-Up Talk: All Employees," which discusses some issues relating to late and extra trips. *See* Cintron Dec. ¶ 24 n.1. USPS, upon investigation, learned that this memo was locally prepared; it was not created, reviewed, or approved by USPS Headquarters. *Id*. The memo does not represent official USPS policy, in fact it mischaracterizes USPS policy and the USPS's initiative to encourage compliance with transportation schedules. *Id.*

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

During the following week, compliance with transportation schedules improved, but USPS experienced a temporary decline in its service performance. *Id.* ¶ 26. However, after USPS addressed the decline, it observed steady improvements in service performance. *Id.* ¶ 27; *See* Declaration of Angela Curtis ("Curtis Dec.") ¶ 30. On August 31, 2020, Postmaster General DeJoy provided updated information to Congress showing "the expected improvements in service. . . . across all major mail categories in the weeks prior to my testimony, and this trend has continued through August, rapidly returning to early July levels. . . . while still adhering to our existing transportation schedules. In other words, we are improving service performance while more consistently running our trucks on time." *See* Service Performance Rebounds at Postal Service (Aug. 31, 2020) at 1, https://about.usps.com/newsroom/national-releases/2020/0831-service-performance-rebounds-at-postal-service.htm; *id.* Congressional Briefing (Aug. 31, 220) at 8 (data showing that USPS service performance has rebounded to early-July 2020 levels), https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf ("Congressional Briefing"); Cintron Dec. ¶ 27. Furthermore, in the last two months, there has been a sharp decrease in late and extra trips. *See* Congressional Briefing at 4-6 (data showing a steep decline since early July in late and extra trips); Cintron Dec. ¶ 27. USPS's performance continues to improve.  *See* USPS Service Performance Continues Upward Trend (Sept. 10, 2020), https://about.usps.com/newsroom/national-releases/2020/0910-usps-service-performance-continues-upward-trend.htm.

### C.    USPS Personnel Practices Related to Overtime Usage and Staffing Shortages Caused by the Covid-19 Pandemic

#### 1.    Overtime

Defendants have not attempted to curtail USPS's ability to handle Election Mail by banning or unreasonably restricting employee overtime. The Postal Service's customary overtime practices, pursuant to which overtime is generally evaluated and approved by local field managers (not Headquarters personnel), have remained

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

unchanged since Postmaster General DeJoy took office, and the rate at which USPS has incurred overtime has remained constant. *See* Curtis Dec. ¶¶ 12, 22-23; Declaration of Joshua Colin, Ph.D. ("Colin Dec.") ¶¶ 3-4. To the extent USPS has made past efforts to monitor or address certain issues regarding overtime usage, such efforts are unrelated to the Election. Instead, these efforts consist of ongoing, routine measures to improve efficiency and reduce unnecessary costs. *See* Curtis Dec. ¶¶ 12-13; Colin Dec. ¶¶ 3-6.

In maintaining the status quo leading up to the Election, Postmaster General DeJoy clarified that he never banned overtime, and continues to approve of its appropriate use. *See, e.g.*, Ex. 14 at 14 (Transcript of House Oversight and Reform Committee on Postal Service Operational Changes Hearing (Aug. 24, 2020)) ("I did not direct the elimination or any cutback in overtime."); Ex. 10 at 1 ("[W]e reassert that overtime has, and will continue to be, approved as needed").

## 2. The Impact of the COVID-19 Pandemic

Since March 2020, USPS has faced significant staffing issues caused by the COVID-19 pandemic. *See* Declaration of John Prokity ("Prokity Dec.") ¶ 4; Curtis Dec. ¶ 18. Prior to the pandemic, USPS experienced, on average, a weekly equivalent of 55,000 employees using full-day leave. Prokity Dec. ¶ 5. In early March, this figure began to increase until it peaked in mid-April at 81,000, or the equivalent of nearly 26,000 additional employees using full-day leave in a week. *Id.* Thereafter, the situation improved somewhat until July, when personnel availability again began to decrease (hitting its lowest levels in the week of July 11, 2020). *Id.*

To mitigate these staffing shortages, which negatively USPS's ability to timely deliver mail, *see id.* ¶¶ 20-21, Prokity Dec. ¶¶ 6, 10, USPS has taken extraordinary steps to hire additional employees.[7] *See* Prokity Dec. ¶ 6. For instance, USPS has

---

[7] On August 7, 2020, in connection with a high-level organizational restructuring, USPS implemented a hiring freeze for managerial positions. Prokity Dec. ¶ 6 n.1.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1
2
3
4
5
6

implemented a number of changes to its normal hiring processes to be able to hire employees more quickly, and has negotiated agreements with the postal workers' unions to allow the hiring of non-career employees above the historical contractual limits. *See id.* ¶¶ 7-8. As a result of these and other efforts, USPS has hired an average of 2,000 to 3,000 employees per week, with a total of 88,627 new employees hired between March 1 and August 27, 2020. *Id.* ¶ 9.

7

### D.  Other Efforts Aimed at Improving Efficiency

8
9
10
11
12
13
14
15
16

There are two other practices that have prompted election-related criticism of USPS: setting "park points" (*i.e.*, locations where a driver parks and exits a postal vehicle to deliver mail on foot) and "Expedited to Street/Afternoon Sortation" ("ESAS"), a limited pilot program aimed at reducing morning activities to allow carriers to begin their routes earlier.  There is no nationwide USPS policy setting a fixed cap on the number of park points that may be used on a route, nor has Postmaster General DeJoy made any changes to USPS practices regarding park points. Colin Dec. ¶¶ 12-14.  Furthermore, ESAS was planned before Mr.  DeJoy took office, and it was suspended at the Postmaster General's direction.  Colin Dec. ¶ 11.

17

## IV.   PROCEDURAL HISTORY

18
19
20
21
22
23
24

Plaintiffs filed this Complaint on August 18, 2020, Compl, ECF No.1, and, after a brief period of expedited discovery, their Motion for Preliminary Injunction, ECF No. 12, on September 9, 2020.  Plaintiffs challenge three purported Postal Service policies: (1) a policy entitled "Leave Mail Behind," which allegedly prohibits extra mail truck trips; (2) a policy of no longer treating Election Mail as First-Class Mail; and (3) the removal of mail processing and sorting machines.  *See* PI Mem. at 4-17.

25
26
27
28

---

This action has had no effect on the hiring of non-management employees, including mail carriers, mail handlers, and clerks.  *Id.*; *see also* Curtis Dec. ¶ 25.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1    Twelve lawsuits, including this one, have been filed recently across the country

2  concerning purported changes made by USPS since Postmaster General DeJoy took

3  office. Generally, the plaintiffs in these cases allege that the purported changes were

4  intended to obstruct voting by mail for the Election, asserting overlapping

5  constitutional and statutory claims. Despite the fact that the USPS suspended almost

6  all of the complained-of activities it had actually been undertaking (almost all of

7  which were long-standing practices of the Postal Service) until after the Election,

8  these plaintiffs continue to pursue litigation.[8]

9  ### **STANDARD OF REVIEW**

10    Injunctive relief "is an extraordinary remedy that may only be awarded upon a

11  clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def.*

12  *Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction

13  must establish that he is likely to succeed on the merits, that he is likely to suffer

14  irreparable harm, that the balance of equities tips in his favor, and that an injunction

15  is in the public interest. *Id.* at 20. When, as here, the government is opposing a motion

16  for a preliminary injunction, the third and fourth factors merge. *See Nken v. Holder*,

17  556 U.S. 418, 435 (2009). Moreover, Plaintiffs seek an order requiring the Postal

18  Service to take particular actions, rather than seeking merely to preserve the status

19  quo. This motion accordingly seeks a mandatory injunction, and "[t]he Ninth Circuit

20  has adopted a heightened standard with respect to mandatory injunctions." *Plumbing*

21  *v. Belodedov*, 2017 WL 888965, at *3 (E.D. Ca. Feb. 14, 2018) (citing *Park Vll.*

22  *Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1161 (9th Cir.

23  2011)). "A district court should deny a mandatory injunction 'unless the facts and

24  _____

25  [8] Because the issues here are largely the same, and in the interest of efficiency,

26  Defendants also rely here on the declarations filed in support of Defendants'

27  preliminary injunction briefing in *Jones, et al. v. United States Postal Service, et al.*,

28  No. 1:20-cv-06516 (S.D.N.Y.).

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

law clearly favor the moving party.'" *Id.* (quoting *Park Vill. Apartment Tenants*, 636 F.3d at 1161).

## ARGUMENT[2]

Plaintiffs have not established the requirements for the extraordinary relief they seek in this motion. First, they are not likely to succeed on the merits of their claim. They cannot show Article III standing based on the injuries alleged in the Complaint, and this Court lacks jurisdiction to adjudicate a statutory claim that Congress has expressly channeled to the PRC and then, if necessary, to the D.C. Circuit. If this Court were to decide, contrary to the overwhelming majority of precedent, that the claim is nonetheless reviewable here, Plaintiffs' claim would still fail to meet the high standard required for an *ultra vires* claim in this Circuit. Nor are Plaintiffs' constitutional claims viable. The first is an entirely novel claim that the Elections Clause—which provides a limited grant of power to the States to set the "time, place, and manner" of Congressional elections, subject to Congressional change— actually serves as a constitutional limitation on federal activity that may have an incidental impact on voting. No Court has ever accepted this theory, and this Court should not be the first. Their second claim is that a set of operational actions by the Postal Service violate a constitutional "right to vote." But the Plaintiffs cannot bring these claims for two reasons: States have no right to vote, and so these claims are brought

---

[9] In addition, the Court lacks jurisdiction to enter the requested injunctive or declaratory relief against the President, whom Plaintiffs have named as a defendant in this action. The Supreme Court has repeatedly held that, in general, the federal courts may not enter injunctive relief against the President in the context of his official, non-ministerial, duties. *See Mississippi v. Johnson*, 71 U.S. 475, 498-99 (1866); *Franklin v. Massachusetts*, 505 U.S. 788, 802-803 (1992). The same rule applies to declaratory relief. *See Newdow v. Roberts*, 603 F.3d 1002, 1012-13 (D.C. Cir. 2010).

- 23 -

1    only on behalf of their citizens (and thus fail the *parens patriae* bar), and even if the

2    claims were viable, the relevant standard of review is rational basis, and the Postal

3    Service's activities are entirely rational.  And relief is still not appropriate, because

4    Plaintiffs are seeking to enjoin changes that have not occurred, while asking this Court

5    to involve itself in monitoring the day-to-day activities of the Postal Service.

6    **I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.[10]**

7        **A.  Plaintiffs Lack Article III Standing**

8        At the outset, Plaintiffs cannot succeed on their claims because they cannot

9    show that they have Article III standing.  To establish standing, Plaintiffs "must have

10   (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of

11   the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

12   *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  When a plaintiff seeks

13   prospective relief, the "threatened injury must be certainly impending to constitute

14   injury in fact;" "[a]llegations of possible future injury are not sufficient." *Clapper v.*

15   *Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  A "theory of standing, which relies on

16   a highly attenuated chain of possibilities, does not satisfy" this requirement. *Id.* at

17   410. "The plaintiff, as the party invoking federal jurisdiction, bears the burden of

18   establishing these elements," and therefore "must clearly . . . allege facts

19   demonstrating each element." *Spokeo*, 136 S. Ct. at 1547.

20       *First*, Plaintiffs allege that they are injured because they have been denied

21   (purportedly) the opportunity to comment on purported changes made by the Postal

22   Service pursuant to 39 U.S.C. § 3661.  PI Mem. at 24-25.  "But deprivation of [such]

23   a procedural right without some concrete interest that is affected by the deprivation –

24   a procedural right *in vacuo* – is insufficient to create Article III standing."  *Summers*

25

26   _____

27   [10] Plaintiffs raise a number of claims in their Complaint, but only press a limited

28   number of those in this motion.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1  *v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Plaintiffs cite to a district court
2  decision, *Buchanan v. USPS*, 375 F. Supp. 1014, 1022 (N.D. Ga. 1974), that held that
3  the failure to comply with section 3661 is itself sufficient for standing; but this
4  decision predates *Summers*' contrary, on-point holding by thirty-five years.  Plaintiffs
5  cannot invoke this Court's jurisdiction based on a procedural injury without a
6  corresponding harm to their substantive interests.

7      *Second*, Plaintiffs allege standing based on purported injury to their citizens,
8  *i.e*, as *parens patriae*.  *See* PI Mem. at 25; *see also id.* at 26 ("The states also have
9  interests in protecting their citizens' fundamental rights to vote and in protecting the
10  health and welfare of residents . . . .").  But it is black letter law that "[a] State does
11  not have standing as *parens patriae* to being an action against the Federal
12  Government."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 610 n.16
13  (1982) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)).

14      *Finally*, Plaintiffs allege injury to their "sovereign interests" and "proprietary
15  interests."  PI Mem. at 25.  But they cannot establish actual – as opposed to
16  speculative – injury to those interests.  With respect to their claimed injury to their
17  "powers to conduct elections by mail," *id.*, the Postal Service is not infringing upon
18  that right – it is not prohibiting any such process for the States' elections; to the
19  contrary, it is putting in place significant efforts to assist the States with those efforts.
20  *Se generally* Glass Decl.

21      To the extent that these purported injuries are an attempt to assert that the Postal
22  Service's activities are causing and will continue to cause them harm in the form of
23  delayed mail, Plaintiffs cannot make such a showing.  Plaintiffs produce no evidence
24  showing that the removal of excess mail processing machines would cause any delays
25  in the mail.  Indeed, even factoring in the now-removed machines, USPS's mail
26  processing machines are still only being utilized at a sixty-five percent rate when mail
27  volume is at its highest, *see* Barber Dec. ¶ 6, which means there is ample extra
28  capacity.  Nor can they show that the Postal Service's focus on mitigating unnecessary

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1    extra or late trips (as opposed to banning all extra or late trips, which it does not do)

2    causes a delay in processing and delivering the mail of such magnitude as to affect

3    their sovereign or proprietary interests.  And even if those efforts were the cause of a

4    general mail delay back in July, given USPS's recent efforts and improvements, *see*

5    Cintron Dec. ¶¶ 26-27, they cannot show that there is a continued threat of injury

6    caused by the Postal Service's purported activities (as opposed to other causes, such

7    as, for example, staffing limitations caused by COVID-19, *see generally* Prokity

8    Dec.).  Absent such a showing of future or ongoing injury, they are not entitled to

9    injunctive relief.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 108-09 (1983).

10        Moreover, while Plaintiffs complain about the delay in Election Mail

11    specifically, such an injury is entirely speculative, particularly considering the

12    enormous efforts that USPS has put into place (and will continue or supplement

13    through the Election) in order to ensure that ballots are timely delivered.  *See*, *e.g.*,

14    DeChambeau Dec. ¶ 23; Barber Dec. ¶ 6.  And to the extent those States are

15    concerned, they are fully in control of the solution to that problem.  Those States can

16    mail their ballots to voters as early as possible to ensure that any fears about mail

17    delays will not impact the Election.  Ballots returned by voters continue to be First-

18    Class Mail and will be handled as such, and, in some cases, will be handled even more

19    expeditiously.  *See* Glass Dec. ¶ 18.

20    **B.  Plaintiffs Are Not Likely To Succeed On Their 39 U.S.C. § 3661 Claim**

21        Plaintiffs' central claim in this lawsuit is that the Postal Service has failed to

22    comply with the requirement to seek an advisory opinion from the PRC pursuant to

23    39 U.S.C. § 3661(b) before enacting certain purported operational "changes," *i.e.*,

24    what Plaintiffs refer to as the "Leave Mail Behind" Policy, and purported "decision

25    to no longer treat election mail as First-Class Mail," and "the removal of hundreds of

26    mail processing and sorting machines."  PI Mem. at 4-17.  Section 3661(b) requires

27    that "[w]hen the Postal Service determines that there should be a change in the nature

28    of postal services which will generally affect service on a nationwide or substantially

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

nationwide basis," it must first submit a proposal to the PRC requesting an advisory opinion. 39 U.S.C. § 3661(b).  The PRC shall issue its written opinion only after an opportunity for a hearing on the record.  39 U.S.C. § 3661(c).

As a threshold matter, clear statutory text and decades of precedent make clear that it is the *PRC* that has exclusive jurisdiction over complaints relating to service issues, including the failure of the Postal Service to first seek an advisory opinion from that body for a nationwide change in service, with the right to appeal to the D.C. Circuit if the complainant is dissatisfied.  District courts play no role in adjudicating such disputes.  But even if Plaintiffs could somehow overcome this hurdle, the Postal Service was not required to seek an advisory opinion relating to any of the purported actions challenged in this suit.

1. **District Courts Lack Subject-Matter Jurisdiction Over Complaints Regarding 39 U.S.C. § 3661, Which Are Channeled to the Postal Regulatory Commission and Then the D.C. Circuit.**

Congress has expressly precluded district court jurisdiction over Plaintiffs' section 3661 claim.  Title 39 of the U.S. Code provides that the district courts have jurisdiction over cases against the Postal Service, "*except* as otherwise provided in this title."  39 U.S.C. § 409(a) (emphasis added); *see also LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799 (8th Cir. 2006) (district court jurisdiction over Postal Service can be preempted by other provisions, including section 3662).  This case involves one of those exceptions: 39 U.S.C. § 3662, which vests exclusive jurisdiction over complaints regarding the Postal Service's compliance with certain statutory requirements – including section 3661 – in the  PRC.

In section 3662, Congress specified that any person "who believes the Postal Service is not operating in conformance with the requirements of various provisions, including "*this chapter* [i.e., Chapter 36 of Title 39, which includes 39 U.S.C. § 3661] (or any regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission."  39 U.S.C. § 3662(a) (emphasis added).  "If the Postal Regulatory Commission finds the complaint to be justified, it

1    shall order that the Postal Service take such action as the Commission considers

2    appropriate in order to achieve compliance with the applicable requirements and to

3    remedy the effects of any noncompliance." *Id.* § 3662(c). If that person is dissatisfied

4    with the PRC's ruling, she may petition for review in the D.C. Circuit. *Id.* § 3663. If

5    she is satisfied with the PRC's order, the district courts have jurisdiction to enforce

6    any PRC orders against USPS. *Id.* § 3664.

7        Courts have repeatedly held that 39 U.S.C. §§ 3662 and 3663 constitute the

8    exclusive jurisdictional remedy for complaints about postal services that fall within

9    the statutory provisions specifically identified in section 3662 – and as discussed

10   above, that includes a claim that the Postal Service is not complying with section

11   3661. Numerous courts of appeals have so held. *See, e.g.*, *Foster v. Pitney Bowes*

12   *Corp.*, 549 F. App'x 982, 986 (Fed. Cir. 2013) (PRC has "exclusive jurisdiction . . .

13   over claims enumerated in § 3662"); *LeMay*, 450 F.3d at 799-800 ("In this case,

14   Congress removed the district courts' jurisdiction over claims regarding postal rates

15   and services. It did so by enacting 39 U.S.C. § 3662."); *Bovard v. U.S. Post Office*,

16   47 F.3d 1178 (10th Cir. 1995) (earlier version of 39 U.S.C. § 3662 "makes clear that

17   a postal customer's remedy for unsatisfactory service [which was identified in section

18   3662] lies with the Postal Rate Commission. . . . Accordingly, the district court was

19   without jurisdiction to review this claim.").

20       And these courts of appeals have been joined by the "countless decisions" of

21   lower courts. *Pep-Wku, LLC v. USPS*, No. 1:20-cv-0009-GNS, 2020 WL 2090514,

22   at *3 (W.D. Ky. Apr. 30, 2020); *see, e.g.*, *McDermott v. Potter*, No. C09-0776RSL,

23   2009 WL 2971585, at *3 (W.D. Wash. Sept. 11, 2009), *aff'd sub nom. McDermott v.*

24   *Donahue*, 408 F. App'x 51 (9th Cir. 2011) ("Read together, [39 U.S.C. §§ 3662, 3663,

25   and 3664] demonstrate that this Court lacks jurisdiction to consider service-related

26   complaints in the first instance" and holding that "the PRC has exclusive jurisdiction"

27   over such claims); *Rodriguez v. Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *2

28   (W.D. Wash. July 30, 2018) (same); *Striley v. USPS*, No. 16-CV-07233-HRL, 2017

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

WL 513166, at *3 (N.D. Cal. Feb. 8, 2017) ("Under 39 U.S.C. Section 3662, the Postal Regulatory Commission has exclusive jurisdiction over such complaints"); *Sears, Roebuck & Co. v. USPS*, 134 F. Supp. 3d 365, 382 (D.D.C. 2015), *aff'd in part on other grounds, vacated in part on other grounds, rev'd in part*, 844 F.3d 260 (D.C. Cir. 2016) ("Particularly excepted [from district court jurisdiction] are claims concerning postal rates and service standards; such claims must first be presented to the Postal Regulatory Commission"); *Murphy v. USPS*, No. C 14-02156 SI, 2014 WL 4437731, at *3 (N.D. Cal. Sept. 9, 2014) ("The PRC has exclusive jurisdiction over service-related complaints with the Postal Service covered by section 3662."); *Powell v. USPS*, No. CV 15-12913-FDS, 2016 WL 409672, at *1 –2 (D. Mass. Feb. 2, 2016) (district courts lack jurisdiction over claims brought under 39 U.S.C. § 3661(a)).[11]

This overwhelming line of precedent has developed for good reason. "Generally, when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular problems' those procedures 'are to be exclusive.'" *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S.411, 420 (1995)).  "It is well settled that even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all

---

[11] Plaintiffs cite *American Postal Workers, Union, AFL-CIO v. USPS*, No. 06-726 (CKK), 2007 WL 2007578, at *18 (D.D.C. July 6, 2007), for the proposition that a court "has explicitly *rejected* the argument that it lacked jurisdiction over a complaint regarding the USPS's alleged non-compliance with Section 3661(b)."  PI Mem. at 34. The district court did no such thing.  Rather, the court dismissed the case as moot (and so never needed to reach the jurisdictional question), and even with respect to its *dicta*, it simply noted, without analysis, that the complaint "appears to be properly brought before this Court," 2007 WL 2007578, at *7, without mentioning section 3662.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

cases covered by that statute." *Telecomms Res. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 186 (D.C. Cir. 2017) ("[W]here 'a special statutory review procedure [exists], it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies.'") (quoting *Media Access Project v. FCC*, 883 F.2d 1063, 1077 (D.C. Cir. 1989)); *Public Util. Comm'r of Or. v. Bonneville Power Admin*, 767 F.2d 622, 627 (9th Cir. 1985) ("[J]urisdiction over a specific class of claims which Congress has committed to the court of appeals generally is exclusive, even in the absence of an express statutory command of exclusiveness."). This principle applies particularly in situations where there are multiple layers of review, *i.e.*, review first to an agency, and then to the federal courts of appeals. *See, In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) ("The multiple layers of review evince Congress's intent to direct challenges . . . to the avenues Congress created."); *see also Bank of Louisiana v. FDIC*, 919 F.3d 916, 922 (5th Cir. 2019) ("[S]ometimes Congress leapfrogs district courts by channeling claims through administrative review and directly to federal appellate courts"). Here, Congress has created just such a channeling scheme: complaints within the ambit of section 3662 (including complaints that the Postal Service has not complied with section 3661) go first to the Commission, an agency with deep expertise in postal matters, and then to the D.C. Circuit. *See* 39 U.S.C. §§ 3661, 3662. Under such circumstances, this court lacks subject matter jurisdiction over this claim.[12]

_____

[12] The Supreme Court has recognized that district court jurisdiction may not be implicitly precluded if three factors are met: (1) "a finding of preclusion could foreclose all meaningful judicial review," (2) if the suit is "wholly collateral to a statute's review provisions," and (3) "if the claims are 'outside the agency's expertise." *Jarkesy v. SEC*, 803 F.3d 9, 17 (D.C. Cir. 2015) (quoting *Free Enterprise*,

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

### 2. Plaintiffs' Jurisdictional Objections Are Unavailing Because Section 3662 Is Mandatory And Reflects Congress's 2006 Decision To Channel Section 3661 Claims to the PRC and D.C. Circuit

Notwithstanding this clear authority, Plaintiffs argue that section 3662 does not, in fact, channel all complaints regarding the Postal Service's compliance with section 3661 to the PRC and then the D.C. Circuit. Their objections cannot overcome the express language of the statute.

*First*, Plaintiffs say that "by its terms, Section 3662 is discretionary, not mandatory," PI Mem. at 33, noting that the provision says that a person "may lodge a complaint with the Postal Regulatory Commission" if they believe "the Postal Service is not operating in conformance with the requirements of [section 3661]," 39 U.S.C. § 3662(a). This argument lacks merit. First, the most natural reading of this provision is that the permissive language suggests only that one who "believes the Postal Service is not operating in conformance with" statutory requirements may lodge a complaint with the PRC, but may also choose to take no action at all. Including the word "shall" would have created an odd outcome where anyone with a grievance against the USPS would arguably be obligated to file a Complaint with the

--------------------

561 U.S. at 489-90. None of these factors is met here. There is meaningful judicial review of a final PRC order in the D.C. Circuit. Nor does it matter that the PRC cannot provide "immediate relief," as the fact that there may eventually be relief is sufficient as a matter of law. *See Am. Fed'n of Gov't Employees*, 929 F.3d at 755-56 ("Here, [the Supreme Court] instructs that the [plaintiffs] are not necessarily entitled to raise a pre-implementation challenge in the district court, and that Congress may require them to litigate their claims solely through the statutory scheme, so long as they can *eventually* obtain review and relief.") (emphasis added) Moreover, the suit is not collateral to the statute's review provisions, but falls within their explicit text, and involves a function committed to the agency's expertise.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PRC.  To read the provision as Plaintiffs might do would create the very types of "external intrusions on the Postal Service's managerial experience" that motivated Congress to create the administrative review scheme in the first place.  Indeed, statutes channeling review in a particular court or agency commonly use the phrase "may appeal," without any suggestion that such a channel is optional or that an applicant could appeal via a separate path.  *See, e.g.*, 28 U.S.C. § 569(a) ("An individual denied reemployment under this section in a position because the individual is not qualified for that position may appeal that denial to the Merit Systems Protection Board under section 7701 of title 5."); 35 U.S.C. § 141(a) ("An applicant who is dissatisfied with the final decision in an appeal to the Patent Trial and Appeal Board under section 134(a) may appeal the Board's decision to the United States Court of Appeals for the Federal Circuit.").

Unsurprisingly, courts have repeatedly rejected exactly this type of textual argument.  In *LeMay*, reviewing a challenge to the earlier version of section 3662 – but which included the same "may" phrasing –  the Eight Circuit recognized that "as a general rule of statutory construction, 'may' is permissive, whereas 'shall' is mandatory."  *LeMay*, 450 F.3d at 799.  It noted, however, that "this general rule does not close the inquiry," as "Courts will infer foreclosure of judicial review 'where congressional intent to preclude judicial review is 'fairly discernable' in the details of the particular legislative scheme."  *Id.* at 799-800 (quoting *Ismailov v. Reno*, 263 F.3d 851, 854-55 (8th Cir. 2001), *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)).  The Court went on to conclude that "Congress intended to afford postal management 'the unfettered authority and freedom that has been denied for years to maintain and operate an efficient service," *id.* at 800 (quoting Sen. Rep. No. 912, 91st Cong., 2d Sess. 2 (1970)), and that review by the PRC was the way that "Congress gave meaning to this intention," *id.*  The Federal Circuit reached the same conclusion regarding the now-operative 2006 amendments to section to 3662.  *See Foster*, 549 F. App'x at 986

- 32 -

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

("In 2006, the PAEA expanded the reach of § 3662 to include claims arising under specific sections of the PAEA . . . .  There is nothing in the statutory text or legislative history to suggest that the PAEA eliminated the exclusive jurisdiction conferred to the Postal Rate Commission (renamed the Postal Regulatory Commission, or PRC, by the PAEA) over claims enumerated in § 3662"); *see also*, *Nat'l Post Office Collaborative v. Donahoe*, No. 3:13-cv-1406, 2013 WL 5818901, at *4 (D. Conn. Oct. 28, 2013) (reaching same conclusion with regard to "may"); *Foster v. Pitney Bowes Inc.*, No. 11-cv-7303 2012 WL 2997810, at *5 (E.D. Pa. July 23, 2012) ("Although the word 'may' appears in Section 3662, it is clear from the statute's history that Congress intended a plaintiff to exhaust the PRC process before challenging an adverse ruling in the United States Court of Appeals for the District of Columbia.").[13]  Indeed, were Plaintiffs' construction correct, decades of case law concluding that the PRC had exclusive jurisdiction over claims brought within the ambit of section 3662 would be wrong, and the district courts could be flooded with the precise type of rate and service complaints that Congress intended to channel to the PRC.

*Second*, Plaintiffs point to the Fifth Circuit's decision in *Buchanan v. USPS*, 508 F.2d 259 (5th Cir. 1975), which involved an older version of section 3662 that has since been materially changed.  *See* PI Mem. at 33-34.  There, as they correctly

---

[13] Plaintiffs cite *Southern California Edison v. USPS*, 134 F. Supp. 3d 311, 318 (D.D.C 2015), where the court noted that section 3662(a) "does not necessarily grant *exclusive* jurisdiction to the PRC."  *See* PI Mem. at 33.  What they fail to mention is that the court concluded that "a number of courts have interpreted this jurisdictional grant to be exclusive," and that "at the end of the day, the Court need not resolve this question," because it could resolve the case on other grounds. 134 F. Supp.3d at 318.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

recite, the Fifth Circuit noted that the previous version of "[s]ection 3662 complements 3661, and together they form a harmonious scheme.  For those 'changes' which do not fall within 3661, the postal user may turn to 3662 if the change does in fact affect his postal service." *Buchanan*, 508 F.2d at 264.  The Fifth Circuit explicitly distinguished between Postal Service actions that fell within section 3661, and those that fell within section 3662; two categories it implied were exclusive of each other.  That may have been true in 1975.[14]  It is not true in 2020.  Recall that the *current* version of section 3662 channels all complaints by a person "who believes the Postal Service is not operating in conformance with the requirements of the provisions of . . . this chapter [i.e., Chapter 36 of Title 39, which includes section 3661]" to the PRC, and then the D.C. Circuit.  39 U.S.C. § 3662(a).  Far from fitting together into a "harmonious scheme," where sections 3661 and 3662 involve distinct challenges and distinct paths, they are now *incorporated*, with complaints regarding compliance with section 3661 are included into the ambit of section 3662.  Moreover, while Plaintiffs note that "Congress is presumed to have been aware of this interpretation when it later amended these sections," PI Mem. at 34, this presumption cannot overcome an express change to section 3662's language the explicitly incorporates the statutory chapter that includes section 3661.

*Third*, Plaintiffs say that although "some courts have found that Section 3662 operates as an exclusive venue provision for certain types of rate and service

---

[14] The version of section 3662 effective until December 19, 2006 stated that "Interested parties who believe the Postal Service is charging rates which do not conform to the policies set out in this title or who believe they are not receiving postal service in accordance with the policies of this title may lodge a complaint with the Postal Rate Commission in such form and in such manner as it may prescribe."  39 U.S.C. § 3662 (2006).  The provision thus did not include a failure to comply with section 3661 within its terms, either directly or by implication.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

complaints, none of those cases concern claims under Section 3661(b)."  PI Mem. at 35.  These courts did not hold that section 3662 is a venue provision, but rather a jurisdictional provision that precludes district courts of jurisdiction over these complaints.  Moreover, *Powell* 2016 WL 409672, at *1 –2, held that a claim under section 3661(a) was exclusively channeled to the PRC; and Plaintiffs provide no reason why subsection (b) should not be treated the same way.  Ultimately, Plaintiffs are left to argue that Congress, despite having explicitly channeled claims involving a number of statutory provisions, including section 3661, to the PRC, *actually* intended to limit this jurisdictional limitation to certain specific provisions even though it never bothered to identify those provisions.  This theory does not accord with ordinary principles of statutory interpretation (the most relevant being the primacy of plain language), and Plaintiffs provide no reason for thinking why those principles should not apply here.  *See also, e.g.*, *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) ("[T]he normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning.").

### 3. The *Ultra Vires* Doctrine Does Not Provide an Avenue for Judicial Review Here

Plaintiffs seeks review under this Court's very limited *ultra vires* review doctrine.  But Plaintiffs cannot satisfy *ultra vires* review, for two reasons – first, *ultra vires* review is *only* available where there is no other potential remedy, and here the statute provides for the filing of a complaint to the PRC and then the D.C. Circuit.  And second, *ultra vires* review is only available if the agency has failed to comply with such a clear and unequivocal statutory command that the agency has acted without any authority.  There is no such error here – indeed, the vast majority of the "changes" of which Plaintiffs complains did not exist.

"[T]he Postal Service is exempt from review under the [APA]."  *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014); 39 U.S.C. § 401(a). For claims—unlike here—where there is no other remedy, some courts have,

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1   however, found "non-statutory review' available for certain Postal Service decisions,

2   notwithstanding the preclusion of APA review under 39 U.S.C. § 410(a)." *Mittleman*,

3   757 F.3d. at 307; *see also Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173

4   (D.C. Cir. 2003) (Postal Service can be reviewed under *ultra vires* doctrine pursuant

5   to "the leading case, *Leedom v. Kyne*, 358 U.S. 184 (1958)"). Such review, however,

6   "is quite narrow," *Mittleman*, 757 F.3d at 307., and "is essentially a Hail Mary pass –

7   and in court as in football, the attempt rarely succeeds." *Nyunt v. Broadcasting Bd.*

8   *of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009)  In order to justify relief under the *ultra*

9   *vires* doctrine "a plaintiff must show, *first* that the agency has acted 'in excess of its

10  delegated powers and contrary to a specific prohibition,' and, *second*, that barring

11  review by the district court 'would wholly deprive [the party] of a meaningful and

12  adequate means of vindicating its statutory rights." *Nat'l Air Traffic Controllers*

13  *Ass'n AFL-CIO v. Fed. Service Impasses Panel*, 437 F.3d 1256, 1264 (D.C. Cir. 2006)

14  (quoting, first, *Leedom v. Kyne*, 358 U.S. 184, 188 (1958), and, second, *Bd. of*

15  *Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)).  With

16  respect to the first prong, "[a]n agency acts *ultra vires* when it violates a 'clear and

17  mandatory' statutory provision.  A statutory provision is 'clear and mandatory' when

18  it has only one unambiguous interpretation." *Nat'l Ass'n of Postal Supervisors v.*

19  *USPS*, No. 18-cv-2236-RCL, 2020 WL 4039177, at *3 (D.D.C. July 17, 2020).

20          **a. *Ultra Vires* Review Fails Because Plaintiffs Have an Adequate**
                **Remedy**

21          Plaintiffs' claim fails each requirement for *ultra vires*.  Most obviously,

22  Plaintiffs fail at the second condition: it has a "meaningful and adequate means of

23  vindicating [its] statutory rights," *MCorp*, 502 U.S. at 43—they can file a complaint

24  to the Postal Regulatory Commission, with judicial review in the D.C. Circuit if they

25  remains unsatisfied.  Plaintiffs' failure to even attempt to pursue the remedy provided

26  by Congress is fatal to their claim.  *See id.* (appeal to agency, followed by review in

27  the courts of appeals, constitutes a meaningful and adequate means of vindicating

28

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

statutory rights).  Moreover, the fact that the statutory scheme would preclude "'pre-implementation' review . . . or immediate relief" does not alter the conclusion that such meaningful review is available.  *See Am. Fed. of Gov't Employees*, 929 F.3d at 755.  Indeed, the Supreme Court is explicit on this point.  *See, e.g.*, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-16 (1994) (statutory review provision that precludes pre-enforcement review provides an adequate remedy); *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 1-14 (2000) (requiring a broad, pre-enforcement challenge to certain Medicare-related regulations to be challenged through the administrative process after the plaintiffs have been harmed by the regulations).  While Plaintiffs "would prefer to challenge the [Postal Service's alleged actions] by some other means, that does not mean their claims may be brought outside [section 3662's] exclusive remedial scheme."  *Am. Fed. of Gov't Employees v. Sec'y of Air Force*, 716 F.3d 633, 638 (D.C. Cir. 2013).

Plaintiffs cannot avoid this conclusion by citing cases where *ultra vires* review was permitted.  *See* PI Mem. at 14 (citing *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d at 305; *Combined Comm'ns Corp. v. USPS*, 891 F.2d 1221 (6th Cir. 1989)).  Cases such as *Mittleman* dealt with a *different* mandatory statutory bar—one that prohibited review altogether.  Section 3662 merely channels judicial review to the D.C. Circuit.[15]  Thus, as opposed to *Mittleman*, where the consequence of the bar on APA review would preclude judicial review altogether, such review is still available here.  *See, e.g.*, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996) (*ultra vires* review is available when the APA was unavailable and the alternative is "insulat[ing] the entire executive branch from judicial review"); *MCorp*,

---

[15] In *Combined Communications*, the Sixth Circuit found that the sought *ultra vires* action was proper because the claims did *not* fall within the scope of a provision channeling review to the courts of appeals.  *See* 891 F.2d at 1225.  Here, the claims do fall within such a challenging provision.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

502 U.S. at 43 (*ultra vires* review is only available when the alternative is no judicial review at all).  The path for such review may not be the one that Plaintiffs would prefer, but that fact is insufficient to establish *ultra vires* jurisdiction.

### b. *Ultra Vires* Review Fails Because Plaintiffs Cannot Show That the Postal Service Has Unequivocally Violated Section 3661(b).

Although this Court need not reach it in light of the express channeling of judicial review to the PRC and the D.C. Circuit, Plaintiffs' claim also fails under the first prong of the *ultra vires* analysis, because they cannot show that the Postal Service has unequivocally violated section 3661(b).  That provision requires the Postal Service to request an advisory opinion whenever it "determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b).  The leading case interpreting this statute is *Buchanan v. USPS*, 508 F.2d 259 (5th Cir. 1975).  There, the Fifth Circuit recognized that "Congress intended 3661 to apply to only a specified class of decisions," and that "Postal management was left with broad decision-making power, subject to 3661's requirements for specified decisions."  *Id.* at 262; *see also id.* ("The language of 3661 indicates the limited scope of application."); *see also id.* at 263-64 (recognizing "a policy of broad management power and an unexpansive interpretation of 3661").  Accordingly, three factors that must be satisfied before section 3661(b) comes into play.

"First, there must be a 'change.'  This implies that a quantitative determination is necessary."  *Id.* at 262.  In other words, "[t]here must be some meaningful impact on service.  Minor alterations which have a minimal effect on the general class of postal users do not fall within 3661."  *Id.*  "Second, the change must be 'in the nature of postal services.'  This involves a qualitative examination of the manner in which postal services available to the user will be altered."  *Id*. at 262-63.  "Third, the change must affect service 'on a nationwide or substantially nationwide basis.'  A broad geographical area must be involved."  *Id.* at 263.  In drawing these lines, courts have

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

made a "distinction between Postal Service managerial decisions and Postal Service decisions which affect the public and give rise to an opportunity to be heard," with decisions like transferring mail processing facilities and maintaining mail trucks falling into the former category. *See, e.g.*, *Wilson v. USPS*, 441 F. Supp. 803, 806 (C.D. Cal. 1977).

None of the supposed "changes" that Plaintiffs identify meets these standards. Plaintiffs first challenge a so-called "Leave Mail Behind" policy, which supposedly mandates that "all trips, including delivery and to processing centers, must depart on time; that late trips are 'no longer authorized or accepted,' and that mail carriers 'must begin on time, leave for street on time, and return on time.' Mail carriers are instructed to leave mail behind on the workroom floor if taking that mail would require them to leave later than scheduled." PI Mem. at 5 (the "Leave Mail Behind" actions). Second, Plaintiffs challenge a purported Postal Service decision "to no longer treat all Election Mail under First Class service standards." *Id.* at 11 (the "First-Class Mail" action. And, third, Plaintiffs challenge "[t]he removal of hundreds of mail processing and sorting machines." *Id.* at 15 (the "Equipment" action).

With respect to the so-called "Leave Mail Behind" actions, Plaintiffs' characterizations do not accurately describe USPS's policies. The Postal Service has not prohibited extra or late trips. *See* Cintron Dec. ¶¶ 23-24. Nor did Postal Service Headquarters "direct any field managers never to use extra trips, to let trucks leave on time even if it meant that mail scheduled to be delivered that day was left behind, or to prevent all late trips and extra trips under any circumstances." *Id.* ¶ 25; The only notable change USPS has made has been to renew its emphasis on adhering to its published schedule, including developing written guidance clarifying the circumstances under which extra truck trips were acceptable, in order to mitigate the number of unplanned and unnecessary trips, *see* Cintron Dec. ¶¶ 23-24.

The actual policy of USPS, as opposed to the one imagined in Plaintiffs' brief is not a "change" as the term is used in section 3661 because it is not a new policy but

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

rather a renewed focus on ensuring the Postal Service complies with its *existing policies*. This is precisely the type of management direction to which section 3661 does not apply. In their brief, Plaintiffs focus on the fact that there was a delay in the mail, *see* PI Mot at 8-11, a delay which has now largely been corrected. But that, by itself, cannot be enough to trigger section 3661 because *any* managerial change can be said to have the effect of changing the Postal Service's operations (i.e., changing how the mail is delivered). If that is true, then nearly any managerial initiative would first need to go through an on-the-record proceeding. It cannot be true, for example, that the Postal Service would be required to seek an advisory opinion from a separate agency if it wanted to upgrade its IT or truck routing systems, even if those upgrades might have a temporary effect on its services (for better or worse in the short term). Indeed, Plaintiffs never argue that USPS's operational plan needed to undergo PRC review when it was initially created; if so, a decision to enforce *compliance* with that plan could not trigger review.

The remaining two purported changes identified by Plaintiffs in their motion are not in fact "changes" in any sense of the word. Plaintiffs say that the Postal Service has made a new decision "to no longer treat election mail as First Class Mail." PI Br. at 11. But this is not true. For starters, ballots returned by voters to their election officials, are, and have been First-Class Mail, and will continue to be handled nad such (and in fact may receive delivery times even faster than most First-Class Mail). *See* Glass Dec. ¶ 18. And for Election Mail sent by the states to voters, state officials have always had the choice to determine "which class of mail to use to send mailings to voters." *Id.* ¶ 4. "If election officials chose to send out Election Mail to voters as Marketing Mail, there is no regulation or formal Postal Service policy providing that Election Mail (including ballots) entered as Marketing Mail be automatically upgraded to First-Class Mail, even if the mail bears the official Election Mail Logo." *Id.* ¶ 18.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

This is not a new development, rather this has been the policy "for many years." *See* Defs.' Objection & Response to Pls.' First Set of Interrogatories and Requests for Production of Documents ("Defs.' First Interrogs."), at 12 (Inter. 5), attached as Ex. J. to Pls.' PI Mot. ("As has been true for many years, if election officials choose to send election mail to voters as Marketing Mail, then it is not reclassified as First-Class Mail."); *see also id.* at 16 (Inter. 6) ("Election officials may generally choose to purchase either Marketing Mail or First-Class Mail service to send election mail to voters. Where Marketing Mail is chosen, the Postal Service has never reclassified such mail as First-Class Mail."). Moreover, the Postal Service has consistently recommended that "Boards of Election should use First-Class Mail postage rather than [Marketing Mail] when paying for the delivery of outbound absentee or vote by mail ballots." *See* Ex. 2 to Glass Dec. (2016 letter to state election officials).

In any event, USPS prioritize the timely delivery of all Election mail, whether sent using Marketing Mail or First-Class Mail. The Postal Service has numerous policies to move Election Mail as expeditiously as possible, and has "several longstanding practices of prioritizing the expeditious processing and delivery of Election Mail, particularly ballots," including advancing Marketing Mail through processing when there is excess First-Class Mail processing capacity  Glass Dec. ¶¶ 11, 20. As a result of these practices "the delivery timeframes for Election Mail entered as Marketing Mail often are comparable to those of Election Mail entered as First-Class Mail." *Id.* ¶ 21; *see also* Defs.' First Interrogs, at 16 (Inter. 6). In short, nothing has changed: the Postal Service has never treated Election Mail as First-Class Mail categorically, but has – and continues to have – numerous practices to move Election Mail as expeditiously as possible, with speeds often meeting or exceeding First Class delivery times. *See* Glass Dec. ¶¶ 21, 26.

Finally, Plaintiffs complain about the removal of mail processing machines. This complaint fails the standards of *ultra vires* review for two reasons: it is not a change, and Plaintiffs have not established that it had an effect on the mail. With

- 41 -

respect to the former, the Postal Service has had a policy since at least 2015 of removing unnecessary mail processing machines, to free up resources as letter mail volumes decline (including to provide more resources for package processing, which has increased). *See* DeChambeau Dec. ¶¶ 7-14. This year is no different. *See id.* ¶ 21. Thus, the removal is not a "change," it is simply a continuation of a longstanding policy of efficiently managing the postal service's fixed assets; exactly the type of managerial decision committed to the Service's discretion. Nor is there any evidence that such removals actually impacted the delivery time of the mail; to the contrary, even with the removal of that equipment, the Postal Service still has – on a busy day – 35% of excess machine capacity nationwide. *See* Barber Dec. ¶ 6.

Moreover, both the Postal Service and the PRC's past practices confirm that these activities do not fall within section 3661's ambit. "[P]ast practice . . . should be given the deference ordinarily accorded any interpretation of a statute by the agency charged with its enforcement." *United Farm Workers of Am., AFL-CIO v. Chao*, 227 F. Supp. 2d 102,107 n.11 (D.D.C. 2002) (quoting *Gelman v. FEC*, 631 F.2d 939, 943 (D.C. Cir. 1980)). The Commission has noted that a "change in the nature of postal services broadly can be defined as changes to a customer's ability to access essential postal services that require a visit to a postal retail facility."[16] Its past practice illustrates that nationwide changes that trigger 3661's review are general changes to postal facility hours or service standards for mail delivery. The Postal Service requires an advisory opinion before, for example, formally changing the service standards for certain pieces of mail (i.e., eliminating overnight delivery for single-

---

[16] Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), at 1, https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

piece First-Class Mail or adding an extra day to Standard Mail),[17] changing the hours of operations at tens of thousands of post offices or retail operations,[18] or eliminating an entire day of mail delivery.[19]  All of these proposals constitute formal changes in published service standards or which customer-facing operations are open.  None of them concern basic, managerial operational changes of the type at issue here.

---

[17] Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling, Docket No. N2014-1 (Mar 26, 2014), at 1, 10, https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-1_Advisory%20Opinion.pdf; Advisory Opinion on Mail Processing Network Rationalization Service Changes, Docket No. N2012-1 (Sept. 28, 2012), at 1. https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf; Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, at 7 Docket No. 2006-1 (Dec. 12, 2006).

[18] Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2 (Aug. 23, 2012), at 1, 3, https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf (proposing to reduce the hours of operations "at more than 13,000 post offices nationwide); Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1 (Dec. 23, 2011), at 1, https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf  (proposing to identify "more than 3,650 post offices, retail annexes, stations and branches for possible closing").; Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf.

[19] Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1 (Mar. 24, 2011), at 1 https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

If there were any doubt as to whether these "changes" are covered by section 3661, that doubt would be sufficient basis to reject Plaintiffs' *ultra vires* claim. Plaintiff's claim emerges at the intersection of two lines of doctrine: the requirement that section 3661 be narrowly interpreted, in order to preserve USPS's "broad management power," *see Buchanan*, 508 F.2d at 263-64, and the *ultra vires* doctrine, which requires that any error be clear and unambiguous. The basic, operational activities that Plaintiffs seek to challenge here cannot meet this set of unequivocal requirements. Indeed, were it otherwise, the *ultra vires* doctrine would swallow Congress's express preclusion of judicial review of these types of claims in district court. Almost any sort of operational or management initiatives that could have an impact on Postal Service operations would fall within the ambit of section 3661 – and require extensive hearings—exactly the sort of ossification Congress intended to avoid. *See id.*

### 4. Mandamus is Unavailable Because Plaintiffs Have an Adequate Remedy And Because Their Right to Relief is Not Clear and Indisputable

Finally, and largely for the reasons discussed above, mandamus is unavailable. "Mandamus is a 'drastic and extraordinary' remedy 'reserved for really extraordinary cases.'" *In re United States*, 791 F.3d 945, 954 (9th Cir. 2015) (quoting *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380 (2004)). "First, the party seeking issuance of the writ must have no other adequate means to obtain the relief he desires. Second, the petitioner's right to issuance of the writ must be clear and indisputable. Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.* at 954-55 (quoting *Cheney*, 542 U.S. at 403). Plaintiffs cannot satisfy these conditions.

With respect to the first prong, Plaintiffs have an adequate remedy: a complaint to the PRC, followed by appeal to the D.C. Circuit. "[T]here is no jurisdiction to issue a writ of mandamus where a different statutory scheme provides the plaintiff with a

1   remedy." *Marciano v. Shulman*, 795 F. Supp. 2d 35, 41 (D.D.C. 2011).   Indeed, "it

2   is clear that under the Mandamus Act exhaustion of remedies is a requirement for

3   granting of the writ." *Hironymous v. Bowen*, 800 F.2d 888, 891 (9th Cir. 1986).

4   Moreover, "the time require[d] to exhaust the administrative remedy [does not]

5   make[] it an inadequate remedy." *Moreno v. Bureau of Citizenship & Immigration*

6   *Servs.*, 185 F. App'x 688 (9th Cir. 2006); *see also Randall D. Wolcott, M.D., P.A. v.*

7   *Sebelius*, 635 F.3d 757, 768 (5th Cir. 2011) ("The Supreme Court has stated that

8   '[o]rdinarily mandamus may not be resorted to as a mode of review where a statutory

9   method of appeal has been prescribed.'") (quoting *Roche v. Evaporated Milk Ass'n*,

10  319 U.S. 21, 27-28 (1943)).   Again, Plaintiffs have not even attempted to conform to

11  Congress's statutory channel for review; much less to have completed that process.

12       The cases Plaintiffs cite are not to the contrary.   *McCarthy v. Madigan*, 503

13  U.S. 140, 146-47 (1992) recognized that "requiring resort to the administrative

14  remedy may occasion undue prejudice to subsequent assertion of a court action.  Such

15  prejudice may result, for example, from an unreasonable or indefinite timeframe for

16  administrative action."  But here – as Plaintiffs themselves recognize – the PRC has

17  a defined timeline for its actions, without an obvious prospect for unreasonable delay.

18  *See* PI Mem. at 38. Similarly, in *U.S. ex rel. Rahman v. Oncology Assocs., PC*, 198

19  F.3d 502, 515 (4th Cir. 1999), the court recognized that "a plaintiff must exhaust

20  administrative remedies before seeking judicial review and the existence of such

21  administrative procedures will preclude the issuance of a writ of mandamus," but

22  concluded that in that case "the administrative process normally available is not

23  accessible because [the agency] will not act on the claims presented to it."  Here, of

24  course, the PRC has never even been presented with any of Plaintiffs' claims; it

25  certainly has not failed to act on them.   Ultimately, Plaintiffs' argument boils down

26  to their theory that they should not have to comply with Congressional direction

27  because they allege injury from the delay that may result from the administrative

28  process established by Congress.  But if the fact that pursuing an administrative

- 45 -

1  remedy takes time is alone sufficient to permit mandamus jurisdiction, then
2  Congress's express directive to the contrary would be meaningless.  *See, e.g.*, *Shalala*,
3  529 U.S. at 1-10; *Heckler v. Ringer*, 466 U.S. 602, 616 (1984) (plaintiff is not entitled
4  to mandamus because he has not "exhausted all other avenues of relief")

5        But even were there no available remedy, Plaintiffs still fail on the second
6  mandamus prong: they cannot show a "clear and indisputable" violation.  This largely
7  collapses into the same inquiry as *ultra vires* review, and their arguments fail for the
8  same reason.  In no way could it be deemed "clear and indisputable" that the limited
9  actions the Postal Service has taken – almost none of which even constitute changes
10 from existing policy – meet this standard.

11       **C. Plaintiffs Are Not Likely To Succeed on their Constitutional Challenge**
12       The USPS policy changes at issue violate neither the Elections Clause, nor
13 the right to vote of Plaintiffs' citizens.

14       **1.  The Postal Service Has Not Violated The Elections Clause.**

15       Plaintiffs next claim that the Elections Clause grants them a constitutional right
16 to demand a certain level of mail service from USPS to further their own laws
17 regarding elections.  In support, Plaintiffs argue that they relied upon USPS policies
18 and performance when crafting their relevant election laws, and thus the alleged
19 USPS policy changes at issue violate the right of their legislatures to enact laws
20 concerning the "times, places, and manner" of elections.  This theory—that the
21 Elections Clause creates ancillary rights against actions by the federal government
22 that may have indirect effects on State elections—is unprecedented and without merit.

23       The Elections Clause states that "[t]he times, places and manner of holding
24 elections for" congresspersons "shall be prescribed in each state by the legislature
25 thereof," but Congress may generally "make or alter such regulations" by law.  *Smiley*
26 *v. Holm*, 285 U.S. 355, 363 (1932).   The Elections Clause thus allows State
27 legislatures "to prescribe the procedural mechanisms for holding congressional
28 elections."  *Cook v. Gralike*, 531 U.S. 510, 523 (2001); *U.S. Term Limits, Inc. v.*

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Thornton*, 514 U.S. 779, 832 (1995) ("The Framers intended the Elections Clause to grant States authority to create procedural regulations."). The "function contemplated by [the Elections Clause] is that of making laws." *Smiley*, 285 U.S. at 366.

Here, USPS has not violated the right of Plaintiffs' legislatures under the Elections Clause. First and foremost, there is no support whatsoever for Plaintiffs' novel theory that the Elections Clause not only confers upon State legislatures the authority to pass laws governing how their citizens may vote, but also restricts federal activity which may have an incidental impact on the effects of these State regulations. The Elections Clause, by its terms, empowers Plaintiffs' legislatures to enact laws governing "the times, places, and manner" in which their citizens may vote, and USPS has done nothing to limit that authority. Plaintiffs have all enacted laws allowing some or all of their citizens to cast their ballots by mail, and those laws remain operative today. Even if Plaintiffs purportedly based these laws on an expectation of a certain level of performance by USPS in delivering the mail, that subjective expectation does not mean the Elections Clause now grants Plaintiffs a concomitant Constitutional right to have this Court oversee USPS operations to ensure that their expectations are met. In short, the Constitution grants the States the power to allow their voters to use the mail to cast their votes, but it does not grant the States the power to oversee or direct how the mail operates.

Unsurprisingly, Plaintiffs do not cite to a single Elections Clause case that has recognized the validity of such a theory, and Defendants are aware of none. The overwhelming majority of Elections Clause cases concern whether State legislatures have enacted elections laws permissible under the Elections Clause, not whether other actors have interfered with powers granted to the States therein.[20] And to the limited

---

[20] *See, e.g., U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 831-35(1995) (an Arkansas law that functionally created congressional term limits could not be justified under the Elections Clause); *Roudebush v. Hartke*, 405 U.S. 15, 26 (1972) (Indiana

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1   extent there is case law concerning whether third parties (other than the federal

2   government) have violated the right of State legislatures under this provision, that

3   case law undermines Plaintiffs' theory.  In *Smiley v. Holm*, for example, the Supreme

4   Court found that the Elections Clause does not protect State legislatures from the

5   inherent limitations of legislative activity, including circumstances external to a

6   legislature which may affect the consequences of (or even undo) relevant election

7   laws. 285 U.S. 355 (1932).  There, the Minnesota legislature enacted an election law,

8   which the governor vetoed.  The State nevertheless sought to implement the law,

9   arguing that the governor could not constitutionally veto a law passed pursuant to the

10  Elections Clause, because that provision confers the relevant authority upon the

11  "legislature" alone. *Id.* at 362-63.  The Supreme Court rejected this argument, noting

12  that the "subject-matter" of the Elections Clause "involves lawmaking in its essential

13  features," and that "limitation[s]" to lawmaking—including the prospect of a veto—

14  are not "incongruous with the grant of legislative authority to regulate congressional

15  elections." *Id.* at 366, 368.  If the Elections Clause does not shield a State legislature

16  from an event which entirely negates an election law, it certainly does not give States

17  a constitutional right against any external event which may incidentally impact an

18  election.

19       Furthermore, Plaintiffs' theory, if accepted, would effectively allow States to

20  wield the Elections Clause as a means to control the actions of federal agencies.  Here,

21  Plaintiffs claim the right to force USPS to operate in a manner Plaintiffs prefer—

———————————————

23  Senate election vote recount was consistent with the Elections Clause); *Cook v.*

24  *Gralike*, 531 U.S. 510, 525 (2001) (Missouri law which required that ballots must

25  identify a candidate's position on term limits could be justified under the Elections

26  Clause); *Washington State Grange v. Washington State Republican Party*, 552 U.S.

27  442, 459 (2008) (Washington State blanket primary was permissible exercise of

28  Elections Clause power).

- 48 -

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

prioritizing certain considerations over others, regardless of the effect on the overall Postal Service—all because Plaintiffs chose to use USPS for mail-in voting. If Plaintiffs' theory were accepted, then in future elections, States could challenge *any* USPS delays—even those caused by events beyond USPS's control—and secure a federal judgment directing the content of USPS's business operations or forcing USPS to incur additional costs in order to satisfy States' particular preferences. And these claims would not be limited to USPS. For example, a State could challenge the decisions of federal agencies not to allow their employees the day off to vote on election days, or the decision of a federal health and safety agency to condemn a building (or otherwise ensure safe conditions) in a facility that has been selected as a polling place. States, and by necessary implication the judiciary, would become overseers of federal agencies to the extent their actions could impact state election laws—a result that would present significant separation of powers concerns, risking a "confrontation between the two branches" that "should be avoided whenever possible." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 389–90 (2004). It would also turn the Supremacy Clause on its head by letting states commandeer the federal government.

This result is, of course, not the one that the Framers intended in crafting the narrow scope of the Elections Clause. Indeed, far from establishing the primacy of State interests, the Elections Clause, if anything, reflects a principle of "federal supremacy over the procedural aspects of determining the times, places, and manner of elections." *U.S. Term Limits, Inc.* 514 U.S. at 810 (describing Congress's authority to preempt State election laws). The Court should therefore conclude that the Elections Clause means what it says: States can issue procedural laws concerning the times, places, and manner of their elections, but the federal government need not contort its programs and policies to best accommodate any given State's election law.

Finally, Plaintiffs cite to no case supporting their assertion that a court must conduct a strict scrutiny analysis when assessing an Elections Clause claim. And it

- 49 -

is unclear why strict scrutiny, or any standard associated with certain other constitutional claims, would apply.  If the Court concludes, accurately, that USPS has done nothing to limit States' legal authority to issue laws governing how their citizens may vote, there can be no Elections Clause violation.  No further inquiry is necessary.  Accordingly, Plaintiffs are unlikely to prevail on their Elections Clause claim.

**2.  The Postal Service's Policy Changes Do Not Violate The Right to Vote**

Plaintiffs next argue that the alleged USPS policy changes may cause delays, and thus if Plaintiffs' citizens choose to mail in their ballots at or near the deadline, the ballots may not be processed and delivered in time to be counted.  Plaintiffs thus claim that the USPS policy changes unconstitutionally burden their citizens' right to vote, not because these changes categorically prevent persons from voting (or even from voting by mail), but because they require persons to *promptly* submit their ballots.  Plaintiffs' claim is without merit.

As a threshold matter, the Plaintiff States cannot assert this claim. Plaintiffs seek to enforce their citizens' right to vote—a "*parens patriae*" action—but States cannot bring *parens patriae* actions against the federal government. *See Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923) ("[T]he citizens of [a State] are also citizens of the United States," and thus "[w]hile the state, under some circumstances, may sue . . . for the protection of its citizens," a State may not "enforce [its citizens'] rights in respect of their relations with the federal government."); *State of Alaska v. Nat'l Parks & Conservation Ass'n, Inc.*, 981 F.2d 1259 (9th Cir. 1992) (States do not have "parens patriae standing to sue an agency of the federal government.").  Plaintiff States cannot claim a right to vote in an election, let alone one that has been harmed indirectly by a delay in the mail.  That right belongs to individual voters, who are not plaintiffs to this lawsuit (and who, indeed, may timely mail their ballots in any event).  *See Clapper*, 568 U.S. at 414 ("Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.") (citation omitted).

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1

2

3

4

But even if Plaintiffs could bring such a claim consistent with binding precedent, it would nonetheless fail on the merits.  The Court may only subject the alleged USPS policy changes at issue to (at most) the rational basis test, which they undoubtedly survive.

5

### a. The Rational Basis Test, Not Strict Scrutiny, Would Apply to the Alleged Postal Service Policy Changes

6

7

8

9

10

11

12

13

14

15

16

The impact of the alleged USPS policy changes on voters (if any) would be indirect, and thus the USPS policy changes would be subject, at most, to the rational basis test.  To argue otherwise, Plaintiffs do not cite to a single case indicating that an indirect burden placed on the right to vote by a non-election law may be subject to strict scrutiny.  Instead, Plaintiffs cite to a line of cases concerning how courts treat state election laws; e.g., laws that directly regulate voters and candidates. *See*, *e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 425 (6th Cir. 2012) (evaluating state law that imposed a deadline on in-person voting); *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 287 (S.D.N.Y. 2020) (action against "New York State Board of Elections" challenging "two of New York's election practices," including ballot restrictions).

17

18

19

20

21

22

23

24

25

26

Applying strict scrutiny to non-election policies that may have some indirect impact on the electoral process would produce odd results. For one, it would be mean that any asserted deficiency in USPS service could give rise to a constitutional voting rights claim.  Additionally, many policies may have an indirect impact on elections. A federal policy that limits transit subsidies may impede persons' ability to travel to the polls; a zoning restriction may inhibit certain persons' ability to live closer to a polling station; inadequate government health care policy may ultimately preclude someone from voting either in-person *or* by mail.  The impact of these policies on voting rights would likely be inadvertent, and yet these policies could be struck down if they cannot survive a strict scrutiny analysis.

27

28

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1    But even if the USPS policy changes may be considered "election laws," and

2    thus subject to relevant election-law jurisprudence, they would be subject to the

3    rational basis test under *McDonald v. Board of Election Com'rs of Chicago*, 394 U.S.

4    802 (1969).  There, plaintiffs—county jail inmates—"[could not] obtain absentee

5    ballots" from their local Board of Elections and "[could not] readily appear at the

6    polls." *Id.* at 803. They brought suit, asserting that the Board's position was subject

7    to strict scrutiny and imposed an unconstitutional burden on their right to vote.  *See*

8    *id.* at 806-07.  The Supreme Court disagreed, holding that "[s]uch an exacting

9    approach is not necessary" since it is "not the right to vote that [was] at stake here but

10   a claimed right to receive absentee ballots."  *Id.* at 807.  It noted that a more rigid

11   standard is proper only when the policy or practice at issue categorically "den[ies]

12   [plaintiffs] the exercise of the franchise . . . preclud[ing] [them] from voting." *Id.* at

13   807-08.   Otherwise, the policy or practice "must bear" only "some rational

14   relationship to a legitimate state end" and "will be set aside only if no grounds can be

15   conceived to justify them." *Id.* at 809.

16    The Court's decision in *McDonald* controls here because Plaintiffs are claiming

17   that USPS policies *may* deprive them of the ability to cast votes through mail-in

18   ballots.  And although Plaintiffs allege that mail-in ballots are necessary since external

19   circumstances make in-person voting challenging, their position is not materially

20   different from the county jail inmates in *McDonald* who were physically restricted

21   from the polls.  Thus, the alleged USPS policy changes would be subject to the

22   rational basis test, which they easily satisfy since policies aimed at making USPS

23   more cost-effective and efficient certainly bear "some rational relationship to a

24   legitimate state end."

25    Furthermore, subjecting the alleged USPS policy changes to strict scrutiny

26   would be inconsistent with established case law confirming that there is no

27   constitutional right to vote by mail at all. *See*, *e.g.*, *Crawford v. Marion Cty. Election*

28   *Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J. concurring) ("That the State accommodates

- 52 -

some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required."); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627 n.6 (1969) (The Supreme Court has rejected "a claimed right to an absentee ballot."); *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (Posner, J.) (There is no "blanket right of registered voters to vote by absentee ballot."); *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020) ("[T]here is no constitutional right to an absentee ballot."); *Texas Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) ("The Virus's emergence has not suddenly obligated Texas to do what the Constitution has never been interpreted to command, which is to give everyone the right to vote by mail."). If a State can constitutionally prohibit mail-in voting altogether, then USPS policies which may indirectly limit *when* a ballot must be mailed cannot be constitutionally suspect either.

In response, Plaintiffs point out that the Supreme Court, in a context unrelated to mail-in ballots, has noted that a defendant must establish a compelling government interest if the election law at issue imposes "severe restrictions" on the right to vote. *Burdick*, 504 U.S. at 434; *see also Disability Law Ctr. of Alaska v. Meyer*, 2020 WL 5351595, at *5 (D. Alaska Sept. 3, 2020) ("[A]ctions that serve to effect a severe burden on the right to vote will be subject to strict scrutiny, whereas actions that impose tempered or minimal burdens on the right to vote will be subject to a lenient rational-basis scrutiny.") (*citing Burdick*, 504 U.S. at 434). Even assuming this test applies here (which it does not), the USPS policy changes at issue have not, and will not, impose a "severe" burden on voters. *See, e.g.*, *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018) (noting that a "severe" burden includes a poll tax or regulations that "effectively barred political party from ballot," but not rules that banned write-in voting or imposed a photo ID requirement). First, as explained *supra*, USPS has not instituted a ban on late trips or extra trips. The Postmaster General did call for a renewed focus on compliance with pre-set schedules, *see supra*, but this hardly

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1    imposes a "severe" burden on the right to vote.  For one, there is little indication that

2    this will alone will cause material delays, especially in light of the resources USPS is

3    committing to Election Mail, and USPS's assurance that it has the capacity to process

4    the expected volume of Election Mail. *See supra* And metrics suggest that these

5    delays were only temporary. *See supra*.

6         But even if this renewed focus on schedules may cause delays, notwithstanding

7    USPS's Election-related efforts, that alone is insufficient to demonstrate a severe

8    burden on voting rights.  Both States and voters can ensure, with minimal burden, that

9    these delays will not impact the voting process. USPS is encouraging States to take

10   certain measures to ensure that mail-in ballots are promptly distributed.  *See* Glass

11   Dec. Additionally, voters can promptly mail in their ballots.  If they wait until the

12   eleventh hour to cast their ballots, and their votes are not counted due to some delay,

13   then "if their plight can be characterized as disenfranchisement at all, it was not

14   caused by" USPS but rather "their own failure to take [the] timely steps" necessary.

15   *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973).   Although USPS takes its

16   obligations seriously and treats Election Mail with special focus as a result, it cannot

17   be required by the Constitution to ensure that a voter's ballot arrive in the timeframe

18   set by her State if that voter mails the ballot the day before the state's deadline. In

19   such instances, the voter has an alternative choice to ensure that her vote is counted—

20   voting in person at a polling place established by the State or even delivering the

21   ballot to a drop box in certain states.  *See* Wash Rev. Code Ann. §§ 29A.40.160

22   (voting centers), 29A.40.180 (ballot drop boxes).

23         Plaintiffs also argue that strict scrutiny applies since the alleged USPS policy

24   changes were driven by political motivations.  But there is no evidence, or even well-

25   pled allegation, to support this assertion.  To begin, even if "partisan considerations

26   may have played a significant role" behind the policies at issue, strict scrutiny still

27   would not apply if the policies are facially "nondiscriminatory" and were also driven

28   by "valid neutral justifications."  *See Crawford v. Marion County Election Bd.*, 553

- 54 -

U.S. 181, 203-04 (2008).  The Postal Service's actions meet this criteria.  Most of the alleged "policy changes" Plaintiffs refer to are actually long-established policies that predate the Postmaster General's tenure, and in any event, the PMG suspended those changes pending the November 2020 election to assuage public concern.  Critically, USPS has made no change to the election mail policies it has followed since before the Postmaster General took office, except that USPS will now commit *even more* resources towards the processing and delivery of election mail.  *See* Glass Dec.  In an attempt to establish some kind of improper motive, Plaintiffs refer to the timing of the alleged policy changes, the procedure followed for their implementation, and certain extraneous comments by the President. But none of these allegations provides any direct support for Plaintiffs' suspicion, and they certainly do not justify any inference of improper motive in light of the measures taken by the Postmaster General (*e.g.*, suspending certain policies at issue in this litigation). Additionally, it is unclear how comments by the President illuminate why USPS made the alleged policy changes at issue.

Accordingly, the alleged USPS policy changes would, at most, be subject to the rational basis test.

### b.  The Alleged Policy Changes Survive Rational Basis Review

The renewed focus on compliance with pre-set schedules is intended to increase efficiency, and minimize unnecessary costs.  *See supra*.  A desire to minimize "administrative costs" constitutes a legitimate "regulatory interest[]," and is thus sufficient to survive rational basis review. *Libertarian Party v. District of Columbia Bd. Of Elections and Ethics*, 682 F.3d 72, 77 (D.C. Cir. 2012).

In response, Plaintiffs simply quibble with soundness of USPS's policy decision. For example, Plaintiffs argue that any savings produced by USPS's insistence on observing the pre-set schedules would be minimal, and that USPS is financially stable.  *See* PI Mem. at 51-52.  But these points do not dispute that USPS took the action at issue, in part, for the purpose of minimizing cost, an interest that

- 55 -

becomes no less legitimate simply because Plaintiffs find it unnecessary. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993) (rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of" government policy; "[w]here there are 'plausible reasons'" for the policy, the court's "inquiry is at an end."). Accordingly, the proffered justifications for the USPS policy at issue are sufficient to survive rational basis review.

## II.    PLAINTIFFS CANNOT DEMONSTRATE IRREPARABE HARM.

Plaintiffs have also failed to meet their burden to show that they will suffer irreparable harm in the absence of a preliminary injunction. The moving party "must demonstrate a significant threat of irreparable injury." *Marrocco v. Johnston*, No. 18-cv-02441-JAD-EJY, 2020 WL 3453077, at *1 (D. Nev. Mar. 13, 2020). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co., Inc. v. Bldridge*, 844 F.2d 668, 674 (9th Cir. 1988).

*First*, Plaintiffs argue that they have suffered irreparable injury because of their deprivation to a procedural right to a hearing on their section 3661 claims. PI Mem. at 52-53. But as discussed above, the deprivation of a procedural right, standing alone, is not even sufficient to establish a case or controversy, let alone to justify the extraordinary remedy of a mandatory injunction. *See Summers*, 555 U.S. at 496.

*Second*, Plaintiffs argue they will be harmed because their mail-in voting processes will be frustrated, and state benefits and programs that rely on the mail might be frustrated. PI Mem. at 53. But the assertion that these injuries will occur in the future *and* that they will be the result of the specific actions challenged here is too speculative to justify relief. *See Caribbean Marine Servs.*, 844 F.2d at 674. Plaintiffs would have to show (1) that the "Leave Mail Behind" plan existed (it does not), and that even if it did, (2) the mail was delayed because of it (as opposed to, for example, COVID-related staffing delays, *see generally* Probity Dec.), *and* (3) that those delays would continue into the future, notwithstanding the Postal Service's overall service

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

improvements for all categories of mail and, in particular, its extraordinary plans and commitments to deliver Election Mail.  With respect to the purported Election Mail changes, they would have to show that the Postal Service's consistent policy on how Election Mail is treated has injured the *States* (as opposed to their citizens) – *i.e.* that the States palnned on mailing their absentee ballots so late in the process that the difference between Marketing Mail and First-Class Mail delivery standards was material.  And they would have to show that the removal of mail processing equipment has and will continue to delay the mail, even though USPS still has ample processing capacity.  *See* Barber Dec. ¶ 6.  Even if they could make all of those showings – which they have not seriously attempted – they would still have to show that any delay of the mail would be materially sufficient to cause the harms alleged.

*Third*, Plaintiffs discuss injury in the context of "[w]idespread voter disenfranchisement."  PI Mem. at 53.  But the Plaintiffs are not voters, and thus this is not an injury *to them*, and in any event, they have not shown how the actions they seek to enjoin constitute such widespread voter disenfranchisement.  To the extent they complain about injury to their residents, *see id.* at 53-54, this is not injury to the Plaintiffs themselves, and the States cannot sue the federal government on behalf of their citizens.  *See Mellon*, 262 U.S. at 485-86. Plaintiffs attempt to skirt this requirement by arguing that small businesses may go out of business from delays in the mail, and this could injure the state in terms of reduced tax revenue; but this argument merely stacks speculation on top of speculation in an attempt to reach the high bar that is required for the relief they seek.

## III.   THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY RELIEF.

A preliminary injunction is also not appropriate because the balance of the equities and public interest weigh in Defendants' favor. As explained *supra*, USPS is currently undertaking extensive efforts to facilitate the timely delivery of Election Mail. There is no dispute that USPS has the capacity, including in terms of financing and machinery, to handle the anticipated surge in Election Mail. And Plaintiffs'

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1  citizens can control any concerns about delays through the timely submission of their
2  ballots. These considerations demonstrate that the equities weigh against an
3  injunction here.

4      Plaintiffs argue that "Defendants cannot plausibly claim harm by adhering to
5  policies and practices that have been in place for years," PI Mem. at 55, but that is
6  exactly the point – Defendants *have* been adhering to those policies; Plaintiffs seek
7  an injunction that would change those policies based on an (incorrect) assumption of
8  what those policies actually are.  That confusion – with the Postal Service attempting
9  to unwind "policy changes" that never actually occurred, is not in the public interest,
10  even if it could rise to the level of a case or controversy that would satisfy the
11  requirements of Article III.

12      Moreover, full compliance could require the Court to act as an overseer of the
13  agency's day-to-day activities (including whether extra trips carrying mail are
14  permitted, or whether they constitute an "unreasonabl[e] restricti[on]", Text of
15  Proposed Order, at 2, ECF No. 54-3); something that is inappropriate even in APA
16  cases, and for good reason.  *See, e.g.*, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55,
17  66-67 (2004) (noting the importance of "protect[ing] agencies from undue judicial
18  interference with their lawful discretion, and to avoid judicial entanglement in
19  abstract policy disagreements which courts lack both expertise and information to
20  resolve.").  Indeed, Plaintiffs seek to enlist this Court in determining the propriety of
21  the Postal Service's schedule, including whether a truck can leave "regardless of
22  whether the mail is actually ready" (a colloquial phrase they do not define), with
23  respect to the details of specific instructions that should be given to postal employees,
24  and even whether specific mail equipment machines should be installed or removed.
25  In effect, they seek to make this Court the Nation's supervisor of the Postal Service's
26  operations.  *See* Text of Proposed Order, ECF No. 54-3, at 2-3.  Such a mandatory
27  injunction is inappropriate, and would serve to frustrate the Postal Service's
28  operations during a key moment.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

## IV.    A NATIONWIDE INJUNCTION IS INAPPROPRIATE.

Finally, Plaintiffs are wrong to seek a nationwide injunction.  "Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.' " *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 1930 (2018) (citations omitted). In short, neither standing nor remedies are "dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).    Principles of equity reinforce those constitutional limitations imposed by Article III. A court's equitable authority to award relief is generally confined to relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). In that tradition, injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" in that case. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Nationwide injunctions are irreconcilable with those constitutional and equitable limitations. By definition, a nationwide injunction extends relief to parties that were not "plaintiff [s] in th[e] lawsuit, and hence were not the proper object of th[e court's] remediation." *Lewis*, 518 U.S. at 358

Indeed, nationwide relief would be particularly inappropriate where, as here, litigation in other districts is not merely hypothetical but presently ongoing, and the issues are important and complex.  Courts have recognized the importance of allowing such legal questions to percolate through the federal judiciary. *See, e.g.*, *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (nationwide relief may be "inappropriate where a regulatory challenge involves important or difficult questions of law, which might benefit from development in different factual contexts and in multiple decisions by the various courts of appeals") (citing *Yamasaki*, 442 U.S. at 702).

## CONCLUSION

Plaintiffs' Motion for a Preliminary Injunction should be denied.[21]

Dated:  August 25, 2020          Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC R. WOMACK
Assistant Director, Federal Programs Branch

*/s/ Joseph E. Borson*
JOSEPH E. BORSON (Va. Bar No. 85519)
KUNTAL CHOLERA
ALEXIS ECHOLS
DENA M. ROTH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 514-1944
Joseph.Borson@usdoj.gov

---

[21] In a footnote, Plaintiffs "move to compel a complete response to Interrogatory No. 1," by which they demanded USPS provide the specific dates that specific machines were removed from service.  PI Mem. at 16 n.42.  Setting aside the fact that a request in this form is inappropriate, Plaintiffs do not show their entitlement to such a relief. Defendants concluded that providing the specific dates on which these machines were removed would be unduly burdensome because such information was not available at the Headquarters level, and would require manually calling every USPS facility to gather that information.  Nor was that information necessary, as Defendants provided data on (1) the specific number of machines at each facility at the beginning and the end of the most recent machine removal process (and thus identified which facilities had machines removed, and how many), and (2) the Postal Service's week-by-week plan for machine removal, within a range of only a few months.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of September, I electronically filed the foregoing Opposition with the Clerk by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  September 15, 2020

By: */s/ Joseph E. Borson*
Joseph E. Borson

Counsel for Defendants

- 61 -