# DECLARATION OF DR. JOSHUA COLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Mondaire Jones, Alessandra Biaggi, Chris
Burdick, Stephanie Keegan, Seth Rosen,
Shannon Spencer, Kathy Rothschild, Diana
M. Woody, Perry Sainati, Robert Golub,
Mary Winton Green, Marsie Wallach,
Matthew Wallach, Mac Wallach, Carol
Sussman, and Rebecca Rieckhoff,
*individually, and on behalf of all others
similarly situated,*

       Plaintiffs,

v.

United States Postal Service, Louis DeJoy,
as Postmaster General of the United States
Postal Service, and Donald J. Trump, as
President of the United States,

       Defendants.

No 20 Civ. 6516 (VM)

**DECLARATION OF JOSHUA COLIN, Ph.D.**

I, Dr. Joshua Colin, under penalty of perjury and in lieu of affidavit as permitted by 28

U.S.C. § 1746, hereby declare as follows:

1. I am currently employed by the Postal Service as Vice President, Delivery Operations. In
   this role, I oversee national operations, initiatives, and programs pertaining to delivery. I
   have been with the Postal Service for 34 years, in which time I have worked as a letter
   carrier, supervisor, station manager, postmaster, district manager, and area vice-president.
   I am also part of the COVID-19 command team, leading the Postal Service's response to
   the pandemic.

2. I have direct and personal knowledge, through my job functions, of the Postal Service's
   policies and practices around overtime, delivery practices (e.g., the Expedited to
   Street/Afternoon Sortation pilot program and carrier park points), and operational
   changes due to the COVID-19. This declaration is based on my personal knowledge, as
   well as information conveyed to me in regular meetings by other knowledgeable Postal
   Service personnel in the course of my official duties and responsibilities.

**Postal Service Overtime Policies**

3. Overtime in the Postal Service is generally evaluated and authorized on the local level by
   supervisors and managers based on workload efficiencies. Higher-level management at
   the district, area and headquarters levels conduct oversight of overtime usage by
   communicating with facility managers about how best to use overtime efficiently and
   effectively. There is no Postal Service ban or cap on the amount of overtime that local
   supervisors and managers are permitted to approve.

4. The Postal Service has long attempted to increase efficiency and limit unnecessary
   overtime, including pre-tour overtime and unearned overtime, which are defined below. I

am not aware of any changes in Postal Service overtime policies or practices since Postmaster General DeJoy took office.

5.  Pre-tour overtime takes place when Postal Service employees clock in before they are scheduled to start their shift. This is inefficient, as there may not always be useful work for these employees to do if they clock in early.

6.  Unearned overtime is overtime that is a result of workers working below expected levels. If, for example, Postal Service data analyses indicate that a facility is expected to be able to process 50,000 pieces of mail in a particular period, and used overtime to process 70,000, that would be earned overtime. If the facility used overtime to process 30,000 pieces of mail, executive leadership or management (*e.g.*, area or district managers or postmasters) might investigate why that facility is operating inefficiently and needs overtime to do work it should be able to accomplish during its regular working hours, according to data analyses, such as the Time and Attendance Control System (TACS), which records employee hours of work and the job functions performed.

**Expedited to Street/Afternoon Sortation Pilot Program**

7.  The Expedited to Street/Afternoon Sortation (ESAS) pilot program was a limited test of a new method of delivery conducted in 384 delivery units (out of a total of approximately 18,755 delivery units). The test took place from approximately July 25, 2020, until approximately August 21, 2020, when Postmaster General DeJoy ordered that the test be suspended. The delivery units that were selected to participate in the test were generally units with a high number (ten or more) of delivery routes, high overtime usage, and significant occurrence of carriers returning late from their routes.

8. Typically, when a carrier comes into work in the morning, most of the mail that carrier will deliver on the route has already been sorted into delivery point sequence by machine, but some mail will need hand sorting, or "casing" (in which the carrier or a clerk hand-places mail or packages into a case arranged by delivery point sequence). The carrier would then go out to deliver all of the mail that had been machine- and hand-sorted. This typical procedure often requires carriers to wait to receive all the day's mail from the mail processing units. Exacerbating the problem is the fact that in the last several years, package volume has increased, and there are an increased number of delivery points (addresses to which mail must be delivered).

9. Under the ESAS pilot program test, a carrier would come in, spend minimal time hand-casing the mail, deliver the mail earlier in the day, and spend the time after delivery casing mail to be delivered the next day. The primary goal of the test was to minimize the time that carriers spent doing nothing, reduce unproductive work hours, and increase efficiency. Mail would be delivered to homes and businesses earlier in the day, but, if a letter arrived at the delivery unit while a carrier was out on their route making deliveries, that piece would be delivered the next day.

10. The ESAS Pilot Program test was implemented after Postmaster General DeJoy took office, but it was already being discussed and planned before that time. The initiative came from the Vice-President of Delivery and Retail, and the Chief Operating Officer.

11. Postmaster General DeJoy ordered the test stopped on approximately August 21, 2020, and it will not resume, if at all, until after the November election. To my knowledge, the Postmaster General has not had any involvement in the ESAS Pilot Program test other than directing that it be stopped.

**Restrictions on carrier park points**

12. When carriers deliver to non-rural neighborhoods via vehicle, their route typically calls
    for them to drive to a location called a park point, park the vehicle, deliver to nearby
    houses/businesses on foot, and then return to the vehicle and drive to the next park point.

13. When planning routes, the Postal Service does analysis on route efficiency (including by
    using a route examination program), and tries to optimize routes so carriers are spending
    more time delivering the mail, and less time driving from park point to park point. There
    is, however, no policy creating a maximum number of park points on a route. Rather,
    localities have the ability to examine routes and local conditions to establish efficient
    park points along a route. The Postal Service's route examination practices have not been
    changed since Postmaster General DeJoy took office.

14. There has not been a change in national policy regarding limitations on park points since
    Postmaster General DeJoy took office; for example, there has been no national directive
    capping the permissible number of park points per route.

**Operational impact of COVID-19**

15. The COVID-19 pandemic has had operational impacts on the Postal Service throughout
    the country. This has created challenges to our ability to meet our service standards. As
    part of the COVID command team, I helped to lead the Postal Service's response to the
    pandemic.

16. A big part of the problem is how concentrated the COVID impact can be at particular
    postal facilities, even if the overall nationwide number of infected employees is relatively
    low. For example, if an employee in one unit or plant became infected, the available

workforce at that worksite could quickly decline. In some units, we have experienced only 50% employee availability at certain points during the pandemic. When employee availability declined significantly in certain localities, we could not process mail as fast as normal, and delays occurred.

17. The command team was established by the Postal Service to address COVID-19 issues, and to communicate with the mailing industry to keep them informed and to minimize the impact on mailers. We also worked to procure protective equipment for our employees, install screens at retail windows in post offices without them, and to address enforcement of mask requirements. We worked with our postal unions on memoranda of understanding allowing us to hire above our usual complements, which helped to compensate for our availability issues.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Washington, D.C. on this ___8th___ day of September, 2020

_____

JOSHUA COLIN, Ph.D.

# DECLARATION OF KEVIN COUCH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Mondaire Jones, Alessandra Biaggi, Chris
Burdick, Stephanie Keegan, Seth Rosen,
Shannon Spencer, Kathy Rothschild, Diana
M. Woody, Perry Sainati, Robert Golub,
Mary Winton Green, Marsie Wallach,
Matthew Wallach, Mac Wallach, Carol
Sussman, and Rebecca Rieckhoff,
*individually, and on behalf of all others
similarly situated,*

       Plaintiffs,

v.

United States Postal Service, Louis DeJoy,
as Postmaster General of the United States
Postal Service, and Donald J. Trump, as
President of the United States,

       Defendants.

No 20 Civ. 6516 (VM)

## DECLARATION OF KEVIN COUCH

I, Kevin Couch, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. §
1746, hereby declare as follows:

1. I am currently employed by the United States Postal Service as Director, Maintenance

    Operations (Headquarters), which has been my position for 1.5 years. I have been at the

    Postal Service for over 24 years, starting as an industrial engineer in the field and moving

    to Postal Service Headquarters in 2011. In my current role, I am responsible for all

    maintenance policies and programs across the country and have broad oversight over all

    maintenance activities related to mail processing.

2. I am responsible for coordinating the removal of sorting machines from Postal Service facilities that has taken place this year. I am also responsible for disseminating information about the current pause in removals and making sure that the current status quo is maintained through the election (and until a new directive is issued).

**The Postal Service's Long-Standing Sorting Machine Removal Practices**

3. The Postal Service's long-standing practice is to regularly remove sorting equipment due to mail volume declines. The purpose of these removals is to free up floorspace, save work hours, and reduce maintenance costs. For example, if a plant has 50 machines, and only enough mail for 40, all 50 are still being operated and maintained, which is a waste of money and resources.

4. As far as I know, there is no written policy dictating when these removals should take place, but the Postal Service Processing Operations department at headquarters (HQ) conducts data analysis regularly to determine when unnecessary equipment should be removed. These analyses look at, among other things, equipment run time, utilization, and mail volumes. Equipment determined to be unnecessary via these data analyses is generally removed during summer months, because that is when mail volume is lowest, making removal less disruptive.

5. I have not seen any change in this long-established process since Postmaster General DeJoy took office, and the targets for this year's planned removals were set by the Processing Operations Director and the Vice President of Processing Operations and Maintenance on May 15, 2020, before Mr. DeJoy became Postmaster General.

6. Reductions may sometimes lead to a facility having only one of a particular machine, which is a common circumstance. We are able to track the reliability of a machine

through its performance data, and the processing machines that the Postal Service uses are very reliable, so having only one of a particular machine at a particular facility does not pose any substantial threat to the integrity of mail processing flow. Nevertheless, in instances where a facility has only one of a particular machine, we prioritize technical support for that machine, and typical downtime when there is an issue is less than an hour. For example, Delivery Barcode Sorters (DBCS, which sort letter-sized mail) can run 35,000 pieces per hour, and have a 99.85% reliability indicator. Based on these data, we may determine that a facility needs only one DBCS and we may recommend reducing an unnecessary second DBCS to free up space that may be used for other purposes, as well as reducing maintenance costs and allowing personnel to be used more efficiently.

**The 2020 Removals**

7. On May 15, 2020, Jason DeChambeau (the Processing Operations Director) published volume modeling and equipment reduction targets, which include separate targets for different sorting machines, including the Advanced Facer Canceler System, Delivery Barcode Sorter, and Advanced Flat Sorting Machine.

8. Around June 10, 2020, I volunteered to take over managing the removal and coordinating with the field.

9. To the best of my knowledge, Postmaster General DeJoy has not attempted to influence this long-standing and consistent process, with the exception of ordering that it be paused due to the recent concerns around the removals.

**What is done with removed sorting machines**

10. When machines are removed from a facility, they are disassembled for their usable parts. Some of the older machines have parts that are now impossible to replace. We take those parts to maintain the other machines. Parts that are not usable are sold.

11. Some machines can also be expanded using parts from others. For example, in a facility where a Delivery Barcode Sorter was decommissioned, many of its sorting stacker units were attached to another sorter in order to increase the second sorter's capabilities, which is a more efficient use of space and personnel than having two separate machines, each with less capacity. A description of that process is attached as Exhibit 1.

12. It would be impossible to undo the decommissioning and removal of some machines, as some machines' critical parts are now in use elsewhere and other machines (once all proprietary components are removed) have been offered for sale to the general public through the Postal Service's Corporate Asset Accountability Office.

**Stopping machine removal**

13. From about June 1, 2020, until the directive was issued to pause equipment reduction, I have had weekly calls with designated coordinators for equipment reduction in each of the seven geographical areas to which the area plants reported during that time (*i.e.*, Northeast Area, Capital Metro Area, Eastern Area, Western Area, Pacific Area, Southern Area, and Great Lakes Area).  These calls were intended to facilitate machine removal according to our normal process, track progress, and discuss any issues. After Postmaster General DeJoy ordered in August 2020 that machine removals be stopped until further notice (and at least through the November election), I spoke to those coordinators, and ordered them to stop all removals.

14. If a machine was partially taken apart, I told them to leave it in that partially disassembled state, and to put caution tape around it. Similarly, machines that were being transported out of a facility were to be left where they were when the order to stop removal came down. If they had been placed in a metal recycling bin for future sale to recycling centers, they were left in the bin, and the bin was left exactly where it was. The Regional Processing Vice-Presidents had calls with their directors, and also conveyed the instruction to cease removing machines and leave everything as it is.

15. In some facilities, machines that were to be removed had not yet been removed. The machines were disconnected and were still in place, but not in operation. After receiving direction from my boss, Mike Barber, I immediately sent out an email to be distributed to the maintenance managers overseeing the maintenance departments at each plant instructing them to contact me for approval before reconnecting machines. That email is attached as Exhibit 2. Our goals were to maintain the status quo and to track the status of machines that we had previously determined should be reduced for operational reasons.

16. I am continuing to monitor the situation to ensure that additional machines are not removed. Our ongoing data analyses suggest that a number of facilities have reconnected machines that had previously been disconnected as part of this year's routine equipment reduction. We are inquiring about those reconnections in order to track the status of the Postal Service's processing equipment, but unless and until the "pause" has been lifted, we will not instruct any facility to again disconnect any machine that has been reconnected.

Executed at Washington, D.C. on this _8th_ day of September, 2020

KEVIN COUCH

**Processing Equipment Removals and Additions**

August 17, 2020

**Extending DBCS – DBCS 302 Project**
Objective
- This project focuses on extending the DBCS equipment sets to the largest extent possible in order to improve Function 1 Letter Automation efficiency in the declining letter volume environment. By extending the amount of bins on a DBCS, more routes can be grouped into a sort program, thereby reducing the time associated with set up, changeover between 1st and 2nd pass, and pull down/dispatch from the letters Delivery Point Sequence (DPS) operations.

Background and Summary
- Delivery Point Sequence sorting requires 2 sorts – 1st pass and 2nd pass. Previous to the extraordinary decline in letters volume, our sort programs were limited by the volume of letters on each sort program. The DBCS typically will run on average about 25k letters per hour during the DPS operation. With enough volume a single sort program can run continuously (1st and 2nd pass) for 4 hours or more. However, as the volumes declined those same sort programs would run just half that time. The time it takes to perform the setup, changeover from 1st to 2nd pass, and the pull down/dispatch remains the same but takes up more of the overall time. Example of a typical process below. In this 12 hour processing window, this one machine sorted just over 105,000 letters. 7.5 hours were dedicated to sorting time, and the remaining 4.5 hours were dedicated to non-sorting activities.



- 
- In this example, the DBCS only has 222 bins to sort. Basically, each bin represents a delivery point sequence on the 1st pass, and a carrier's route on the 2nd pass. These sort programs cannot grow with the current machine sizes due to the limitation of how many sequences and carriers it can hold. Expanding this machine to 302 bins allows for a significant increase in the number of sequences and carriers, and adds more volume into the sort program. The more volume the DBCS is able to run, the more effective time is spent sorting mail rather than performing the non-sorting activities. This effectively increases the overall operational capacity within the same operational time windows. In the example above, this machine could potentially run all 3 sort programs it currently runs in just 1 sort program, eliminating nearly 2.5 hours of non-sorting time and completing operations earlier in the operational window.

Reallocation of stackers:
- In order to accomplish this, stackers (groups of bins) are utilized from the equipment reductions. The following process will be used to reallocate stackers to extend the DBCS machines
  1. Facility inventories excess stackers and determines what can be used from inventory to extend DBCS within the facility
  2. Area inventories excess stackers and reallocates based on need
  3. Headquarters reallocates from other regions and Topeka inventory based on needs

Benefits:
- Sort Program Reduction Creates Improved Capacity, Reduced Workhours, and Increased Productivity

Impact:
- Target reduction of 2000 DPS sort programs nationally - Savings 1.2M LDC11 workhours
- Mailers can reduce overall "working" trays of letters to the USPS, accounting for an additional 372K workhours savings.
- Total Savings:
  - Approximately 1.572 M workhours, $80.0 M



Please message out to your respective Maintenance Managers tonight.

They are not to reconnect / reinstall machines that have previously been disconnected without approval from HQ Maintenance, no matter what direction they are getting from their plant manager.  Please have them flow that request through you then on to me for a decision.

Thanks

KC

Kevin Couch
Director, Maintenance Operations (HQ)
Office (405) 573-2200
Cell  (405) 245-9985

# DECLARATION OF JUSTIN DeCHAMBEAU

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Mondaire Jones, Alessandra Biaggi, Chris Burdick, Stephanie Keegan, Seth Rosen, Shannon Spencer, Kathy Rothschild, Diana M. Woody, Perry Sainati, Robert Golub, Mary Winton Green, Marsie Wallach, Matthew Wallach, Mac Wallach, Carol Sussman, and Rebecca Rieckhoff, *individually, and on behalf of all others similarly situated,*<br><br>       Plaintiffs,<br><br>v.<br><br>United States Postal Service, Louis DeJoy, as Postmaster General of the United States Postal Service, and Donald J. Trump, as President of the United States,<br><br>       Defendants. | No 20 Civ. 6516 (VM) |

**DECLARATION OF JASON DeCHAMBEAU**

I, Jason DeChambeau, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, state as follows:

1. I am currently employed by the United States Postal Service as Headquarters Director of Processing Operations, a position I have held for approximately two years. I began working for the Postal Service in 1995 as an Industrial Engineer and advanced through other positions, primarily various management positions in Operations, including Manager of Distribution in two locations and Senior Plant Manager.

2. In my role as Director of Processing Operations, I oversee nationwide mail processing operations, including mail processing equipment requirements.

3. I am familiar with the complaint filed in this case and plaintiffs' claims therein.

4. This declaration is based on my personal knowledge, as well as information conveyed to me by my staff and other knowledgeable Postal Service personnel in the course of my official duties and responsibilities.

**Longstanding practice of removing unnecessary mail processing equipment**

5. The Postal Service has a nationwide inventory of machines to process letter and flat mail. Letter mail refers to machinable envelopes enclosing folded letters, greeting cards, and the like, which fall within height, width, and length limitations ranging from less than ¼ inch in thickness to less than a 11 ½ inches in length. The Postal Service uses the word "flats" in reference to larger envelopes, newsletters, magazines. In order to be processed by flat sorting machines, flats must also meet defined size requirements.

6. Machines that process letter and flat mail include the Advanced Facer Canceler System (AFCS), Delivery Barcode Sorter (DBCS), and Automated Flat Sorting Machine (AFSM). The AFCS collates mail piece information, provides electronic image

processing, storage, and interfacing functions, and applies a cancellation postmark. The AFSM sorts flats, using automatic feeders, acquires address images for video encoding, and processes mail using optical character recognition technology. Its design includes a module that holds trays (also called bins) that are filled with mail. The DBCS sorts letter mail based on address and ZIP Code information into designated bins to other downstream plants, delivery units, or into ZIP Code sequence for delivery.

7. The Postal Service has removed and/or replaced unnecessary or outdated mail processing and sorting equipment for many years. The Postal Service has numerous reasons for removing machines. Older machines that have been outdated are removed and replaced with machines with improved technology. When facilities or processing operations are consolidated, the Postal Service will remove machines when they are no longer needed to process the volume of mail flowing through the remaining facilities.

8. Postal Service Headquarters has a longstanding practice of monitoring the volume of mail flow at facilities throughout the nation through transmission of electronic data from each machine. Each machine is capable of processing a specific volume of mail when it is operating at full or maximum capacity. If a machine is only operating at, for example, 60% capacity, it is capable of processing much more mail. When data indicates each of two letter sorting machines in one facility is handling less than the capacity of one machine, one of the machines is redundant. For numerous reasons it is more cost-efficient for the number and type of machines to be in alignment with the volume handled by each facility.

9. Unnecessarily keeping underutilized machines in certain locations is inefficient and costly, and, consequently, removing machines is an essential part of the Postal Service's

ongoing efforts to manage its human resources and costs while still striving to deliver mail as expeditiously as possible throughout the nation.  Running unnecessary machines leads to numerous additional costs.

10. First, when letter and flat mail volume declines significantly and fewer machines within a facility are needed to process the volume of mail, leaving all machines in place in all locations requires the use of unnecessary work hours.  That is so because a facility needs fewer employees to run one machine than two.  Additional work time is also required for running each machine that is used.  Workers must set up each machine at the beginning of the processing period by taking steps such as setting up trays to hold the processed mail for transportation and must close down the machines when processing is complete. Depending upon employee efficiency, these processes require from approximately twenty minutes to approximately half an hour per shift.

11. In addition, removal of unnecessary machines reduces utility and maintenance costs, including the need for staff hours.  The Postal Service employs various numbers of Maintenance Mechanics and Electronic Technicians at each processing facility, depending upon the number of machines at the facility.

12. Use of the correct number of mail processing machines contributes to cost-effectiveness in the transportation of mail, as well.  One machine functioning at capacity requires the use of fewer mail trays and processes a higher volume of mail per tray.  Accordingly, when the appropriate number and type of equipment needed is utilized, each plane or truck may hold a higher volume of mail moved on efficiently packed trays.  Cost savings are achieved when the Postal Service requires fewer trucks or less space on a plane to transport mail.

13. The volume of letter and flat mail has declined significantly during the last decade as use of electronic communications has risen, meaning that the Postal Service needs less letter and flat equipment in order to align with volume reductions. Based on data analyses of machine utilization, the Postal Service removed an average of approximately 388 machines per year from mail processing operations from the beginning of 2015 through 2019. We refer to the process as reduction, or "reducing machines." The reduction numbers include machines that were disconnected from the network, temporarily covered with a tarp, or physically removed. The number of machines reduced varies widely from each fiscal year to the next and is based on the most recent data available on the number and types of machines needed. Postal Service fiscal years begin on October 1 of the preceding calendar year and end on September 30 of that fiscal and calendar year, e.g., fiscal year 2015 ran from October 1, 2014, through September 30, 2015. In fiscal year 2016, we reduced 1,120 letter and flat sorting machines, while the following year we reduced only 197 machines. (See chart following paragraph 20.)

**Nationwide equipment reduction**

14. In January 2017, Headquarters began an equipment-reduction initiative as a network operations efficiency strategy. The first phase was directed at reducing DBCS and AFSM machines to match mail volume projections. Each of the seven Postal Service areas completed an initial analysis to arrive at the number of machines to be reduced, which they submitted to Headquarters Processing Operations. Headquarters tracked the progress of reductions weekly and addressed any area requests for a deviation from the plan, such as delays in removing machines.

15. Between 2017 and April 2020, the Postal Service ran four additional phases. Headquarters Operations Research group created and ran a computer model to determine the optimum number of machines required for efficient mail processing at facilities across the nation and monitored the reductions on an ongoing basis. The model considers the variation in volume by using the 95th percentile of heaviest daily volume excluding December (a month with especially high mail volume), machine capacity, and processing windows.

16. In phases two through five, Operations adjusted and reran the model several times to more accurately identify the optimum number of machines required for efficient processing of current mail flow and applying any adjustments in tracking methodology. The AFCS was added to the types of equipment to be assessed for possible removal in Phase 2, due to our observation of continued volume reduction. Phase 5 ran in June 2019 using the prior 12 months of data, excluding December, a month with especially high mail volume.

17. Headquarters has continued its customary daily monitoring of machine utilization. Beginning in March 2020, the COVID-19 pandemic significantly accelerated the decline in the volume of mail, primarily letter and flat mail, that has occurred in recent years. At the same time, package volume increased significantly. As the pandemic period has continued to affect the nation, this decline in letter and flat mail has continued, and package volume has continued to increase significantly. By May 2020, Headquarters Operations concluded based on our ongoing data monitoring and analyses that the letter and flat mail volume was highly unlikely to return to the significantly higher pre-March level, and that the increased package volume would likely continue. Letter and flat mail

processing machines in various facilities were operated far below the optimal capacity, and more package sorting machines and/or floor space was needed for processing the increased package mail volume. To operate more efficiently, the Postal Service needed fewer letter and flat sorting machines and more package machines and/or more workroom floor space for nonautomated package processing.

18. The fluctuation in types of mail was a major factor in the reduction analysis and had a significant effect on the Postal Service's mail processing equipment needs. Where a smaller number of letter or flat mail sorting machines are needed in facilities to efficiently process the volume of such mail, removing unnecessary machines frees up space for other package-processing machines, which may be staffed with employees who are no longer needed for running additional letter or flat mail sorting machines. Even where sorting machines are not yet available, floor space is necessary to accommodate the increased volume of packages.

19. In May 2020, in Phase 6 of the reduction initiative, the model was rerun to identify targets for reduction based on the significantly higher volume reductions in letter and flat mail and the increase in package mail. On May 15, 2020, Headquarters Processing Operations sent volume modeling and equipment reduction targets for various mail processing equipment to the area Vice Presidents for review and implementation. As in prior years, many machines were scheduled for removal during the summer months preceding August when mail volume is historically lower. Excess machines were either disassembled and physically removed, turned off and disconnected from the network, or temporarily tarped.

20. I am aware that Plaintiffs in this matter have alleged that sorting capacity was reduced
    more dramatically in some areas for reasons related to the November election. That is
    not correct. The selection of the number of machines to be reduced, in 2020 and in past
    years, has been based solely on ongoing analysis of mail volume and mail processing
    needs nationwide.

21. In 2020, approximately 711 letter and flat sorting machines have been reduced. The
    following chart reflects ongoing changes in equipment inventory from the beginning of
    Fiscal Years 2015 to August 2020. It shows that the total number of reductions during
    Fiscal Year 2020 (beginning October 1, 2019, and to end on September 30, 2020) was
    higher than during the preceding four fiscal years, but not as great as the number during
    Fiscal Year 2016. Fiscal Year 2016 was the year that the Postal Service initiated a plan
    to expand the operating window in the plants by adjusting the service standards. The
    plan known as the Operational Window Change (OWC) was necessary due to declining
    volumes and the need to improve efficiencies. The change in the 2016 operating plan
    reduced the need for letter and flat sorting equipment.

| Fiscal Year | Letter Machines | Flats Machines | Total Machines | Number Reduced |
|---|---|---|---|---|
| FY 2015 10-1-14 | 6,242 | 521 | 6,763 | |
| FY 2016 10-1-15 | 5,145 | 498 | 5,643 | 1,120 |
| FY 2017 10-1-16 | 4,946 | 500 | 5,446 | 197 |
| FY 2018 10-1-17 | 4,625 | 468 | 5,093 | 353 |
| FY 2019 10-1-18 | 4,533 | 459 | 4,992 | 101 |
| FY 2020 10-1-19 | 4,376 | 448 | 4,824 | 168 |
| 8-18-20 | 3,722 | 391 | 4,113 | 711 |

22. The May 2020 scheduled removals were in place under the leadership of former Postmaster General Megan Brennan. Postmaster General DeJoy played no role in developing the plans or implementing the plans. At the Postmaster General's directive of August 18, 2020, however, Headquarters suspended all removals of equipment until after the November election.

23. Headquarters continues to monitor mail volume and machine utilization daily to ensure that the Postal Service operates at a high efficiency level while maintaining a high level of service performance for our customers. Headquarters has anticipated that the volume of election mail, including ballots, will increase, as a greater number of voters use election mail due to COVID-19 concerns and various states' decisions to adjust laws and procedures relating to voting via mail. This anticipated increase in volume due to election mail represents only a small fraction of the normal volume successfully processed and delivered on a daily basis. If every eligible voter chose to vote by mail, this would add, approximately 160 million pieces of mail over a four-week period, or 40 million pieces on average per week. By comparison, the 2020 Census, which was successfully handled over an eight-week period, added 521 million pieces or an average of 65 million per week. Another means of evaluation is to compare the potential increase with the overall volume processed by the Postal Service to determine the overall potential impact. The average total pieces handled (TPH) for the months of April, May, June, and July of 2020 was 16.1 billion pieces per month. This is 21% less than the same period last year due to impacts of COVID-19. Adding 160 million pieces of election mail and assuming that each piece would be run twice, this still only equates to a 2% increase in total pieces handled. Based on the current equipment set of 3,722 letter sorting machines

running at 21,000 pieces per hour over 24 days in the month of October preceding the
election, this equates to only 10 minutes per day per machine of additional processing
time needed to process the Election ballots.

I declare under penalty of perjury that the foregoing is true and correct to the best of my
knowledge, information, and belief.

Executed at Washington, D.C. on the 8th day of September, 2020

JASON DeCHAMBEAU

10

# DECLARATION OF ROBERT GLASS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Mondaire Jones, Alessandra Biaggi, Chris Burdick, Stephanie Keegan, Seth Rosen, Shannon Spencer, Kathy Rothschild, Diana M. Woody, Perry Sainati, Robert Golub, Mary Winton Green, Marsie Wallach, Matthew Wallach, Mac Wallach, Carol Sussman, and Rebecca Rieckhoff, *individually, and on behalf of all others similarly situated,*<br><br>        Plaintiffs,<br><br>v.<br><br>United States Postal Service, Louis DeJoy, as Postmaster General of the United States Postal Service, and Donald J. Trump, as President of the United States,<br><br>        Defendants. | No 20 Civ. 6516 (VM) |

**DECLARATION OF ROBERT JUSTIN GLASS**

I, Robert Justin Glass, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, hereby declare as follows:

1. I am currently employed by the United States Postal Service as Manager, Operations Industrial Engineering, at Postal Service Headquarters in Washington, DC. I am currently serving as the Postal Service's Director of Election Season. I have been employed by the Postal Service for 15 years, in which time I have served as an industrial engineer and a Plant Manager, as well as overseeing the Postal Service's participation in the 2020 Census.

2. I am familiar with the above-captioned action. I am familiar with the Postal Service's Election Mail policies and practices, and the Election Mail-related actions the Postal Service has taken to facilitate the 2020 election. This declaration is based on my personal knowledge, as well as information conveyed to me by other knowledgeable Postal Service personnel in the course of my official duties and responsibilities.

**Election Mail**

3. The Postal Service defines "Election Mail" as any item mailed to or from authorized election officials that enables citizens to participate in the voting process. This includes ballots, voter registration forms, ballot applications, polling place notifications, and similar materials. This mail qualifies as Election Mail both when it is sent to voters from election officials at the state and local levels and when it is returned by voters to those officials. This is distinct from "political mail," which is sent by political candidates, political action committees, and similar organizations in order to engage in issue advocacy or to advocate for candidates or other things, such as initiatives, that may appear on a ballot.

4.   States have the responsibility and authority to administer elections. Accordingly, state legislatures or state or local officials generally determine how election materials will be made available to voters (e.g., through the mail, in-person, online), when such materials will be sent out, and how such materials will be designed. Where the mail is used, state legislatures, and sometimes election officials themselves, also choose how to design ballot envelopes. A ballot envelope's design includes its shape and size; and also includes the content, format, and layout of elements that appear on the outside of the envelope. For example, ballot envelopes typically contain some combination of the Postal Service's recommended elements (e.g., official Election Mail logo, Intelligent Mail barcode), as well as voter instructions, warnings, an oath, a signature block, and additional signature blocks for witnesses. In addition, the states determine, or leave it up to state or local election officials to decide, which class of mail to use to send mailings to voters (generally either First-Class Mail or Marketing Mail), the cut-off times to enter these mailings into the postal network (meaning the timeframes that election officials set for their own entry of Election Mail directed to voters into the mailstream), deadlines for voters to request ballots and to return completed ballots, and whether to provide any tracking for a specific mailpiece (usually via the Postal Service's Intelligent Mail barcode, or a third-party system). Likewise, the states, or in some cases the state or local election officials themselves, determine whether to prepay return postage for mail-in ballots or other Election Mail that voters must return to election officials, or whether to instead require the voters to pay for postage themselves. Regardless of whether postage is prepaid by the state/locality or affixed by the voter, all Election Mail (including completed ballots) that a voter mails to

election officials is First-Class Mail, unless the voter or state pays for one of the Postal Service's premium services like Priority Mail or Priority Mail Express.[1]

5.  Every federal election cycle (including primary elections), the Postal Service conducts significant outreach to state and local election officials about how to successfully use our services should they choose to utilize the Postal Service as part of their election process. Through this outreach, we explain our services and our delivery processes; discuss our recommendations and best practices; and provide guidance on how election officials can design and send their mailings in a manner that comports with postal regulations, improves mailpiece visibility, and ensures timely and efficient processing and delivery. These outreach efforts establish points of contact between election officials and Postal Service personnel to foster ongoing coordination, and also provide repeated opportunities for the Postal Service to address questions and discuss our delivery standards, postage-payment options, mailpiece design issues, tracking and mailpiece-visibility services, and other matters regarding Election Mail.

6.  Each federal election cycle, the Postal Service mails copies of its official Election Mail kit, a comprehensive guide to official Election Mail, to thousands of election officials nationwide. In 2020, the Postal Service mailed these kits, known as Kit 600, to approximately 11,500 election officials.[2] The Postal Service also conducts numerous outreach meetings with election officials, sends out written communication, and recommends that election officials contact Postal Service

---

[1] Because ballots being sent by voters back to election officials are individual pieces (not sent in bulk), and because ballots contain personal handwritten or typewritten information, they cannot be mailed as Marketing Mail (which has volume minimums and content restrictions).

[2] Kit 600 is also publicly available online at: https://about.usps.com/kits/kit600.pdf.

mailpiece design analysts to review their Election Mail envelope designs. Also,
during each election cycle, the Postal Service also assigns talented and experienced
personnel to serve in temporary positions as Political and Election Mail Coordinators,
who conduct outreach and serve as the primary points of contact for election officials,
among other things. Many districts also have members of their staff provide part-time
coordinator support, splitting duties between their normal jobs and the coordinator
role. In 2020, the Postal Service has 441 Coordinators, 76 Full-Time and 365 Part-
time.

7. The Postal Service's outreach efforts have intensified in 2020 with the expected
increase in mail-in voting. In May, the Postal Service's General Counsel sent a
guidance letter to more than 11,500 election officials and state political parties,
reiterating several aspects of the Postal Service's processes and delivery standards
and highlighting recommendations that would help ensure a successful election
season. That May letter attached a copy of Publication 632, State and Local Election
Mail – User's Guide, which provides further guidance to election officials about the
Postal Service's recommendations, key considerations, and the services available to
them.  A copy of the May 2020 letter sent by the Postal Service's General Counsel is
attached as Exhibit 1.

8. In July, the General Counsel followed that May letter with a letter to the top election
official in each state and the District of Columbia, noting instances where, under the
Postal Service's reading of that jurisdiction's election laws, certain state-law
deadlines may be in tension with the Postal Service's existing delivery standards and
recommendations. That letter repeated the Postal Service's prior recommendation that

5

voters who choose to use the mail should request their ballots early and should mail in their completed ballots at least one week before the election.  These recommendations are consistent with guidance provided by the Postal Service for past elections, including for example the 2016 Presidential Election.  Attached as Exhibit 2 is a letter dated September 23, 2016, which I understand was sent to election officials in every state.

9.  This year, the Postal Service has already had approximately 42,000 total touchpoints with election officials to help facilitate the smooth and orderly conduct of the 2020 election and we will continue our outreach efforts through Election Day.

10.  This year, the Postal Service expanded its leadership taskforce on Election Mail to enhance our ongoing work. Leaders of our postal unions and management associations have joined this taskforce to ensure strong coordination throughout the Postal Service, with state and local partners, and to make sure any concerns can be raised and resolved at the highest levels of the organization. Because of the unprecedented demands of the 2020 election, this taskforce will help ensure that election officials and voters are well informed and fully supported by the Postal Service. In addition, on August 21, 2020, the Postal Service Board of Governors established a bipartisan Election Mail Committee to actively oversee the Postal Service's processes in support of mail-in voting. The Committee will use its oversight role to reinforce the Postal Service's strong commitment to voting by mail as an important part of the nation's democratic process and will regularly monitor execution of our work on Election Mail to ensure that our part of this election process is implemented in the most effective way possible.

11. One of the most important recommendations that the Postal Service makes to state and local election officials is to use one or more methods to distinguish Election Mail from other mailpieces, which in turn helps the Postal Service identify Election Mail flowing through the postal network so that it can be appropriately treated and expeditiously moved (as discussed further below). A primary method of distinguishing Election Mail is through the use of the Postal Service's official Election Mail logo:



12. Postal Service employees are trained to identify this logo on Election Mail. Similarly, election officials are encouraged to distinguish ballot mailings that they send to voters by affixing (or instructing their third-party vendors to affix) Green Tag 191 (image below) to containers (e.g., trays or sacks) containing ballots.



13. If Green Tag 191 is affixed to a particular tray or sack of mail when the mail is entered into the postal network, the Postal Service knows that the tray or sack contains ballots being sent to voters, and ensures that it receives the appropriate handling and processing based on our longstanding practices and policies.[3] The Postal Service also recommends that election officials identify mail as Election Mail by checking a box on the postage statement form that may be used when tendering a mailing to the Postal Service.[4] These are three of the primary methods election officials may use to identify Election Mail containing ballots for the Postal Service, if they choose to identify it; the Postal Service does not require election officials to use any of these methods. The Postal Service's official Election Mail logo and Green Tag

---

[3] Green Tag 191 can be used only for ballots being sent to voters, and not for any other kind of Election Mail.

[4] A postage statement is a special form produced by the Postal Service that documents the number of pieces in the mailing and the postage price for those pieces.

191 have been in use since the 2012 election. The check box on the postage statement form was introduced in 2014 and has been in use since.

14.  These identifiers help increase the visibility of Election Mail as it travels through our network, from entry to delivery. The Election Mail logo distinguishes the piece through the entire process, and the postage statement form check box and Green Tag 191 ensure that the Postal Service's employees and systems recognize a particular mailing as Election Mail when it is entered into our network. The Postal Service uses these identifiers to help ensure we are following existing processes for handling Election Mail. That practice is the same for the upcoming November election as it has been in prior ones.

**Prioritization of Election Mail**

15.  Except where a voter chooses to purchase one of the Postal Service's premium services – Priority Mail (which has a retail price starting at $7.50) or Priority Mail Express (which has a retail price starting at $26.35) – completed ballots mailed by a voter to an election official are First-Class Mail, just like other single-piece mail such as holiday cards and bill payments. Such completed ballots are First-Class Mail whether they are prepaid by election officials or mailed with a stamp by the voter. States, and sometimes election officials themselves, choose whether to prepay postage on behalf of voters on ballots or not. The most common methods of prepaid postage for Election Mail are Business Reply Mail, Qualified Business Reply Mail, Metered Reply Mail, Permit Reply Mail, or stamps. If election officials choose to use Business Reply Mail or Qualified Business Reply Mail, they will only be charged for the pieces that are actually returned by voters through the mail.

16. For most U.S. citizens who live abroad but are eligible to vote in U.S. elections, their ballots mailed from foreign countries are handled as First-Class Mail once they arrive in the United States and enter the Postal Service's processing network. For general elections for Federal office, overseas uniformed services voters, including active duty military personnel and their families, may use Priority Mail Express Label 11-DOD, *DOD Express Mail Label Absentee Ballot*, to return their ballots from an Army Post Office (APO), Fleet Post Office (FPO), or Diplomatic Post Office (DPO). Where Label 11-DOD is used to return a ballot, the ballot will be treated as Priority Mail Express when it reaches the United States and enters the Postal Service's processing network. We recommend that other voters who live abroad should return their mail-in ballots as early as possible, because domestic delivery timeframes do not account for international deliveries, and foreign postal operators may have different delivery standards. Acting early is especially important this year because of exigent circumstances created by the COVID-19 pandemic. For example, regular postal service is currently still suspended with some countries. However, voters living abroad may return their ballot at any U.S. embassy, consulate, or Diplomatic Post Office (where the ballots would be included in diplomatic mail, which continues without disruption). For overseas voters who have authorized access to a military base, they may return their ballot at that U.S. military base (where the ballots would be included in APO/FPO mail, which continues without disruption).

17. This year, as in years past, election officials who use the mail to provide voters with election materials, including blank ballots, may mail such materials to voters as First-Class Mail or Marketing Mail. There are some differences between First-Class Mail

and Marketing Mail, although they are processed using the same equipment. Single
Piece First-Class Mail generally is delivered within a two to five day timeframe,
meaning two to five days after the mail is entered into the mailstream or collected by
the Postal Service, while most Marketing Mail is delivered on a three to ten day
timeframe. First-Class Mail can be transported by air when the mail needs to travel a
long distance to be delivered, but Marketing Mail is moved only by ground
transportation. The Postal Service provides automatic forwarding for First-Class
Mail, but not Marketing Mail. First-Class Mail pieces are also sealed against
inspection, whereas Marketing Mail is not. These differences between First-Class and
Marketing Mail are set forth in the Mail Classification Schedule, which is maintained
on the Postal Regulatory Commission's website, as well as the Domestic Mail
Manual, which is a Postal Service regulation.

18. With respect to Election Mail, the differences between First-Class and Marketing
Mail are relevant only to Election Mail that officials send out to voters, since (as
discussed above) ballots being returned by voters are, at a minimum, First-Class Mail.
The Postal Service has, for many years, recommended that election officials use First-
Class Mail service for all Election Mail. If election officials choose to send out
Election Mail to voters as Marketing Mail, there is no regulation or formal Postal
Service policy providing that Election Mail (including ballots) entered as Marketing
Mail be automatically upgraded to First-Class Mail, even if the mail bears the official
Election Mail logo. To my knowledge, no such regulation or policy has ever existed.

19. The Postal Service recognizes the importance of Election Mail, however, and has
policies and established practices to help prevent Election Mail – whether sent by

election officials as Marketing Mail or First-Class Mail – from being lost or delayed. For example, the Postal Service uses log sheets that account for and help track Election Mail through processing. If a county election board enters a container of Election Mail into the postal system on a particular day, that container gets logged by Postal employees at each step along the way – in the business mail entry unit, the processing facility, and the delivery unit, for example – so that the container can be tracked. The Postal Service also uses daily "all clears" to ensure that all Election Mail is accounted for within the system. In the all clear process, in-plant support personnel in processing or delivery units use a checklist to confirm that mail scheduled or "committed" to go out that day has gone out, and anything committed for the next day is at the front of the line. Personnel conducting all clears may consult the logs that were described earlier, and also check all locations within the facility (e.g., processing equipment) to ensure that all pieces of Election Mail in the facility's possession are in the right location.  Attached as Exhibit 3 is an example of an "Operational Clean Sweep Search Checklist – Political and Election Mail" that USPS personnel routinely use as part of the "all clear" procedure.

20. In terms of delivery speed, the Postal Service recognizes that Election Mail, and ballots in particular, are time-sensitive. Accordingly, while there is no formal policy, the Postal Service has several longstanding practices of prioritizing the expeditious processing and delivery of Election Mail, particularly ballots. I have knowledge of and experience with these practices both in my current role, and as a Plant Manager during the 2016 election.

21. Specifically, a longstanding practice within the Postal Service is to devote excess First-Class Mail processing capacity to Election Mail, including blank ballots sent out to voters. A plant can process a finite amount of mail per day within First-Class Mail standards. Where there is not enough First-Class Mail to fill that capacity, we fill it with other mail such as Marketing Mail. This is called "advancing." Although there is no formal policy to this effect, it is a longstanding practice to advance Election Mail entered as Marketing Mail ahead of all other Marketing Mail. As a result of this practice, the delivery timeframes for Election Mail entered as Marketing Mail often are comparable to those of Election Mail entered as First-Class Mail. In my experience, the majority of Election Mail entered locally as Marketing Mail ultimately has a similar delivery speed to First-Class Mail because of "advancing" and other Postal Service practices.

22. Another practice is ensuring that Election Mail including blank ballots sent to voters is not left behind. If a truck leaving a facility is going to be 100 percent full, we prioritize placing the ballots on the truck.

23. In addition to those practices, Postal Service employees also often undertake extraordinary efforts to accelerate the delivery of ballots that have been mailed by election officials, whether sent using First-Class Mail or Marketing Mail service, or by voters very close to or on Election Day. There is no formal Postal Service policy discussing this practice, but it is culturally understood within the Postal Service, and, in my experience, has been part of Postal Service culture during the whole time I have been aware of the Election Mail process.

24. The decision to undertake these efforts is generally made at the local level by District and/or Plant leadership and staff. The Postal Service's Area and Headquarters leadership and officers have, to my knowledge, always approved of these efforts when informed of them. I am unaware of any opposition by management to these efforts.

25. An example of the efforts undertaken by the Postal Service's employees this year occurred when New York City mailed thousands of blank ballots to voters on the Friday before a Tuesday primary election. When the local Plant Manager and District Manager heard about this from the Postal Service's local Election Mail coordinator, they ordered our employees to undertake extraordinary efforts to ensure that as many ballots as possible reached the voters before Election Day so they could still be returned in time to be counted. After giving that order, they informed their Area Vice President, who endorsed the decision and told them to do anything they needed to do to deliver the ballots. Postal Service employees then segregated the ballots from the other mail and sent them as Priority Mail Express (formerly known as Express Mail), the Postal Service's fastest and most expensive service, so that the ballots moved as quickly as possible through our network. This was done at considerable expense to the Postal Service, which we did not seek to recover from the election officials.

26. Other extraordinary measures we have undertaken include providing additional deliveries during the day and making deliveries on Sundays. Postal personnel, including managers, will also personally deliver ballots on a same-day basis to election officials throughout Election Day, in recognition of the fact that many local election boards require that they must physically receive ballots by a certain time on

Election Day. I have personal knowledge of the fact that on previous Election Days, if a state has, for example, a 7 p.m. return deadline, postal employees have been instructed to search a facility at 5 p.m. to find every ballot they can so that it can be turned over to election officials by the state's deadline. Again, the Postal Service undertakes these extraordinary measures at its own cost, including overtime, fuel, mileage, and other similar expenses. During this election season, I am aware that we made extra deliveries over the weekend in Georgia and Washington, D.C., to ensure to the best of our ability that ballots would be delivered to voters in time to vote in primaries, despite mailings by election officials very close to Election Day.

27. I am not aware of anyone in the Postal Service who has disapproved efforts to do anything reasonably possible to deliver ballots in time for votes to be counted. To the best of my knowledge, Postmaster General DeJoy has not done anything to change these practices or expressed any intention to do so. Nor have any other members of the Postal Service's Executive Leadership Team. In sum, I am not aware of anyone within the Postal Service expressing any intention to stop, curtail, discourage, or interfere with any effort to accelerate the delivery of ballots so they may arrive in time to be counted during this year's election cycle.

28. I expect us to undertake these same extraordinary efforts during the November 2020 general election when necessary. I fully support these efforts and intend to use my position to facilitate them. In fact, this year the Postal Service has implemented additional measures to ensure the timely delivery of ballots, as discussed below.

29. For example, on August 18, 2020, Postmaster General DeJoy committed that, starting on October 1, 2020, the Postal Service will engage standby resources in all areas of

our operations, including transportation, to satisfy any unforeseen demand related to the November general election. His testimony under oath before both the Senate Homeland Security and Government Affairs Committee on August 21, 2020, and the House Committee on Oversight and Reform on August 24, 2020, confirmed this commitment. These "standby resources" will include, as needed, additional staffing, additional transportation, extra trips, and expanded mail processing windows. With respect to expanded mail processing, the Postal Service's mail processing machines generally have, across the board, unused excess capacity (e.g., idle windows) that we can utilize as needed to ensure the timely processing of Election Mail.  For example, on average, Advanced Facer Canceller Systems (AFCS), which cancel (apply postmarks) to letter-sized mail, run less than 8 hours per day (outside of the Peak holiday season in December). Operations officers throughout the Postal Service will deploy these standby resources as needed.

30. There are practical limitations to what these extraordinary efforts can accomplish. If a ballot is mailed from the West coast to the East coast on Election Day, it will be impossible for the Postal Service to deliver it on the same day. There are also limitations of scale. It may be possible for us to provide same-day delivery for 5,000 ballots through extraordinary delivery measures, but, as the number increases to 50,000 or beyond, such special measures become much more difficult.

31. Because of the anticipated increase in voting using the mail due to COVID-19, and the inexperience of many state and local election officials in administering an election with such a high volume of mail-in ballots, there is a high risk that large mailings may be entered close to or on Election Day, as we have already experienced during

some primary elections this year. Such occurrences may strongly test what is realistically possible regarding accelerated delivery times, even with heroic efforts from the Postal Service.

32. To help educate election officials about how the mail works and what they can expect when using the mail as part of their elections, and as part of our commitment to delivering Election Mail in a timely manner, in addition to publishing comprehensive guidance materials on our website (usps.com/votinginfo), we regularly communicate with election officials by letter, phone, meetings, and otherwise to educate them on our processes, procedures, and recommended best practices, including recommended mailing timeframes, using First-Class Mail, and using available labeling tools to increase visibility and tracking for Election Mail. This communication strategy has not changed since Postmaster General DeJoy took office. However, this year, the frequency of communications between the Postal Service and election officials has increased, because of the need to address challenges stemming from the COVID-19 pandemic.

**Ballot Cancellation**

33. A postmark is an official Postal Service imprint applied on the address side of a stamped mailpiece. A postmark indicates the location and date the Postal Service accepted custody of a mailpiece, and its primary purpose is to cancel affixed postage so that it may not be reused (thereby providing some revenue assurance for the Postal Service). Cancellation is not required for mailpieces that bear a permit, meter, precancelled stamp for postage, or for pieces with an indicia applied by various postage evidencing systems, because this type of postage is not at risk of being

17

reused. As such, the Postal Service's mail processing system is not designed to cancel every single mailpiece that flows through the system.

34. It has, however, been the Postal Service's policy for several years to "cancel" (commonly understood by the public as "postmark") all ballots returned by voters, regardless of the method of payment used; this policy remains in place. For example, if a mailpiece comes in that is permitted or metered and, if it is identifiable as a ballot, the Postal Service will still try to "cancel" or "postmark" that mailpiece. This policy is in recognition of the importance that many states place on a postmark, as a means of validating that the ballot was returned on time.

35. Letter-sized mail is typically cancelled using an AFCS machine at a plant. Based on my own knowledge of the Postal Service's inventory of AFCS machines, including removals prior to Postmaster DeJoy's August 18, 2020 direction to suspend such activity, and the processing capacity of those machines, the Postal Service has sufficient AFCS capacity to handle all ballots during this year's election. In general, most processing plants run AFCS machines only from 4 p.m. to about 11 p.m., meaning that these machines typically have many extra hours of processing capacity that can be used, for example, to cancel ballots.

36. During the Postal Service's regular operations, some mail bypasses the cancellation machine, like trays of prepaid (usually metered) mail. Even for mail that runs on the cancellation machine, there are some mailpieces that the machine cannot read or apply a cancellation mark to, for instance if the piece is overly wet or crumpled. Those mailpieces enter the "reject" or "return" processing flows. The "reject" or "return" mail is ordinarily moved through processing without applying a cancellation

mark. However, during election season, if a cancellation machine rejects a mailpiece, and that mailpiece is identifiable as a ballot, then the ballot is cancelled by hand before continuing through processing. In addition, as discussed further below, the Postal Service recently began using dedicated ballot monitors to ensure that all ballots are, to the extent possible, being identified and cancelled, either by machine or by hand.

37. There are limited instances where the Postal Service may not be able to attempt "postmarking" or "cancellation" on a ballot. For example, many businesses and other bulk mailers send mail in bulk-mailing trays containing roughly 400 pieces each. These trays often consist primarily of metered mail, which does not require cancellation. As such, these trays of metered mail generally bypass the cancellation machines and are entered directly into sorting machines. This means a ballot mailed from an office or similar location that has primarily metered outgoing mail that is entered into the mailstream in trays would not receive a cancellation unless a Postal Service employee recognized the ballot within the tray and separated it for cancellation.

38. There are other reasons a ballot might not receive a legible cancellation mark. For example, occasionally two pieces may be stuck together when they are run through the machine, or the ink in a given cancellation machine may smear.

39. In order to minimize these issues, the Postal Service has modified its regular processes to maximize the likelihood that a ballot is cancelled. These measures include making extra efforts to hand cancel ballots that are rejected by automated cancellation machines and training Postal Service employees to recognize ballots

19

using the official Election Mail logo to make sure that these mailpieces are cancelled. This year, for the first time of which I am aware, the Postal Service also began utilizing ballot monitors in every processing facility to monitor the postmarking process and ensure all processes are being adhered to properly with a goal to minimize any missed postmarks on ballots. For the week before the November general election and through Election Day, each facility will have a ballot monitor who is fully familiar with processing operations and the procedures that should be followed for cancelling ballots.

40.  In order to successfully implement the ballot postmarking processes, Postal Service employees must recognize a mailpiece as a ballot. To help Postal Service employees recognize ballots in the mailstream, the Postal Service has recommended (and recommends again this year) that election officials include the official Election Mail logo on the ballot envelope, as well as other identifiers discussed above. Because return ballots can be mailed from anywhere in the country, the use of the universally recognized official Election Mail logo is particularly important for visibility. A Postal Service employee may not be familiar with the appearance of a ballot for King County, Washington, for example, but would recognize the official Election Mail logo. Election officials are not required to include these identifiers, but, without them, it is significantly more difficult for the Postal Service to identify and cancel ballots.

41. In this election cycle, the Postal Service has intensified its efforts to improve the postmarking process by convening a Postmark Team that has worked to identify and correct potential process deficiencies, and has updated Processing Operations Management Orders, Stand Up Talks, and Standard Work Instructions. This team also

recommended the use of ballot monitors, who have been used successfully in several of the later primary elections in 2020 and will be in place for the November general election.

**Ability of the Postal Service to process Election Mail**

42. The Postal Service typically delivers well over 400 million mailpieces per day. In 2019, the Postal Service delivered an average of 472 million mailpieces per delivery day. Even if every registered voter in the United States were to vote by mail this year (which, based on available data, would total around 155 million mailed-in ballots), their ballots would represent only a tiny portion of the total mail volume that the Postal Service handles. Currently, even with the anticipated increase in the use of voting by mail, the Postal Service is projecting that only two to five percent of total volume in October and November will be Election Mail. However, to help ensure that all Election Mail can be delivered on time, and to mitigate the impacts of any surges in Election Mail sent in the days immediately before Election Day, the Postal Service is actively encouraging voters and election officials to act early to allow enough time for voters to request, receive, complete, and return their ballots.

43. There will be surges in Election Mail volume near the November general election date, but we experience these types of mail surges regularly for things such as monthly billing cycles, holidays, and the 2020 Census, and we are prepared for them. We expect less total volume during the entire election season of October to November than during the peak mailing season, which begins after Thanksgiving and extends into early January. Peak in 2019 was projected to have around 13 billion mailpieces. During the peak week of the holiday season, the Postal Service expected

2.5 billion pieces of First-Class Mail, not counting any Marketing Mail. If every registered voter was to receive an application for a mail-in ballot and return it via mail, then receive a mail-in ballot and also return it by mail, the total volume handled by the Postal Service for all four legs in this scenario would total around 640 million pieces, which is roughly 25 percent less than the peak seven days handled by the Postal Service. The Postal Service's routine, data-based reductions in the number of sorting machines in facilities, and other reductions in equipment, are done conservatively, with anticipated surges in mind and accounted for. In my time as a Plant Manager, equipment was removed routinely due to declining mail volume, and I am not aware of any policy change or change to this practice this year, other than the recent pause to the practice ordered by Postmaster General DeJoy until the November election is over.

44. While the COVID-19 pandemic presents challenges for the Postal Service due to decreased availability of Postal Service workers, we have worked with the Postal Service's unions to bring on additional workers and are confident that we will have the workforce we need. We have plans in place to respond to the continued negative impact of COVID-19 and are making plans to rapidly respond to crises that may occur, including spikes in COVID-19-related absences.

45. The Postal Service's most significant concerns with respect to this election are envelope design, including ballot envelope design, because poorly designed envelopes can impact processing and cause improper delivery; and the state's mailing timeframes or deadlines, particularly those deadlines and timeframes that may have changed or be changed near Election Day in light of circumstances resulting from the

COVID-19 pandemic. These concerns have driven our expanded efforts this year to

reach out to and educate election officials, in order to ensure a smooth mail-in voting

process.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed at Washington, DC on this ___8___ day of September, 2020

Robert Justin Glass

THOMAS J. MARSHALL
GENERAL COUNSEL
AND EXECUTIVE VICE PRESIDENT


UNITED STATES
POSTAL SERVICE

May 29, 2020

Re:  Election Mail

Due to the impacts of the COVID-19 pandemic, the Postal Service anticipates that many
voters will choose to use the mail to participate in upcoming elections, including the 2020
General Election in November.  This letter is a follow-up communication to the 2020 Official
Election Mail Kit (Kit 600), which was provided to elections officials in March and which is
available at https://about.usps.com/kits/kit600.pdf.

Following up on several topics addressed in that Election Mail Kit, this letter highlights some
key aspects of the Postal Service's delivery processes, to allow you to take those
processes into account when making decisions and when educating the public on what to
expect when using the mail to vote.  You will also find some additional recommendations
that the Postal Service has regarding how to ensure the efficient and timely handling of mail
pertaining to elections (which includes ballots as well as registration cards, absentee-ballot
applications, polling-place notifications, or other materials sent from authorized election
officials to allow citizens to participate in the voting process, and is collectively referred to
as "Election Mail").  These and other issues are discussed in the above mentioned Election
Mail Kit and in Publication 632, *State and Local Election Mail – User's Guide*, which is
enclosed to this letter.  Publication 632 and other Election Mail resources are available on
the Postal Service's Election Mail website at https://about.usps.com/election-mail/election-
mail-resources.htm.

**How Election Mail can be Sent**

As an initial matter, the Postal Service offers a variety of mailing services that voters and
election officials may utilize to transmit Election Mail.  The two main classes of mail that are
used for Election Mail are First-Class Mail and USPS Marketing Mail, the latter of which
includes the Nonprofit postage rate.  These mail classes have different delivery standards
and price ranges, and are subject to eligibility requirements that include the volume of a
given mailing and the mailpiece's contents, weight, and size.  As a general matter, all
Election Mail (including ballots) mailed from individual voters to state or local election
officials *must* be sent by First-Class Mail.  Election materials (including blank absentee
ballots) mailed from state or local election officials to voters may generally be sent by either
First-Class Mail or Marketing Mail.

**Mail Processing Times Need to be Considered when Communicating Deadlines**

It is important to note that First-Class Mail and Marketing Mail have different delivery
standards, and that delivery times further depend on the origin and destination of a given
mailpiece.  Most domestic First-Class Mail is delivered in 2-5 days.  Most domestic
Marketing Mail is delivered in 3-10 days.  *However, the Postal Service cannot guarantee a
specific delivery date or alter standards to comport with individual state election laws.*

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-1100
PHONE: 202-268-5555
FAX: 202-268-6981
THOMAS.J.MARSHALL@USPS.GOV
www.usps.com

To account for delivery standards and to allow for contingencies (e.g., weather issues or unforeseen events), voters should mail their return ballots at least 1 week prior to the due date established by state law.  Similarly, for election materials (such as blank ballots) sent to voters, the Postal Service also recommends that state or local election officials use First-Class Mail and allow 1 week for delivery to voters.

It is critical that the Postal Service's delivery standards be kept in mind when informing voters how to successfully participate in an election using the mail, and when state and local election officials are making decisions as to the establishment of deadlines and the means used to send a piece of Election Mail to voters.  Voters should be made aware of these transit times when offered the opportunity to request that an absentee ballot be mailed to them, and when deciding when to mail a ballot back to election officials.  For example, if a state law requires completed ballots to be received by election officials by a specified date (such as Election Day) in order to be counted, voters should be aware of the possibility that completed ballots mailed less than a week before that date may not, in fact, arrive by the state's deadline.  Similarly, if a state law allows a qualified voter to request an absentee ballot shortly before Election Day and requires the state or local election official to mail that ballot to the voter, voters should be made aware that the absentee ballot may not reach the voter before Election Day if requested less than a week before the election.

**Proper Labeling Helps Avoid Delivery Delays and Increases Mailpiece Visibility**

The Postal Service is committed to the efficient and timely processing and delivery of Election Mail in accordance with its delivery standards, and has developed labeling to provide greater visibility for these mailpieces during processing, including the Official Election Mail logo, which is used on all Election Mail, and Tag 191, *Domestic and International Ballots*, which is used specifically for ballots.  Neither Tag 191 nor the Official Election Mail logo is mandatory, and they do not upgrade service or substitute for postage, but they help to alert the Postal Service of the presence of Election Mail in the postal network and distinguish Election Mail from the millions of other mailpieces that are moving through the network.

The Postal Service further recommends that election officials use Intelligent Mail barcodes for their Election Mail.  These barcodes are used to improve a mailer's ability to track individual mailpieces and gain greater mailstream visibility.  The Postal Service also offers an Intelligent Mail barcode identifier specifically for ballots that increases mailpiece visibility within the processing system, is used by the Postal Service to sort individual mailpieces, and can be used both by the Postal Service and by the mailer to track the delivery and return of ballots.

**Consult with Election Mail Coordinators BEFORE Printing Mailpieces**

In addition, the Postal Service has assigned election mail coordinators to each locality that stand ready to assist and consult with state and local election officials concerning the logistics of their mailings and the services that are available.  A list of election mail coordinators may be found on our website at: https://about.usps.com/election-mail/political-election-mail-coordinators.pdf.  Also, mailpiece design analysts will assist election officials in designing and preparing envelopes that are consistent with postal regulations, increase

- 3 -

mailpiece visibility, facilitate the application of postmarks, and allow officials to receive available postage discounts. You may reach a mailpiece design analyst by calling the MDA Customer Service Help Desk at 855-593-6093 (between 8 a.m. and 5 p.m. Central Time, Monday through Friday) or by sending an email to *MDA@usps.gov*. Mailpieces that do not adhere to the Postal Service's requirements may experience longer processing times or other delivery problems. To avoid incurring delivery delays and unnecessary costs, the Postal Service strongly recommends that state and local election officials work with the Postal Service ***before*** designing and printing any mailpieces for use in elections.

This letter, which has been sent to local and state election officials around the country, is part of a broader outreach effort aimed at educating all interested parties about the Postal Service's mailing requirements and services. The Postal Service is proud of its role as an important component of the nation's democratic process and it remains committed to providing the resources needed to implement a successful election season.

Thomas J. Marshall

Enclosure

RONALD A. STROMAN
DEPUTY POSTMASTER GENERAL
AND CHIEF GOVERNMENT RELATIONS OFFICER


UNITED STATES
POSTAL SERVICE

September 23, 2016

Mr. Ed Packard
Director of Elections
Office of the Alabama Secretary of State
Post Office Box 5616
Montgomery, AL 36103-5616

Dear Director Packard:

With the general election fast approaching, I wanted to remind you that our Political and
Election Mail Coordinators are your principal points of contact during the election season.
Our Coordinators will resolve issues that arise during the election cycle and suggest the best
mailing practices to ensure timely and secure delivery of absentee and vote-by-mail ballots.
To find the names and contact information for the Political and Election Mail Coordinators
within your state, please go to <about.usps.com/gov-services/election-mail/> and use the
coordinator locator tool. We also recommend that you urge voters to mail back their ballots
one week prior to Election Day in order to ensure the ballots' timely delivery.

In addition, we have developed the enclosed summary of reminders, recommendations and
resources. We hope you will find the information on the following pages helpful as you
prepare and distribute your Official Election Mail materials to voters in the November election.

Working closely together, we can achieve a successful general election season in 2016.

Sincerely,

Ronald A. Stroman

Ronald A. Stroman

Enclosures

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-0050
WWW.USPS.COM

## Postal Service General Election Recommendations

### Work With Your Local Election and Political Mail Coordinator

- A key to success in 2016 will be local partnerships between Postal Service™ election coordinators and the election community.  Election and Political Mail Coordinators are trusted to log and resolve issues locally.

- Contact a Postal Service Election Mail Coordinator <about.usps.com/gov-services/election-mail/> to discuss all aspects of your mailing, including:
  - o  Mailpiece design.
  - o  Mailing preparation/entry.
  - o  Delivery and pickup activities.

- Early communication is very important.
  - o  Contact your local Election Mail Coordinator as soon as questions or concerns arise.
  - o  Should your concern regard a specific mailing, please provide front and back PDF copies of the mailpiece as well as physical samples.  This will aid the Postal Service's investigation with regard to identifying the cause and providing timely corrective action when necessary.

### Use Postal Service Recommended Best Practices

- Reply envelopes should include:
  - o  Official Election Mail Logo for visibility.
  - o  Delivery point Intelligent Mail barcode (IMb®).
  - o  The specific amount of postage needed to return balloting materials by mail, as required under current mailing standards, unless subject to the following exceptions:
    - ▪  The balloting materials are qualified under the special exemption for military and overseas voting.
    - ▪  The ballot is returned under Business Reply Mail service.
    - ▪  Return postage is guaranteed through a postage-due account.
    - ▪  Postage on the ballot is prepaid by stamps, meter, or Permit Reply Mail.

- Use letter-size reply envelopes.
  - o  The use of letter-size reply envelopes will increase the operational likelihood that the ballot receives a postmark.

- Use First-Class Mail® postage.
  - o  Board of Elections should use First-Class Mail postage rather than Standard or Non-Profit postage rates when paying for the delivery of outbound absentee or vote by mail ballots. Most First-Class Mail is delivered within 2–5 days.

- Use Green Tag for 191 domestic and international ballots.
    - The tag identifies trays and sacks that contain ballot mail.
    - The designation provides greater visibility during mailing induction.
    - It can ONLY be applied to ballot mail, such as vote-by-mail Ballot and absentee ballots.

 

- Review sample mailpieces.
- At the time of mail entry, the Postal Service strongly encourages the mailer to supply an unaddressed copy of all official election mailpieces. However, for official ballots, regardless of class of mail, the mailer must provide a sample mailpiece with its contents, unless an exception is met. See DMM 703.8 at <pe.usps.com/text/dmm300/703.htm#1174014>.
- Properly label postage statements.
    - Check off the "Yes" box next to "This is Official Election Mail."

### Encourage Voters to Mail Early

- The Postal Service recommends that voters mail ballots one week before the due date to account for any unforeseen events or weather issues, and to allow for timely receipt and processing by election officials.
- The Postal Service is committed to processing and delivering Official Election mail within our stated delivery standards. Most First-Class Mail deliveries are made within 2–5 days. Standard Mail® deliveries are made within 3–10 days (within the contiguous 48 states).
- Customers should understand their options in receiving a postmark on ballots.
    - Home or Business Mailboxes: Ballots will be postmarked the day the Postal Service mail carrier collects it.
    - Local Post Office™ facility: Take the ballot to a local Post Office facility and confirm with the counter representative that the ballot will be postmarked that day.
    - USPS® Blue Collection Boxes: If the ballot is deposited after the printed collection time on the box, the ballot will not be postmarked until the next day of collection.

**Election officials should consider including a voter notification with the above guidelines, as well as state deadlines and requirements, in the ballot material packet to clarify key information.**

### Resources

The following resources are available during the election season to assist in the mailing process:

- Mailpiece Design Analysts (MDA).
  - o For assistance with mailpiece design, contact a Mailpiece Design Analyst by calling the MDA Support Center at 855-593-6093 (hours of operation are Monday—Friday, 7 a.m. to 5 p.m. CT) or by sending a request by email message to mda@usps.gov.

- 2016 Official Election Mail Program Kit (Mailed to Election Officials April 19, 2016).
  - o A soft copy is available online at <about.usps.com/election-mail/election-mail-resources.htm>.

- USPS Election Mail Websites and email addresses:
  - o The following Web resources and email addresses are available at <about.usps.com/gov-services> for additional information:
    - *USPS Election Mail Homepage*: Find links to Postal Service Election Mail resources and guidelines. <www.about.usps.com/gov-services/election-mail/>
    - *Election Mail Coordinators*: Find a local Election Mail Coordinator to support preparation, entry delivery and pickup planning.
    - *Find a Business Mail Entry Unit*: Learn where to drop off government and Election Mail.
    - *Contact the Election Mail Task Force Program Manager*: ElectionMailProgramManager@usps.gov

# ELECTION MAIL CHECKLIST

## The following checklist will help to ensure a successful election mailing:

### 1. CALL YOUR POSTAL SERVICE ELECTION MAIL COORDINATOR

- ☐ Discuss the specific purpose for the mailing (e.g., information, ballots, and voter registration).
- ☐ Discuss when you intend to present the mail to the Postal Service.
- ☐ Discuss your delivery date requirements.
- ☐ Determine if the mailing must go as First-Class Mail—USPS recommends the use of First-Class Mail postage on all outbound absentee or vote by mail ballots.
- ☐ Determine where and when the mailpieces must be presented to the Postal Service to meet your desired delivery dates.
- ☐ Determine the size of the mailings.
- ☐ Determine the best method of receiving return mail (e.g., Post Office Box or Caller Service).
- ☐ Determine the best time to pick up the mail each day.
- ☐ Determine the latest time when an election official can pick up returns.
- ☐ Determine the final date for receiving return mail.
- ☐ Determine the necessary postal equipment and supplies needed.
- ☐ Determine payment method.
- ☐ Determine what forms are needed for mailing and for postage payment.
- ☐ Determine if the mailing must meet address or Move Update requirements.
- ☐ Determine if the mailing needs to have an ancillary service endorsement (e.g., Return Service Requested).
- ☐ Determine if the mailing needs extra services (e.g., Certified Mail, Registered Mail).

### 2. DETERMINE IF THE MAILING NEEDS TO INCLUDE A REPLY PIECE

- ☐ Decide if you plan to use Business Reply Mail or Courtesy Reply Mail.
- ☐ Decide if it is cost-effective to use Qualified Business Reply Mail.

### 3. PREPARE YOUR ADDRESS LIST

- ☐ Decide who should receive the mailpieces.
- ☐ Compile your address list.
- ☐ Ensure proper address list hygiene.
- ☐ Validate physical address accuracy.
- ☐ Validate that you meet the Move Update standard, if applicable.

## 4.  FILE REQUIRED FORMS FOR POSTAGE DISCOUNTS AND OTHER MAILING SERVICES (IF NEEDED)

- ☐  PS Form 1093, Application for Post Office Box Service.
- ☐  PS Form 1093-C, Application for Post Office Caller Service.
- ☐  PS Form 3615, Mailing Permit Application and Customer Profile (for Permit Imprint and Business Reply Mail permits).
- ☐  PS Form 3623, Request for Confirmation of Authorization (or Pending Application) to Mail at Nonprofit Standard Mail Prices.
- ☐  PS Form 3624, Application to Mail at Nonprofit Standard Mail Prices.
- ☐  PS Form 6805, BRM/QBRM Application for ZIP+4 Code Assignment/Validation and QBRM Approval (Business Reply Mail/Qualified Business Reply Mail).

## 5.  MAILPIECE DESIGN–WORK WITH A MAILPIECE DESIGN ANALYST TO ENSURE MAILPIECE COMPLIANCE–POSTAL SERVICE RECOMMENDATIONS

- ☐  Voter communication is an essential component of preventing late ballots.
  - —  Election officials should consider including a voter notification in the ballot packet to ensure timely delivery of ballots.
  - —  Return by Mail date guidance based on state/local laws.
- ☐  Use letter-size reply envelopes.
- ☐  Board of Elections should use First-Class Mail postage on all outbound absentee or vote-by-mail ballots.
- ☐  Use the Official Election Mail Logo on all Official Election Mail.
- ☐  Use IMb Tracing–a service which provides near real-time tracking information for your automation-compatible letters and flats.
- ☐  Use Tag 191 on all Domestic and International Ballot mailings.
- ☐  Consider appropriate colors, weight limitations, proper wording, placement of postal markings, etc.
- ☐  Obtain an evaluation of the final mailpiece design before printing.

## 6.  PREPARE AND PRESENT THE MAILING

- ☐  Print mailing in time for preparation and delivery to the Post Office.
- ☐  Affix Tag 191 for Domestic and International Ballots.
- ☐  Obtain postal supplies and equipment (e.g., carts, trays, stickers, rubber bands, and tags).
- ☐  Prepare mailing for delivery to the Post Office.
- ☐  Obtain and complete postage statements to be presented with mailing:
  - ▪  If using Bulk First-Class Mail, you will need to use one or more forms in the 3600 series.
  - ▪  If using Standard Mail, you will need to use one or more forms in the 3602 series.
- ☐  Present mailing, postage statement, and check (payment) for postage account, if needed.

---

**Note:** The following are trademarks of the United States Postal Service: ACS™, AEC II®, Business Reply Mail®, CASS™, Certified Mail®, Courtesy Reply Mail™, DMM®, DPV®, Express Mail®, First-Class Mail®, NCOALINK®, Official Election Mail®, Post Office™, Postal Explorer®, Postal Service™, Standard Mail®, USPS®, usps.com®, ZIP+4®.

| Name | Title | Department | Street | Second Line | City, State Zip | Greeting |
|---|---|---|---|---|---|---|
| Mr. Ed Packard | Director of Elections | Office of the Alabama Secretary of State | Post Office Box 5616 | | Montgomery, AL 36103-5616 | Dear Director Packard: |
| Ms. Josephine Bahnke | Director of Elections | Alaska Division of Elections | Post Office Box 110017 | | Juneau, AK 99811-0017 | Dear Director Bahnke: |
| Mr. Soliai T. Fuimaono | Chief Election Officer | Office of the American Samoa Secretary of State | Post Office Box 3970 | | Pago Pago, AS 96799-3970 | Dear Chief Election Officer: |
| Mr. Eric H. Spencer | Election Director | Office of the Arizona Secretary of State | 1700 West Washington Street, 7th Floor | | Phoenix, AZ 85007-2808 | Dear Director Spencer: |
| Ms. Kartik Surani | Interim Director | Office of the Arkansas Secretary of State | Room 026, State Capitol | | Little Rock, AR 72201-1088 | Dear Director Surani: |
| Ms. Jana Lean | Chief of Elections | Elections Division | 1500 11th Street, 5th Floor | | Sacramento, CA 95814 | Dear Chief Lean: |
| Ms. Peggy Reeves | Director of Elections | Colorado Department of State | 1700 Broadway, Suite 270 | | Denver, CO 80290-1700 | Dear Director Reeves: |
| Mr. Judd Choate | Director of Elections | Office of the Secretary of State | 30 Trinity Street | | Hartford, CT 06106-1634 | Dear Director Choate: |
| Ms. Elaine Manlove | State Election Commissioner | Department of Elections | 905 South Governors Avenue, Suite 170 | | Dover, DE 19904-5174 | Dear Commissioner Manlove: |
| Mr. Alice Miller | Executive Director | District of Columbia Board of Elections and Ethics | 441 Fourth Street, NW, Suite 250N | | Washington, DC 20001-2745 | Dear Director Miller: |
| Ms. Maria I.D. Pangelinan | Assistant Director, Division of Elections | Florida Department of State | Room 316, R.A. Gray Building | | Tallahassee, FL 32399-0250 | Dear Assistant Director Pangelinan: |
| Mr. Scott Nago | Director of Elections | Georgia Secretary of State's Office | Suite 802, West Tower | | Atlanta, GA 30334-9000 | Dear Director Nago: |
| Ms. Kathy Rogers | Executive Elections Director | Guam Election Commission | 2 Martin Luther King Jr. Drive, SE | | Atlanta, GA 30334-9000 | Dear Director Rogers: |
| Ms. Maria Benvenuto | Administrator of Elections | Office of the Guam Secretary of State | 414 West Soledad Avenue | | Hagatna, GU 96910-5067 | Dear Administrator Benvenuto: |
| Mr. Scott Nago | Chief Election Officer | Office of Elections | 802 Lehua Avenue | | Pearl City, HI 96782-3821 | Dear Chief Nago: |
| Ms. Betsie Kimbrough | Election Division Director | Idaho Secretary of State | 304 North 8th Street, Suite 149 | | Boise, ID 83720-0033 | Dear Director Kimbrough: |
| Ms. Becky Glazier | Executive Assistant to the Director | State Board of Elections | 2329 South MacArthur Boulevard | | Springfield, IL 62704-4503 | Dear Director Glazier: |
| Mr. Brad King | Co-Director | Indiana Election Division | 302 West Washington Street, Room E204 | | Indianapolis, IN 46204-2767 | Dear Director King: |
| Ms. Angela Nussmeyer | Co-Director | Indiana Election Division | 302 West Washington Street, Room E204 | | Indianapolis, IN 46204-2767 | Dear Director Nussmeyer: |
| Ms. Carol Olson | Deputy Secretary of State | State Office Building | 321 East 12th Street | | Des Moines, IA 50319-1002 | Dear Deputy Olson: |
| Mr. Bryan Caskey | Election Director | Elections Division | First Floor, Memorial Hall | | Topeka, KS 66612-1594 | Dear Director Caskey: |
| Ms. Erica Galyon | Executive Director | Commissioner of Elections | 140 Walnut Street | | Frankfort, KY 40601 | Dear Director Galyon: |
| Ms. Angie Rogers | Commissioner of Elections | Louisiana Secretary of State's Office | 8585 Archives Avenue | | Baton Rouge, LA 70809-2125 | Dear Commissioner Rogers: |
| Ma. Julie L. Flynn | Deputy Secretary of State | State Board of Elections | 101 State House Station | | Augusta, ME 04333-0101 | Dear Director Flynn: |
| Ms. Nikki Charlson | Deputy Administrator of Elections | State Board of Elections | Post Office Box 6486 | | Annapolis, MD 21401-0486 | Dear Deputy Charlson: |
| Mr. Michelle Tassinari | Director, Legal Counsel | Bureau of Elections | 1st Floor | | Boston, MA 02108-1508 | Dear Counsel Tassinari: |
| Mr. Christopher M. Thomas | Director of Elections | Secretary of State Robin Carnahan's Office | Oak Room, Room 1705 | | Lansing, MI 48933-1590 | Dear Director Thomas: |
| Mr. Gary Poser | Director of Elections | 174 State Office Building | 100 Reverend Dr. Martin Luther King Jr. Blvd. | | St. Paul, MN 55155-1299 | Dear Director Poser: |
| Mr. Kim | Director | Mississippi Secretary of State's Office | 401 Mississippi Street | | Jackson, MS 39201-1004 | Dear Mr. Kim: |
| Mr. Wayne Hiles | Interim Deputy Secretary of State for Elections | Elections Division | 600 West Main Street, Suite 5 | | Jefferson City, MO 65102-1767 | Dear Director Hiles: |
| Mr. Todd Valentine | Administrator, Legal Counsel | State Board of Elections | 40 North Pearl Street, Suite 5 | | Albany, NY 12207-2729 | Dear Director Valentine: |
| Mr. Anthony Stevens | Assistant Secretary of State | New Jersey Division of Elections | Post Office Box 304 | | Trenton, NJ 08625-0304 | Dear Assistant Secretary Stevens: |
| Mr. Robert A. Brehm | Co-Director | New Mexico | 225 West State Street, 3rd Floor | | Santa Fe, NM 87501-4601 | Dear Director Brehm: |
| Ms. Todd Valentine | Co-Director | State Board of Elections | 40 North Pearl Street, Suite 300 | | Albany, NY 12207-2729 | Dear Director Valentine: |
| Ms. Kimberly Galvin | Executive Director | State Board of Elections | 40 North Pearl Street, Suite 5 | | Albany, NY 12207-2729 | Dear Director Galvin: |
| Mr. Jim Silrum | Deputy Secretary of State | Office of Elections | Post Office Box 2262001 | | Raleigh, NC 27611-7255 | Dear Director Silrum: |
| Mr. Neal Erickson | Director of Elections | State Canvassing Board | Post Office Box 1787 | | Bismarck, ND 58502-1787 | Dear Deputy Erickson: |
| Mr. John Arnold | Director of Elections | Office of the Secretary of State | Room 20A, State House | | Bismarck, ND 58505-0500 | Dear Director Arnold: |
| Mr. Damschroder | Deputy Assistant SOS | | 180 East Broad Street, 15th Floor | | Columbus, OH 43215-3726 | Dear Assistant Deputy Damschroder: |
| Mr. Paul Ziriax | Secretary | Secretary of State's Office | Post Office Box 12068 | | Oklahoma City, OK 73105-3105 | Dear Secretary Ziriax: |
| Ms. Brenda Bayes | Interim Director of Elections | Office of the Secretary of State | 255 Capitol Street NE, Suite 501 | | Salem, OR 97310-1008 | Dear Director Bayes: |
| Mr. Jonathan Marks | Commissioner | Bureau of Commission, Elections and Legislation | Pennsylvania Department of State | 210 North Office Building | Harrisburg, PA 17120-0060 | Dear Commissioner Marks: |
| Honorable Angel A. Gonzalez Roman | Puerto Rico State Election Commission | | Post Office Box 195552 | | San Juan, PR 00919-5552 | Dear Commissioner Roman: |
| Ms. Rob Rock | Director of Elections | Rhode Island Secretary of State's Office | 148 West River Street | | Providence, RI 02904-2615 | Dear Director Rock: |
| Mr. Kosti Wilson | Deputy Secretary of State, Elections Division | State Election Commission | Post Office Box 5987 | | Columbia, SC 29250-5987 | Dear Secretary Wilson: |
| Ms. Kea Warne | Director of the South Dakota Secretary of State | Office of the South Dakota Secretary of State | 500 East Capitol Avenue, Suite 204 | | Pierre, SD 57501-5070 | Dear Director Warne: |
| Mr. Mark Goins | Coordinator of Elections | Tennessee Secretary of State's Office | 9th Floor, William R. Snodgrass Tower | 312 Rosa L. Parks Avenue | Nashville, TN 37243-0305 | Dear Director Goins: |
| Mr. Keith Ingram | Director of Elections | Office of the Secretary of State | Post Office Box 12060 | | Austin, TX 78711-2060 | Dear Director Ingram: |
| Mr. Will Senning | Director of Elections and Campaign Finance | Office of the Lieutenant Governor | 28 Terrace Street, Drawer 09 | | Salt Lake City, UT 84114-2325 | Dear Director Senning: |
| Mr. Mark Thomas | Director of Elections | Office of Secretary of State | Post Office Box 1409, Kongshill | | Montpelier, VT 05609-1101 | Dear Director Thomas: |
| Ms. Caroline Fawkes | Supervisor of Elections | Election System of the Virgin Islands | 1100 Bladensburg Road, 1st Floor | | St. Croix, VI 00851-1499 | Dear Ms. Fawkes: |
| Mr. Edgardo Cortés | Director of Elections | Office of Secretary, Elections Division | Post Office Box 40229 | | Richmond, VA 23218-3497 | Dear Commissioner Cortés: |
| Ms. Lori Augino | Director of Elections | | Room 157/A, State Capitol | | Olympia, WA 98504-0229 | Dear Director Augino: |
| Ms. Layna Valentine-Brown | Manager of Elections | | Post Office Box 205-5025 | 1900 Kanawha Boulevard East | Charleston, WV 25305-0770 | Dear Ms. Valentine-Brown: |
| Mr. Kai Bohm | State Election Director | Wisconsin Elections Commission | 212 East Washington Avenue, 3rd Floor | | Madison, WI 53707-7984 | Dear Administrator Haas: |
| Mr. John Merrill | Alabama Secretary of State | Office of the Alabama Secretary of State | Post Office Box 5616 | | Montgomery, AL 36103-5616 | Dear Secretary Merrill: |
| Mr. Lemanu Peleti Mauga | Lieutenant Governor | Office of the Lieutenant Governor of American Samoa | 550 West 7th Avenue, Suite 1700 | | Anchorage, AK 99501-3569 | Dear Lieutenant Governor Mauga: |
| Mr. Michele Reagan | Secretary of State | Arizona Secretary of State's Office | Office of the Lieutenant Governor of American Samoa | Territory of American Samoa | Pago Pago, AS 96799-2828 | Dear Lieutenant Governor Reagan: |
| Mr. Mark Martin | Secretary of State | Arkansas Secretary of State's Office | Room 256, State Capitol Room | | Little Rock, AR 72201-1085 | Dear Secretary Martin: |
| Ms. Alex Padilla | Secretary of State | California Secretary of State's Office | 1500 11th Street | | Sacramento, CA 95814-5701 | Dear Secretary Padilla: |
| Mr. Wayne Williams | Secretary of State | Colorado Secretary of State's Office | 1700 Broadway, Suite 250 | | Denver, CO 80290-1700 | Dear Secretary Williams: |
| Ms. Denise Merrill | Secretary of State | Connecticut Secretary of State's Office | 30 Trinity Street | | Hartford, CT 06106-1634 | Dear Secretary Merrill: |
| Mr. Jeffrey W. Bullock | Secretary of State | Delaware Secretary of State's Office | 401 Federal Street | | Dover, DE 19901-3639 | Dear Secretary Bullock: |
| Ms. Lauren Vaughn | Secretary of the District of Columbia | | 1350 Pennsylvania Avenue, NW, Suite 419 | | Washington, DC 20004-3003 | Dear Secretary Vaughn: |

| Name | Title | Office | Address | City, State ZIP | Salutation |
|---|---|---|---|---|---|
| Mr. Ken Detzner | Secretary of State | Florida Secretary of State's Office | Suite 100, R.A. Gray Building | Tallahassee, FL 32399 | Dear Secretary Detzner: |
| Mr. Brian Kemp | Secretary of State | Georgia Secretary of State's Office | Suite 802, West Tower | Atlanta, GA 30334-9000 | Dear Secretary Kemp: |
| Mr. Ray Tenorio | Lieutenant Governor | Office of the Lieutenant Governor of Guam | Post Office Box 2950 | Hagatna, GU 96932-2950 | Dear Lieutenant Governor Tenorio: |
| Mr. Shan S. Tsutsui | Lieutenant Governor | Office of the Lieutenant Governor of Hawaii | State Capitol | Honolulu, HI 96813-2477 | Dear Lieutenant Governor Tsutsui: |
| Mr. Lawerence Denney | Secretary of State | Idaho Secretary of State's Office | | Boise, Idaho 83720-0080 | Dear Secretary Denney: |
| Mr. Jesse White | Secretary of State | Illinois Secretary of State's Office | Suite 213, State Capitol | Springfield, IL 62756-0001 | Dear Secretary White: |
| Ms. Connie Lawson | Secretary of State | Indiana Secretary of State's Office | 200 West Washington Street, Room 201 | Indianapolis, IN 46204-2731 | Dear Secretary Lawson: |
| Mr. Paul Pate | Secretary of State | Iowa Secretary of State's Office | 1st Floor, Lucas Building | Des Moines, IA 50319-1002 | Dear Secretary Pate: |
| Mr. Kris Kobach | Secretary of State | Kansas Secretary of State's Office | 120 Southwest 10th Avenue | Topeka, KS 66612-1594 | Dear Secretary Kobach: |
| Mr. Alison Lundergan-Grimes | Secretary of State | Kentucky Secretary of State's Office | 700 Capital Avenue, Suite 152 | Frankfort, KY 40601-3498 | Dear Secretary Grimes: |
| Mr. Tom Schedler | Secretary of State | Louisiana Secretary of State's Office | Post Office Box 94125 | Baton Rouge, LA 70804-9125 | Dear Secretary Schedler: |
| Mr. Matthew Dunlap | Secretary of State | Maine Secretary of State's Office | 148 State House Station | Augusta, ME 04333-0148 | Dear Secretary Dunlap: |
| Mr. John Wobensmith | Secretary of State | Maryland Secretary of State's Office | 16 Francis Street | Annapolis, MD 21401-1730 | Dear Secretary Wobensmith: |
| Mr. William Galvin | Secretary of the Commonwealth | Office of the Secretary of the Commonwealth | Room 337, State House | Boston, MA 02133-1099 | Dear Secretary Galvin: |
| Ms. Ruth Johnson | Secretary of State | Michigan Secretary of State's Office | 430 West Allegan Street 4th Floor | Lansing, MI 48918-1602 | Dear Secretary Johnson: |
| Mr. Steve Simon | Secretary of State | Minnesota Secretary of State's Office | 180 State Office Building | Saint Paul, MN 55155-1299 | Dear Secretary Simon: |
| Mr. Delbert Hosemann, Jr. | Secretary of State | Mississippi Secretary of State's Office | 125 South Congress Street | Jackson, MS 39201-3301 | Dear Secretary Hosemann: |
| Mr. John Ashcroft | Secretary of State | Missouri Secretary of State's Office | Post Office Box 1767 | Jefferson City, MO 65101-1767 | Dear Secretary Ashcroft: |
| Ms. Linda McCulloch | Secretary of State | Montana Secretary of State's Office | Post Office Box 202801 | Helena, MT 59620-2801 | Dear Secretary McCulloch: |
| Mr. John Gale | Secretary of State | Nebraska Secretary of State's Office | Post Office Box 94608 | Lincoln, NE 68509-4608 | Dear Secretary Gale: |
| Ms. Barbara Cegavske | Secretary of State | Nevada Secretary of State's Office | 101 North Carson Street, Suite 3 | Carson City, NV 89701-3714 | Dear Secretary Cegavske: |
| Mr. Bill Gardner | Secretary of State | New Hampshire Secretary of State's Office | 107 North Main Street | Concord, NH 03301-4989 | Dear Secretary Gardner: |
| Mr. Kim Guadagno | Lieutenant Governor | New Jersey Office of the Lieutenant Governor | Post Office Box 001 | Trenton, NJ 08625-0001 | Dear Lieutenant Governor Guadagno: |
| Mr. Brad Winter | Secretary of State | New Mexico Secretary of State's Office | 325 Don Gaspar Avenue, Suite 300 | Santa Fe, NM 87501-4401 | Dear Secretary Winter: |
| Ms. Rossana Rosado | Secretary of State | New York Secretary of State's Office | 99 Washington Avenue, Suite 1100 | Albany, NY 12231-0311 | Dear Secretary Rosado: |
| Ms. Elaine Marshall | Secretary of State | North Carolina Secretary of State's Office | Post Office Box 29622 | Raleigh, NC 27626-0622 | Dear Secretary Marshall: |
| Mr. Alvin Jaeger | Secretary of State | North Dakota Secretary of State's Office | 600 East Boulevard Avenue, Department 108 | Bismarck, ND 58505-0500 | Dear Secretary Jaeger: |
| Mr. Jon Husted | Secretary of State | Ohio Secretary of State's Office | 180 East Broad Street, 16th Floor | Columbus, OH 43215-3726 | Dear Secretary Husted: |
| Mr. Chris Benge | Secretary of State | Oklahoma Secretary of State's Office | 2300 North Lincoln Boulevard, Suite 101 | Oklahoma City, OK 73105-4897 | Dear Secretary Benge: |
| Ms. Jeanne Atkins | Secretary of State | Oregon Secretary of State's Office | 136 State Capitol | Salem, OR 97310-0722 | Dear Secretary Atkins: |
| Mr. Pedro A. Cortes | Secretary of State | Pennsylvania Secretary of State's Office | 302 North Office Building | Harrisburg, PA 17120-0500 | Dear Secretary Cortes: |
| Mr. Nellie Gorbea | Secretary of State | Rhode Island Secretary of State's Office | 82 Smith Street Room 217 | Providence, RI 02903-1120 | Dear Secretary Gorbea: |
| Mr. Victor Suarez Melendez | Secretary of State | Puerto Rico Secretary of State's Office | Post Office Box 9023271 | San Juan, PR 00902-3271 | Dear Secretary Melendez: |
| Mr. Mark Hammond | Secretary of State | South Carolina Secretary of State's Office | 1205 Pendleton Street, Suite 525 | Columbia, SC 29201-3746 | Dear Secretary Hammond: |
| Mr. Shantel Krebs | Secretary of State | South Dakota Secretary of State's Office | 500 East Capitol Avenue | Pierre, SD 57501-5007 | Dear Secretary Krebs: |
| Mr. Tre Hargett | Secretary of State | Tennessee Secretary of State's Office | First Floor, State Capitol | Nashville, TN 37243-0305 | Dear Secretary Hargett: |
| Mr. Carlos Cascos | Secretary of State | Texas Secretary of State's Office | Post Office Box 12697 | Austin, TX 78711-2697 | Dear Secretary Cascos: |
| Mr. Spencer Cox | Lieutenant Governor | Office of the Lieutenant Governor of Utah | 350 North State Street, Suite 220 | Salt Lake City, UT 84114-2325 | Dear Lieutenant Governor Cox: |
| Mr. Jim Condos | Secretary of State | Vermont Secretary of State's Office | 128 State Street | Montpelier, VT 05633-1101 | Dear Secretary Condos: |
| Mr. Osbert Potter | Lieutenant Governor | Office of the Lieutenant Governor of Virgin Islands | 1131 King Street, Suite 101 | St. Croix, VI 00820-4974 | Dear Lieutenant Governor Potter: |
| Mr. Kelly Thomasson | Secretary of the Commonwealth | Office of the Secretary of the Commonwealth | Post Office Box 2454 | Richmond, VA 23218-2454 | Dear Secretary Thomasson: |
| Mr. Kim Wyman | Secretary of State | Washington Secretary of State's Office | Post Office Box 40220 | Olympia, WA 98504-0220 | Dear Secretary Wyman: |
| Ms. Natalie Tennant | Secretary of State | West Virginia Secretary of State's Office | Suite 157K, Building 1 | Charleston, WV 25305-0500 | Dear Secretary Tennant: |
| Ms. Douglas La Follette | Secretary of State | Wisconsin Secretary of State's Office | Post Office Box 7848 | Madison, WI 53707-7848 | Dear Secretary La Follette: |
| Mr. Ed Murray | Secretary of State | Wyoming Secretary of State's Office | 2020 Carey Avenue, Suite 600 | Cheyenne, WY 82002-0001 | Dear Secretary Murray: |

**PROCESSING OPERATIONS**
**HEADQUARTERS**
**UNITED STATES POSTAL SERVICE**

# Processing Operations Management Order



## Operational Clean Sweep Search Checklist- Political and Election Mail

**Purpose:** *To provide an operational checklist to be used in performing a daily mail search. This list includes the minimal areas to check and is not limited to these areas within facility. Checklist must be retained by the District Political and Election Mail Operations Coordinator information for investigating possible missing or delayed Political and/or Election Mail.* **District:** _____ **Name***:*
_____

*Title:* _____ *Phone #:*_____

| Check box when checked | Section/Operation:<br><br>*Defines the work area to be searched.* | Comments:<br><br>*Specifics: include copies of PMOD label and /or container placard. Names of individuals contacted* |
|---|---|---|
| ☑ | **Incoming dock** | |
| ☑ | **BMEU & BMEU Plant Staging** | |
| ☑ | **Opening units** | |
| ☑ | **AO / Station dispatch area** | |
| ☑ | **Outbound dock** | |
| ☑ | **Outgoing Dispatch Area** | |
| ☑ | **Trailers in yard (Yard Check)** | |
| ☑ | **MTE Plant Staging Area** | |
| ☑ | **MTE trailers** | |
| ☑ | **Site MTESC** | |
| ☑ | **PARS Staging and Operations** | |
| ☑ | **Rewrap Operations** | |
| ☑ | **CFS (if applicable)** | |
| ☑ | **BRM/Postage Due** | |

# DECLARATION OF JOHN PROKITY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Mondaire Jones, Alessandra Biaggi, Chris
Burdick, Stephanie Keegan, Seth Rosen,
Shannon Spencer, Kathy Rothschild, Diana
M. Woody, Perry Sainati, Robert Golub,
Mary Winton Green, Marsie Wallach,
Matthew Wallach, Mac Wallach, Carol
Sussman, and Rebecca Rieckhoff,
*individually, and on behalf of all others
similarly situated,*

      Plaintiffs,

v.

United States Postal Service, Louis DeJoy,
as Postmaster General of the United States
Postal Service, and Donald J. Trump, as
President of the United States,

      Defendants.

---

No 20 Civ. 6516 (VM)

## DECLARATION OF JOHN PROKITY

I, John Prokity, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, hereby declare as follows:

1. I am currently employed by the United States Postal Service as Manager, Workforce Planning, Insights & Analytics at Postal Service Headquarters in Washington, D.C. I have occupied this position for approximately one year. In this role, I am responsible for monitoring both career and non-career employee complements in regard to established staffing models, including compliance with national labor contracts. In addition, I provide analysis of factors affecting available staffing. I have worked for the Postal Service for approximately 29 years. Prior to this assignment, I served in several operational capacities, including: HQ Manager of Network Distribution Center Operations, Area In-Plant Support Manager, and District Senior Plant Manager.

2. I am familiar with the above-referenced action and plaintiffs' claims therein.

3. This declaration is based on my personal knowledge, as well as information conveyed to me by other knowledgeable Postal Service personnel in the course of my official duties and responsibilities.

### USPS staffing shortages due to the COVID-19 pandemic, and the Postal Service's response to alleviate the impact on mail delivery services

4. Postal Service operations rely on a workforce of over 600,000 employees, including but not limited to letter carriers, who deliver the mail, mail handlers, who sort and pack mail for delivery, and clerks, who perform mail processing or retail duties. The COVID-19 pandemic led to significant

staffing shortages beginning in March 2020 due to illness, quarantine, and leave associated with the Families First Coronavirus Response Act.

5. For example, prior to the pandemic, the Postal Service experienced a weekly equivalent of 55,000 employees using full-day leave, on average. In early March, this figure began to increase steadily until reaching, in mid-April, a peak of more than 81,000, or nearly 26,000 additional employees absent from work on a weekly basis. The average weekly full-day leave usage leveled to approximately 69,000, or 13,000 additional weekly absences, in May 2020. After another improvement in June, the availability for July again began to decrease, with availability falling to its lowest levels in the week of July 11, 2020, due primarily to a combination of localized COVID impacts in hot-spot areas, as discussed further below, and increased usage of annual leave.

6. These staffing shortages led to some difficulties in the Postal Service's ability to process and deliver mail on time during the ongoing pandemic. The Postal Service has therefore worked diligently to bring on additional workers quickly and to ensure that it has the workforce necessary to process and deliver mail on time.[1]

7. For instance, to support hiring during the pandemic, the Postal Service implemented key changes to the hiring process to significantly shorten

---

[1] On August 7, 2020, the Postal Service implemented a hiring freeze for management level positions, which currently remains in place. This hiring freeze has no effect on the hiring of non-management employees, including mail carriers, mail handlers and clerks, in response to COVID-19 impacts.

overall time-to-hire, meaning the time that passes between an initial job posting and actually hiring a new employee. The posting period time, meaning the number of days that a job opening is posted, was modified from five to three days, and due to service-wide drug screening clinic closures, programming was developed and implemented to temporarily bypass drug screening. In addition, the National Agency Check with Inquiries (NACI) integration deployment on March 27, 2020, allowed us to receive expedited information on fingerprint checks from the Postal Inspection Service for criminal background clearance to hire. These changes allowed us to shorten our hiring process by approximately 15 to 21 days.

8. The Postal Service also reached agreement with the postal workers' unions to allow the hiring of additional non-career employees above the historical contractual non-career employee limits.

9. The shortened time for hiring and use of additional non-career employees has allowed the Postal Service to address the leave issues associated with COVID-19. Nationwide, the Postal Service hired additional staffing at a rate of approximately 2000 to 3000 persons each week, with a total of 88,627 new employees hired between March 1, 2020, and August 21, 2020.

**USPS staffing shortages in COVID-19 pandemic "Hot Spots" in July 2020**

10. Although overall staffing availability numbers improved between May and June 2020, the availability began to fall again in July 2020, with certain "hot-spots" showing a July spike in COVID-19 cases. As the chart below

4

illustrates, areas with reported increases in COVID-19 cases, such as Miami,
Philadelphia, North Houston, Atlanta and North Texas (among others) saw a
dip in staffing availability rates in July 2020. The figures in the below chart
represent the percentage of the normal employee workforce that was
available to work in the referenced locality during that time frame.[2]

| Facility | June | July | August-8/21 | |
|---|---|---|---|---|
| NORTH METRO P&DC | 77.51% | 73.11% | 77.53% | |
| ATLANTA | 77.34% | 73.77% | 76.59% | |
| NORTH HOUSTON | 77.10% | 74.09% | 76.76% | |
| CLEVELAND | 68.42% | 64.70% | 66.91% | |
| AIRPORT MAIL CENTER (Atlanta) | 75.95% | 72.83% | 75.85% | |
| PHILADELPHIA | 76.28% | 72.43% | 72.81% | |
| PHILADELPHIA NDC | 75.26% | 70.83% | 70.26% | |
| SACRAMENTO P&DC | 80.19% | 76.24% | 77.86% | |
| PALATINE | 73.69% | 71.42% | 74.51% | |
| ROYAL PALM | 78.80% | 75.20% | 77.12% | |
| FRESNO | 71.54% | 68.87% | 73.76% | |
| MIAMI | 80.95% | 75.96% | 75.83% | |
| NORTH TEXAS | 75.51% | 73.13% | 74.50% | |
| LITHONIA POST OFFICE | 77.31% | 59.03% | 78.68% | |

These localized staffing shortages resulted in additional service disruptions
in July. Staffing availability in some of these localities has steadily improved
as additional employees have been hired, and others have returned to work
following illness or quarantine. The Greater Philadelphia area, however (as

---

[2] To provide some context as to the significance of this reduction, nationally, for the
month of June 2020, a 1% change in overall availability was equal to over 850,000
work hours.

an example of one of the hardest hit hot spots), has continued to experience

staffing shortage issues as of August 21, 2020, as discussed further below.

USPS staffing shortages in Philadelphia due to the COVID-19 pandemic

11. Philadelphia is one of the "hot-spot" areas that has been hard hit by the

pandemic. It had periods in which insufficient staff was available to deliver

mail every day, although local management took steps to ensure that routes

would not go over two days without delivery. For example, during the period

from June 27, 2020, to July 18, 2020, the availability of employees in the

Greater Philadelphia area was 75.56 percent. To put this in context,

approximately one in four employees were unavailable during this period.

Availability numbers continued to decrease for the period from July 11, 2020,

through August 21, 2020.

12. The following is employee availability data for the City of Philadelphia,

broken down by craft, in three date ranges:

| Craft | 3/1 - 4/3 | 4/4 - 7/10 | 7/11 - 8/21 |
|---|---|---|---|
| Clerk | 78.48% | 74.66% | 73.31% |
| Carrier | 76.85% | 73.31% | 70.29% |
| Mail Handler | 73.08% | 69.26% | 68.20% |

13. In order to address these staffing shortages, the Postal Service has hired

approximately 1,141 new employees for the Philadelphia Metropolitan PFC

since March 1, 2020.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Charleston, West Virginia on this _5TH_ day of September, 2020

JOHN PROKITY

# DECLARATION OF JENNIFER VO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Mondaire Jones, Alessandra Biaggi, Chris
Burdick, Stephanie Keegan, Seth Rosen,
Shannon Spencer, Kathy Rothschild, Diana
M. Woody, Perry Sainati, Robert Golub,
Mary Winton Green, Marsie Wallach,
Matthew Wallach, Mac Wallach, Carol
Sussman, and Rebecca Rieckhoff,
*individually, and on behalf of all others
similarly situated,*

      Plaintiffs,

v.

United States Postal Service, Louis DeJoy,
as Postmaster General of the United States
Postal Service, and Donald J. Trump, as
President of the United States,

      Defendants.

---

No 20 Civ. 6516 (VM)

## DECLARATION OF JENNIFER VO

I, Jennifer Vo, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, declare as follows:

1.     I am currently employed by the United States Postal Service as Director, City Delivery at Postal Service Headquarters in Washington, D.C., and have occupied that position for approximately two years. My duties include oversight of operations, policies, and procedures relating to the approximately 142,000 city routes in the nation, including overseeing collection boxes.

2.     I have worked for the Postal Service for approximately 26 years, mostly in operations. In 1994, I began working as a letter carrier, and I have served in numerous supervisory and management positions, including Station Manager, Postmaster, Manager of Customer Service Operations, and Acting District Manager for Philadelphia.

3.     I am familiar with the above-captioned action and with the plaintiffs' allegations therein. This declaration is based on my personal knowledge gained during the years I worked as a letter carrier, managed facilities with delivery operations, and exercised oversight over nationwide city delivery routes, as well as information conveyed to me by other officials with similar knowledge, duties, and responsibilities.

4.     Collection boxes are metal containers dedicated to the collection of mail deposited by customers. The Postal Service has over 140,000 blue collection boxes, placed at collection points throughout the nation.

5.     The Postal Service regularly reviews the need for and location of collection boxes in accordance with U.S. Postal Service Postal Operations Manual ("POM") Section 314, "Collection Point Management System, Collection Tests, and Density Tests (Volume Reviews)," and section 315, "Collection Boxes," which are attached as Exhibit 1 to this Declaration. In

2

general, boxes are relocated or removed if they average less than 25 pieces of mail per day.

POM § 315.3 (Issue 9, updated with changes through July 31, 2020).  The purpose of these

reviews is to ensure that mail collection within areas served by letter carriers is accomplished in

a cost-efficient manner, while still meeting customers' needs.

6.      The Postal Service conducts annual assessments of collection box density, i.e.,

volume of mail per box, and has done so for many years (including every year that I have

worked at the Postal Service).  Each test is conducted for a two-week period (usually in

September, when the Postal Service anticipates relatively high mail volumes), using scanners to

record the data.  POM § 314.3.  The processes, assessments, and decisions about whether to

remove collection boxes are conducted and made by local postal officials throughout the nation

based on this data.  These determinations are made without involvement from Headquarters,

absent unusual circumstances (e.g., the August 18, 2020 Headquarters directive requiring that no

collection boxes be removed until after the November 2020 Presidential election).

7.      Based on the annual two-week tests, the Postal Service identifies seldom used

collection boxes, i.e., collection boxes averaging less than 25 pieces of mail per day, for potential

relocation or removal .  District and area manager approval is needed to identify a box for

potential relocation or removal .  Per POM § 315.3, the Postal Service will leave boxes with

fewer than 25 pieces per day in place in certain locations to optimize the customer experience

(for example, boxes adjacent to senior citizen housing, hospitals, municipal and judicial

buildings, and other public facilities).

8.      Before the collection box relocation or removal  decision is made, the Postal

Service places notices of removal on identified boxes for 30 days to give customers an

opportunity to comment by contacting their local post office.  POM § 314.3.  Before removing a

3

collection box, the Postal Service first considers whether it can relocate the collection box to another location within the neighborhood or community where the volume of mail is higher. If the Postal Service does not identify any such location, district management seeks approval from the overseeing area's Manager Delivery Program Support before removal. POM § 315.3.

9. The process of removing collection boxes is one of the many ways the Postal Service has adjusted its infrastructure to match the declining volumes of First-Class Mail in recent years. Under-used collection boxes require the inefficient use of additional personnel hours along delivery and collection routes, as well as additional maintenance.

10. Over the last seven years, the Postal Service has removed an average of 3,100 collection boxes per year pursuant to its data-based analytical process. The Postal Service has removed approximately 1,500 boxes thus far in Fiscal Year 2020. The chart below reflects the decrease in the number of collection boxes from October 1, 2012 through August 21, 2020.

**Blue Collection Box Removal Data 2013 – Present**

|  | Fiscal Year 2013 | Fiscal Year 2014 | Fiscal Year 2015 | Fiscal Year 2016 | Fiscal Year 2017 | Fiscal Year 2018 | Fiscal Year 2019 | Fiscal Year 2020 to date | Total Remaining to Date |
|---|---|---|---|---|---|---|---|---|---|
| Boxes Removed | -4,370 | -3,380 | -2,343 | -1,467 | -6,287 | -2,275 | -1,677 | -1,648 | 140,837 |

11. The graph below reflects the count of collection boxes removed per Fiscal Year from 2012 to the present. The chart is based on data that Headquarters collects from CPMS (Collection Point Management System), which collects information from areas and districts.

4



12.     Over the years, the Postal Service has identified and addressed a number of different issues relating to the potentially inefficient deployment of collection boxes. For example, in October 2017, the Postal Service performed a collection box initiative that performed an assessment on approximately 38,238 collection boxes assigned to dedicated collection routes. Collection routes are carrier assignments dedicated to collecting mail only from collection boxes, i.e., they do not collect mail from residential or business mail receptacles.

13.     The project's goal was to improve the cost efficiency of deliveries on dedicated collection routes. For example, letter carriers in residential neighborhoods pick up mail from each residence or mail receptacle. The fact that a nearby collection box has low density shows that the local customers' needs for collection can be adequately served by the carriers when delivering along their regular route assignment. Keeping the underutilized collection box in place incurs unnecessary costs to a dedicated collection route. Each stop along a collection route requires more carrier work time. In February 2018, 1,951 boxes were reassigned from dedicated collection carriers to city delivery routes.

5

14.     The Postal Service also evaluates the need for multiple collection boxes adjacent

to one another at one location. If the total volume of mail collected from adjacent boxes could

be accomplished by fewer boxes, the Postal Service could potentially determine that the

redundant boxes be removed (thus reducing mail carrier and maintenance time and costs).

15.     Apart from annual density studies, the Postal Service promptly removes

mailboxes that have been vandalized or tampered with and on a sporadic basis removes boxes

that have been damaged or are in poor condition. POM § 315.4. Attached as Exhibit 2 to this

Declaration is the Postal Service's Maintenance Management Order dated March 31, 2020,

which sets current collection box policy and procedure (subject to Postmaster General DeJoy's

recent directive to pause collection box removal, which is discussed below). If the Area

Manager, Delivery Programs Support, determines that a box that has been vandalized or

tampered with is unsecure, a local facility may remove the box immediately (without posting a

30-day notice),  POM § 315.4.

16.     The Postal Service on occasion removes collection boxes for safety reasons. For

example, recent civil unrest in Oakland, California, prompted local officials to remove some

collection boxes. When the safety concerns are resolved, the Postal Service generally reinstalls

the boxes, and it has done so in Oakland.

17.     The Postal Service has no plans to reinstall removed collection boxes because,

according to the long-established standards discussed above, those boxes do not regularly collect

a sufficient volume of mail to justify collection. These boxes were identified by USPS's normal,

objective data-based processes, governed by the POM.

18.     Pursuant to Postmaster DeJoy's recent directive, the Postal Service has stopped

removal of collection boxes until further notice, not to resume until after the November

6

Presidential election. Damaged collection boxes that cannot be feasibly or safely used and provide security of the mail will be removed and replaced as soon as possible.

19.     Postmaster General Louis DeJoy was not involved in any decisions relating to removal of collection boxes prior to August 18, 2020, when he issued a directive that the Postal Service postpone removing collection boxes for a period of 90 days (through the November election and until further notice) while the Postal Service evaluates recent customer concerns regarding removals.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Washington, D.C. on this 8th day of September, 2020

JENNIFER VO

7

Collection Service — National Service Standards                                        314.3

314  **Collection Point Management System, Collection Tests, and Density Tests (Volume Reviews)**

314.1  **General**

All collection points are required to be entered in the Collection Point Management System (CPMS) by the responsible District where Internet access is available. No scheduled collection may be excluded from CPMS.

The information recorded in CPMS must be accurate and complete and must be reviewed at least annually by the District for accuracy. All exceptions must be in accordance with 313.3. CPMS is utilized to electronically verify collections. Any collection points recorded in these systems and receiving electronic scan data do not require the manual test as specified in 314.2.

Collection points are defined locations where a customer drops off mail for collection by the Postal Service. These can include mailchutes, receiving boxes, firm pickups, Self-Service Kiosk (SSKs) drops, lobby drops, and mail collection racks. Collection boxes are a subset of collection points.

314.2  **Manual Collection Tests**

In any delivery office lacking Internet access and any such office not using electronic collection management tools, the collection points process must be tested quarterly. This test is completed using plastic collection test card D-1148 and PS Form 3702, *Test Mailing Record (Collection and Special Test Mailings),* in accordance with Handbook M-39, *Management of Delivery Services,* part 133.

314.3  **Volume Density Tests**

Estimates of collection box volumes should only be used for preliminary information, where no changes are considered, or to determine which boxes will have a density test performed. All determinations made under POM 315.3 (relocation/removal of boxes) should use the following density-test process:

a.  Use an actual count for letters or record a linear measurement of letters contained in the box.

b.  Convert the linear measurement to pieces at 227 pieces per foot (or current conversion figure).

c.  Add actual piece counts for flats and small parcels.

Density tests should be for a continuous 2-week period. At a minimum, density tests must be performed annually.

If the potential action under consideration involves Saturday collection alone, only collect data from four consecutive Saturdays.

Where multiple boxes are collected, mail volume from all boxes must be totaled. Collectors are required to record all density test mail volumes in the scanner. Collections density volume will be stored in Postal systems for use as needed.

For offices without Internet access, use locally available tools (e.g., Excel) to generate density-test worksheets. Retain data locally until a subsequent density test is conducted. Provide feedback to the District collections coordinator as needed.

## 315 Collection Boxes

### 315.1 Appearance

All collection boxes must have a uniform appearance and indicia so that customers can readily identify the type of service provided at each box. All boxes must be maintained in good condition with a clean and legible collection schedule decal. Boxes must be painted in accordance with and have only the decals prescribed by Brand and Policy at Headquarters. Collection boxes are to be maintained in good condition.

### 315.2 Number, Location Type, and Box Type

Install a sufficient number and type of collection boxes (see parts 313.1, and 322.22) within the delivery area to handle mail volume.

### 315.3 Relocation Before Removal

Collection boxes averaging less than 25 pieces a day should be relocated within the neighborhood or community to a potentially higher volume location. A two-week density test and analysis must occur at least annually.

Boxes adjacent to senior citizen housing, municipal and judicial buildings, and other public facilities are examples of the types of boxes that may be left in place even if fewer than 25 pieces per day are generated. Before removing a collection point, it must be considered for relocation within the neighborhood.

If after exhausting/reviewing potential relocation options, it is ultimately decided that the collection point should be removed, approval must be granted by the exception authority listed in 313.3. Before a collection box can be removed or relocated, a notice to that effect for customers must be placed on the box 30 days prior to the removal or relocation showing the location(s) and collection schedule(s) for other collection points in the vicinity.

### 315.4 Immediate Removal

If, after a collection box has been vandalized or tampered with, the location is determined to be unsecure by the Area manager, Delivery Programs Support, the box may be removed immediately without notice.

## 316 Collection Schedule Decals

A correct and legible collection schedule decal, Decal 55B, displaying all scheduled collections, must be affixed at each collection point. This decal must also indicate the location of the nearest collection point with a 5:00 P.M. (or later) scheduled collection.

For collection schedule changes that eliminate a 5:00 P.M. or later collection on weekdays or that eliminate a Saturday collection, post a notice on the box at least 30 days before any changes to inform affected customers, showing the location of the nearest collection point with a 5:00 P.M. or later collection and a Saturday collection. Retain a copy of the posted notice in the local files. Before any such action is taken on a collection box with a scheduled pick-up of 5:00 P.M. or later, be sure a two-week density test was completed and it justifies the change.

**MAINTENANCE TECHNICAL SUPPORT CENTER**
**HEADQUARTERS MAINTENANCE OPERATIONS**
**UNITED STATES POSTAL SERVICE**

# Maintenance Management Order



**SUBJECT:** Refurbishment and Disposal Procedures of Collection Boxes

**TO:** All Maintenance Capable Sites

**DATE:** March 31, 2017

**NO:** MMO-020-17

**FILE CODE:** M

bjam:mm15055al

| Online Change Record | | |
|---|---|---|
| **Change #** | **Date** | **Description of Change** |
| 2 | 01/16/2020 | Removed the link that no longer worked and had no replacement in the 3rd bullet on the 1st page of the TL. |
| 1 | 4/14/2017 | Attachment 1, Section 1.0, page 6, deleted step and figure for Chute Cover Plate requirement. |

This Maintenance Management Order (MMO) notifies the field of the current Collection Box refurbishment policy and procedure. This bulletin applies to Acronym Box and Class Code AA.

The U.S. Postal Service has a contract with the Steel Craft Corporation and Hartford Finishing for refurbishment of Collection Boxes. Models included in the refurbishment contract are, 1170K Standard Collection Box, 1171K Relay Box, 1170T Large Collection Box, 1170EXP Express Collection Box, 1170V Single Chute Jumbo Collection Box, and 1170S Double Chute Jumbo Collection Box.

When a Collection Box has been deemed defective and requires replacement, or a Box is taken out of operation, the site is responsible to assess whether the defective or removed box meets the refurbishment criteria and coordinate the refurbishment.

All collection boxes that can be refurbished must be sent to Steel Craft and Hartford Finishing under the refurbishment contract agreement.

The following will provide guidance with the return of the collection boxes:

- Collection boxes are to be returned without locks, as the locks are specific and accountable to the site.

- Collection boxes should be palletized if at all possible and secured by strapping or shrink wrap to limit damage in transit.

- If site has an inventory of at least 15 boxes (any combination of the listed models), contact TMDC to schedule a pick up. A Bill of Lading (BOL) will be generated for the collection boxes to be shipped directly to the refurbishing contractor. The Topeka MDC will pay the freight.

- If the site has 14 boxes or less, contact District Maintenance and a pickup will be coordinated across multiple sites within the district.

MMO-020-17                                          Maintenance Technical Support Center

Attachment 1 outlines the Collection Box Inspection process and Shipping Instructions.

Direct any questions or comments concerning this bulletin to the MTSC HelpDesk, online at https://tickets.mtsc.usps.gov/login.php or call (800) 366-4123.

Kevin Couch
Manager
Maintenance Technical Support Center
HQ Maintenance Operations

Attachments:   1.   Collection Box Inspection and Shipping Instructions
               2.   Bill of Lading (BOL) Shipment Request Form

2

Maintenance Technical Support Center                                    MMO-020-17

**ATTACHMENT 1**

**COLLECTION BOX INSPECTION AND SHIPPING INSTRUCTIONS**

**1.0.        COLLECTION BOX INSPECTION**

Perform the following procedure to determine if the collection box(es) should be disposed of locally or shipped to Steel Craft for refurbishment.

1.   Ensure the collection box **Does Not** have any of the following issues or items:

a.   Lock installed (Figure 1-1) – All boxes submitted for refurbishment must have all locks removed prior to shipment.



**Figure 1-1.  Lock Installed**

b.   Rusted through holes (Figure 1-2).



**Figure 1-2.  Rusted Through Holes**

MMO-020-17                                        Maintenance Technical Support Center

c.   Excessively bent legs (Figure 1-3).



**Figure 1-3.  Bent Legs**

d.   Chute Installed (Figure 1-4).  If the box has the chute installed, and this is the only issue keeping the box from being refurbished, remove the chute and reuse the chute on another box.  It is permissible to send the box to Steel Craft if the site cannot remove the chute.



**Figure 1-4.  Chute Installed**

Maintenance Technical Support Center                                    MMO-020-17

e.   Missing Chute Access Panel (Figure 1-5).



**Figure 1-5.  Missing Chute Access Panel**

f.   Padlock hasps installed (Figure 1-6).  If the box has the padlock hasps installed, and this is the only issue keeping the box from being refurbished, remove the padlock hasps.  It is permissible to send the box to Steel Craft if the site cannot remove the padlock hasp.



**Figure 1-6.  Padlock Hasps Installed**

MMO-020-17                                          Maintenance Technical Support Center

g.  Visible dents or dings (Figure 1-7).



**Figure 1-7.  Dents and Dings**

h.  Time Card Cover (D1178B) or Frame (D1176A) installed on the front of the collection box (Figure 1-8).  If a Time Card Cover or Frame is present, the collection box is still eligible for refurbishment.



**Figure 1-8.  Time Card Cover or Frame**

i.  If any of the unrepairable conditions exist, the collection box must be disposed of locally.

Maintenance Technical Support Center                     MMO-020-17

2.  Ensure the collection box meets all of the following cirteria for refurbishment:

   a.  Box must be relatively straight and undamaged (Figure 1-9).



**Figure 1-9.  Straight and Undamaged**

   b.  The collection box must have four relatively straight legs that stand near flush to the floor (Figure 1-10).



**Figure 1-10.  Straight Legs**

Attachment 1                                                              5

MMO-020-17                                    Maintenance Technical Support Center

   c.  The collection box must have the Customer Access Door (except for Jumbos)
      and Postal Access Door installed (Figure 1-11).



Customer Access Door

Postal Access Door

**Figure 1-11.  Customer Access Door and Postal Access Door**

   d.  If the collection box meets all the criteria for refurbishment, proceed to Section
      2.0 to ship the collection box.

Maintenance Technical Support Center                                    MMO-020-17

## 2.0.     SHIPPING INSTRUCTIONS

1. Site must fill out the highlighted portions of the Bill of Lading (BOL) form in Attachment 2, providing address, contact information, pickup dates/times, and quantity of boxes.

2. Email the form to the following email address yz1n00@usps.gov.

3. The MDC will provide the shipping dates and times once the BOL is processed.

4. Contact NMCS at (800) 332-0317, and select Option 4, Option 4 should assistance be required with filling out the Shipment Request Form.

5. Ensure that all boxes are palletized, secured, and staged before the truck comes for pickup.  If additional materials are needed for loading, note that on the BOL form in the Notes and Special Instructions section.

## 3.0.     DISPOSAL PROCEDURES

When the expected combined cost of repairs and repainting a collection box exceeds allowable cost limitations, and refurbishment criteria has not been met, boxes will be retired, destroyed, and disposed of locally, in accordance with Handbook AS-701 - Asset Management, dated January 2015.

PS Form 969, Material Recycling and Disposal, is required with all supervised destructions. Form 969; box 17 must be signed by local Finance department, and box 18 of the form must be signed by local Maintenance department.

Upon receipt of these signatures, the form should be sent to Local ASC, with a local copy filed for record keeping requirements. This process ensures local inventory is correctly managed.

MMO-020-17                                    Maintenance Technical Support Center

# THIS PAGE BLANK

Maintenance Technical Support Center                                    MMO-020-17

## **ATTACHMENT 2**

**BILL OF LADING (BOL) SHIPMENT REQUEST FORM**

MMO-020-17                                    Maintenance Technical Support Center

## Bill of Lading (BOL) Shipment Request Form

| | | |
|---|---|---|
| *Requested by: | | Date Requested: |
| *Phone/cell: | *Fax: | Email: |

| **Origin** |
|---|
| *FEDSTRIP # |
| *Address Name |
| *Address Line 1 |
| Address Line 2 |
| *City, State, Zip |
| *Contact Name: |
| *Contact Phone/Cell: |
| *Contact Fax or (EMAIL ADDRESS PREFERRED): |

| **Destination** |
|---|
| *FEDSTRIP # |
| *Address Name **Hartford Finishing** |
| *Address Line 1 **844 W. State** |
| Address Line 2 |
| *City, State, Zip **Hartford, WI  53027** |
| *Contact Name: **Russ Berger** |
| *Contact Phone: **(262) 673-6770** |
| *Contact Fax or (EMAIL ADDRESS PREFERRED):  russ.berger@scc-wi.com |
| **Pickup Date:**  List date Shipment is Available for Pickup: (PLEASE PROVIDE DOCK AVAIL  HOURS) |
| **Delivery Date** List date Shipment is to be Delivered by: (PLEASE PROVIDE AVAIL DOCK HOURS) |
| *List any Contract # or Purchase # or Reference #'s that are associated with this shipment: |
| *Inside Delivery Needed? |
| *Finance # to be charged for Shipment:671981 |
| List any Capital ID number associated with this shipment? |
| Description of Items to be shipped.1170K Collection Boxes to be refurbished. |
| Postal Account Code: **52801** |
| ***TOTAL VALUE OF SHIPMENT $_____      AND  EBuy2 Request #_____** |

*Denotes required field

Maintenance Technical Support Center                                    MMO-020-17

## Bill of Lading (BOL) Shipment Request Form

| *Commodity Type: | Hazardous ☐ | Pharmaceuticals ☐ |
|---|---|---|
| | Firearms ☐ | General ☐ |
| Standard Comments: | Fragile ☐ | No-liability ☐ |

**Notes and Special Instructions:** (specify any special requirements for your shipment. Examples would be: Require Air Ride Trailer, Carrier to Provide Straps and Pads, "Deliver to Dock Door #9, Inside Delivery Needed (Inside delivery means the driver is responsible for unloading and will have to deliver it within the building its self not the dock), Carrier, hours of operation, dock height requirements etc.) Any Additional Information for your load should be listed in this block:

**ATTENTION, this product is an Internal USPS Materials move – PS-Form 8125 is not needed!**

HOW MANY TRUCKS :1

RUCK SIZE NEEDED:53'

Air-Ride    or    Non Air-Ride

SMOOTH FLOOR :  noX    yes

E-TRACK :  (REQUIRED W/ RATCHET STRAPS)  noX    yes
Ratchet Straps:    noX    yes    how many?

Pads:    noX    yes      how many?

Padded Bar Bracing:    noX    yes    how many?

NON-USPS (HIRED) MANPOWER :  noX    yes    how many?

**Shipment Line Items (Note: Maximum Total Wt is 45,000 pounds per trailer)**

| *QTY | PSN / PSIN | *Total Wt. | *Dimensions (L x W x H) | *Description |
|---|---|---|---|---|
| ?? | 7110-01-364-3061 | 36,000 lbs | 24" X 24" X 55" | 1170K Collection Boxes to be refurbished. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Total Wt. 36,000 lbs. | | | | |

Attachment 2                                                                 3

MMO-020-17                                    Maintenance Technical Support Center

## Bill of Lading (BOL) Shipment Request Form

**Instructions:**

Perform steps in Attachment 1.

**What Information is needed on the Request Form?**

**Origin Information**: Location Name and Address of where the shipment will be picked up from.  You will also include a Point of Contact for the Origin.

**Destination Information**: Location Name and Address of where the shipment will be delivered.  You will include a Point of Contact for the Destination.

**Dates**: Requested Pickup Date or use "Must be Picked up on" fields.  Same for Delivery Dates

**Finance #**:  List the Finance Number that is to be billed for the shipping charges

**Postal Acct #**:  Will ALWAYS be **52801**

**Description of Item**:  Brief description of item or items to be shipped.

**Shipment Value**:  Value of Entire Shipment.  This is used to ensure enough Insurance is obtained.

**Inside Delivery**:  If you require the Carrier to make an inside delivery, Indicate on this line. An extra fee is added for this option and can be expensive.  Please make every attempt to have Postal Employees off-load.

**Equipment Type**:  If you need a trailer other than a standard enclosed Non Air Ride Trailer, You will indicate that information on this line.  Indicate if you need Air Ride Trailer, Trailer w/ Lift Gate, etc.

**Commodity Type**:  Indicate here if shipment is a Hazardous substance

**Standard Comments**:  Is shipment Fragile or requires refrigeration?

**Notes & Special Instructions**:  List any special requirements for this load.  Examples would be "Deliver to Dock #9, Carrier is to provide Straps and Padding, Picked up a specified time, Require Carrier to provide Dunnage to secure load (Vehicles).  Any special instructions for Carrier would be listed here.  Do not worry about duplicating any information here.  If the information is important, list it here as well.

**Shipment Line Items**:  This is Self Explanatory. It helps the carrier to know the dimensions of the loads as well as assisting TMC in getting a better price.

**How much lead time is needed to request a shipment?**

- At least 48 hours notice is preferred in order achieve reasonable savings.

- Shipments can be initiated for same day pickup if necessary.

For specialty moves such as bulky equipment, Machinery, at least 1 week lead time is needed. These moves require experienced carriers and often require additional services.

4                                                        Attachment 2